Federal Register / Vol. 67, No. 179 / Monday, September 16, 2002 / Rules and Regulations     58335

running easterly to 32°39′38.5″ N, 117°07′06.5″ W (Point O); thence running generally northwesterly along the shoreline of the Naval Base to the beginning point.

(b) *Effective period.* This temporary section is effective from 12:01 a.m. on September 11, 2002 to 11:59 p.m. on February 11, 2003.

(c) *Regulations.* In accordance with the general regulations in § 165.33 of this part, entry into the area of this zone is prohibited unless authorized by the Captain of the Port or the Commander, Navy Region Southwest.

(d) *Enforcement.* The U.S. Coast Guard may be assisted in the patrol and enforcement of this security zone by the U.S. Navy.

Dated: August 28, 2002.

**Robert McFarland,**

*Lieutenant Commander, Coast Guard, Acting Captain of the Port, San Diego, California.*

[FR Doc. 02–23480 Filed 9–13–02; 8:45 am]

**BILLING CODE 4910–15–P**

---

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 52**

[CO–001–0067; FRL–7261–3]

**Approval and Promulgation of Air Quality Implementation Plans; State of Colorado; Denver PM$_{10}$ Redesignation to Attainment, Designation of Areas for Air Quality Planning Purposes**

**AGENCY:** Environmental Protection Agency (EPA).

**ACTION:** Final rule.

**SUMMARY:** On July 30, 2001, the Governor of the State of Colorado submitted a State Implementation Plan (SIP) revision for the purpose of establishing a redesignation for the Denver, Colorado area from nonattainment to attainment for particulate matter with an aerodynamic diameter less than or equal to a nominal 10 microns (PM$_{10}$) under the 1987 standards. The Colorado Air Pollution Control Division's submittal, among other things, documents that the Denver area has attained the PM$_{10}$ national ambient air quality standards (NAAQS), requests redesignation to attainment and includes a maintenance plan for the area demonstrating maintenance of the PM$_{10}$ NAAQS for thirteen years. EPA is approving the redesignation request, maintenance plan, revisions to Colorado's Regulations No. 1 and 16, the request for the removal of Regulation No. 12 (''Diesel Inspection/Maintenance Program'') and the removal of the stationary source construction permits for six sources from the SIP because the State has met the applicable requirements of the Clean Air Act, as amended. This action is being taken under sections 107, 110, and 175A of the Clean Air Act (Act).

**DATES:** This final rule is effective October 16, 2002.

**ADDRESSES:** Copies of the documents relevant to this action are available for public inspection during normal business hours at the Air and Radiation Program, Environmental Protection Agency, Region VIII, 999 18th Street, Suite 300, Denver, Colorado, 80202–2466 and copies of the Incorporation by Reference material are available at the Air and Radiation Docket and Information Center, Environmental Protection Agency, 1301 Constitution Avenue, NW., Room B108, Mail Code 6102T Washington DC 20460. Copies of the State documents relevant to this action are available for public inspection at the Colorado Department of Public Health and Environment, Air Pollution Control Division, 4300 Cherry Creek Drive South, Denver, Colorado 80246–1530.

**FOR FURTHER INFORMATION CONTACT:** Libby Faulk, EPA, Region VIII, (303) 312–6083.

**SUPPLEMENTARY INFORMATION:** On May 23, 2002, EPA published a notice of proposed rulemaking (NPR) for approval of the redesignation of the Denver PM$_{10}$ nonattainment area to attainment (67 FR 36124). Throughout this document, wherever ''we,'' ''us,'' or ''our'' are used, we mean the Environmental Protection Agency (EPA).

Table of Contents

I. EPA's Final Action
   A. What Action Is EPA Finalizing?
   B. Updates to EPA's Proposed Approval
II. Response to Comments
III. Administrative Requirements

**I. EPA's Final Action**

*A. What Action Is EPA Finalizing?*

We are approving the Governor of Colorado's submittal of July 30, 2001, that requests a redesignation for the Denver nonattainment area to attainment for the 1987 PM$_{10}$ standards. We are using 1999–2001 ambient air quality data from the Denver PM$_{10}$ nonattainment area as the basis for our decision. We are also approving the maintenance plan for the Denver PM$_{10}$ nonattainment area, which was submitted with Colorado's July 30, 2001 redesignation request. In conjunction with the maintenance plan, the Governor also submitted revisions to Colorado's Regulation No. 1, ''Emission Control For Particulates, Smokes, Carbon Monoxide, & Sulfur Oxides,'' and Colorado's Regulation No. 16, ''Street Sanding Emissions.'' With their submittal, Colorado also requested that we remove Regulation No. 12, the ''Diesel Inspection/Maintenance Program'' and the stationary source construction permits that we had incorporated by reference into our April 17, 1997 approval of the PM$_{10}$ SIP (62 FR 18716). Thus, Regulation No. 12 and the permits for Public Service Company of Colorado's Cherokee Electric Generating Station, Purina Mills, Electron Corporation, Trigen-Colorado Energy Corporation, Rocky Mountain Bottle Company (which includes earlier permits that were issued in 1993 under the former name of Coors Brewing Company), and Conoco Refinery are being removed from the SIP with this action. We are approving this request, the maintenance plan and its accompanying regulation revisions because the Colorado Air Pollution Control Division (Colorado) has adequately addressed all of the requirements of the Act for redesignation to attainment applicable to the Denver PM$_{10}$ nonattainment area. Upon the effective date of this final action, the Denver area's designation status under 40 CFR part 81 will be revised to attainment. By using ''Denver'' or the ''Denver area,'' we mean Denver, Jefferson, and Douglas Counties, as well as part of Boulder, Adams and Arapahoe Counties. Please refer to our proposed action published on May 23, 2002 at 67 FR 36124 for a more detailed explanation of the redesignation requirements and analysis of how the Denver area has met those requirements.

*B. Updates to EPA's Proposed Approval*

i. Attainment of the PM$_{10}$ NAAQS

Whether an area has attained the PM$_{10}$ NAAQS is based exclusively upon measured air quality levels over the most recent and complete three calendar year period. *See* 40 CFR part 50 and 40 CFR part 50, appendix K. A State must demonstrate that an area has attained the PM$_{10}$ NAAQS through submittal of ambient air quality data from an ambient air monitoring network representing maximum PM$_{10}$ concentrations. The data, which must be quality assured and recorded in the Aerometric Information Retrieval System (AIRS), must show that the average annual number of expected exceedances for the area is less than or equal to 1.0, pursuant to 40 CFR 50.6. In making this showing, three

consecutive years of complete air quality data must be used.

Our proposed approval of the Denver redesignation to attainment was based on 1998 through 2000 air quality monitoring data, however, we now have a more recent year of data available to use for the final redesignation. Thus, we are using 1999 through 2001 data for the basis of this final rulemaking. Between 1999 and 2001, Colorado operated thirteen $PM_{10}$ monitors, which were either State and Local Air Monitoring Stations (SLAMS) or National Air Monitoring Sites (NAMS), in the Denver $PM_{10}$ nonattainment area. Data from these monitors have been quality-assured and placed in AIRS on a quarterly basis. Only one exceedance of the 24-hour $PM_{10}$ NAAQS was measured between 1999 and 2001. In 1999, the Adams City monitor recorded a 24-hour value of 160 µg/m³ (the 24-hour $PM_{10}$ NAAQS is 150 µg/m³). Because data collection was less than 100% at this monitoring site, the expected exceedance rate for 1999 at this site was 1.16, (as calculated according to 40 CFR part 50, appendix K). For 2000 and 2001, the expected exceedance rate was 0.0. Thus, the three-year average was less than 1.0, which indicates the Denver area attained the 24-hour $PM_{10}$ NAAQS. All other sites had expected exceedance rates of 0.0 for this three-year period. Review of the annual standard for calendar years 1999, 2000 and 2001 reveals that the Denver area has also attained the annual $PM_{10}$ NAAQS. There was no violation of the annual standard for the three year period from 1999 through 2001. Further information on $PM_{10}$ monitoring is presented in Chapter 3, section B of the redesignation request and maintenance plan. We have evaluated the ambient air quality data and believe that Colorado has adequately demonstrated that the $PM_{10}$ NAAQS have been attained in the Denver area.

ii. Conoco Consent Decree

In the proposed approval of the redesignation request and maintenance plan, we explained that we were relying on a proposed federal consent decree that would require significant emission reductions at the Conoco facility before 2015. On December 20, 2001, a proposed Complaint and Consent Decree in *United States* v. *Conoco Inc.* was lodged with the United States District Court for the Southern District of Texas. (*See* 67 FR 107 for the notice of lodged consent decree.) That consent decree was entered by the Court on April 29, 2002. Under the consent decree, Conoco Denver Refinery's fluid catalytic cracking unit (FCCU) is required to comply with a New Source Performance Standard (NSPS), subpart J, emissions limit for PM of 1 pound per 1000 pounds of coke burned by no later than June 30, 2006. This restriction will limit Conoco to approximately 67 tons per year of primary $PM_{10}$, which is far less than the 1233 tons per year which Colorado used to re-model Conoco's emissions and less than the 185 tons per year Colorado used in the maintenance plan; this new limit will more than offset the 0.3 µg/m³ increase that Colorado projected based on the 1233 tons per year value and that would have affected the year 2015 "safety margin" allocation for mobile sources. Because it is based on an NSPS requirement, this new PM limit at Conoco will be permanent.

**II. Summary of Public Comments and EPA's Responses**

(1) *Comment:* One commentor expressed concern that it was unclear whether the commitment that Colorado has made in the $PM_{10}$ maintenance plan to revise the maintenance demonstration using the new mobile source emissions model (MOBILE6) is enforceable. The commentor believes that it is important that mobile source modeling uses MOBILE6 when emission reduction credits are taken for the federal Tier II emission standards and pointed out that EPA has acknowledged that Tier II assumptions may not be as accurate when MOBILE5 is used instead of MOBILE6.

*Response:* Colorado's commitment was adopted through Colorado's SIP process and is part of the maintenance plan. With the effective date of this final action, this commitment will be an enforceable part of Colorado's SIP. In addition, the SIP doesn't take credit for the Tier II program until 2004, and we expect Colorado to have fulfilled their commitment to revise the maintenance plan using MOBILE6 by that time.

(2) *Comment:* One commentor expressed concern that the recent EPA announcement of future revisions to the new source review (NSR) program may have implications for this redesignation and maintenance plan. The commentor also stated that in taking final action on the Denver $PM_{10}$ redesignation and maintenance plan, we should clarify that any SIP revision implementing the federal NSR changes must analyze the suite of air quality implications associated with such changes.

*Response:* To the extent these comments on the possible NSR program revisions pertain to NSR under Part D of the CAA, they are irrelevant to the Denver $PM_{10}$ redesignation because the area will be subject to the prevention of significant deterioration requirements (PSD) under Part C of the Clean Air Act upon redesignation to attainment. The Denver $PM_{10}$ maintenance plan is premised upon PSD applying to the area rather than the NSR requirements under Part D of the Act. To the extent the comments pertain to PSD, EPA has not yet taken final action regarding the changes to the NSR program; thus, the effect of any possible changes to the PSD program is speculative. Furthermore, Colorado's existing PSD regulations will remain part of the SIP until EPA approves a change to those regulations following notice and comment rulemaking. Thus, if EPA were to take final action on changes to the PSD program, Colorado would then have to revise their State PSD regulations and submit those revisions to us for approval. Any PSD program change that would affect Denver's continued maintenance of the $PM_{10}$ standard, or any other NAAQS, would be evaluated at that time.

(3) *Comment:* One commentor asked why there were significant and inexplicable differences between the onroad $NO_X$ mobile source emissions budgets in the ozone maintenance plan and the $PM_{10}$ maintenance plan. The commentor noted that the differences between the $NO_X$ budgets in the ozone maintenance plan and the $NO_X$ budgets in the $PM_{10}$ maintenance plan may be based on seasonality.

*Response:* The commentor is correct in pointing out that one reason for the difference between the $NO_X$ emission inventories in the $PM_{10}$ maintenance plan and the ozone maintenance plan is that the ozone plan uses a summertime inventory, whereas the $PM_{10}$ maintenance plan uses a wintertime inventory. Aside from this seasonal variation, we believe that the differences between the $NO_X$ emissions in the two maintenance plans result from the following: (1) While the nonattainment areas for both pollutants were the same, the emissions inventory domains differ. The ozone emissions inventory includes the entire nonattainment area while the $PM_{10}$ maintenance plan covers a smaller area than the actual nonattainment area, although all areas with the expected maximum $PM_{10}$ concentrations are included in the domain; (2) The $PM_{10}$ maintenance plan takes emission reduction credit from EPA's *Tier 2 Motor Vehicle Emissions Standards and Gasoline Sulfur Control Requirements*, which take effect in 2004, and EPA's *Heavy Duty Engines and Vehicle Standards and Highway Diesel Sulfur Control Requirements*, which take effect in 2007. The ozone maintenance plan

does not take emission reduction credit from these control programs; (3) The vehicle miles traveled (VMT) is higher in the summertime versus the wintertime; and (4) The mobile source emission modeling inputs for the ozone plan came from the Denver Regional Council of Government's (DRCOG) 1999 through 2004 Transportation Improvement Program (TIP) while the modeling inputs for the $PM_{10}$ maintenance plan are based on DRCOG's more recent 2001 through 2006 TIP. We believe that the difference in the $NO_X$ inventories between the ozone and $PM_{10}$ maintenance plans is reasonable and that these numbers are accurate.

### III. Administrative Requirements

Under Executive Order 12866 (58 FR 51735, October 4, 1993), this action is not a ''significant regulatory action'' and therefore is not subject to review by the Office of Management and Budget. For this reason, this action is also not subject to Executive Order 13211, ''Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use'' (66 FR 28355, May 22, 2001). This action merely approves state law as meeting Federal requirements and imposes no additional requirements beyond those imposed by state law. Accordingly, the Administrator certifies that this rule will not have a significant economic impact on a substantial number of small entities under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). Because this rule approves pre-existing requirements under state law and does not impose any additional enforceable duty beyond that required by state law, it does not contain any unfunded mandate or significantly or uniquely affect small governments, as described in the Unfunded Mandates Reform Act of 1995 (Pub. L. 104–4).

This rule also does not have tribal implications because it will not have a substantial direct effect on one or more Indian tribes, on the relationship between the Federal Government and Indian tribes, or on the distribution of power and responsibilities between the Federal Government and Indian tribes, as specified by Executive Order 13175 (65 FR 67249, November 9, 2000). This action also does not have Federalism implications because it does not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government, as specified in Executive Order 13132 (64 FR 43255, August 10, 1999). This action merely approves a state rule implementing a Federal standard, and does not alter the relationship or the distribution of power and responsibilities established in the Clean Air Act. This rule also is not subject to Executive Order 13045 ''Protection of Children from Environmental Health Risks and Safety Risks'' (62 FR 19885, April 23, 1997), because it is not economically significant.

In reviewing SIP submissions, EPA's role is to approve state choices, provided that they meet the criteria of the Clean Air Act. In this context, in the absence of a prior existing requirement for the State to use voluntary consensus standards (VCS), EPA has no authority to disapprove a SIP submission for failure to use VCS. It would thus be inconsistent with applicable law for EPA, when it reviews a SIP submission, to use VCS in place of a SIP submission that otherwise satisfies the provisions of the Clean Air Act. Thus, the requirements of section 12(d) of the National Technology Transfer and Advancement Act of 1995 (15 U.S.C. 272 note) do not apply. This rule does not impose an information collection burden under the provisions of the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*).

The Congressional Review Act, 5 U.S.C. 801 *et seq.*, as added by the Small Business Regulatory Enforcement Fairness Act of 1996, generally provides that before a rule may take effect, the agency promulgating the rule must submit a rule report, which includes a copy of the rule, to each House of the Congress and to the Comptroller General of the United States. EPA will submit a report containing this rule and other required information to the U.S. Senate, the U.S. House of Representatives, and the Comptroller General of the United States prior to publication of the rule in the **Federal Register**. A major rule cannot take effect until 60 days after it is published in the **Federal Register**. This action is not a ''major rule'' as defined by 5 U.S.C. 804(2).

Under section 307(b)(1) of the Clean Air Act, petitions for judicial review of this action must be filed in the United States Court of Appeals for the appropriate circuit by November 15, 2002. Filing a petition for reconsideration by the Administrator of this final rule does not affect the finality of this rule for the purposes of judicial review nor does it extend the time within which a petition for judicial review may be filed, and shall not postpone the effectiveness of such rule or action. This action may not be challenged later in proceedings to enforce its requirements. (*See* section 307(b)(2).)

### List of Subjects

*40 CFR Part 52*

Environmental protection, Air pollution control, Incorporation by reference, Intergovernmental relations, Particulate matter, Reporting and recordkeeping requirements.

*40 CFR Part 81*

Environmental protection, Air pollution control.

Dated: August 9, 2002.

**Christine Todd Whitman,**
*EPA Administrator.*

Chapter I, title 40, parts 52 and 81 of the Code of Federal Regulations is amended as follows:

### PART 52—[AMENDED]

1. The authority citation for Part 52 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

### Subpart G—Colorado

2. Section 52.320 is amended by adding paragraph (c)(95) to read as follows:

### § 52.320   Identification of plan.

\* \* \* \* \*

(c) \* \* \*

(95) On July 30, 2001, the State of Colorado submitted a maintenance plan for the Denver $PM_{10}$ nonattainment area and requested that the area be redesignated to attainment for the $PM_{10}$ National Ambient Air Quality Standards. The maintenance plan deletes from the SIP Regulation No. 12, ''Diesel Inspection/Maintenance Program'' and permits for six stationary sources incorporated by reference in paragraphs (c)(91)(i)(A) and (c)(82)(i)(E) through (J), of this section respectively. In conjunction with the maintenance plan, Colorado revised previously approved regulations and requirements to control particulate matter (Regulation No. 1 and Regulation No. 16.) Among other changes, the revision to Regulation No. 1 includes the deletion of section VII.B of Regulation No. 1 from the SIP. Among other changes, the revision to Regulation No. 16 includes the deletion of sections III and IV of Regulation No. 16 from the SIP. The redesignation request, maintenance plan, and revisions to Regulations Nos. 1 and 16 satisfy all applicable requirements of the Clean Air Act.

(i) Incorporation by reference.

(A) Section VII and VIII.A of Regulation No. 1, ''Emission Control for

Particulates, Smokes, Carbon Monoxide, & Sulfur Oxides,'' 5 CCR 1001–3, as adopted August 16, 2001 and effective September 30, 2001. (See paragraph (c)(95)(ii)(I) of this section regarding clerical error in section VIII.A of Regulation No. 1.)

(B) Sections I and II, Regulation No. 16, ''Street Sanding Emissions,'' 5 CCR 1001–18, as adopted April 19, 2001, effective June 30, 2001.

(ii) Additional material.

(A) Letter dated September 5, 2001 from Casey Shpall, Colorado Office of the Attorney General to Cindy Rosenberg, EPA Region 8, clarifying that public notice was given of the proposed changes and transmitting the appropriate documentation.

(B) Fax dated September 6, 2001 from Doug Lempke, Colorado Department of Public Health and Environment, to Cindy Rosenberg, EPA Region 8, submitting Colorado Attorney General's opinion concerning revisions to Regulation No. 16.

(C) Letter dated September 10, 2001 from Kevin Briggs, Colorado Department of Public Health and Environment, to Kevin Golden, EPA Region 8, transmitting model input files for maintenance demonstration.

(D) Letter dated September 13, 2001 from Casey Shpall, Colorado Office of the Attorney General to Cindy Rosenberg, EPA Region 8, explaining that an error occurred in the publication of Colorado Regulation No. 1.

(E) Letter dated November 27, 2001 from Margie Perkins, Colorado Department of Public Health and Environment, to Richard Long, EPA Region 8, transmitting the justification for the revised street sweeping credits used in the $PM_{10}$ maintenance plan.

(F) Letter dated April 5, 2002 from Margie Perkins, Colorado Department of Public Health and Environment, to Richard Long, EPA Region 8, transmitting a supplement to the Technical Support Documentation correcting the emission rates used in the $PM_{10}$ maintenance plan for Conoco and Ultramar Diamond Shamrock.

(G) Complaint and Consent Decree in *United States* v. *Conoco Inc.,* entered by the United States District Court for the Southern District of Texas on April 29, 2002.

(H) July 31, 2002 memorandum from Cindy Rosenberg, EPA Region 8, to the Denver $PM_{10}$ Redesignation and Maintenance Plan Docket, regarding the August 16, 2001 version of Regulation No. 1, ''Emission Control for Particulates, Smokes, Carbon Monoxide, & Sulfur Oxides.''

(I) Letter dated July 31, 2002 from Frank R. Johnson, Assistant Attorney General, Colorado Department of Law, to Jonah Staller, EPA Region 8, explaining a clerical error in the version of Regulation No. 1 referenced in paragraph (c)(95)(i)(A) of this section, assuring the continued enforceability of section VIII.A of Regulation No. 1 regardless of the air quality classification of the Denver area, and indicating that the clerical error will be promptly remedied.

\* \* \* \* \*

3. Section 52.332 is amended by adding paragraph (l) to read as follows:

### § 52.332  Control strategy: Particulate matter.

\* \* \* \* \*

(l) On July 30, 2001, the State of Colorado submitted a maintenance plan for the Denver $PM_{10}$ nonattainment area (''PM–10 Redesignation Request and Maintenance Plan For the Denver Metropolitan Area,'' Chapter 4: ''Maintenance Plan,'' adopted April 19, 2001 by the Colorado Air Quality Control Commission and effective April 19, 2001) and requested that the area be redesignated to attainment for the $PM_{10}$ National Ambient Air Quality Standards. The redesignation request and maintenance plan satisfy all applicable requirements of the Clean Air Act.

### PART 81—[AMENDED]

1. The authority citation for part 81 continues to read as follows:

**Authority:** 42 U.S.C. 7401 *et seq.*

2. In § 81.306, the table entitled ''Colorado—PM–10'' is amended by revising the entry under Adams, Denver, and Boulder Counties for the ''Denver Metropolitan area'' to read as follows:

### § 81.306  Colorado.

\* \* \* \* \*

COLORADO—PM–10

| Designated area | Designation | | Classification | |
|---|---|---|---|---|
| | Date | Type | Date | Type |
| \*     \*     \* | \* | \* | \* | \* |
| Adams, Denver, and Boulder Counties | | | | |
|     Denver Metropolitan area | October 16, 2002 | Attainment. | | |
|         All of Denver, Jefferson, and Douglas Counties, Boulder County (excluding the Rocky Mountain National Park) and the Colorado automobile inspection and readjustment program portions of Adams and Arapahoe Counties. | | | | |
| \*     \*     \* | \* | \* | \* | \* |

\* \* \* \* \*

[FR Doc. 02–23380 Filed 9–13–02; 8:45 am]
**BILLING CODE 6560–50–P**

**ENVIRONMENTAL PROTECTION AGENCY**

**40 CFR Part 63**

**[FRL–7271–1]**

**Approval of the Clean Air Act, Section 112(l), Authority for Hazardous Air Pollutants: Perchloroethylene Air Emission Standards for Dry Cleaning Facilities: Commonwealth of Massachusetts Department of Environmental Protection**

**AGENCY:** Environmental Protection Agency (EPA).
**ACTION:** Direct final rule.

**SUMMARY:** Pursuant to section 112(l) of the Clean Air Act (CAA), the Massachusetts Department of Environmental Protection submitted a request for approval to implement and enforce 310 CMR 70.01–04 Environmental Results Program (ERP) Certification and 310 CMR 7.26(10)–(16) Perchloroethylene Air Emissions Standards for Dry Cleaning Facilities in place of National Emissions Standard for Hazardous Air Pollutants (NESHAP) for Perchloroethylene Dry Cleaning Facilities as it applies to area sources. EPA has reviewed this request and found that it satisfies the requirements necessary to qualify for approval. Thus, EPA is hereby granting the Massachusetts Department of Environmental Protection the authority to implement and enforce its perchloroethylene air emissions regulation in place of the Federal dry cleaning NESHAP for area sources. This approval makes the Massachusetts Department of Environmental Protection rule federally enforceable and reduces the burden on area sources within the state of Massachusetts as that they will only have one rule with which they must comply. Major sources remain subject to the Federal dry cleaning NESHAP.

**DATES:** This action will be effective November 15, 2002, unless EPA receives relevant adverse comments by October 16, 2002. If EPA receives such comments, then it will publish a timely withdrawal in the **Federal Register** informing the public that this direct final rule will not take effect. The incorporation by reference of certain publications listed in the regulations is approved by the Director of the Federal Register as of November 15, 2002.

**ADDRESSES:** Written comments should be mailed concurrently to the addresses below: Steven Rapp, Chief, Air Permits, Toxics and Indoor Programs Unit (CAP), U.S. Environmental Protection Agency, Region I, One Congress Street, Suite 1100, Boston, MA 02114. Steven DeGabriele, Director, Business Compliance Division, Massachusetts Department of Environmental Protection, One Winter Street, Boston, MA 02108. Copies of the requests for approval are available for public inspection at EPA's Region I Office, Air Permits, Toxics, and Indoor Programs Unit, during normal business hours.

**FOR FURTHER INFORMATION CONTACT:** MaryBeth Smuts, Air Permits, Toxics, and Indoor Programs Unit, U.S. EPA Region I, One Congress St., Suite 1100 (CAP), Boston, MA 02114, (617) 918–1512.

**SUPPLEMENTARY INFORMATION:** This Supplementary Information is organized as follows:

I. Background and Purpose
II. EPA Evaluation of Differences Between the State and the Federal Regulations
　A. What Major Differences Between the Massachusetts Department of Environmental Protection's Dry Cleaning Rule and the Dry Cleaning NESHAP Were Selected for Explanations?
　1. How Does the Applicability of Sources Differ?
　2. Are There Differences in the Compliance Dates?
　3. What Are the Differences in Temperature Requirements for Refrigerated Condensers?
　4. How Do the Work Practice Standards Differ?
　5. What Are the Requirement Differences in Compliance Certifications?
　6. Do the Record Retention Requirements Differ?
　B. What Is EPA's Action Regarding the MA DEP Rule?
　C. When Did the Massachusetts Department of Environmental Protection's Authorities To Implement and Enforce Section 112 Standards Become Effective?
III. Opportunity for Public Comments
IV. Summary of EPA's Action
V. Administrative Requirements

**I. Background and Purpose**

Under CAA section 112(l), EPA may approve state or local rules or programs to be implemented and enforced in place of certain otherwise applicable Federal rules, emissions standards, or requirements. The Federal regulations governing EPA's approval of state and local rules or programs under section 112(l) are located at 40 CFR part 63, subpart E (*see* 58 FR 62262, November 26, 1993) and the subsequently amended regulations (*see* 65 FR 55810, September 14, 2000). Under these regulations, a state air pollution control agency has the option to request EPA's approval to substitute a state rule for the applicable Federal rule (*e.g.* the Federal National Emission Standards for Hazardous Air Pollutants (NESHAP)). Upon approval, the state agency is given the authority to implement and enforce its rule in place of the NESHAP.

This ''rule substitution'' option requires EPA to ''make a detailed and thorough evaluation of the State's submittal to ensure that it meets the stringency and other requirements'' of 40 CFR 63.93 (*see* 58 FR 62274). A rule will be approved if EPA finds: (1) The State, local and territorial agencies and Indian tribes (S/L/T) are ''no less stringent'' than the corresponding Federal regulation, (2) adequate authorities exist, (3) the schedule for implementation and compliance is ''no less stringent'', and (4) the S/L/T program is otherwise in compliance with Federal guidance.

On September 22, 1993, the Environmental Protection Agency (EPA) promulgated the NESHAP for perchloroethylene dry cleaning facilities (*see* 58 FR 49354), which has been codified in 40 CFR part 63, subpart M, ''National Perchloroethylene Air Emission Standards for Dry Cleaning Facilities'' (dry cleaning NESHAP). On October 24, 2001, EPA received Massachusetts Department of Environmental Protection's (MA DEP) request to implement and enforce its 310 CMR 7.26(10)–(16) Perchloroethylene Air Emissions Standards for Dry Cleaning Facilities and 310 CMR 70.01–04 Environmental Results Program (ERP) Certification known as the ''ERP for dry cleaning facilities in lieu of the dry cleaning NESHAP rule. MA DEP's request for approval was submitted pursuant to the provisions of 40 CFR part 63, subpart E and was found to be complete on January 8, 2002.

The ERP is a multimedia compliance program which requires self certification regarding air, water and hazardous waste requirements while providing extensive compliance assistance to dry cleaners through training programs and workbooks. Inspections and enforcement are part of the air program. Only the air portion of the ERP for dry cleaning facilities is evaluated by this EPA action.