## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | |
|---|---|
| SIERRA CLUB, CITIZENS FOR A GREATER DENVER, ELYRIA AND SWANSEA NEIGHBORHOOD ASSOCIATION, CROSS COMMUNITY COALITION, | ) ) ) ) ) ) ) |
| *Petitioners*, | ) ) |
| v. | ) No. 16-1097 ) |
| U.S. ENVIRONMENTAL PROTECTION AGENCY and GINA McCARTHY, Administrator, U.S. Environmental Protection Agency, | ) ORAL ARGUMENT NOT YET ) SCHEDULED ) ) ) |
| *Respondents*. | ) ) ) |

_____

On Petition for Review of final agency action of the United States
Environmental Protection Agency's EPA-420-B-15-084 (November 2015)

_____

## ADDENDUM TO THE OPENING BRIEF
## OF PETITIONERS

_____

Dated: October 11, 2016.

Robert E. Yuhnke
Robert E. Yuhnke & Associates
(303) 499-0425
bob.yuhnke@prodigy.net
*Counsel for Petitioners Sierra Club, Citizens for a
Greater Denver, Elyria and Swansea
Neighborhood Association, and Cross Community
Coalition*

# ADDENDUM TABLE OF CONTENTS

STANDING

"The Adverse Human Health Effects of Traffic-Related Air Pollution," George D. Thurston, Sc.D……………………………………………………A1

*Integrated Science Assessment for Particulate Matter* (US EPA, December 2009) (excerpts)………………… …………….………………………A16

EPA, Technical Assistance Document for the Reporting of Daily Air Quality—the Air Quality Index (AQI) (May 2016) (excerpts)….. ..……..A20

I-710 Corridor Project EIR/EIS, Appendix I: Federal Transportation Improvement Program/ Regional Transportation Plan………………..…..A25

I-710 Corridor Project EIR/EIS, 3.13 Air Quality………………..…...A31

Declaration of Candi CdeBaca……………………..…………...…..…A91

Declaration of Eric Diesel………………………………….….….……A92

Declaration of Luis Fundora……………………………………...…..A95

Declaration of Maxine Ichikawa…………………………...………A100

Declaration of Jean L. Ramsay………………………………….....A104

Declaration of San Juana Romero…………………………………A105

Declaration of John P. Sanders…………………………………....A110

LEGAL AUTHORITIES

Statutes:

42 U.S.C. § 7506…………………………………………....…A111

Regulations:

40 C.F.R. §93.101………………………………………………A116

40 C.F.R. §93.123………………………………………………A120

**OTHER MATERIALS INCLUDED FOR THE CONVENIENCE OF THE COURT**

Clean Air Act Conference Committee Report, reprinted in A Legislative History of the Clean Air Act Amendments of 1990, U.S. Senate, Committee on Environment and Public Works (103d Cong., 1st Sess., S. Prt. 103-38, 1993) (excerpts)………………………………………...………………A122

Comments on Notice of Proposed Rulemaking from U.S. EPA, Assistant Administrators Jennifer Joy Wilson and Don R. Clay, to Robert E. Ferris, Administrator, FHWA (Nov. 8, 1988)…………………………….....A133

Letter from Secretary of Transportation Skinner to Chairman Dingell (June 22, 1989) (reproduced without attachments)………………...……….A150

Senate Committee on Environment and Public Works, 101st Cong., 1st Sess., Report 101–228, p.30 (to be reproduced in Joint Appendix)

# <u>The Adverse Human Health Effects of Traffic-Related Air Pollution</u>

SUBMITTED ON BEHALF OF
**THE SIERRA CLUB**

**October 10, 2016**

I declare, subject to the penalty of perjury under the laws of the United States, that the following assessment of the health effects literature, and my conclusions based thereon, is true and correct to the best of my knowledge, understanding and belief.

Executed at Chester, New York, this 10th day of October, 2016:

_____
**George D. Thurston, Sc. D.**
**3 Catherine Court**
**Chester, NY  10918**

*Background & Qualifications*

I am a full Professor at the New York University (NYU) School of Medicine in the Department of Environmental Medicine. I have also served as the Deputy Director of the NYU Particulate Matter Health Research Center, and am presently the Director of the Program in Exposure Assessment and Health Effects in my department at the School of Medicine.

I received my undergraduate degree in Environmental Engineering from Brown University in 1974, and my Doctorate of Science (Sc.D.) in Environmental Health Sciences from the Harvard University School of Public Health in 1983. I served on the New York State Department of Environmental Conservation's Air Management Advisory Committee from 1991 to 1996, and was Chairman of the Health and Environment Panel of the Canadian Joint Industry/Government Study of Sulfur in Gasoline and Diesel Fuels in 1997.

I have published extensively regarding the human health effects of inhaled air pollutants, particularly in relation to asthma attacks, hospital admissions, and human mortality. I have been called upon by both the U.S. House of Representatives and the U.S. Senate multiple times in recent years to provide testimony before them regarding the human health effects of air pollution.

I have served as an advisor to the U.S. EPA regarding the human health effects of air pollution as a member of the Clean Air Scientific Advisory Committee (CASAC) panel on Sulfur Oxides and Nitrogen Oxides, and as a contributing author of various EPA Integrated Science Assessments (ISAs), which are relied upon by the EPA to set air pollution air quality standards in the US. A copy of my professional curriculum vitae is attached to this letter, and it accurately represents my relevant education, training, and experience.

*Introduction*

Traffic is an increasingly dominant contributor to air pollution in Phoenix, and elsewhere in the United States. Cars, buses, trucks and other motorized vehicles are amongst the largest sources of air pollution that have been clearly linked to adverse health effects (e.g., see HEI, 2010). These adverse effects of traffic related air pollution have been documented in cities around the world, across the nation, including in around cities like Phoenix, AZ. Most people are exposed to air pollution from road traffic on a daily basis, whether as a result of residing at homes located near highways, or driving, walking, or standing along busy streets. Vehicle engines are known to produce a number of air pollutants that pose risks to public health. When engines burn fuel (gasoline or diesel), chemicals such as fine particulate matter, ultrafine particles (UFP), nitrogen oxides,

A2

carbon monoxide, volatile organic compounds (VOCs), and elemental carbon (EC) black carbon soot are all emitted.

## THE HEALTH EFFECTS OF AIR POLLUTION FROM ROAD TRAFFIC

The epidemiological literature on the health effects of traffic related air pollution is growing rapidly, with many of the effects being related to particulate matter air pollution, including both fine ($PM_{2.5}$) and thoracic ($PM_{10}$) particulate matter.  The findings of recent scientific studies indicate that traffic is a significant contributor to the adverse effects of air pollution on public health.  Studies of air pollution near roadways have provided insights into the spatially and temporally dynamic nature of traffic related pollution. The epidemiological studies on traffic and health have largely focused on the consequences of exposures incurred by living near large roadways, such as freeways in southern California.  Air pollution from road traffic has been linked to a variety of negative health effects. To date, the findings indicate associations of traffic indicators with increased risk for multiple adverse health effects that include asthma and allergic diseases, cardiac effects, respiratory symptoms, reduced lung function, inhibited lung function growth and development, premature mortality, adverse reproductive outcomes, and lung cancer, as elaborated below.

• *Asthma and allergic disease*

Numerous studies have documented the role of traffic related pollution in respiratory health. Scientific studies in North America and Europe show that children living in areas with high road traffic volumes have more respiratory-related illness symptoms than other children.  More specifically, a significant number of studies conclude that exposure to traffic pollution can aggravate asthma in children (HEI, 2010).  Brauer et al. (2002, 2007) found associations by elevated concentrations of $NO_2$ and diesel soot at children's homes with increased risk of wheezing in children in the Dutch PIAMA cohort.  Symptom associations were also reported in two separate analyses of the GINI and LISA cohort study in Munich (Gehring et al. 2002; Morgenstern et al. 2007), in which dry cough at night had an association with traffic-related pollution in boys at ages 1 and 2 years.  In a subsequent study (Morgenstern et al., 2008), children ages 4 and 6 years exhibited associations by distances from a busy street (50 m, 250 m, 1000 m, or > 1000 m) in Munich with symptoms of asthma, hay fever, and eczema. At the nearest (50-m) distance category, the roadway proximity association reached statistical significance for asthma symptoms (OR = 1.24; 95% CI,

<span style="color:red">A3</span>

1.01–1.52), indicating a 24% increase in asthma symptoms in those children vs. children living more than 1 km away from the roadway.

Venn et al. (2001) investigated the relation between proximity of the family home to the nearest main road, estimated objectively using geographical information system software, and the risk of wheeze in the past year in a case-control sample of 6,147 primary schoolchildren (age 4 to 11 yr.) and a random cross-sectional sample of 3,709 secondary schoolchildren (age 11 to 16 yr.) in Nottingham, United Kingdom. Among children living within 150 m of a main road, the risk of wheeze increased with increasing proximity by an odds ratio (OR) of 1.08 (95% confidence interval [CI] 1.00 to 1.16) per 30-m increment in primary schoolchildren, and 1.16 (1.02 to 1.32) in secondary schoolchildren (See Figure 1).



Figure 1.   Living Near a Main Road Increases the Risk of Wheezing Illness in Primary (left) and Secondary (right) School Children (Venn et al., 2001)

Recent evidence indicates that these adverse traffic-associated health effects are contributed to by the traffic particles in the $PM_{10}$ size range.  For example, Somoli et al. (2016) used air particle composition and number networks in London between 2011 and 2012 to derive six source-related factors for $PM_{10}$ and four factors for size distributions of ultrafine particles (NSD). They assessed the associations of these factors, at pre-specified lags, with daily total, cardiovascular (CVD) and respiratory mortality and hospitalizations using Poisson regression. Traffic-related $PM_{10}$ displayed an association with CVD admissions aged 15-64 years (1.01% ,95% CI: 0.03%-2.00%), as well as a positive association with pediatric (0-14years) respiratory hospitalizations (0.92%, 95%CI: − 0.40%, 2.26%), per interquartile range (IQR).

Esposito and co-authors (2014) evaluated the effects of traffic-related pollution on the exacerbation of asthma and development of respiratory infections in Italian children suffering from asthma or wheezing, compared with healthy subjects, and estimated the association between

incremental increases in principal pollutants and the incidence of respiratory symptoms.  Among the 329 children with recurrent wheezing or asthma and 364 healthy subjects who completed follow-up, living close to the street with a high traffic density was a risk factor for asthma exacerbations (odds ratio [OR]=1.79; 95% confidence interval [CI], 1.13-2.84), whereas living near green areas was found to be protective (OR=0.50; 95% CI, 0.31 -0.80). An increase of 10 μg/m3 of particulates less than 10 microns in diameter (PM10) increased the onset of pneumonia in wheezing/asthmatic children (continuous rate ratio [RR]=1.08, 95% CI: 1.00-1.17).  The authors concluded that there is a significant association between traffic-related pollution and the development of asthma exacerbations and respiratory infections in children born to atopic parents and in those suffering from recurrent wheezing or asthma, suggesting that environmental control may be crucial for respiratory health in children with underlying respiratory disease.

Overall, the 2010 Health Effects Institute (HEI) Publication 17 found (on page xv.) that: "the Panel concluded that the evidence is sufficient to support a causal relationship between exposure to traffic-related air pollution and exacerbation of asthma."   I agree with this HEI Publication 17 conclusion.

While the HEI Publication 17 Review of the health effects of traffic air pollution concluded that the evidence showing associations between exposure to traffic air pollution and the onset of new asthma in healthy children was only suggestive at that time (i.e. not enough to conclude causality), that report was published in January 2010, before more definitive evidence of this relationship was published.  Notably, McConnell et al (2010) later published a study of the relationship of new-onset asthma with traffic-related pollution near homes and schools of children participating in the highly regarded California Children's Health Study.  Physician diagnosis of new-onset asthma ($n = 120$) was identified during 3 years of follow-up of a cohort of 2,497 kindergarten and first-grade children who were asthma- and wheezing-free at study entry into the Southern California Children's Health Study. The researchers assessed traffic-related pollution exposure based on a line source dispersion model of traffic volume, distance from home and school, and local meteorology.   They found that asthma risk increased with modeled traffic-related pollution exposure from roadways near homes [HR 1.51; 95% confidence interval (CI), 1.25–1.82] and near schools (HR 1.45; 95% CI, 1.06–1.98). Thus, these findings more definitively indicate that the risk of new asthma was increased by approximately 50% among children exposed to roadway pollution, vs. children who went to school and/or lived further away from the roadways. It is now clear that living and/or going to school near a major roadway is a significant risk to healthy children, not only for worsening their asthma if they

have it, but also of developing asthma disease among those who previously did not have that disease.

• *Reduced lung function*

Research by Svendsen et al. (2012) has found both long-term and short-term reductions in lung function (i.e., ability to inhale and exhale air) as a result of traffic-related air pollution exposure. For example, investigators examined 5,654 children enrolled in the El Paso, Texas, public school district by questionnaire in 2001. School-level and residence-level exposures to traffic-related air pollutants were estimated using a land use regression model. For 1,529 children with spirometry, residential levels of traffic-related ambient air pollution were associated with a 2.4% decrement in forced vital capacity (95% confidence interval (CI): -4.0, -0.7) after adjustment for demographic, anthropomorphic, and socioeconomic factors and spirometer/technician effects.

In my own work in the South Bronx, NY, I have found reduced lung function among elementary school children occurs on days of elevated traffic-related pollution concentrations (Spira-Cohen et al, 2011). As shown in the plots below, the impact of diesel traffic related elemental carbon particles (a marker for diesel pollution in urban areas) was larger and more significant than particles in general (PM$_{2.5}$).



Figure 2. Lung Function in Children Decreases with Increasing Exposure to Traffic Related EC.

• *Reduced Lung Development and Growth*

Traffic-related air pollution has also been indicated to inhibit the growth of young lungs among children over the long-term of exposure. Schultz et al (2012) followed more than 1,900 children in the Swedish birth cohort BAMSE with repeated questionnaires, dynamic spirometry, and IgE measurements until 8 years of age. Outdoor concentrations of particulate matter with an aerodynamic diameter less than 10 µm (PM$_{10}$) from road traffic were estimated for residential, day care, and school addresses from birth and onward using dispersion modeling. The relationship between time-weighted average exposure during different time windows and FEV at 8 years was

analyzed by linear regression, adjusting for potential confounding factors, including short-term exposure to air pollution.  The authors found that a 5th to 95th percentile difference in traffic-related average $PM_{10}$ exposure during the first year of life was associated with a reduced FEV1 of 259.3 ml (95% confidence interval, 2113 to 25.6) at 8 years of age. Clearly, exposure to traffic-related air pollution reduces the ability for children to properly grow and develop their full lung capacity.

In addition, a total of 2,278 children from the Swedish birth cohort BAMSE (Children, Allergy, Milieu, Stockholm, Epidemiological Survey) performed spirometry at age 16 years. Levels of outdoor air pollution from local road traffic were estimated (nitrogen oxides [NOx] and particulate matter with an aerodynamic diameter of <10 μm [PM10]) for residential, daycare, and school addresses during the lifetime using dispersion modeling. Exposure to traffic-related air pollution during the first year of life was associated with FEV1 at age 16 years of -15.8 ml (95% confidence interval [CI], -33.6 to 2.0 for a 10 $\mu g/m^3$ difference in NOx), predominately in males (-30.4 ml; 95% CI, -59.1 to -1.7), and in subjects not exposed to maternal smoking during pregnancy or infancy. Later exposures appeared to have had an additional negative effect.  The results for PM10 were concluded by the authors to be similar to those for NOx, indicating that it is the particulate matter from traffic that is associated with the effects seen on lung function growth.

• *Cardiac effects*

Exposure to air pollution from road traffic has also been linked to a number of other health issues including heart attack, coronary artery disease and increased risk of death from cardiac conditions in adults.  For example, Peters et al. (2000) compared patient implanted defibrillator discharge interventions among 100 patients with such devices in eastern Massachusetts, according to variations in concentrations of particulate matter, black carbon, and gaseous air pollutants that were measured daily for the years 1995 through 1997. Patients with ten or more interventions experienced increased arrhythmias in association with nitrogen dioxide, carbon monoxide, black carbon, and fine particle mass.  A stronger association was found for $NO_2$ and black carbon than for $PM_{2.5}$. Consistent positive associations were observed with black carbon, CO, and $NO_2$ (noted markers for local traffic-related pollution), with the strongest associations observed for $NO_2$.  A 26-ppb increase in nitrogen dioxide was associated with nearly a doubling of defibrillator interventions (odds ratio = 1.8; 95% confidence interval = 1.1–2.9). These results indicate that exposure to elevated levels of these traffic-related air pollutants are associated with potentially life-threatening arrhythmias.

In January 2010, the HEI Publication 17 Report (HEI, 2010) concluded that the evidence

supporting the effects of traffic-related air pollution on cardiac morbidity and mortality were suggestive, but that was also concluded before newer, more definitive evidence was published.  In my own work (Lall et al, 2010) in New York City, daily $PM_{2.5}$ speciation measurements collected in Mid-town Manhattan were analyzed via Positive Matrix Factorization source apportionment to determine the original source of different components of air pollution. Daily and distributed-lag Generalized Linear Models of Medicare respiratory and cardiovascular hospital admissions during 2001-2002 considered $PM_{2.5}$ mass and $PM_{2.5}$ from five sources: transported sulfate, residual oil, traffic, steel/construction and soil.  Traffic-related particulate matter was significantly associated with an increase in the risk of cardiovascular hospital admissions.

Investigations have also found biological markers of cardiac effects by traffic-related air pollution.  Hoffmann et al. (2007) conducted a cross-sectional analysis of data collected at baseline for 4,494 residents of Germany followed from 2000 to 2003. The age of participants ranged from 45-74 yrs. of age. The authors estimated 1-yr avg. exposure to $PM_{2.5}$ in 2002 (the midpoint of the baseline exam).  They found a 43% (95% CI: -15 to 115) increase in coronary-artery calcification (CAC) per 10 $\mu g/m^3$ increase in $PM_{2.5}$. The strength of association was similar across demographic and clinical characteristics subgroups. The authors reported a more consistent association of CAC with traffic exposure (i.e., distance from a major roadway) than with $PM_{2.5}$ mass in general, indicating a stronger role by traffic particles. In a subsequent analysis of these data, Hoffmann et al. (2009) examined the association between Ankle-Brachial Index (ABI, an index of Peripheral Arterial Disease, PAD) and $PM_{2.5}$ in this population.  In both studies, residing near a major roadway was the strongest predictor of atherosclerotic disease progression.

• *Premature mortality*

Premature mortality, especially for cardiac causes, has been widely found to be associated with traffic-related air pollution.  In my own research in New York City, We analyzed daily deaths and emergency hospitalizations for CVDs among persons $\geq 40$ years of age for associations with $PM_{2.5}$, its chemical components, nitrogen dioxide ($NO_2$), carbon monoxide (CO), and sulfur dioxide for the years 2000-2006 using a Poisson time-series model adjusting for temporal and seasonal trends, temperature effects, and day of the week (Ito et al, 2011). We estimated excess risks per interquartile-range increases at lags 0 through 3 days for warm (April through September) and cold (October through March) seasons.  We found that increased CVD mortality and increased CVD hospitalizations were both associated with increased exposure to traffic–related elemental carbon

A8

and $NO_2$ throughout the year in New York City, NY.

Similarly, Beckerman et al. (2012) assessed the association between the occurrence of Ischemic Heart Disease (IHD) and air pollutants in Toronto, Ontario, Canada. Confounding was controlled with individual and neighborhood-level covariates. After adjusting for multiple covariates, nitrogen dioxide($NO_2$) (a pollutant derived from traffic) was significantly associated with increased IHD risk, relative risk (RR) = 1.33 (95% confidence interval [CI]: 1.2, 1.47). Subjects living near major roads and highways had a trend toward an elevated risk of IHD, RR = 1.08 (95% CI: 0.99, 1.18).

In Phoenix, research by Mar et al (2000) evaluated the association between mortality outcomes in elderly individuals and particulate matter (PM) of varying aerodynamic diameters (in micrometers) [PM10, PM2.5, and PMCF ($PM_{10}$ minus $PM_{2.5}$)], and selected particulate and gaseous phase pollutants in Phoenix, Arizona, using 3 years of daily data (1995–1997). Although source apportionment and epidemiologic methods have been previously combined to investigate the effects of air pollution on mortality, this was the first study to use detailed PM composition data in a time–series analysis of mortality. These authors found that total and cardiovascular disease mortality was significantly associated with air pollution factors associated with motor vehicle emissions. Total mortality was significantly associated with CO and $NO_2$ ($p < 0.05$). Increased cardiovascular mortality was significantly associated with CO, $NO_2$, $SO_2$, $PM_{2.5}$, $PM_{10}$, PMCF ($p < 0.05$), and EC soot (related to diesel truck emissions).

Thus, the evidence indicating that the risk of cardiac illness and mortality from exposure to traffic-related air pollution has expanded since the HEI Publication 17 report in 2010, and I conclude that adults are at increased risk of cardiac illness and/or mortality from increased exposure to traffic-related air pollution.

*Lung Cancer Risk*

There are a host of other adverse health effects that could result from human exposures to the air pollution emitted by living proximal to highways.  These other potential adverse effects of air pollution exposure from traffic-related air pollution exposure may include increased risk of lung cancer (especially from increased exposure to diesel particulate matter) and adverse birth outcomes (e.g., low birth weight, small for gestational age, and perinatal mortality).  In my own research in the largest cohort studied to date, we have found an increased risk of lung cancer to be associated with increased exposure to $PM_{2.5}$ air pollution (Pope et al, 2002).  As a result of this research, as well as

other studies, the evidence for the association of particulate matter and lung cancer has strengthened, and The International Agency for Research on Cancer (IARC) has recently declared particulate matter air pollution carcinogenic to humans. Furthermore, recent evidence has implicated traffic particulate matter in this association. Hart and colleagues (2015) studied the long-term ambient residential traffic-related exposures and their relationship to risk of incident lung cancer in the Netherlands Cohort Study on Diet and Cancer.  They observed elevated risks of incident lung cancer with exposure to measures of traffic at the baseline address. Thus, recent research indicates that exposure to traffic-related particulate matter early in life may lead to increased risk of lung cancer later in life.

*Adverse Health Effects of Air Pollution Exposure During Periods of Ambient Standard Compliance*

Regarding the ambient exposure levels at which the above described adverse health effects may be seen, it is important to note that there is no known safe level of exposure of particulate matter such as those from traffic emissions in question here. The various serious adverse effects of long-term exposure to particulate matter extends well below the prevailing US air quality standards as set by the US EPA, or on days above those standards, but not classified as violations (e.g. during those days exceeding the standard limits, but not exceeding the number of allowable exceedance days).  As shown in the Figure 3 below, my research has shown that increases in long-term exposure to $PM_{2.5}$ particulate matter air pollution are associated with increases in the risk of cardiovascular death among those exposed, even well below the present 12 $\mu g/m^3$ annual $PM_{2.5}$ air quality standard.

It should be noted that the U.S EPA agrees with me that meeting an air quality standard does not prevent significant adverse health effects from occurring in the exposed population. Indeed, in its 2013 rulemaking, adopting the revised annual particulate matter NAAQS standard, EPA explained that "evidence- and risk-based approaches using information from epidemiological studies to inform decisions on $PM_{2.5}$ standards are complicated by the recognition that *no population threshold, below which it can be concluded with confidence that $PM_{2.5}$-related effects do not occur, can be discerned from the available evidence*."  (emphasis added).  The same conclusion also applies to PM10, as no threshold has been found to exist below which there are no PM10 adverse health effects.



Figure 3. Mortality Risk from Cardiovascular Disease Increases with Rising $PM_{2.5}$ Exposure, Even Well Below the Present US Ambient Air Quality Standard annual limit for $PM_{2.5}$ (12 µg/m³). Thurston et al, 2015.

Furthermore, in its calculations of the benefits of potentially reducing the $PM_{2.5}$ NAAQS, EPA has also implicitly acknowledged that there can be extant adverse health risks occurring below the NAAQS.  For example, in a recent EPA Regulatory Impact Analysis for reducing the annual $PM_{2.5}$ standard from 15 µg/m³ to 12 µg/m³ (U.S. EPA, 2012), EPA included a figure summarizing the best, most current science regarding $PM_{2.5}$ health effects, which clearly illustrates that air pollution deaths occur below the existing $PM_{2.5}$ NAAQS (35 µg/m³ for the daily standard, and 12 µg/m³ for the annual standard).  This figure, shown below, provides EPA's best estimate of the deaths that would be avoided by implementing the proposed more stringent standard, with roughly half of the avoided deaths occurring in places where the air would be cleaned to levels below (i.e., with air quality better than) the proposed air quality standard. While this particular EPA analysis is for the annual average concentrations, the same principle of effects occurring below the standard applies to the short-term $PM_{2.5}$ standard as well, and, in my opinion, to other particulate matter measures, such as PM10.  Thus, just as cleaning the air below the standards would avoid more of those deaths, any increase in pollution will increase the risk of adverse effects at all levels of prevailing air pollution, even when the NAAQS standards are not violated.



Figure 4.  U.S. EPA Regulatory Impact Assessment of the Number of Premature PM$_{2.5}$-Related Deaths Avoided for 12/35 vs. 13/35 Ambient PM$_{2.5}$ Air Quality Standards. (LML = Lowest Measured Level of PM$_{2.5}$ in the study population) (U.S. EPA 2012, Fig. 5-7)

*Conclusions*

Based upon my review of the existing published scientific and medical literature, including my own relevant research, I conclude that the increased exposure to residents living or going to school near to traffic and its related exposures to particulate matter air pollution, including PM$_{10}$, will be at significantly increased risk of both short- and long-term adverse health effects.  In particular, children with asthma are at much greater risk of experiencing asthma exacerbations (e.g., asthma attacks, wheezing, cough, etc.) if they have asthma, and healthy children will be at significantly higher risk of getting new-onset asthma.  All children living near the traffic are at greater risk of have their lung growth and development inhibited from what it would have been without such exposure.  In adults, the primary health threat from increased exposure to highway air pollution will be increased risks of chronic cardiovascular illness (e.g., PAD), acute myocardial infarctions (MIs), lung cancer, and premature mortality.  These increased adverse health risks will occur even if the expected air pollution concentration exposure increments do not violate the ambient air quality standards.

REFERENCES

Beckerman BS, Jerrett M, Finkelstein M, Kanaroglou P, Brook JR, Arain MA, Sears MR, Stieb D, Balmes J, Chapman K. (2012). The association between chronic exposure to traffic-related air pollution and ischemic heart disease. J Toxicol Environ Health A. 2012;75(7):402-11.

Brauer M, Hoek G, van Vliet P, Meliefste K, Fischer PH, Wijga A, Koopman LP, Neijens HJ, Gerritsen J, Kerkhof M, Heinrich J, Bellander T, Brunekreef B. (2002). Air pollution from traffic and the development of respiratory infections and asthmatic and allergic symptoms in children. Am J Respir Crit Care Med 166:1092–1098.

Brauer M, Hoek G, Smit HA, de Jongste JC, Gerritsen J, Postma DS, Kerkhof M, Brunekreef B. (2007). Air pollution and development of asthma, allergy and infections in a birth cohort. Eur Respir J 29:879–888.

Esposito S, Galeone C, Lelii M, Longhi B, Ascolese B, Senatore L, Prada E, Montinaro V, Malerba S, Patria MF, Principi N.. Impact of air pollution on respiratory diseases in children with recurrent wheezing or asthma. BMC Pulm Med. 2014 Aug 7;14:130. doi: 10.1186/1471-2466-14-130.

Gehring U, Cyrys J, Sedlmeir G, Brunekreef B, Bellander T, Fischer P, Bauer CP, Reinhardt D, Wichmann HE, Heinrich J. 2002. Traffic-related air pollution and respiratory health during the first 2 yrs of life. Eur Respir J 19:690–698.

Grineski SE, Staniswalis JG, Peng Y, Atkinson-Palombo C.  Children's asthma hospitalizations and relative risk due to nitrogen dioxide (NO2): effect modification by race, ethnicity, and insurance status. Environ Res. 2010 Feb;110(2):178-88. doi: 10.1016/j.envres.2009.10.012. Epub 2009 Nov 26.

Hart JE, Spiegelman D, Beelen R, Hoek G, Brunekreef B, Schouten LJ, van den Brandt P. Long-Term Ambient Residential Traffic-Related Exposures and Measurement Error-Adjusted Risk of Incident Lung Cancer in the Netherlands Cohort Study on Diet and Cancer. Environ Health Perspect. 2015 Sep;123(9):860-6. doi: 10.1289/ehp.1408762. Epub 2015 Mar 27.

Health Effects Institute (HEI) (2010). Traffic-Related Air Pollution: A Critical Review of the Literature on Emissions, Exposure, and Health Effects. Special Report 17. January, 2010. Boston, MA

Hoffmann B; Moebus S; Kroger K; Stang A; Mohlenkamp S; Dragano N; Schmermund A; Memmesheimer M; Erbel R; Jockel K-H (2009). Residential exposure to urban pollution, ankle-brachial index, and peripheral arterial disease.
Epidemiology, 20: 280-288.

Hoffmann B, Moebus S, Möhlenkamp S, Stang A, Lehmann N, Dragano N, Schmermund A, Memmesheimer M, Mann K, Erbel R, Jöckel K-H. 2007. Residential exposure to traffic is associated with coronary atherosclerosis. Circulation 116:489–496.

Hoffmann B; Moebus S; Kroger K; Stang A; Mohlenkamp S; Dragano N; Schmermund A; Memmesheimer M; Erbel R; Jockel K-H (2009). Residential exposure to urban pollution, ankle-

brachial index, and peripheral arterial disease. Epidemiology, 20: 280-288.

Ito K, Mathes R, Ross Z, Nádas A, Thurston G, Matte T. (2011). Fine particulate matter constituents associated with cardiovascular hospitalizations and mortality in New York City.  Environ Health Perspect. 2011 Apr;119(4):467-73. doi: 10.1289.ehp.1002667.

Mar TF, Norris GA, Koenig JQ, Larson TV. Associations between air pollution and mortality in Phoenix, 1995-1997. Environ Health Perspect. 2000 Apr;108(4):347-53.

McConnell R, Islam T, Shankardass K, Jerrett M, Lurmann F, Gilliland F, Gauderman J, Avol E, Künzli N, Yao L, Peters J, Berhane K. (2010). Childhood incident asthma and traffic-related air pollution at home and school.  Environ Health Perspect. 2010 Jul;118(7):1021-6.

Morgenstern V, Zutavern A, Cyrys J, Brockow I, Gehring U, Koletzko S, Bauer CP, Reinhardt D, Wichmann HE, Heinrich J. 2007. Respiratory health and individual estimated exposure to traffic-related air pollutants in a cohort of young children. Occup Environ Med 64:8–16.

Morgenstern V, Zutavern A, Cyrys J, Brockow I, Koletzko S, Krämer U, Behrendt H, Herbarth O, von Berg A, Bauer CP, Wichmann HE, Heinrich J; GINI Study Group; LISA Study Group. Atopic diseases, allergic sensitization, and exposure to traffic-related air pollution in children. Am J Respir Crit Care Med. 2008 Jun 15;177(12):1331-7. doi: 10.1164/rccm.200701-036OC. Epub 2008 Mar 12. PMID: 18337595

Peters, A.; Liu, E.; Verrier, R. L.; Schwartz, J.; Gold, D. R.; Mittleman, M.; Baliff, J.; Oh, J. A.; Allen, G.; Monahan, K.; Dockery, D. W. (2000) Air pollution and incidence of cardiac arrhythmia. Epidemiology 11: 11-17.

Schultz ES, Gruzieva O, Bellander T, Bottai M, Hallberg J, Kull I, Svartengren M, Melén E, Pershagen G. (2012). Traffic-related air pollution and lung function in children at 8 years of age: a birth cohort study. Am J Respir Crit Care Med. 2012 Dec 15;186(12):1286-91. doi: 10.1164/rccm.201206-1045OC. Epub 2012 Oct 26.

Svendsen ER, Gonzales M, Mukerjee S, Smith L, Ross M, Walsh D, Rhoney S, Andrews G, Ozkaynak H, Neas LM. GIS-modeled indicators of traffic-related air pollutants and adverse pulmonary health among children in El Paso, Texas. Am J Epidemiol. 2012 Oct 1;176 Suppl 7:S131-41. doi: 10.1093/aje/kws274.

Samoli E, Atkinson RW, Analitis A, Fuller GW, Beddows D, Green DC, Mudway IS, Harrison RM, Anderson HR, Kelly FJ.**Differential health effects of short-term exposure to source-specific particles in London, U.K.** Environ Int. 2016
http://www.sciencedirect.com/science/article/pii/S0160412016304512

Spira-Cohen A, Chen LC, Kendall M, Lall R, Thurston GD. Personal Exposures to Traffic-Related Air Pollution and Acute Respiratory Health Among Bronx School Children with Asthma. Environ Health Perspect. 2011 Apr;119(4):559-65 (Epub. Dec. 2010 ahead of print)

National Ambient Air Quality Standards for Particulate Matter, 78 Fed. Reg. 3086 (Jan. 15, 2013)

(Pg 3098).

Thurston GD, Ahn J, Cromar KR, Shao Y, Reynolds HR, Jerrett M, Lim CC, Shanley R, Park Y, Hayes RB. Ambient Particulate Matter Air Pollution Exposure and Mortality in the NIH-AARP Diet and Health Cohort. Environ Health Perspect. 2015 Sep 15. [Epub ahead of print]. PMID: 26370657. http://dx.doi.org/10.1289/ehp.1509676

U.S. EPA (2009).  Integrated Science Assessment for Particulate Matter. EPA/600/R-08/139F. National Center for Environmental Assessment-RTP Division. Office of Research and Development. U.S. Environmental Protection Agency.  Research Triangle Park, NC.  December, 2009.

U.S. Environmental Protection Agency (2012). Regulatory Impact Analysis for the Proposed Revisions to the National Ambient Air Quality Standards for Particulate Matter,  OAQPS, EPA-452/R-12-003. RTP, NC

Venn AJ, Lewis SA, Cooper M, Hubbard R, and Fritton J. (2001) Living Near a Main Road and the Risk of Wheezing Illness in Children.  Am J Respir Crit Care Med. 2001 Dec 15;164(12):2177-80.



December 2009
EPA/600/R-08/139F

# Integrated Science Assessment for Particulate Matter

Includes Errata Sheet created on 2/10/2010

National Center for Environmental Assessment-RTP Division
Office of Research and Development
U.S. Environmental Protection Agency
Research Triangle Park, NC

A16

# Table of Contents

LIST OF TABLES _____ XV

LIST OF FIGURES _____ XXIII

PM ISA PROJECT TEAM _____ XLIII

AUTHORS, CONTRIBUTORS, REVIEWERS _____ XLVI

CLEAN AIR SCIENTIFIC ADVISORY COMMITTEE FOR PARTICULATE MATTER NAAQS _____ LII

ACRONYMS AND ABBREVIATIONS _____ LIV

CHAPTER 1. INTRODUCTION _____ 1-2

1.1. Legislative Requirements _____ 1-4

1.2. History of Reviews of the NAAQS for PM _____ 1-5

1.3. ISA Development _____ 1-9

1.4. Document Organization _____ 1-13

1.5. EPA Framework for Causal Determination _____ 1-14
     1.5.1. Scientific Evidence Used in Establishing Causality _____ 1-15
     1.5.2. Association and Causation _____ 1-15
     1.5.3. Evaluating Evidence for Inferring Causation _____ 1-15
     1.5.4. Application of Framework for Causal Determination _____ 1-19
     1.5.5. First Step—Determination of Causality _____ 1-20
     1.5.6. Second Step—Evaluation of Response _____ 1-22
             1.5.6.1. Effects on Human Populations _____ 1-22
             1.5.6.2. Effects on Public Welfare _____ 1-24
     1.5.7. Concepts in Evaluating Adversity of Health Effects _____ 1-24

1.6. Summary _____ 1-24

Chapter 1 References _____ 1-26

CHAPTER 2. INTEGRATIVE HEALTH AND WELFARE EFFECTS OVERVIEW _____ 2-1

2.1. Concentrations and Sources of Atmospheric PM _____ 2-2
     2.1.1. Ambient PM Variability and Correlations _____ 2-2
             2.1.1.1. Spatial Variability across the U.S. _____ 2-2
             2.1.1.2. Spatial Variability on the Urban and Neighborhood Scales ____ 2-3
     2.1.2. Trends and Temporal Variability _____ 2-3
     2.1.3. Correlations between Copollutants _____ 2-4
     2.1.4. Measurement Techniques _____ 2-4
     2.1.5. PM Formation in the Atmosphere and Removal _____ 2-4
     2.1.6. Source Contributions to PM _____ 2-5
     2.1.7. Policy-Relevant Background _____ 2-6

2.2. Human Exposure _____ 2-6
     2.2.1. Spatial Scales of PM Exposure Assessment _____ 2-6
     2.2.2. Exposure to PM Components and Copollutants _____ 2-7
     2.2.3. Implications for Epidemiologic Studies _____ 2-7

2.3. Health Effects _____ 2-8
    2.3.1.  Exposure to $PM_{2.5}$ _____ 2-9
        2.3.1.1.  Effects of Short-Term Exposure to $PM_{2.5}$ _____ 2-9
        2.3.1.2.  Effects of Long-Term Exposure to $PM_{2.5}$ _____ 2-11
    2.3.2.  Integration of $PM_{2.5}$ Health Effects _____ 2-13
    2.3.3.  Exposure to $PM_{10-2.5}$ _____ 2-18
        2.3.3.1.  Effects of Short-Term Exposure to $PM_{10-2.5}$ _____ 2-18
    2.3.4.  Integration of $PM_{10-2.5}$ Effects _____ 2-19
    2.3.5.  Exposure to UFPs _____ 2-21
        2.3.5.1.  Effects of Short-Term Exposure to UFPs _____ 2-21
    2.3.6.  Integration of UFP Effects _____ 2-22

2.4. Policy Relevant Considerations _____ 2-23
    2.4.1.  Potentially Susceptible Populations _____ 2-23
    2.4.2.  Lag Structure of PM-Morbidity and PM-Mortality Associations _____ 2-24
        2.4.2.1.  PM-Cardiovascular Morbidity Associations _____ 2-24
        2.4.2.2.  PM-Respiratory Morbidity Associations _____ 2-24
        2.4.2.3.  PM-Mortality Associations _____ 2-25
    2.4.3.  PM Concentration-Response Relationship _____ 2-25
    2.4.4.  PM Sources and Constituents Linked to Health Effects _____ 2-26

2.5. Welfare Effects _____ 2-27
    2.5.1.  Summary of Effects on Visibility _____ 2-27
    2.5.2.  Summary of Effects on Climate _____ 2-28
    2.5.3.  Summary of Ecological Effects of PM _____ 2-29
    2.5.4.  Summary of Effects on Materials _____ 2-30

2.6. Summary of Health Effects and Welfare Effects Causal Determinations _____ 2-31

Chapter 2 References _____ 2-34

CHAPTER 3. SOURCE TO HUMAN EXPOSURE _____ 3-1

3.1. Introduction _____ 3-1

3.2. Overview of Basic Aerosol Properties _____ 3-1

3.3. Sources, Emissions and Deposition of Primary and Secondary PM _____ 3-6
    3.3.1.  Emissions of Primary PM and Precursors to Secondary PM _____ 3-8
    3.3.2.  Formation of Secondary PM _____ 3-10
        3.3.2.1.  Formation of Nitrate and Sulfate _____ 3-10
        3.3.2.2.  Formation of Secondary Organic Aerosol _____ 3-10
        3.3.2.3.  Formation of New Particles _____ 3-12
    3.3.3.  Mobile Source Emissions _____ 3-13
        3.3.3.1.  Emissions from Gasoline Fueled Engines _____ 3-13
        3.3.3.2.  Emissions from Diesel Fueled Engines _____ 3-13
    3.3.4.  Deposition of PM _____ 3-14
        3.3.4.1.  Deposition Forms _____ 3-16
        3.3.4.2.  Methods for Estimating Dry Deposition _____ 3-17
        3.3.4.3.  Factors Affecting Dry Deposition Rates and Totals _____ 3-18

3.4. Monitoring of PM _____ 3-20
    3.4.1.  Ambient Measurement Techniques _____ 3-20
        3.4.1.1.  PM Mass _____ 3-20
        3.4.1.2.  PM Speciation _____ 3-23
        3.4.1.3.  Multiple-Component Measurements on Individual Particles _____ 3-28
        3.4.1.4.  UFPs: Mass, Surface Area, and Number _____ 3-29
        3.4.1.5.  PM Size Distribution _____ 3-29
        3.4.1.6.  Satellite Measurement _____ 3-29
    3.4.2.  Ambient Network Design _____ 3-30
        3.4.2.1.  Monitor Siting Requirements _____ 3-30
        3.4.2.2.  Spatial and Temporal Coverage_____ 3-31

A18

In addition to examining the concentration-response relationship between short-term exposure to PM and mortality, Schwartz et al. (2008, 156963) conducted an analysis of the shape of the concentration-response relationship associated with long-term exposure to PM. Using a variety of statistical methods, the concentration-response curve was found to be indistinguishable from linear, and, therefore, little evidence was observed to suggest that a threshold exists in the association between long-term exposure to $PM_{2.5}$ and the risk of death (Section 7.6).

## 2.4.4.  PM Sources and Constituents Linked to Health Effects

Recent epidemiologic, toxicological, and controlled human exposure studies have evaluated the health effects associated with ambient PM constituents and sources, using a variety of quantitative methods applied to a broad set of PM constituents, rather than selecting a few constituents a priori (Section 6.6). There is some evidence for trends and patterns that link particular ambient PM constituents or sources with specific health outcomes, but there is insufficient evidence to determine whether these patterns are consistent or robust.

For cardiovascular effects, multiple outcomes have been linked to a $PM_{2.5}$ crustal/soil/road dust source, including cardiovascular mortality and ST-segment changes. Additional studies have reported associations between other sources (i.e., traffic and wood smoke/vegetative burning) and cardiovascular outcomes (i.e., mortality and ED visits). Studies that only examined the effects of individual $PM_{2.5}$ constituents found evidence for an association between EC and cardiovascular hospital admissions and cardiovascular mortality. Many studies have also observed associations between other sources (i.e., salt, secondary $SO_4^{2-}$/long-range transport, other metals) and cardiovascular effects, but at this time, there does not appear to be a consistent trend or pattern of effects for those factors.

There is less consistent evidence for associations between PM sources and respiratory health effects, which may be partially due to the fact that fewer source apportionment studies have been conducted that examined respiratory-related outcomes (e.g., hospital admissions) and measures (e.g., lung function). However, there is some evidence for associations between respiratory ED visits and decrements in lung function with secondary $SO_4^{2-}$ $PM_{2.5}$. In addition, crustal/soil/road dust and traffic sources of PM have been found to be associated with increased respiratory symptoms in asthmatic children and decreased PEF in asthmatic adults. Inconsistent results were observed in those $PM_{2.5}$ studies that used individual constituents to examine associations with respiratory morbidity and mortality, although Cu, Pb, OC, and Zn were related to respiratory health effects in two or more studies.

A few studies have identified $PM_{2.5}$ sources associated with total mortality. These studies found an association between mortality and the $PM_{2.5}$ sources: secondary $SO_4^{2-}$/long-range transport, traffic, and salt. In addition, studies have evaluated whether the variation in associations between $PM_{2.5}$ and mortality or $PM_{10}$ and mortality reflects differences in $PM_{2.5}$ constituents. $PM_{10}$-mortality effect estimates were greater in areas with a higher proportion of Ni in $PM_{2.5}$, but the overall $PM_{10}$-mortality association was diminished when New York City was excluded in sensitivity analyses in two of the studies. V was also found to modify $PM_{10}$-mortality effect estimates. When examining the effect of species-to-$PM_{2.5}$ mass proportion on $PM_{2.5}$-mortality effect estimates, Ni, but not V, was also found to modify the association.

Overall, the results indicate that many constituents of PM can be linked with differing health effects and the evidence is not yet sufficient to allow differentiation of those constituents or sources that are more closely related to specific health outcomes. These findings are consistent with the conclusions of the 2004 PM AQCD (U.S. EPA, 2004, 056905) (i.e., that a number of source types, including motor vehicle emissions, coal combustion, oil burning, and vegetative burning, are associated with health effects). Although the crustal factor of fine particles was not associated with mortality in the 2004 PM AQCD (U.S. EPA, 2004, 056905), recent studies have suggested that PM (both $PM_{2.5}$ and $PM_{10-2.5}$) from crustal, soil or road dust sources or PM tracers linked to these sources are associated with cardiovascular effects. In addition, $PM_{2.5}$ secondary $SO_4^{2-}$ has been associated with both cardiovascular and respiratory effects.



# Technical Assistance Document
# for the Reporting of Daily Air Quality –
# the Air Quality Index (AQI)

**May 2016**

EPA-454/B-16-002
May 2016

# Technical Assistance Document
# for the Reporting of Daily Air Quality –
# the Air Quality Index (AQI)

Contact:
David Mintz
U.S. Environmental Protection Agency
Research Triangle Park, North Carolina

U.S. Environmental Protection Agency
Office of Air Quality Planning and Standards
Research Triangle Park, North Carolina 27711

**CONTENTS**

    **I.**       **REPORTING THE AQI**

    **II.**      **CALCULATING THE AQI**

    **III.**     **FREQUENTLY ASKED QUESTIONS**

    **IV.**     **RESOURCES**


**LIST OF TABLES**

Table 1. Names and colors for the six AQI categories
Table 2. AQI color formulas
Table 3. Pollutant-Specific Sensitive Groups
Table 4. Health Effects Statements
Table 5. Cautionary Statements
Table 6. Breakpoints for the AQI

**LIST OF FIGURES**

Figure 1. The AQI is reported in many formats
Figure 2. Display of AQI forecast
Figure 3. The NowCast
Figure 4. Airnow.gov page showing the AQI at U.S. Embassies and Consulates
Figure 5. The AQI on AirNow's *Fires: Current Conditions* page
Figure 6. The AirNow widget

Table 4. Pollutant-Specific Sub-indices and Health Effects Statements
for Guidance on the Air Quality Index (AQI)

| AQI Categories: Index Values | Ozone (ppm) | | Particulate Matter ($\mu g/m^3$) | | Carbon Monoxide (ppm) [8-hour] | Sulfur Dioxide (ppb) [1-hour] | Nitrogen Dioxide (ppb) [1-hour] |
|---|---|---|---|---|---|---|---|
| | [8-hour] | [1-hour] | $PM_{2.5}$ [24-hour] | PM10 [24-hour] | | | |
| Good (Up to 50) | 0 - 0.054 None | - | 0 – 12.0 None | 0 – 54 None | 0 – 4.4 None | 0 - 35 None | 0 - 53 None |
| Moderate (51 - 100) | 0.055 - 0.070 Unusually sensitive individuals may experience respiratory symptoms. | - | 12.1 – 35.4 | 55 – 154 | 4.4 – 9.4 None | 36 - 75 None | 54 - 100 None |
| | | | Respiratory symptoms possible in unusually sensitive individuals; possible aggravation of heart or lung disease in people with cardiopulmonary disease and older adults. | | | | |
| Unhealthy for Sensitive Groups (101 - 150) | 0.071 - 0.085 | 0.125 - 0.164 | 35.5 – 55.4 | 155 – 254 | 9.5 – 12.4 Increasing likelihood of reduced exercise tolerance due to increased cardiovascular symptoms, such as chest pain, in people with heart disease. | 76 - 185 Increasing likelihood of respiratory symptoms, such as chest tightness and breathing discomfort, in people with asthma. | 101 - 360 Increasing likelihood of respiratory symptoms, such as chest tightness and breathing discomfort, in people with asthma. |
| | Increasing likelihood of respiratory symptoms and breathing discomfort in people with lung disease (such as asthma), children, older adults, people who are active outdoors (including outdoor workers), people with certain genetic variants, and people with diets limited in certain nutrients. | | Increasing likelihood of respiratory symptoms in sensitive groups including older adults, children, and people of lower socioeconomic status; aggravation of heart or lung disease and premature mortality in people with heart or lung disease | | | | |

| Unhealthy (151 - 200) | 0.086 - 0.105 | 0.165 - 0.204 | 55.5 – 150.4 | 255 – 354 | 12.5 - 15.4 | 186 - 304 | 361 - 649 |
|---|---|---|---|---|---|---|---|
|  | Greater likelihood of respiratory symptoms and breathing in people with lung disease (such as asthma), children, older adults, people who are active outdoors (including outdoor workers), people with certain genetic variants, and people with diets limited in certain nutrients; possible respiratory effects in general population. | | Increased aggravation of respiratory symptoms in sensitive groups including older adults, children, and people of lower socioeconomic status; increased aggravation of heart or lung disease and premature mortality in people with heart or lung disease; increased respiratory effects in general population. | | Reduced exercise tolerance due to increased cardiovascular symptoms, such as chest pain, in people with heart disease. | Increased respiratory symptoms, such as chest tightness and wheezing in people with asthma; possible aggravation of other lung diseases. | Increased respiratory symptoms, such as chest tightness and wheezing in people with asthma; possible aggravation of other lung diseases. |
| Very Unhealthy (201 - 300) | 0.106 - 0.200 | 0.205 - 0.404 | 150.5 – 250.4 | 355 – 424 | 15.5 – 30.4 | 305 – 604 [24-hour] | 650 - 1249 |
|  | Increasingly severe symptoms and impaired breathing likely in people with lung disease (such as asthma), children, older adults, people who are active outdoors (including outdoor workers), people with certain genetic variants, and people with diets limited in certain nutrients; increasing likelihood of respiratory effects in general population. | | Significant aggravation of respiratory symptoms in sensitive groups including older adults, children, and people of lower socioeconomic status; significant aggravation of heart or lung disease and premature mortality in people with heart or lung disease; significant increase in respiratory effects in general population. | | Significant aggravation of cardiovascular symptoms, such as chest pain, in people with heart disease. | Significant increase in respiratory symptoms, such as wheezing and shortness of breath, in people with asthma; aggravation of other lung diseases. | Significant increase in respiratory symptoms, such as wheezing and shortness of breath, in people with asthma; aggravation of other lung diseases. |
| Hazardous (301 - 500) | - | 0.405 - 0.604 | 250.5 – 500.4 | 425 – 604 | 30.5 – 50.4 | 605 – 1004 [24-hour] | 1250 - 2049 |
|  | Severe respiratory effects and impaired breathing likely in people with lung disease (such as asthma), children, older adults, people who are active outdoors (including outdoor workers), people with certain genetic variants, and people with diets limited in certain nutrients; increasingly severe respiratory effects likely in general population. | | Serious aggravation of respiratory symptoms in sensitive groups including older adults, children, and people of lower socioeconomic status; serious aggravation of heart or lung disease and premature mortality in people with heart or lung disease; serious risk of respiratory effects in general population. | | Serious aggravation of cardiovascular symptoms, such as chest pain, in people with heart disease; impairment of strenuous activities in general population. | Severe respiratory symptoms, such as wheezing and shortness of breath, in people with asthma; increased aggravation of other lung diseases; possible respiratory effects in general population. | Severe respiratory symptoms, such as wheezing and shortness of breath, in people with asthma; increased aggravation of other lung diseases; possible respiratory effects in general population. |

I-710 Corridor Project EIR/EIS

# Appendix I  FEDERAL TRANSPORTATION IMPROVEMENT PROGRAM/REGIONAL TRANSPORTATION PLAN

A25

**This page intentionally left blank**

A26

# 2011 Federal Transportation Improvement Program

Los Angeles County
State Highway
Including Amendments 1-15 and 17-23
(in $000's)

| ProjectID | County | Air Basin | Model | RTP ID | Program | Route | Begin | End | System | Conformity Category | Amendment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LA0B062 | Los Angeles | SCAB | | LA0B062 | PLN4O | 710 | 5 | 25 | S Agency | EXEMPT - 93.126 LOS ANGELES COUNTY MTA | 18 |

Description: Route 710: Reconstruct I-710 interchanges at I-5, at I-405, at SR 91, and at I-105. As part of the I-710 Corridor Program proposing 4 truck lanes (ports-rail yards), 10 general lanes (port-SR-60)/5TEA.

| Fund | ENG | RW | CON | Total | Prior | 2010/2011 | 2011/2012 | 2012/2013 | 2013/2014 | 2014/2015 | 2015/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DEMO - ISTEA | 570 | | | 570 | 570 | | | | | | | 570 |
| DEMO-SAFETEA-LU | 5,500 | | | 5,500 | | | | 5,500 | | | | 5,500 |
| GENERAL FUNDS | 2,000 | | | 2,000 | 2,000 | | | | | | | 2,000 |
| LOCAL TRANS FUNDS | 1,000 | | | 1,000 | | | | 1,000 | | | | 1,000 |
| PROP 'C25' FUNDS | 4,430 | | | 4,430 | 4,430 | | | | | | | 4,430 |
| PORT FUNDS | 10,000 | | | 10,000 | 10,000 | | | | | | | 10,000 |
| PRIVATE FUNDS | 2,000 | | | 2,000 | 2,000 | | | | | | | 2,000 |
| STATE CASH - IIP | 10,000 | | | 10,000 | 10,000 | | | | | | | 10,000 |
| STATE CASH - RIP | 5,000 | | | 5,000 | 5,000 | | | | | | | 5,000 |
| LA0B062 Total | 40,500 | | | 40,500 | 34,000 | | | 6,500 | | | | 40,500 |

| ProjectID | County | Air Basin | Model | RTP ID | Program | Route | Begin | End | System | Conformity Category | Amendment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| LA996143 | Los Angeles | SCAB | | LA996143 | NCRS1 | 710 | 5.5 | 6.8 | S Agency | EXEMPT - 93.126 CALTRANS | 13 |

Description: Route 710: RTE 710 PCH TO DOWNTOWN LB., PAVEMENT RECON, MEDIAN, LANDSCAPING IMPROVE (EA 2203M, 23640, PPNO 2945.3245)

| Fund | ENG | RW | CON | Total | Prior | 2010/2011 | 2011/2012 | 2012/2013 | 2013/2014 | 2014/2015 | 2015/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| STP LOCAL - REGIONAL | | | 5,400 | 5,400 | 5,265 | 145 | | | | | | 5,400 |
| CITY FUNDS | | | 500 | 500 | 500 | | | 87 | | | | 500 |
| PROP 'C25' FUNDS | 798 | | 830 | 1,596 | 1,033 | | | 963 | | | | 1,596 |
| LA996143 Total | 798 | | 6,730 | 7,496 | 6,761 | 145 | | 650 | | | | 7,496 |

| ProjectID | County | Air Basin | Model | RTP ID | Program | Route | Begin | End | System | Conformity Category | Amendment |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 16790 | Los Angeles | SCAB | | 16790 | PLN4O | 710 | 26.5 | 32.7 | S Agency | EXEMPT - 93.126 CALTRANS | 17 |

Description: Route 710: Study to Evaluate Technical Feasibility and Impacts of an Alternative to Close 710 Freeway Gap. This study includes environmental studies (EIR/EIS) (EA# 187W01, PPNO# 22215)

| Fund | ENG | RW | CON | Total | Prior | 2010/2011 | 2011/2012 | 2012/2013 | 2013/2014 | 2014/2015 | 2015/2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| DEMO-SAFETEA-LU | 2,400 | | | 2,400 | 2,400 | | | 2,400 | | | | 2,400 |
| MEASURE R | 59,000 | | | 59,000 | | | | 50,000 | | 9,000 | | 59,000 |
| STATE CASH - PP PRIOR | 4,054 | | | 4,054 | 4,054 | | | | | | | 4,054 |
| STATE CASH - RIP PRIOR | 5,000 | | | 5,000 | 5,000 | | | | | | | 5,000 |
| 16790 Total | 70,454 | | | 70,454 | 9,054 | | | 52,400 | | 9,000 | | 70,454 |

A27



REGIONAL TRANSPORTATION PLAN

RTP

2012-2035

PROJECT LIST

A28

28   Project List

| County | Type | ID | Route | Description | Amount |
|---|---|---|---|---|---|
| LOS ANGELES | STATE HIGHWAY | LAFY103 | 405 | ROUTE 405: WILMINGTON AVENUE INTERCHANGE MODIFICATION AT I-405. IMPROVE I-405/WILMINGTON AVENUE INTERCHANGE BY ADDING A NEW NORTHBOUND ON-RAMP AND WIDENING OF WILMINGTON AVENUE. 22295G, AND EXISTING ON- AND OFF-RAMPS. | $28,170 |
| LOS ANGELES | STATE HIGHWAY | LA66N4 | 605 | ROUTE 605: STUDY – CONSTRUCT I-605 INTERCHANGE CAPACITY IMPROVEMENTS IN IRWINDALE | $1,920 |
| LOS ANGELES | STATE HIGHWAY | 1B790 | 710 | ROUTE 710: STUDY TO EVALUATE TECHNICAL FEASIBILITY AND IMPACTS OF AN ALTERNATIVE TO CLOSE 710 FREEWAY GAP. THIS STUDY INCLUDES ENVIRONMENTAL STUDIES (SR/VES) (EA# 187907, PPNO# 2313) | $87,454 |
| LOS ANGELES | STATE HIGHWAY | LA0BN52 | 710 | ROUTE 710: RECONSTRUCT I-710 INTERCHANGES AT I-5, AT I-405, AT SR 91, AND AT I-105. AS PART OF OF THE I-710 CORRIDOR PROGRAM PROPOSING 4 TRUCK LANES (PORT-RAIL YARDS), 10 GENERAL LANES (PORT-SR-605/SR5A ID # 37/(EA#TEA-LU 2273) | $40,500 |
| LOS ANGELES | STATE HIGHWAY | LA0BN143 | 710 | ROUTE 710: RTE 710 PCH TO DOWNTOWN LB., PAVEMENT RECON, MEDIAN, LANDSCAPING IMPROVE (EA 22693J, 23440, PPNO: 2945,3348) | $7,496 |
| LOS ANGELES | STATE HIGHWAY | LAL502 | 999 | ROUTE 999: GROUPED PROJECTS FOR PAVEMENT RESURFACING AND/OR REHABILITATION – SHOPP ROADWAY PRESERVATION PROGRAM . PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126 EXEMPT TABLES 2 CATEGORIES – PAVEMENT RESURFACING AND/OR REHABILITATION, EMERGENCY RELIEF (23 U.S.C. 125), WIDENING NARROW PAVEMENTS OR RECONSTRUCTING BRIDGES (NO ADDITIONAL TRAVEL LANES) | $914,264 |
| LOS ANGELES | STATE HIGHWAY | LAGG441 | 999 | ROUTE 999: GROUPED PROJECTS FOR PAVEMENT RESURFACING AND/OR REHABILITATION ON THE STATE HIGHWAY SYSTEM – HIGHWAY MAINTENANCE. PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126 EXEMPT TABLES 2 AND TABLE 3 CATEGORIES – PAVEMENT RESURFACING AND/OR REHABILITATION. | $28,817 |
| LOS ANGELES | STATE HIGHWAY | LAL526 | 999 | ROUTE 999: GROUPED PROJECTS FOR EMERGENCY REPAIR – SHOPP EMERGENCY RESPONSE PROGRAM . PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126 EXEMPT TABLES 2 CATEGORIES – REPAIR DAMAGE CAUSED BY NATURAL DISASTERS, CIVIL UNREST, OR TERRORIST ACTS. THIS APPLIES TO DAMAGES THAT DO NOT QUALIFY FOR FEDERAL EMERGENCY RELIEF FUNDS BUT EXTEND BEYOND THE FEDERALLY DECLARED DISASTER PERIOD. QUALIFY FOR FEDERAL EMERGENCY RELIEF FUNDS | $94,523 |
| LOS ANGELES | STATE HIGHWAY | LAL531 | 999 | ROUTE 999: GROUPED PROJECTS FOR SAFETY IMPROVEMENTS – SHOPP COLLISION REDUCTION PROGRAM . PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126 EXEMPT TABLES 2 AND TABLE 3 CATEGORIES. | $142,924 |
| LOS ANGELES | STATE HIGHWAY | LAL537 | 999 | ROUTE 999: GROUPED PROJECTS FOR SAFETY IMPROVEMENTS – SHOPP MANDATES PROGRAM PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126 EXEMPT TABLES 2 AND TABLE 3 CATEGORIES. | $107,264 |
| LOS ANGELES | STATE HIGHWAY | LAL526 | 999 | ROUTE 999: GROUPED PROJECTS FOR SAFETY IMPROVEMENTS – SHOPP MOBILITY PROGRAM . PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126 EXEMPT TABLES 2 AND TABLE 3 CATEGORIES. | $4,379 |
| LOS ANGELES | STATE HIGHWAY | LAL529 | 999 | ROUTE 999: GROUPED PROJECTS FOR SAFETY IMPROVEMENTS, SHOULDER IMPROVEMENTS, PAVEMENT RESURFACING AND/ OR REHABILITATION – MINOR PROGRAM. PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126 EXEMPT TABLES 2 AND TABLE 3 CATEGORIES – HWYAY CROSSING, SAFER NON-FED AID SYS RCS, SILDER IMPROV, TRAFFIC CONTROL DEVICES & OPERATING ASSISTANCE OTHER THAN SIGNAL(DEPARTMENT RESURFACING AND/OR REHABILITATION) | $22,418 |
| LOS ANGELES | STATE HIGHWAY | LAL503 | 999 | ROUTE 999: IN LOS ANGELES COUNTY. LUMP SUM ROADSIDE PRESERVATION PROJECTS (PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126,127,128, EXEMPT TABLES 2 & 3) | $4,792 |
| LOS ANGELES | STATE HIGHWAY | LA02479 | 999 | ROUTE 999: LOS ANGELES COUNTY ITIP TRANSPORTATION ENHANCEMENT PROJECT LUMP SUM (PPNO 3348, 3547, 3548, 3349, 3550, ETC) | $12,947 |
| LOS ANGELES | STATE HIGHWAY | LA09G021 | 999 | ROUTE 999: ON VARIOUS HIGHWAYS. GROUPED PROJECTS FOR NOISE ATTENUATION (SOUNDWALLS) (ONLY EA00234 ON RTE 710 REMAINING. PROJECTS ARE CONSISTENT WITH 40 CFR PART 93.126 EXEMPT TABLES 2 AND TABLE 3 CATEGORIES. | $238,390 |

1/54   Project List

| County | ID | Facility | Route | Location | Description | Year | Cost |
|---|---|---|---|---|---|---|---|
| LOS ANGELES | TM1004 | STATE HIGHWAY | 605 | I-605 | I-605 CORRIDOR "HOT SPOT" INTERCHANGES IN GATEWAY CITIES | 2025 | $3,200,000 |
| LOS ANGELES | LA0051N | STATE HIGHWAY | 605 | I-605 | ROUTE 605: STUDY – CONSTRUCT I-605 INTERCHANGE CAPACITY IMPROVEMENTS IN IRWINDALE | 2013 | $1,500 |
| LOS ANGELES | 1C9491 | STATE HIGHWAY | 710 | I-710 | OCEAN BLVD IN LONG BEACH | INTERMODAL RAILROAD YARDS IN COMMERCE/ VERNON | I-710 CORRIDOR USER-FEE BACKED CAPACITY ENHANCEMENT – WIDEN TO 5 MIXED FLOW + 2 DEDICATED LANES FOR CLEAN TECHNOLOGY TRUCKS (EACH DIRECTION) AND INTERCHANGE IMPROVEMENTS, FROM OCEAN BLVD IN LONG BEACH TO THE INTERMODAL RAILROAD YARDS IN COMMERCE/VERNON | 2030 | $6,580,000 |
| LOS ANGELES | LA04030 | STATE HIGHWAY | 710 | I-710 | POST MILE 6.4 | POST MILE 8 | I-710 IMPROVEMENTS-SHOEMAKER BRIDGE – DOWNTOWN OFF RAMPS. THE PROJECT REPLACES THE EXISTING SHOEMAKER BRIDGE AND MAKES BICYCLE, PEDESTRIAN, AND STREETSCAPE IMPROVEMENTS ON MAJOR THOROUGHFARES. | 2023 | $85,000 |
| LOS ANGELES | TM7002 | STATE HIGHWAY | 710 | I-710 | | I-710 EARLY ACTION PROJECTS | 2022 | $642,000 |
| LOS ANGELES | TM0101 | STATE HIGHWAY | 710 | SR-710 | VALLEY BOULEVARD | SR-710 NORTH EXTENSION (TUNNEL) (ALIGNMENT TBD) | 2030 | $3,076,300 |
| LOS ANGELES | 18790 | STATE HIGHWAY | 710 | I-710 | CALIFORNIA BL & PASADENA AVE | ROUTE 710: STUDY TO EVALUATE TECHNICAL FEASIBILITY AND IMPACTS OF AN ALTERNATIVE TO CLOSE I710 FREEWAY GAP. THIS STUDY INCLUDES ENVIRONMENTAL STUDIES (EIR/EIS) (EA# 187901, PPNO# 2211). | 2025 | $87,454 |
| LOS ANGELES | LA08852 | STATE HIGHWAY | 710 | I-710 | | ROUTE 710: RECONSTRUCT I-710 INTERCHANGES AT I-5, AT I-405, AT SR 91, AND AT I-105, AS PART OF OF THE I-710 CORRIDOR PROGRAM PROPOSING 4 TRUCK LANES (PORT-SR-405)(STEA ID # 57)(SAFETEA-LU 3773) | 2015 | $45,500 |
| LOS ANGELES | LAP0E143 | STATE HIGHWAY | 710 | I-710 | | ROUTE 710: RTE 710 PCH TO DOWNTOWN L.B. PAVEMENT RECON, MEDIAN, LANDSCAPING IMPROVE (EA 22933A, 22646), PPNO: 2945.32H8) | 2013 | $7,494 |

*For modeled projects, represents the Plan network year for which the project was analyzed for the RTP modeling and regional emissions analysis

I-710 Corridor Project EIR/EIS

## 3.13  AIR QUALITY

The information in this section is based on the *Air Quality and Health Risk Assessment* (AQ/HRA) (February 2012). Given the existing air quality/health risk concerns in the Interstate 710 (I-710) Corridor (see discussion of project need in Chapter 1), the Los Angeles County Metropolitan Transportation Authority (Metro), the California Department of Transportation (Caltrans), and the I-710 Funding Partners conducted special analyses beyond the standard Caltrans analyses typically done for roadway/freeway projects (as described in Caltrans' Standard Environmental Reference at www.dot.ca.gov/ser/vol1/sec3/physical/ch11air/chap11.htm). These additional special project analyses over and above the standard analyses done for freeway projects were conducted because of the unique goods movement component of the project and the air quality purpose of the project.

The I-710 Corridor Project's effects on air quality were evaluated for three different geographic areas: (1) the South Coast Air Basin (SCAB), (2) the I-710 "Area of Interest" (AOI), which generally corresponds to the overall I-710 Corridor Project Study Area described in Chapter 1, and (3) the I-710 freeway corridor.

### 3.13.1  REGULATORY SETTING

The Federal Clean Air Act (CAA) as amended in 1990 is the Federal law that governs air quality. The California Clean Air Act of 1988 is its companion State law. These laws, and related regulations by the United States Environmental Protection Agency (U.S. EPA) and California Air Resources Board (ARB), set standards for the quantity of pollutants that can be in the air. At the Federal level, these standards are called National Ambient Air Quality Standards (NAAQS). NAAQS and State ambient air quality standards have been established for six transportation-related criteria pollutants that have been linked to potential health concerns. The criteria pollutants are: carbon monoxide (CO), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter (PM, broken down for regulatory purposes into particles of 10 micrometers or smaller – $PM_{10}$ and particles of 2.5 micrometers and smaller – $PM_{2.5}$), lead (Pb), and sulfur dioxide ($SO_2$). In addition, State standards exist for visibility reducing particles, sulfates, hydrogen sulfide ($H_2S$), and vinyl chloride. The NAAQS and State standards are set at a level that protects public health with a margin of safety, and are subject to periodic review and revision. Both State and Federal regulatory schemes also cover toxic air contaminants (air toxics). Some criteria pollutants are also air toxics or may include certain air toxics within their general definition.

Federal and State air quality standards and regulations provide the basic scheme for project-level air quality analysis under the National Environmental Policy Act (NEPA) and the California Environmental Quality Act (CEQA). In addition to this type of environmental analysis, a parallel "Conformity" requirement under the FCAA also applies.

A31

FCAA Section 176(c) prohibits the U.S. Department of Transportation and other Federal agencies from funding, authorizing, or approving plans, programs or projects that are not first found to conform to State Implementation Plan (SIP) for achieving the goals of Clean Air Act requirements related to the NAAQS. "Transportation Conformity" takes place on two levels: the regional, or planning and programming, level, and the project level. The proposed project must conform at both levels to be approved. Conformity requirements apply only in nonattainment and "maintenance" (former nonattainment) areas for the NAAQS, and only for the specific NAAQS that are or were violated. U.S. EPA regulations at 40 CFR 93 govern the conformity process.

Regional conformity is concerned with how well the regional transportation system supports plans for attaining the standards set for carbon monoxide (CO), nitrogen dioxide ($NO_2$), ozone ($O_3$), particulate matter ($PM_{10}$ and $PM_{2.5}$), and in some areas sulfur dioxide ($SO_2$). California has attainment or maintenance areas for all of these transportation-related "criteria pollutants" except $SO_2$, and also has a nonattainment area for lead. However, lead is not currently required by the FCAA to be covered in transportation conformity analysis. Regional conformity is based on Regional Transportation Plans (RTPs) and Federal Transportation Improvement Programs (FTIPs) that include all of the transportation projects planned for a region over a period of at least 20 years for the RTP, and four years for the FTIP. RTP and FTIP conformity is based on use of travel demand and air quality models to determine whether or not the implementation of those projects would conform to emission budgets or other tests showing that requirements of the Clean Air Act and the SIP are met. If the conformity analysis is successful, the Metropolitan Planning Organization (MPO), Federal Highway Administration (FHWA), and Federal Transit Administration (FTA), make determinations that the RTP and FTIP are in conformity with the SIP for achieving the goals of the Clean Air Act. Otherwise, the projects in the RTP and/or FTIP must be modified until conformity is attained. If the design concept, scope, and open to traffic schedule of a proposed transportation project are the same as described in the RTP and FTIP, then the proposed project is deemed to meet regional conformity requirements for purposes of project-level analysis.

Conformity at the project-level also requires "hot spot" analysis if an area is "nonattainment" or "maintenance" for carbon monoxide (CO) and/or particulate matter ($PM_{10}$ or $PM_{2.5}$). A region is "nonattainment" if one or more of the monitoring stations in the region measures violation of the relevant standard, and U.S. EPA officially designates the area nonattainment. Areas that were previously designated as nonattainment areas but subsequently meet the standard may be officially redesignated to attainment by U.S. EPA, and are then called "maintenance" areas. "Hot spot" analysis is essentially the same, for technical purposes, as CO or particulate matter analysis performed for NEPA purposes. Conformity does include some specific procedural and documentation standards for projects that require a hot spot analysis. In general, projects must

A32

not cause the "hot spot"-related standard to be violated, and must not cause any increase in the number and severity of violations in nonattainment areas. If a known CO or particulate matter violation is located in the project vicinity, the project must include measures to reduce or eliminate the existing violation(s) as well.

### 3.13.2 AFFECTED ENVIRONMENT

#### 3.13.2.1 CLIMATIC CONDITIONS

The project site is in Los Angeles County, an area within the South Coast Air Basin (Basin), which includes Orange County and the nondesert parts of Los Angeles, Riverside, and San Bernardino Counties. Air quality regulation in the Basin is administered by the South Coast Air Quality Management District (SCAQMD).

The Basin climate is determined by its terrain and geographical location. The Basin is a coastal plain with connecting broad valleys and low hills. The Pacific Ocean forms the southwestern boundary of the Basin, and high mountains surround the rest of the Basin. The region lies in the semipermanent high-pressure zone of the eastern Pacific Ocean. The resulting climate is mild and tempered by cool ocean breezes. This climatological pattern is rarely interrupted. However, periods of extremely hot weather, winter storms, and Santa Ana wind conditions do occur in the Basin.

The annual average temperature varies little throughout the Basin, ranging from the low to middle 60s measured in degrees Fahrenheit (°F). With a more pronounced oceanic influence, coastal areas show less variability in annual minimum and maximum temperatures than inland areas. The climatological stations closest to the project limits that monitor temperature are the Long Beach WSCMO Station and the Los Angeles Civic Center Station.[1] The annual average maximum temperature recorded at these stations is 74.0 to 74.2°F, and the annual average minimum temperature is 54.8 to 55.8°F. December is typically the coldest month in this area of the Basin.

The majority of rainfall in the Basin occurs between November and April. Summer rainfall is minimal and generally limited to scattered thundershowers in coastal regions and slightly heavier showers in the eastern part of the Basin along the coastal side of the mountains. The climatological stations closest to the project limits that monitor precipitation are the Long Beach WSCMO Station and the Los Angeles Civic Center Station. Average rainfall measured at these stations varied from a high 2.94 to 3.40 inches in February to 0.28 inches or less between May

---

[1]   Western Regional Climatic Center. 2010. http://www. wrcc.dri.edu, accessed February 24, 2010.

A33

and September, with an average annual total of 11.89 to 14.76 inches. Patterns in monthly and yearly rainfall totals are unpredictable due to fluctuations in the weather.

The Basin experiences a persistent temperature inversion (increasing temperature with increasing altitude) as a result of the Pacific high. This inversion limits the vertical dispersion of air contaminants, holding them relatively near the ground. As the sun warms the ground and the lower air layer, the temperature of the lower air layer approaches the temperature of the base of the inversion (upper) layer until the inversion layer finally breaks, allowing vertical mixing with the lower layer. This phenomenon is observed from mid-afternoon to late afternoon on hot summer days, when the smog appears to clear up suddenly. Winter inversions frequently break by midmorning.

Winds in the vicinity of the Study Area blow predominantly from the west and southwest at relatively low velocities, with wind speeds averaging approximately 4 miles per hour (mph). Summer wind speeds average slightly higher than winter wind speeds. Low average wind speeds together with a persistent temperature inversion limit the vertical dispersion of air pollutants throughout the Basin. Strong, dry, northerly or northeasterly winds, known as Santa Ana winds, occur during the fall and winter months, dispersing air contaminants. Santa Ana conditions tend to last for several days at a time.

Inversion layers have a substantial role in determining $O_3$ formation. Ozone and its precursors will mix and react to produce higher concentrations under an inversion. The inversion will also simultaneously trap and hold directly emitted pollutants such as CO. $PM_{10}$ is both directly emitted and created indirectly in the atmosphere as a result of chemical reactions. Concentration levels are directly related to inversion layers due to the limitation of mixing space.

Surface or radiation inversions are formed when the ground surface becomes cooler than the air above it during the night. The earth's surface goes through a radiative process on clear nights, when heat energy is transferred from the ground to a cooler night sky. As the earth's surface cools during the evening hours, the air directly above it also cools, while air higher up remains relatively warm. The inversion is destroyed when heat from the sun warms the ground, which in turn heats the lower layers of air; this heating stimulates the ground-level air to float up through the inversion layer.

The combination of stagnant wind conditions and low inversions produces the greatest concentration of pollutants. On days of no inversion or high wind speeds, ambient air pollutant concentrations are the lowest. During periods of low inversions and low wind speeds, air pollutants generated in urbanized areas are transported predominantly onshore into Riverside and San Bernardino Counties. In the winter, the greatest pollution problems are CO and nitrogen oxide ($NO_X$) because of extremely low inversions and air stagnation during the night

A34

I-710 Corridor Project EIR/EIS

and early morning hours. In the summer, the longer daylight hours and the brighter sunshine combine to cause a reaction between hydrocarbons and $NO_x$ to form photochemical smog.

### 3.13.2.2  MONITORED AIR QUALITY

The I-710 Corridor Project is in the jurisdiction of the SCAQMD. As shown in Figure 3.13-1, the SCAQMD maintains ambient air quality monitoring stations throughout the Basin. The closest monitoring stations to the Study Area are the North Long Beach Station, located at 3648 North Long Beach Blvd.; the Los Angeles Station, located at 1630 N. Main St.; and the Lynwood Station, located at 11220 Long Beach Blvd. Tables 3.13-1, 3.13-2, and 3.13-3 provide monitoring data from these stations for 2006, 2007, and 2008.

From the ambient air quality data provided in Tables 3.13-1, 3.13-2, and 3.13-3, it can be seen that CO and $SO_2$ levels are below the relevant State and Federal standards. One-hour $O_3$ levels exceeded the State standard up to eight times per year within the past three years. Eight-hour $O_3$ levels exceeded the Federal standard up to three times per year and the State standards up to seven times per year in the past three years. The annual $NO_2$ concentration exceeded the State standard at the Lynwood Station in 2008. The $PM_{10}$ levels in the project area exceeded the State standards in each of the past three years. The Federal 24-hour $PM_{2.5}$ standard was exceeded in each of the past three years. The State annual $PM_{2.5}$ standard was also exceeded in each of the past three years. It should be noted that exceedance of a standard is not necessarily a violation, especially for many Federal standards.

### 3.13.2.3  CRITERIA POLLUTANT ATTAINMENT/NONATTAINMENT STATUS

The national and California ambient air quality standards (AAQS) for the criteria pollutants are summarized in Table 3.13-4.

Air quality monitoring stations are located throughout the nation and maintained by the local air districts and State air quality regulating agencies. Data collected at permanent monitoring stations are used by the EPA to identify regions as "attainment," "nonattainment," or "maintenance," depending on whether the regions meet the requirements stated in the primary NAAQS. Nonattainment areas are imposed with additional restrictions as required by the EPA. In addition, different classifications of nonattainment, such as marginal, moderate, serious, severe, and extreme, are used to classify each air basin in the State on a pollutant-by-pollutant basis. The classifications are used as a foundation to create air quality management strategies to improve air quality and comply with the NAAQS. Attainment status for each of the criteria pollutants in the Basin is listed in Table 3.13-4.

A35

**This page intentionally left blank**

A36

**Figure 3.13-1  Air Quality Monitoring Stations and Modeled Receptor Locations**



A37

**This page intentionally left blank**

A38

I-710 Corridor Project EIR/EIS

## Table 3.13-1  N. Main St. Air Quality Concentrations

| Pollutant | Standard | 2008 | 2007 | 2006 |
|---|---|---|---|---|
| **Carbon Monoxide** | | | | |
| Max 1-hour concentration (ppm) | | 3 | 3 | 3 |
| No. days exceeded:   State | > 20 ppm/1-hour | 0 | 0 | 0 |
| Federal | > 35 ppm/1-hour | 0 | 0 | 0 |
| Max 8-hour concentration (ppm) | | 2.1 | 2.2 | 2.6 |
| No. days exceeded:   State | > 9 ppm/8-hour | 0 | 0 | 0 |
| Federal | > 9 ppm/8-hour | 0 | 0 | 0 |
| **Ozone** | | | | |
| Max 1-hour concentration (ppm) | | 0.109 | 0.115 | 0.11 |
| No. days exceeded:   State | > 0.09 ppm/1-hour | 3 | 3 | 8 |
| **Ozone** | | | | |
| Max 8-hour concentration (ppm) | | 0.090 | 0.102 | 0.079 |
| No. days exceeded:   State | > 0.07 ppm/8-hour | 7 | 6 | 4 |
| Federal | > 0.075 ppm/8-hour | 3 | 3 | 3 |
| **Particulates (PM$_{10}$)** | | | | |
| Max 24-hour concentration ($\mu$g/m$^3$) | | 66 | 78 | 59 |
| No. days exceeded:   State | > 50 $\mu$g/m$^3$ | 2 | 5 | 3 |
| Federal | > 150 $\mu$g/m$^3$ | 0 | 0 | 0 |
| Annual avg. concentration ($\mu$g/m$^3$) | | 30.9 | 33.3 | 30.3 |
| Exceeds standard?   State | > 20 $\mu$g/m$^3$ | Yes | Yes | Yes |
| **Particulates (PM$_{2.5}$)** | | | | |
| Max 24-hour concentration ($\mu$g/m$^3$) | | 78.3 | 64.2 | 56.2 |
| No. days exceeded:   Federal[2] | > 35 $\mu$g/m$^3$ | 10 | 20 | 11 |
| Annual avg. concentration ($\mu$g/m$^3$) | | 15.7 | 16.8 | 15.6 |
| Exceeds standard?   State | > 12 $\mu$g/m$^3$ | Yes | Yes | Yes |
| Federal | > 15 $\mu$g/m$^3$ | No | No | No |
| **Nitrogen Dioxide** | | | | |
| Max 1-hour concentration (ppm): State | > 0.18 ppm/1-hour | 0.12 | 0.10 | 0.11 |
| No. days exceeded | | 0 | 0 | 0 |
| Annual avg. concentration: Federal | 0.053 ppm annual avg. | 0.028 | 0.030 | 0.029 |
| Exceeds Federal standard? | | No | No | No |
| **Sulfur Dioxide** | | | | |
| Max 24-hour concentration (ppm) | | 0.002 | 0.003 | 0.006 |
| No. days exceeded:   State | 0.04 ppm | 0 | 0 | 0 |
| Federal | 0.14 ppm | 0 | 0 | 0 |
| Annual avg. concentration: Federal | 0.030 ppm annual avg. | 0.0003 | 0.0009 | 0.0019 |
| Exceeds Federal standard? | | No | No | No |

Sources: EPA and ARB, 2006 to 2008.
$\mu$g/m$^3$ = micrograms per cubic meter
ARB = California Air Resources Board
EPA = United States Environmental Protection Agency
PM$_{2.5}$ = particulate matter less than 2.5 microns in size
PM$_{10}$ = particulate matter less than 10 microns in size
ppm = parts per million

A39

## Table 3.13-2  North Long Beach Air Quality Concentrations

| Pollutant | Standard | 2008 | 2007 | 2006 |
|---|---|---|---|---|
| **Carbon Monoxide** | | | | |
| Max 1-hour concentration (ppm) | | 3 | 3 | 4 |
| No. days exceeded:    State | > 20 ppm/1-hour | 0 | 0 | 0 |
|        Federal | > 35 ppm/1-hour | 0 | 0 | 0 |
| Max 8-hour concentration (ppm) | | 2.5 | 2.6 | 3.4 |
| No. days exceeded:    State | > 9 ppm/8-hour | 0 | 0 | 0 |
|        Federal | > 9 ppm/8-hour | 0 | 0 | 0 |
| **Ozone** | | | | |
| Max 1-hour concentration (ppm) | | 0.093 | 0.099 | 0.081 |
| No. days exceeded:    State | > 0.09 ppm/1-hour | 0 | 1 | 0 |
| **Ozone** | | | | |
| Max 8-hour concentration (ppm) | | 0.074 | 0.073 | 0.058 |
| No. days exceeded:    State | > 0.07 ppm/8-hour | 1 | 1 | 0 |
|        Federal | > 0.075 ppm/8-hour | 0 | 0 | 0 |
| **Particulates ($PM_{10}$)** | | | | |
| Max 24-hour concentration ($\mu g/m^3$) | | 62 | 75 | 78 |
| No. days exceeded:    State | > 50 $\mu g/m^3$ | 1 | 6 | 5 |
|        Federal | > 150 $\mu g/m^3$ | 0 | 0 | 0 |
| Annual avg. concentration ($\mu g/m^3$) | | 29 | 30 | 31 |
| Exceeds standard?    State | > 20 $\mu g/m^3$ | Yes | Yes | Yes |
| **Particulates ($PM_{2.5}$)** | | | | |
| Max 24-hour concentration ($\mu g/m^3$) | | 57.2 | 82.9 | 58.5 |
| No. days exceeded:    Federal[2] | > 35 $\mu g/m^3$ | 8 | 12 | 5 |
| Annual avg. concentration ($\mu g/m^3$) | | 14.2 | 14.6 | 14.2 |
| Exceeds standard?    State | > 12 $\mu g/m^3$ | Yes | Yes | Yes |
|        Federal | > 15 $\mu g/m^3$ | No | No | No |
| **Nitrogen Dioxide** | | | | |
| Max 1-hour concentration (ppm): State | > 0.18 ppm/1-hour | 0.13 | 0.11 | 0.10 |
| No. days exceeded | | 0 | 0 | 0 |
| Annual avg. concentration: Federal | 0.053 ppm annual avg. | 0.021 | 0.021 | 0.022 |
| Exceeds Federal standard? | | No | No | No |
| **Sulfur Dioxide** | | | | |
| Max 24-hour concentration (ppm) | | 0.012 | 0.011 | 0.010 |
| No. days exceeded:    State | 0.04 ppm | 0 | 0 | 0 |
|        Federal | 0.14 ppm | 0 | 0 | 0 |
| Annual avg. concentration: Federal | 0.030 ppm annual avg. | 0.0022 | 0.0027 | 0.0022 |
| Exceed Federal standard? | | No | No | No |

Sources: EPA and ARB, 2006 to 2008.
$\mu g/m^3$ = micrograms per cubic meter
ARB = California Air Resources Board
EPA = United States Environmental Protection Agency
$PM_{2.5}$ = particulate matter less than 2.5 microns in size
$PM_{10}$ = particulate matter less than 10 microns in size
ppm = parts per million

A40

I-710 Corridor Project EIR/EIS

## Table 3.13-3  Lynwood Air Quality Concentrations

| Pollutant | Standard | 2008 | 2007 | 2006 |
|---|---|---|---|---|
| **Carbon Monoxide** | | | | |
| Max 1-hour concentration (ppm) | | 6 | 8 | 8 |
| No. days exceeded:    State | > 20 ppm/1-hour | 0 | 0 | 0 |
| Federal | > 35 ppm/1-hour | 0 | 0 | 0 |
| Max 8-hour concentration (ppm) | | 4.3 | 5.1 | 6.4 |
| No. days exceeded:    State | > 9 ppm/8-hour | 0 | 0 | 0 |
| Federal | > 9 ppm/8-hour | 0 | 0 | 0 |
| **Ozone** | | | | |
| Max 1-hour concentration (ppm) | | 0.078 | 0.102 | 0.080 |
| No. days exceeded:    State | > 0.09 ppm/1-hour | 0 | 1 | 0 |
| **Ozone** | | | | |
| Max 8-hour concentration (ppm) | | 0.060 | 0.077 | 0.066 |
| No. days exceeded:    State | > 0.07 ppm/8-hour | 0 | 2 | 0 |
| Federal | > 0.075 ppm/8-hour | 0 | 1 | 0 |
| **Particulates (PM$_{10}$)** | | | | |
| Max 24-hour concentration ($\mu$g/m$^3$) | | NM | NM | NM |
| No. days exceeded:    State | > 50 $\mu$g/m$^3$ | NM | NM | NM |
| Federal | > 150 $\mu$g/m$^3$ | NM | NM | NM |
| Annual avg. concentration ($\mu$g/m$^3$) | | NM | NM | NM |
| Exceeds Standard?   State | > 20 $\mu$g/m$^3$ | Yes | Yes | Yes |
| **Particulates (PM$_{2.5}$)** | | | | |
| Max 24-hour concentration ($\mu$g/m$^3$) | | 44.2 | 49.0 | 55.0 |
| No. days exceeded:    Federal$^2$ | > 35 $\mu$g/m$^3$ | 3 | 4 | 4 |
| Annual avg. concentration ($\mu$g/m$^3$) | | 15.5 | 15.9 | 16.7 |
| Exceeds Standard?   State | > 12 $\mu$g/m$^3$ | Yes | Yes | Yes |
| Federal | > 15 $\mu$g/m$^3$ | Yes | Yes | Yes |
| **Nitrogen Dioxide** | | | | |
| Max 1-hour concentration (ppm): State | > 0.18 ppm/1-hour | 0.12 | 0.10 | 0.14 |
| No. days exceeded | | 0 | 0 | 0 |
| Annual avg. concentration: Federal | 0.053 ppm annual avg. | 0.030 | 0.029 | 0.031 |
| Exceed Federal standard? | | No | No | No |
| **Sulfur Dioxide** | | | | |
| Max 24-hour concentration (ppm) | | NM | NM | NM |
| No. days exceeded:    State | 0.04 ppm | NM | NM | NM |
| Federal | 0.14 ppm | NM | NM | NM |
| Annual avg. concentration: Federal | 0.030 ppm annual avg. | NM | NM | NM |
| Exceed Federal standard? | | NM | NM | NM |

Sources: EPA and ARB, 2006 to 2008.
$\mu$g/m$^3$ = micrograms per cubic meter
ARB = California Air Resources Board
EPA = United States Environmental Protection Agency
NM = Not Monitored at this Station
PM$_{2.5}$ = particulate matter less than 2.5 microns in size
PM$_{10}$ = particulate matter less than 10 microns in size
ppm = parts per million

A41

I-710 Corridor Project EIR/EIS

## Table 3.13-4  State and Federal Criteria Air Pollutant Standards, Effects, and Sources

| Pollutant | Averaging Time | State Standard[8] | Federal Standard[8] | Principal Health and Atmospheric Effects | Typical Sources | Attainment Status |
|---|---|---|---|---|---|---|
| Ozone (O$_3$) | 1 hour<br>8 hours | 0.09 ppm<br>0.070 ppm | ---<br>0.075 ppm | High concentrations irritate lungs. Long-term exposure may cause lung tissue damage and cancer. Long-term exposure damages plant materials and reduces crop productivity. Precursor organic compounds include many known toxic air contaminants. Biogenic VOC may also contribute. | Low-altitude ozone is almost entirely formed from ROG or VOC and NO$_x$ in the presence of sunlight and heat. Major sources include motor vehicles and other mobile sources, solvent evaporation, and industrial and other combustion processes. | Federal: Extreme Nonattainment (8-hour)<br><br>State: Nonattainment (1-hour and 8-hour) |
| Carbon Monoxide (CO) | 1 hour<br>8 hours<br>8 hours (Lake Tahoe) | 20 ppm<br>9.0 ppm[1]<br>6 ppm | 35 ppm<br>9 ppm[1]<br>--- | CO interferes with the transfer of oxygen to the blood and deprives sensitive tissues of oxygen. CO also is a minor precursor for photochemical ozone. | Combustion sources, especially gasoline-powered engines and motor vehicles. CO is the traditional signature pollutant for on-road mobile sources at the local and neighborhood scale. | Federal: Attainment/ Maintenance<br><br>State: Attainment |
| Respirable Particulate Matter (PM$_{10}$)[2] | 24 hours<br>Annual | 50 µg/m$^3$<br>20 µg/m$^3$ | 150 µg/m$^3$<br>--- | Irritates eyes and respiratory tract. Decreases lung capacity. Associated with increased cancer and mortality. Contributes to haze and reduced visibility. Includes some toxic air contaminants. Many aerosol and solid compounds are part of PM$_{10}$. | Dust- and fume-producing industrial and agricultural operations; combustion smoke; atmospheric chemical reactions; construction and other dust-producing activities; unpaved road dust and re-entrained paved road dust; natural sources (wind-blown dust, ocean spray). | Federal: Serious Nonattainment<br><br>State: Nonattainment |
| Fine Particulate Matter (PM$_{2.5}$) | 24 hours<br>Annual | ---<br>12 µg/m$^3$ | 35 µg/m$^3$<br>15.0 µg/m$^3$ | Increases respiratory disease, lung damage, cancer, and premature death. Reduces visibility and produces surface soiling. Most diesel exhaust particulate matter – a toxic air contaminant – is in the PM$_{2.5}$ size range. Many aerosol and solid compounds are part of PM$_{2.5}$. | Combustion including motor vehicles, other mobile sources, and industrial activities; residential and agricultural burning; also formed through atmospheric chemical (including photochemical) reactions involving other pollutants including NO$_x$, SO$_x$, ammonia, and ROG. | Federal: Nonattainment<br><br>State: Nonattainment |

A42

**Table 3.13-4  State and Federal Criteria Air Pollutant Standards, Effects, and Sources**

| Pollutant | Averaging Time | State Standard[8] | Federal Standard[8] | Principal Health and Atmospheric Effects | Typical Sources | Attainment Status |
|---|---|---|---|---|---|---|
| Nitrogen Dioxide ($NO_2$)[4] | 1 hour<br><br>Annual | 0.18 ppm<br><br>0.030 ppm | 0.100 ppm[3] (98th percentile over 3 years) 0.053 ppm | Irritating to eyes and respiratory tract. Colors atmosphere reddish-brown. Contributes to acid rain. Part of the "$NO_x$" group of ozone precursors. | Motor vehicles and other mobile sources; refineries; industrial operations. | Federal: Attainment/ Maintenance<br><br>State: Nonattainment |
| Sulfur Dioxide ($SO_2$)[5] | 1 hour<br><br>24 hours<br><br>Annual | 0.25 ppm<br><br>0.04 ppm<br><br>--- | 0.075 ppm (98th percentile over 3 years) 0.14 ppm (for certain areas) 0.030 ppm (for certain areas) | Irritates respiratory tract; injures lung tissue. Can yellow plant leaves. Destructive to marble, iron, steel. Contributes to acid rain. Limits visibility. | Fuel combustion (especially coal and high-sulfur oil), chemical plants, sulfur recovery plants, metal processing; some natural sources like active volcanoes. Limited contribution possible from heavy-duty diesel vehicles if ultra-low sulfur fuel not used. | Federal: Attainment/ Unclassified<br><br>State: Attainment/ Unclassified |
| Lead (Pb)[2, 6] | Monthly<br>Quarterly<br>Rolling 3-month average | 1.5 µg/m³<br>---<br>--- | ---<br>1.5 µg/m³<br>0.15 µg/m³ | Disturbs gastrointestinal system. Causes anemia, kidney disease, and neuromuscular and neurological dysfunction. Also a toxic air contaminant and water pollutant. | Lead-based industrial processes like battery production and smelters. Lead paint, leaded gasoline. Aerially deposited lead from gasoline may exist in soils along major roads. | Federal: Nonattainment (LA County only)<br><br>State: Nonattainment (LA County only) |
| Sulfate | 24 hours | 25 µg/m³ | --- | Premature mortality and respiratory effects. Contributes to acid rain. Some toxic air contaminants attach to sulfate aerosol particles. | Industrial processes, refineries and oil fields, mines, natural sources like volcanic areas, salt-covered dry lakes, and large sulfide rock areas. | Federal: Attainment/ Unclassified<br><br>State: Attainment/ Unclassified |
| Hydrogen Sulfide ($H_2S$) | 1 hour | 0.03 ppm | --- | Colorless, flammable, poisonous. Respiratory irritant. Neurological damage and premature death. Headache, nausea. | Industrial processes such as: refineries and oil fields, asphalt plants, livestock operations, sewage treatment plants, and mines. Some natural sources like volcanic areas and hot springs. | Federal: Attainment/ Unclassified<br><br>State: Attainment/ Unclassified |
| Visibility Reducing Particles (VRP)[7] | 8 hours | Visibility of 10 miles or more (Tahoe: 30 miles) at relative humidity less than 70 percent | --- | Reduces visibility. Produces haze. NOTE: not related to the Regional Haze program under the Federal Clean Air Act, which is oriented primarily toward visibility issues in National Parks and other "Class I" areas. | See particulate matter above. | Federal: Attainment/ Unclassified<br><br>State: Attainment/ Unclassified |

I-710 Corridor Project EIR/EIS

## Table 3.13-4  State and Federal Criteria Air Pollutant Standards, Effects, and Sources

| Pollutant | Averaging Time | State Standard[8] | Federal Standard[8] | Principal Health and Atmospheric Effects | Typical Sources | Attainment Status |
|---|---|---|---|---|---|---|
| Vinyl Chloride[2] | 24 hours | 0.01 ppm | --- | Neurological effects, liver damage, cancer. Also considered a toxic air contaminant. | Industrial processes | Federal: Attainment/ Unclassified<br><br>State: Attainment/ Unclassified |

Source: www.arb.ca.gov/research/aaqs/aaqs2.pdf, February 7, 2012; California Air Resources Board, *Area Designations*, accessed May 2012.

Footnotes:

[1] Rounding to an integer value is not allowed for the State 8-hour CO standard. Violation occurs at or above 9.05 ppm. Violation of the Federal standard occurs at 9.5 ppm due to integer rounding.

[2] The ARB has identified vinyl chloride and the particulate matter fraction of diesel exhaust as toxic air contaminants. Diesel exhaust particulate matter is part of $PM_{10}$ and, in larger proportion, $PM_{2.5}$. Both the ARB and U.S. EPA have identified lead and various organic compounds that are precursors to ozone and $PM_{2.5}$ as toxic air contaminants. There are no exposure criteria for adverse health effect due to toxic air contaminants, and control requirements may apply at ambient concentrations below any criteria levels specified above for these pollutants or the general categories of pollutants to which they belong. Lead NAAQS are not required to be considered in Transportation Conformity analysis.

[3] Final 1-hour $NO_2$ NAAQS published in the Federal Register on 2/9/2010, effective 3/9/2010. Initial nonattainment area designations should occur in 2012 with conformity requirements effective in 2013. Project-level hot spot analysis requirements, while not yet required for conformity purposes, are expected.

[4] To attain the 1-hour standard, the 3-year average of the annual 98th percentile of the 1-hour daily maximum 1-hour average at each monitor within an area must not exceed 100 ppb. Note that the national standards are in units of parts per billion (ppb). California standards are in units of parts per million (ppm). To directly compare the national standards to the California standards, the units can be converted from ppb to ppm. In this case, the national standards of 53 ppb and 100 ppb are identical to 0.053 ppm and 0.100 ppm, respectively

[5] On June 2, 2010, the new 1-hour $SO_2$ standard was established and the existing 24-hour and annual primary standards were revoked. To attain the 1-hour national standard, the 3-year average of the annual 99th percentile of the 1-hour daily maximum concentrations at each site must not exceed 75 ppb. The 1971 $SO_2$ national standards (24-hour and annual) remain in effect until one year after an area is designated for the 2010 standard, except that in areas designated nonattainment for the 1971 standards, the 1971 standards remain in effect until implementation plans to attain or maintain the 2010 standards are approved.

  Note that the 1-hour national standard is in units of parts per billion (ppb). California standards are in units of parts per million (ppm). To directly compare the 1-hour national standard to the California standard the units can be converted to ppm. In this case, the national standard of 75 ppb is identical to 0.075 ppm.

[6] The national standard for lead was revised on October 15, 2008 to a rolling 3-month average. The 1978 lead standard (1.5 $\mu g/m^3$ as a quarterly average) remains in effect until one year after an area is designated for the 2008 standard, except that in areas designated nonattainment for the 1978 standard, the 1978 standard remains in effect until implementation plans to attain or maintain the 2008 standards are approved.

[7] In 1989, the ARB converted both the general statewide 10-mile visibility standard and the Lake Tahoe 30-mile visibility standard to instrumental equivalents, which are "extinction of 0.23 per kilometer" and "extinction of 0.07 per kilometer" for the statewide and Lake Tahoe Air Basins, respectively.

[8] State standards are "not to exceed" unless stated otherwise. Federal standards are "not to exceed more than once a year" or as noted above.

$\mu g/m^3$ = micrograms per cubic meter      ppb = parts per billion
ARB = California Air Resources Board      ROG = reactive organic gases
EPA = United States Environmental Protection Agency      $SO_x$ = sulfur oxides
$mg/m^3$ = milligrams per cubic meter      volatile organic compounds
ppm = parts per million

A44

### 3.13.2.4   REGIONAL AIR QUALITY CONFORMITY

The project is in the 2008 RTP, which was found to conform by the FHWA/FTA on June 5, 2008 (Project ID: iC0401; Description: I-710 Corridor user-fee backed capacity enhancement – widen to five mixed flow plus two dedicated lanes for clean technology trucks [each direction], and interchange improvements). The design concept and scope of Alternative 6B is consistent with the project description in the 2008 RTP. This same concept and design scope is also included in the Draft 2012 RTP.

A project to reconstruct the I-710 interchanges at Interstate 105 (I-105), State 91 (SR-91), Interstate 405 (I-405), and Interstate 5 (I-5) as part of the I-710 Corridor Project is included in the SCAG-adopted 2011 Federal Transportation Improvement Program (FTIP) (Project ID No. LA0B952). The project is also included in the list of financially constrained projects in the SCAG 2012 Regional Transportation Plan/Sustainable Communities Strategy (RTP/SCS) (Project ID No. LAOB952). The project is also included in the Metro Final 2009 Long-Range Transportation Plan (LRTP) as a Funded Freeway Improvement. The list of financially constrained projects in the 2012 RTP/SCS also includes the full I-710 Corridor Project (Project ID No. ICO401) and is described as follows:

> I-710 Corridor User-Fee Backed Capacity Enhancement – Widen to five mixed flow + two dedicated lanes for clean technology trucks (each direction) and interchange improvements, from Ocean Blvd. in Long Beach to the intermodal railroad yards in Commerce/Vernon.

This description is consistent with the description of Alternatives 6B and 6C provided in Chapter 2 of this Draft Environmental Impact Report/Environmental Impact Statement (EIR/EIS). The 2011 FTIP and 2012 RTP/SCS project listings are provided in Appendix I of this Draft EIR/EIS.

### 3.13.2.5   PROJECT LEVEL AIR QUALITY CONFORMITY

Because the I-710 Corridor Project is within an attainment/maintenance area for CO and a nonattainment area for Federal $PM_{2.5}$ and $PM_{10}$ standards, local hot-spot analyses for CO, $PM_{2.5}$, and $PM_{10}$ are required for conformity purposes. The results of these hot-spot analyses are provided in Section 3.13.3, Environmental Consequences.

### 3.13.3   ENVIRONMENTAL CONSEQUENCES

#### 3.13.3.1   PERMANENT IMPACTS

**CARBON MONOXIDE (CO).** The Caltrans *Transportation Project-Level Carbon Monoxide Protocol* (December 1997) was used to assess the project's impact on local CO concentrations. Based

on this protocol, a screening analysis was conducted to determine whether the project would result in any CO hot spots. Localized emissions of CO may increase with implementation of the project. Based on I-710 Corridor Project traffic study data, afternoon (PM) peak-hour data were considered the worst-case scenario and used as the basis for the intersection selection and "hot spot" modeling process. Because traffic conditions (delay) under Alternative 6B were generally worse compared to the other build alternatives, modeling results associated with projected future conditions at ten selected intersections under proposed Alternative 6B were used to quantitatively assess the potential for traffic-related impacts of the proposed project.

The hot spot analysis assessed the potential for localized CO impacts due to the project and whether the project alternatives would either cause violation of the CO ambient air quality standards or exacerbate the air quality conditions to delay the progress of meeting attainment of the standard. The one-hour and eight-hour NAAQS for CO are 35 parts per million (ppm) and nine ppm, respectively. Of the ten intersections studied, the highest one-hour concentration for Alternative 6B was seven ppm and the highest eight-hour concentration was five ppm. Based on the modeling performed using EPA-approved methods and the traffic study data, the build alternatives would not cause CO concentrations to exceed the CO standards or delay the timely attainment of the standards.

**PARTICULATE MATTER (PM$_{2.5}$ AND PM$_{10}$).**

**PROJECTS OF AIR QUALITY CONCERN.** The first step in the hot-spot analysis is to determine whether a project meets the standard for a project of air quality concern (POAQC). The EPA specified in 40 CFR 93.123(b)(1) of the 2006 Final Rule that POAQC are certain highway and transit projects that involve significant levels of diesel vehicle traffic, or any other project that is identified in the PM$_{2.5}$ and PM$_{10}$ SIP as a localized air quality concern. The 2006 Final Rule defines the POAQC that require a PM$_{2.5}$ and PM$_{10}$ hot-spot analysis in 40 CFR 93.123(b)(1) as:

i. New or expanded highway projects that have a significant number of or significant increase in diesel vehicles;

ii. Projects affecting intersections that are at level of service (LOS) D, E, or F with a significant number of diesel vehicles, or those that will change to LOS D, E, or F because of increased traffic volumes from a significant number of diesel vehicles related to the project;

iii. New bus and rail terminals and transfer points that have a significant number of diesel vehicles congregating at a single location;

A46

     iv.  Expanded bus and rail terminals and transfer points that significantly increase the number of diesel vehicles congregating at a single location; or

     v.  Projects in or affecting locations, areas, or categories of sites that are identified in the $PM_{2.5}$ and $PM_{10}$ applicable implementation plan or implementation plan submission, as appropriate, as sites of violation or possible violation.

As the proposed I-710 Corridor Project would expand the existing facility and would impact existing intersections, and as the existing highway has a substantial number of diesel vehicles, it would meet the criteria in Items i and ii above. Therefore, this project is considered to be a POAQC, and a project-level $PM_{2.5}$ and $PM_{10}$ hot-spot analysis has been conducted to assess whether the project would cause or contribute to any new localized $PM_{2.5}$ or $PM_{10}$ violations, increase the frequency or severity of any existing violations, or delay timely attainment of the $PM_{2.5}$ and $PM_{10}$ AAQS.

**TYPES OF EMISSIONS CONSIDERED.** In accordance with the EPA/FHWA Guidance, this hot-spot analysis is based on directly emitted and re-entrained $PM_{2.5}$ and $PM_{10}$ emissions. Tailpipe, brake wear, tire wear, and road dust $PM_{2.5}$ and $PM_{10}$ emissions were considered in this hot-spot analysis.

Vehicles cause dust from paved and unpaved roads to be re-entrained, or resuspended, in the atmosphere. According to the 2006 Final Rule, road dust emissions are to be considered for $PM_{10}$ hot-spot analyses. For $PM_{2.5}$, road dust emissions are only to be considered in hot-spot analyses if the EPA or the State air agency has made a finding that such emissions are a significant contributor to the $PM_{2.5}$ air quality problem (40 CFR 93.102(b)(3)). The EPA has published a guidance on the use of AP-42 for re-entrained road dust for SIP development and conformity (August 2007); therefore, re-entrained $PM_{2.5}$ is considered in this analysis.

Secondary particles formed through $PM_{2.5}$ and $PM_{10}$ precursor emissions from a transportation project take several hours to form in the atmosphere, giving emissions time to disperse beyond the immediate project area of concern for localized analyses; therefore, they were not considered in this hot-spot analysis. Secondary emissions of $PM_{2.5}$ and $PM_{10}$ are considered as part of the regional emission analysis prepared for the conforming RTP and FTIP.

**ANALYSIS METHOD.** According to hot-spot methodology, estimates of future localized $PM_{2.5}$ and $PM_{10}$ pollutant concentrations need to be determined. This analysis establishes that the local air quality is consistent with the 2007 Air Quality Management Plan (AQMP) by comparing the locally monitored $PM_{2.5}$ and $PM_{10}$ concentrations to the AQMP's projections. Additionally, the impacts of the project on the regional $PM_{2.5}$ and $PM_{10}$ emissions and the

likelihood of these impacts interacting with the ambient $PM_{2.5}$ and $PM_{10}$ levels to cause hot spots are discussed.

RE-ENTRAINED DUST. The ARB has recently prepared a revised methodology for entrained road dust emissions. This methodology will be used in the 2012 AQMP being prepared by the SCAQMD for the required December 2012 $PM_{2.5}$ SIP submittal.[1] The I-710 Corridor Project AQ/HRA used the January 2011 EPA method (with local ARB/SCAQMD silt loadings) for entrained road dust. When compared to the AP-42 method of calculating re-entrained dust, the ARB method (1) uses lower silt loadings in Los Angeles County for nonfreeway roadways, (2) uses a 15 percent $PM_{2.5}/PM_{10}$ ratio rather than the 25 percent ratio in AP-42, and (3) changes in future entrained road dust emissions (for all road types) are proportional to increases in centerline miles, not vehicle miles traveled. In this way, the ARB method is very similar to the SCAQMD's 2007 AQMP methodology.

Based on the inconsistencies using the AP-42 method paved road dust method with the 2007 AQMP method and new ARB method, entrained road dust emissions (as calculated by AP-42) were not used in these emissions comparisons (build to No Build) in this report; instead, the latest ARB approach for future year emissions was used. The build alternatives do not change the centerline length of I-710; they add lanes (one lane in each direction for Alternative 5A and three lanes in each direction for Alternatives 6A/B/C) to the existing I-710 (8 lanes). In the ARB methodology, adding lanes does not increase emissions; the silt (which results from track-out, erosion, etc.) is distributed over the increased roadway surface (i.e., silt amount stays the same, even as the per-area silt loading decreases). Some trucks that would travel the mainline (or decide to go onto the local roads) in Alternative 1 will travel in the freight corridor. This would not increase the amount of track-out onto I-710 (mainline and freight corridor). There is also no source of soil erosion onto the freight corridor, which is elevated for much of its length.

DATA CONSIDERED. The closest air monitoring stations to the Study Area are the North Long Beach and Los Angeles Main St. stations. All of these stations monitor $PM_{2.5}$ and $PM_{10}$ concentrations. These monitoring stations are located in Los Angeles County within the vicinity of I-405, State Route 110 (SR-110), United States Route 101 (US-101), Interstate 10 (I-10), and I-710. The North Long Beach Station is located approximately 2,500 feet from I-405 and 1 mile from I-710. The Long Beach Pacific Coast Hwy. Station is located approximately two miles from I-710. The Los Angeles Station is located approximately 3,000

---

[1]   http://www.aqmd.gov/gb_comit/stmpradvgrp/2012AQMP/meetings/2011/dec15/PavedRoadDust.pdf.

A48

I-710 Corridor Project EIR/EIS

feet from SR-110, 3,000 feet from US-101, and 1 mile from I-10. The I-405, I-710, SR-110, US-101, and I-10 freeways currently carry between 7,000 and 23,000 daily truck trips. Therefore, the air quality concentrations monitored at these stations are representative of the conditions within the Study Area.

TRENDS IN BASELINE PM$_{2.5}$ CONCENTRATIONS. The monitored PM$_{2.5}$ concentrations at the North Long Beach, Long Beach Pacific Coast Hwy., and Los Angeles Stations are shown in Table 3.13-5. These data show that the Federal 24-hour PM$_{2.5}$ AAQS (35 micrograms per cubic meter [µg/m$^3$]) has been exceeded at the North Long Beach Station in five out of the past six years, at the Long Beach Pacific Coast Hwy. Station in four out of the past six years, and at the Los Angeles Station in each of the past six years. In addition, the annual average PM$_{2.5}$ AAQS (15 µg/m$^3$) at the North Long Beach and the Long Beach Pacific Coast Hwy. Stations was exceeded in 2005 and 2006 and at the Los Angeles Station from 2005 through 2009; however, the concentrations continue to diminish every year.

### Table 3.13-5  Ambient PM2.5 Monitoring Data (µg/m$^3$)

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **North Long Beach Air Quality Monitoring Station** | | | | | | |
| 3-year average 98th percentile | 44.6 | 40.7 | 39.0 | 38.2 | 37.9 | 33.5 |
| Exceeds Federal 24-hour standard (35 µg/m$^3$)? | Yes | Yes | Yes | Yes | Yes | No |
| 3-year National annual average | 17.3 | 16.0 | 14.9 | 14.3 | 13.9 | 12.5 |
| Exceeds Federal annual average standard (15 µg/m$^3$)? | Yes | Yes | No | No | No | No |
| **Long Beach PCH Air Quality Monitoring Station** | | | | | | |
| 3-year average 98th percentile | 44.3 | 38.3 | 35.5 | 35.1 | 33.8 | 31.7 |
| Exceeds Federal 24-hour standard (35 µg/m$^3$)? | Yes | Yes | Yes | Yes | No | No |
| 3-year National annual average | 17.3 | 15.2 | 14.3 | 13.9 | 13.3 | 12.2 |
| Exceeds Federal annual average standard (15 µg/m$^3$)? | Yes | Yes | No | No | No | No |
| **Los Angeles – N. Main St. Air Quality Monitoring Station** | | | | | | |
| 3-year average 98th percentile | 56.3 | 48.8 | 47.8 | 43.5 | 41.8 | 35.1 |
| Exceeds Federal 24-hour standard (35 µg/m$^3$)? | Yes | Yes | Yes | Yes | Yes | Yes |
| 3-year National annual average | 19.6 | 17.6 | 16.6 | 16.1 | 15.7 | 14.3 |
| Exceeds Federal annual average standard (15 µg/m$^3$)? | Yes | Yes | Yes | Yes | Yes | No |

Source: ARB website: http://www.arb.ca.gov/adam/, February 2012.
µg/m$^3$ = micrograms per cubic meter

PROJECTED 24-HOUR CONCENTRATIONS. The levels of PM$_{2.5}$ in the project vicinity exceeded the Federal 24-hour standard between 2005 and 2009. The Federal 24-hour standard was not exceeded at either Long Beach station in 2010. Using various methodologies, the 2007 AQMP estimated the 2015 24-hour PM$_{2.5}$ concentrations. Table V-2-16 in the 2007 AQMP estimates that the 24-hour PM$_{2.5}$ concentration in Long Beach

will range from 31.2 to 41.9 µg/m$^3$ in 2015. However, based on the data in Table 3.13-5, the concentrations measured in 2010 range from 31.7 to 35.1 µg/m$^3$. Therefore, it is estimated that the 24-hour PM$_{2.5}$ level would be 31.2 µg/m$^3$, 11 percent below the Federal standard.

PROJECTED ANNUAL CONCENTRATIONS. While the current levels of PM$_{2.5}$ in the project vicinity are generally above the Federal annual standard, indications are that levels in the future will continue to decrease. Table V-2-15c in the 2007 AQMP estimates that the annual PM$_{2.5}$ concentration in long beach will be 12.7 µg/m$^3$ in 2014, which is approximately 15 percent below the Federal standard.

TRENDS IN BASELINE PM$_{10}$ CONCENTRATIONS. The PM$_{10}$ concentrations monitored at the North Long Beach, the Long Beach Pacific Coast Hwy., and the Los Angeles Stations are shown in Table 3.13-6. With the exception of 2007 at the North Long Beach Station, the Federal 24-hour PM$_{10}$ AAQS (150 µg/m$^3$) was not exceeded between 2005 and 2010.

### Table 3.13-6  Ambient PM10 Monitoring Data (µg/m$^3$)

|  | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|---|
| **North Long Beach Air Quality Monitoring Station** | | | | | | |
| First Highest | 66 | 78 | 232 | 62 | 62 | 44 |
| Second Highest | 61 | 64 | 75 | 45 | 56 | 41 |
| Third Highest | 57 | 63 | 54 | 45 | 55 | 38 |
| Fourth Highest | 54 | 58 | 53 | 44 | 50 | 36 |
| No. of days above National 24-hour standard (150 µg/m$^3$) | 0 | 0 | 1 | 0 | 0 | 0 |
| **Long Beach PCH Air Quality Monitoring Station** | | | | | | |
| First Highest | 131 | 117 | 123 | 81 | 83 | 76 |
| Second Highest | 74 | 113 | 87 | 64 | 78 | 53 |
| Third Highest | 72 | 92 | 67 | 64 | 60 | 50 |
| Fourth Highest | 72 | 90 | 66 | 63 | 58 | 47 |
| No. of days above National 24-hour standard (150 µg/m$^3$) | 0 | 0 | 0 | 0 | 0 | 0 |
| **Los Angeles – N. Main St. Air Quality Monitoring Station** | | | | | | |
| First Highest | 70 | 59 | 78 | 66 | 72 | 42 |
| Second Highest | 68 | 55 | 77 | 65 | 62 | 41 |
| Third Highest | 68 | 55 | 63 | 50 | 57 | 41 |
| Fourth Highest | 51 | 48 | 58 | 49 | 63 | 41 |
| No. of days above National 24-hour standard (150 µg/m$^3$) | 0 | 0 | 0 | 0 | 0 | 0 |

Source: ARB website: http://www.arb.ca.gov/adam/, February 2012.
µg/m$^3$ = micrograms per cubic meter

The 2007 AQMP (SCAQMD) reports that since the Federal annual PM$_{10}$ standard has been revoked, the Basin is expected to be declared in attainment for the 24-hour Federal PM$_{10}$ standard since 2000. Table V-3-1 in the 2007 AQMP lists the projected 24-hour PM$_{10}$

A50

I-710 Corridor Project EIR/EIS

concentrations at various stations within the Basin. It is estimated that the 24-hour concentration in Long Beach will be 77 µg/m$^3$ by 2015, 51 percent of the Federal standard.

**TRANSPORTATION AND TRAFFIC CONDITIONS.** Existing and future (2035) No Build average daily traffic (ADT) volumes and average daily truck volumes for I-710 in the project area are shown in Table 3.13-7. The table indicates that I-710 currently experiences more than 10,000 trucks annual average daily traffic (AADT).

### Table 3.13-7  Existing (2008) and No Build (2035) Average Daily Traffic Volumes

| I-710 Segment | | Existing (2008) | | 2035 No Build | |
|---|---|---|---|---|---|
| From | To | Total | Trucks | Total | Trucks |
| SR-60 | I-5 | 185,700 | 17,600 | 212,700 | 23,200 |
| I-5 | Washington Blvd. | 215,300 | 20,100 | 233,400 | 25,300 |
| Washington Blvd. | Atlantic St. | 206,900 | 19,400 | 235,800 | 27,800 |
| Atlantic St. | Florence Blvd. | 196,600 | 28,600 | 224,600 | 37,800 |
| Florence Blvd. | Firestone Blvd. | 196,600 | 28,600 | 224,600 | 37,800 |
| Firestone Blvd. | Imperial Hwy. | 205,600 | 30,400 | 232,200 | 39,700 |
| Imperial Hwy. | I-105 | 206,600 | 31,500 | 237,600 | 43,200 |
| I-105 | Rosecrans Ave. | 213,100 | 31,700 | 242,000 | 43,400 |
| Rosecrans Ave. | Alondra Blvd. | 135,500 | 26,300 | 170,400 | 38,500 |
| Alondra Blvd. | SR-91 | 213,800 | 36,700 | 267,100 | 59,300 |
| SR-91 | Long Beach Blvd. | 214,200 | 37,000 | 264,100 | 60,100 |
| Long Beach Blvd. | Del Amo Blvd. | 188,100 | 42,100 | 238,200 | 74,100 |
| Del Amo Blvd. | I-405 | 179,800 | 42,000 | 227,600 | 74,300 |
| I-405 | Wardlow Rd. | 179,600 | 41,600 | 227,500 | 74,400 |
| Wardlow Rd. | Willow St. | 160,700 | 41,200 | 202,700 | 71,600 |
| Willow St. | Pacific Coast Hwy. | 150,000 | 41,400 | 186,000 | 71,800 |
| Pacific Coast Hwy. | Anaheim St. | 131,800 | 33,900 | 170,100 | 60,100 |
| Anaheim St. | 9th St. | 52,000 | 26,000 | 76,100 | 46,600 |
| 9th St. | Ocean Blvd. | 22,200 | 10,300 | 32,100 | 20,100 |

Source: *I-710 Corridor Project Traffic Operations Analysis Report,* February 2012.
I-5 = Interstate 5                             SR-60 = State Route 60
I-105 = Interstate 105                       SR-91 = State Route 91
I-405 = Interstate 405

**TRAFFIC CHANGES DUE TO THE PROPOSED PROJECT.** The proposed project is a highway expansion project. Based on the *Freeway Traffic Operations Analysis Report* (August 2011), the proposed project would increase the traffic volumes along I-710. The future traffic volumes along I-710 for each of the build alternatives are shown in Table 3.13-8. As shown, the proposed project would increase the total traffic volume and the number of trucks using I-710.

**Table 3.13-8  2035 Project Alternative Average Daily Traffic Volumes**

| I-710 Segment | | Alternative 5A | | Alternative 6A | | Alternative 6B | | Alternative 6C | |
|---|---|---|---|---|---|---|---|---|---|
| From | To | Total | Trucks | Total | Trucks | Total | Trucks | Total | Trucks |
| SR-60 | I-5 | 266,900 | 28,500 | 273,400 | 40,300 | 273,400 | 40,300 | 273,400 | 40,300 |
| I-5 | Washington Blvd. | 315,800 | 32,400 | 328,000 | 45,000 | 328,000 | 45,000 | 328,000 | 45,000 |
| Washington Blvd. | Atlantic St. | 304,600 | 33,800 | 322,400 | 50,600 | 322,400 | 50,600 | 322,400 | 50,600 |
| Atlantic St. | Florence Blvd. | 316,800 | 45,900 | 344,300 | 65,300 | 344,300 | 65,300 | 344,300 | 65,300 |
| Florence Blvd. | Firestone Blvd. | 302,000 | 46,300 | 330,800 | 64,600 | 330,800 | 64,600 | 330,800 | 64,600 |
| Firestone Blvd. | Imperial Hwy. | 303,800 | 47,000 | 332,300 | 64,800 | 332,300 | 64,800 | 332,300 | 64,800 |
| Imperial Hwy. | I-105 | 297,700 | 49,600 | 327,700 | 65,800 | 327,700 | 65,800 | 327,700 | 65,800 |
| I-105 | Rosecrans Ave. | 296,300 | 49,700 | 328,500 | 70,000 | 328,500 | 70,000 | 328,500 | 70,000 |
| Rosecrans Ave. | Alondra Blvd. | 209,600 | 43,500 | 238,100 | 65,300 | 238,100 | 65,300 | 238,100 | 65,300 |
| Alondra Blvd. | SR-91 | 311,000 | 65,300 | 341,300 | 80,900 | 341,300 | 80,900 | 341,300 | 80,900 |
| SR-91 | Long Beach Blvd. | 269,100 | 63,600 | 297,400 | 79,000 | 297,400 | 79,000 | 297,400 | 79,000 |
| Long Beach Blvd. | Del Amo Blvd. | 296,100 | 80,300 | 328,800 | 93,200 | 328,800 | 93,200 | 328,800 | 93,200 |
| Del Amo Blvd. | I-405 | 286,000 | 80,600 | 317,400 | 93,400 | 317,400 | 93,400 | 317,400 | 93,400 |
| I-405 | Wardlow Rd. | 291,000 | 80,900 | 314,100 | 89,500 | 314,100 | 89,500 | 314,100 | 89,500 |
| Wardlow Rd. | Willow St. | 246,000 | 76,300 | 265,900 | 85,400 | 265,900 | 85,400 | 265,900 | 85,400 |
| Willow St. | Pacific Coast Hwy. | 218,000 | 76,600 | 238,000 | 85,500 | 238,000 | 85,500 | 238,000 | 85,500 |
| Pacific Coast Hwy. | Anaheim St. | 95,800 | 50,300 | 90,000 | 43,900 | 90,000 | 43,900 | 90,000 | 43,900 |
| Anaheim St. | 9th St. | 73,800 | 42,500 | 71,400 | 41,500 | 71,400 | 41,500 | 71,400 | 41,500 |
| 9th St. | Ocean Blvd. | 35,400 | 21,300 | 35,900 | 24,500 | 35,900 | 24,500 | 35,900 | 24,500 |

Source: *I-710 Corridor Project Traffic Operations Analysis Report,* February 2012.
I-5 = Interstate 5                              SR-60 = State Route 60
I-105 = Interstate 105                        SR-91 = State Route 91
I-405 = Interstate 405

A52

Table 3.13-9 shows the 2035 Alternative 1 LOS and delay in the project area for the a.m. and p.m. peak hours. Tables 3.13-10, 3.13-11, 3.13-12, and 3.13-13 show the 2035 LOS and delay in the project area for Alternatives 5A and 6A/B/C, respectively. As shown, the proposed project would improve the LOS and reduce the delay at some intersections in the project area while worsening the LOS and increasing the delay at other intersections within the project area. Therefore, a vehicle emission analysis was prepared to determine the proposed project's effect on the region attaining the Federal $PM_{2.5}$ and $PM_{10}$ AAQS.

### Table 3.13-9  2035 Alternative 1 - No Build Intersection Levels of Service

|   | Intersection | AM Peak Hour | | PM Peak Hour | |
|---|---|---|---|---|---|
|   |   | LOS | Delay (sec) | LOS | Delay (sec) |
| 10 | Pico Ave. and 9th St. | D | 37.8 | C | 26.3 |
| 19 | Pacific Coast Hwy. and Santa Fe Ave. | F | 246.8 | F | 243.4 |
| 22 | Pacific Coast Hwy. and Atlantic Ave. | C | 31.1 | D | 47.7 |
| 34 | Del Amo Blvd. and Santa Fe Ave. | E | 56.8 | E | 76.1 |
| 41 | Alondra Blvd. and Santa Fe Ave. | D | 50.8 | E | 63.8 |
| 43 | Alondra Blvd. and Atlantic Ave. | E | 59.9 | D | 47.9 |
| 45 | Alondra Blvd. and Paramount Blvd. | D | 35.3 | E | 76.7 |
| 71 | Slauson Ave. and Eastern Ave. | D | 35.3 | F | 93.0 |
| 112 | I-710 northbound ramps and Long Beach Blvd. | D | 36.8 | C | 31.1 |
| 148 | Wardlow Rd. and Cherry Ave. | D | 36.8 | F | 88.7 |
| 155 | Wilmington Ave. and 223rd St. | D | 50.1 | F | 170.2 |
| 159 | 38th St. and Santa Fe Ave. | C | 25.5 | D | 53.8 |

Source: *I-710 Corridor Project Intersection Traffic Impact Analysis Report,* February 2012.
I-710 = Interstate 710
LOS = Level of Service
sec = seconds

I-710 Corridor Project EIR/EIS

**Table 3.13-10  2035 Alternative 5A Intersection Levels of Service**

| | Intersection | AM Peak Hour | | PM Peak Hour | |
|---|---|---|---|---|---|
| | | LOS | Delay (sec) | LOS | Delay (sec) |
| 10 | Pico Ave. and 9th St. | C | 32.0 | C | 25.8 |
| 19 | Pacific Coast Hwy. and Santa Fe Ave. | F | 146.8 | F | 143.0 |
| 22 | Pacific Coast Hwy. and Atlantic Ave. | D | 36.1 | F | 145.9 |
| 34 | Del Amo Blvd. and Santa Fe Ave. | E | 62.5 | F | 96.6 |
| 41 | Alondra Blvd. and Santa Fe Ave. | D | 54.5 | F | 90.0 |
| 43 | Alondra Blvd. and Atlantic Ave. | E | 71.1 | F | 92.9 |
| 45 | Alondra Blvd. and Paramount Blvd. | E | 59.7 | F | 125.1 |
| 71 | Slauson Ave. and Eastern Ave. | E | 77.1 | F | 107.8 |
| 112 | I-710 northbound ramps and Long Beach Blvd. | D | 40.4 | C | 27.6 |
| 148 | Wardlow Rd. and Cherry Ave. | D | 48.2 | F | 137.4 |
| 155 | Wilmington Ave. and 223rd St. | D | 42.0 | F | 166.9 |
| 159 | 38th St. and Santa Fe Ave. | D | 52.9 | D | 51.2 |

Source: *I-710 Corridor Project Intersection Traffic Impact Analysis Report,* February 2012.
I-710 = Interstate 710                              sec = seconds
LOS = Level of Service

**Table 3.13-11  2035 Alternative 6A Intersection Levels of Service**

| | Intersection | AM Peak Hour | | PM Peak Hour | |
|---|---|---|---|---|---|
| | | LOS | Delay (sec) | LOS | Delay (sec) |
| 10 | Pico Ave. and 9th St. | F | 123.0 | E | 41.1 |
| 19 | Pacific Coast Hwy. and Santa Fe Ave. | F | 125.5 | F | 114.8 |
| 22 | Pacific Coast Hwy. and Atlantic Ave. | C | 33.5 | F | 132.6 |
| 34 | Del Amo Blvd. and Santa Fe Ave. | E | 72.1 | F | 138.7 |
| 41 | Alondra Blvd. and Santa Fe Ave. | D | 44.0 | F | 28.0 |
| 43 | Alondra Blvd. and Atlantic Ave. | E | 64.3 | F | 90.8 |
| 45 | Alondra Blvd. and Paramount Blvd. | D | 52.5 | F | 103.8 |
| 71 | Slauson Ave. and Eastern Ave. | E | 63.6 | F | 87.5 |
| 112 | I-710 northbound ramps and Long Beach Blvd. | D | 53.5 | C | 31.0 |
| 148 | Wardlow Rd. and Cherry Ave. | E | 71.1 | F | 167.2 |
| 155 | Wilmington Ave. and 223rd St. | D | 52.5 | F | 154.0 |
| 159 | 38th St. and Santa Fe Ave. | E | 79.3 | F | 129.2 |

Source: *I-710 Corridor Project Intersection Traffic Impact Analysis Report,* February 2012.
I-710 = Interstate 710                              sec = seconds
LOS = Level of Service

A54

I-710 Corridor Project EIR/EIS

## Table 3.13-12  2035 Alternative 6B Intersection Levels of Service

| | Intersection | AM Peak Hour | | PM Peak Hour | |
|---|---|---|---|---|---|
| | | LOS | Delay (sec) | LOS | Delay (sec) |
| 10 | Pico Ave. and 9th St. | F | 139.1 | E | 61.1 |
| 19 | Pacific Coast Hwy. and Santa Fe Ave. | F | 125.4 | F | 122.5 |
| 22 | Pacific Coast Hwy. and Atlantic Ave. | C | 33.7 | F | 137.6 |
| 34 | Del Amo Blvd. and Santa Fe Ave. | E | 72.1 | F | 137.7 |
| 41 | Alondra Blvd. and Santa Fe Ave. | D | 43.4 | F | 94.2 |
| 43 | Alondra Blvd. and Atlantic Ave. | E | 64.4 | F | 94.6 |
| 45 | Alondra Blvd. and Paramount Blvd. | D | 49.5 | F | 102.5 |
| 71 | Slauson Ave. and Eastern Ave. | E | 61.7 | F | 85.9 |
| 112 | I-710 northbound ramps and Long Beach Blvd. | D | 49.5 | C | 28.8 |
| 148 | Wardlow Rd. and Cherry Ave. | E | 64.8 | F | 169.5 |
| 155 | Wilmington Ave. and 223rd St. | D | 51.4 | F | 165.3 |
| 159 | 38th St. and Santa Fe Ave. | F | 93.8 | F | 120.8 |

Source: *I-710 Corridor Project Intersection Traffic Impact Analysis Report*, February 2012.
I-710 = Interstate 710                              sec = seconds
LOS = Level of Service

## Table 3.13-13  2035 Alternative 6C Intersection Levels of Service

| | Intersection | AM Peak Hour | | PM Peak Hour | |
|---|---|---|---|---|---|
| | | LOS | Delay (sec) | LOS | Delay (sec) |
| 10 | Pico Ave. and 9th St. | E | 64.1 | E | 59.3 |
| 19 | Pacific Coast Hwy. and Santa Fe Ave. | F | 121.8 | F | 108.3 |
| 22 | Pacific Coast Hwy. and Atlantic Ave. | C | 34.1 | F | 123.1 |
| 34 | Del Amo Blvd. and Santa Fe Ave. | E | 73.3 | F | 134.8 |
| 41 | Alondra Blvd. and Santa Fe Ave. | D | 45.5 | F | 92.8 |
| 43 | Alondra Blvd. and Atlantic Ave. | E | 56.1 | F | 92.1 |
| 45 | Alondra Blvd. and Paramount Blvd. | D | 48.8 | F | 97.1 |
| 71 | Slauson Ave. and Eastern Ave. | E | 63.2 | F | 85.6 |
| 112 | I-710 northbound ramps and Long Beach Blvd. | F | 94.1 | D | 38.5 |
| 148 | Wardlow Rd. and Cherry Ave. | E | 70.9 | F | 171.5 |
| 155 | Wilmington Ave. and 223rd St. | D | 51.6 | F | 165.6 |
| 159 | 38th St. and Santa Fe Ave. | E | 71.6 | F | 103.1 |

Source: *I-710 Corridor Project Intersection Traffic Impact Analysis Report*, February 2012.
I-710 = Interstate 710                              sec = seconds
LOS = Level of Service

A55

**DAILY VEHICLE EMISSION CHANGES DUE TO THE PROPOSED PROJECT.** The $PM_{2.5}$ and $PM_{10}$ emissions for the I-710 are presented in Tables 3.13-14 and 3.13-15, respectively. These emissions were calculated using the I-710 Traffic model data. As noted above in the Analysis Method section, the entrained paved road emissions for the 2035 Alternatives (including Alternative 1) would be equal to the 2008 emissions, as calculated using EPA's January 2011 AP-42 method with local silt loadings.

### Table 3.13-14  I-710 Freeway $PM_{2.5}$ Emissions (lbs/day)

| Source | 2008 | 2035 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Alt 1 | Alt 5A | Alt 6A | Alt 6B | Alt 6C |
| Exhaust | 690 | 391 | 465 | 600 | **354** | **387** |
| Re-entrained | 252 | 252 | 252 | 252 | 252 | 252 |
| Total | 942 | 642 | 717 | 852 | **605** | **639** |
| % Change from 2035 Alt 1 | - | - | 12% | 33% | **-6%** | **-1%** |

Source: Environ, 2012.
Note: Numbers in **bold** represent emission levels at or below the Alternative 1 (No Build) level
Alt = Alternative                          $PM_{2.5}$ = particulate matter less than 2.5 microns in diameter
lbs/day = pounds per day

### Table 3.13-15  I-710 Freeway $PM_{10}$ Emissions (lbs/day)

| Source | 2008 | 2035 | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | Alt 1 | Alt 5A | Alt 6A | Alt 6B | Alt 6C |
| Exhaust | 868 | 569 | 678 | 857 | **534** | 578 |
| Re-entrained | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 | 1,025 |
| Total | 1,893 | 1,594 | 1,703 | 1,882 | **1,559** | 1,603 |
| % Change from 2035 Alt 1 | - | - | 7% | 18% | **-2%** | 1% |

Source: Environ, 2012.
Note: Numbers in **bold** represent emission levels at or below the Alternative 1 (No Build) level
Alt = Alternative                          $PM_{10}$ = particulate matter less than 10 microns in diameter
lbs/day = pounds per day

Within the I-710 region, Alternatives 5A and 6A would increase the $PM_{2.5}$ and $PM_{10}$ emissions, Alternative 6C would result in a small increase in $PM_{10}$ emissions while having no effect on $PM_{2.5}$ emissions, and Alternative 6B would result in a net decrease in $PM_{2.5}$ and $PM_{10}$ emissions.

A56

**ZEE Design Option.** Implementing the ZEE design option for Alternative 6B would reduce the alternative's $PM_{2.5}$ exhaust emissions by a further 18 lbs/day to 336 lbs/day, 55 lbs/day less than the Alternative 1 conditions. The ZEE design option for Alternative 6B would reduce the alternative's $PM_{10}$ exhaust emissions by a further 24 lbs/day to 510 lbs/day, 59 lbs/day less than the Alternative 1 conditions.

Implementing the ZEE design option for Alternative 6C would reduce the alternative's $PM_{2.5}$ exhaust emissions by a further 15 lbs/day to 372 lbs/day, 19 lbs/day less than the Alternative 1 conditions. The ZEE design option for Alternative 6C would reduce the alternative's $PM_{10}$ exhaust emissions by a further 20 lbs/day to 558 lbs/day, 11 lbs/day less than the Alternative 1 conditions.

CONCLUSION. Transportation conformity is required under Section 176(c) of the CAA to ensure that Federally supported highway and transit project activities are consistent with the purpose of the SIP. Conformity for the purpose of the SIP means that transportation activities will not cause new air quality violations, worsen existing violations, or delay timely attainment of the relevant AAQS. As required by the 2006 Final Rule, this qualitative $PM_{2.5}$ and $PM_{10}$ hot-spot analysis demonstrates that this project meets the CAA conformity requirements to support State and local air quality goals with respect to potential localized air quality impacts.

It is not expected that changes to $PM_{2.5}$ and $PM_{10}$ emissions levels associated with the proposed project would result in new violations of the Federal air quality standards for the following reasons:

- Based on the projected $PM_{2.5}$ concentrations listed in the 2007 AQMP, without the proposed project, the 24-hour $PM_{2.5}$ concentrations within the project area would be reduced to 11 percent below the Federal standard by 2015.

- Based on the projected $PM_{2.5}$ concentrations listed in the 2007 AQMP, without the proposed project, the annual average $PM_{2.5}$ concentrations within the project area would be reduced to 15 percent below the Federal standard by 2014.

- With the exception of 2007, the ambient $PM_{10}$ concentrations have not exceeded the 24-hour or annual Federal standard.

- Based on the projected $PM_{10}$ concentrations listed in the 2007 AQMP, without the proposed project, the 24-hour $PM_{10}$ concentrations would be 49 percent below the Federal standard by 2015.

A57

- Alternatives 5A and 6A would increase the $PM_{2.5}$ and $PM_{10}$ emissions, Alternative 6C would have little or no affect on the $PM_{2.5}$ and $PM_{10}$ emissions, and Alternative 6B would decrease the $PM_{2.5}$ and $PM_{10}$ emissions on the I-710 freeway.

- Under the ZEE design options, Alternative 6B and Alternative 6C would result in a net decrease in $PM_{2.5}$ and $PM_{10}$ emissions.

For these reasons, future new or worsened $PM_{2.5}$ and $PM_{10}$ violations of any standards are not anticipated; therefore, the project meets the conformity hot-spot requirements in 40 CFR 93-116 and 93-123 for both $PM_{2.5}$ and $PM_{10}$.

In regard to the related interagency consultation required for this project, SCAG's Transportation Conformity Working Group (TCWG) reviewed and discussed this project during its meetings in January and February 2012. Because a preferred alternative has not yet been identified, the TCWG has not yet concurred on a conformity determination for the project. At the February 2012 meeting, a subcommittee was formed to review the Particulate Matter Hot-Spot Qualitative Analysis, which will be submitted to the TCWG once a preferred alternative is identified following public review of the Draft EIR/EIS.

PROJECT-LEVEL MOBILE SOURCE AIR TOXICS (MSAT). In addition to the criteria air pollutants for which there are NAAQS, the EPA also regulates air toxics. Most air toxics originate from humanmade sources, including on-road mobile sources, other mobile sources (e.g., airplanes), area sources (e.g., dry cleaners), and stationary sources (e.g., factories or refineries).

Controlling air toxic emissions became a national priority with the passage of the CAA Amendments of 1990, whereby Congress mandated that the EPA regulate 188 air toxics, also known as hazardous air pollutants. The EPA assessed this expansive list in its latest rule on the Control of Hazardous Air Pollutants from Mobile Sources (FR, Volume 72, No. 37, page 8,430, February 26, 2007) and identified a group of 93 compounds emitted from mobile sources that are listed in its Integrated Risk Information System (IRIS).[1] In addition, the EPA identified the following seven compounds with substantial contributions from mobile sources that are among the national- and regional-scale cancer risk drivers from its 1999 National Air Toxics Assessment (NATA)[2]: acrolein, benzene, 1,3-butadiene, diesel particulate matter plus diesel exhaust organic gases (DPM), formaldehyde, naphthalene, and polycyclic organic matter

---

[1]   http://www.epa.gov/ncea/iris/index.html.

[2]   http://www.epa.gov/ttn/atw/nata1999/.

A58

I-710 Corridor Project EIR/EIS

(POM). While FHWA considers these to be the priority MSAT, the list is subject to change and may be adjusted in response to future EPA rules.

The 2007 EPA rule mentioned above requires controls that will dramatically decrease MSAT emissions through cleaner fuels and cleaner engines. According to an FHWA analysis using EPA's MOBILE6.2 model, even if VMT increase by 145 percent as assumed, a combined reduction of 72 percent in the total annual emission rate for the priority MSATs is projected from 1999 to 2050, as shown in Figure 3.13-2. The projected reduction in MSAT emissions would be slightly different in California due to the use of the EMFAC2007 emission model in place of the MOBILE6.2 model.

## Figure 3.13-2  National MSAT Emission Trends

NATIONAL MSAT EMISSION TRENDS 1999 - 2050 FOR VEHICLES OPERATING ON
ROADWAYS USING EPA's MOBILE6.2 MODEL



Source:  http://www.fhwa.dot.gov/environment/airtoxic/100109guidmem.htm.

Air toxics analysis is a continuing area of research. While much work has been done to assess the overall health risk of air toxics, many questions remain unanswered. In particular, the tools and techniques for assessing project-specific health outcomes as a result of lifetime MSAT exposure remain limited. These limitations impede the ability to evaluate how the potential

A59

health risks posed by MSAT exposure should be factored into project-level decision-making within the context of NEPA.

In September 2009, FHWA issued a memorandum titled *Interim Guidance Update on Mobile Source Air Toxic Analysis in NEPA Documents*[1] to advise FHWA division offices as to when and how to analyze MSATs in the NEPA process for highways. This document is an update to the previous guidance released in February 2006. The guidance is described as interim because

MSAT science is still evolving. As the science progresses, FHWA will update the guidance. This analysis follows the FHWA guidance.

**MSAT ANALYSIS METHODOLOGY.** Depending on the specific project circumstances, FHWA has identified three levels of analysis.

- **Exempt Projects or Projects with No Meaningful MSAT Impacts:** Exempt projects typically include those with no effects on traffic volume or vehicle mix. Projects qualifying as categorical exclusions under 23 CFR 771.117I or that are exempt from CAA conformity under 40 CFR 93.126 are also considered projects with no meaningful MSAT impacts.

- **Projects with Low Potential MSAT Effects:** These projects have average annual daily trips less than 140,000 per day and for which the project does not add substantially to the number of trips. In California, the corresponding AADT criteria are 100,000 on urban nonfreeways and 50,000 on rural nonfreeways. In addition, California has a third criterion, which states that if freeway modifications are to be completed more than 500 to 1,000 feet from a sensitive land use (e.g., residences, schools, day care centers, playgrounds, and medical facilities), the project will result in low potential MSAT effects (Brady pers. comm.; ARB 2005). These projects are usually evaluated qualitatively.

- **Projects with Higher Potential MSAT Effects:** These projects typically are those that have average annual daily trips exceeding 140,000 per day and that have the potential to significantly increase diesel particulate matter exhaust. In California, the corresponding AADT criteria are 100,000 on urban nonfreeways and 50,000 on rural nonfreeways. In addition, California considers a project to have a higher potential MSAT effect if modifications to freeways are proposed to take place within 500 to 1,000 feet of sensitive land uses (Brady pers. comm.; ARB 2005). These projects require a quantitative evaluation.

---

[1]   http://www.fhwa.dot.gov/environment/airtoxic/100109guidmem.htm.

The proposed project includes the expansion of an existing highway that has average annual daily trips exceeding 140,000 per day and a high percentage of diesel vehicles. Therefore, the project qualifies as having higher potential MSAT effect.

The basic procedure for analyzing emissions for on-road MSATs is to calculate emission factors using EMFAC2007 and apply the emission factors to speed and VMT data specific to the project. EMFAC2007 is the emission inventory model developed by the California Air Resources Board (ARB) that calculates emission inventories for motor vehicles operating on roads in California. The emission factors information used in this analysis is from EMFAC2007 and is specific to the Basin.

This analysis focuses on the seven MSAT pollutants identified by the EPA as being the highest priority MSATs: acrolein, benzene, 1,3-butadiene, DPM, formaldehyde, naphthalene, and POM. EMFAC2007 provides emission factor information for DPM, but does not provide emission factors for the remaining six MSATs. Each of the remaining six MSATs, however, is a constituent of motor vehicle total organic gas (TOG) emissions, and EMFAC2007 provides emission factors for TOG. ARB has supplied Caltrans with speciation factors for each of the remaining six MSATs not directly estimated by EMFAC2007.[1] Each speciation factor represents the portion of TOG emissions estimated to be a given MSAT. For example, if a speciation factor of 0.03 is provided for benzene, its emissions level is estimated to be 3 percent of total TOG emissions, utilizing the speciation factor as a multiplier once TOG emissions are known. This analysis used the ARB-supplied speciation factors to estimate emissions of the aforementioned six MSATs as a function of TOG emissions.

The University of California, Davis (UCD), in cooperation with Caltrans, developed a spreadsheet tool that incorporates EMFAC2007 emission factors, ARB speciation factors, and project-specific traffic activity data such as peak- and off-peak-hour VMT, speed, travel times, and traffic volumes. The spreadsheet tool applies the traffic activity data to the emission factors and estimates MSAT emissions for the I-710 Corridor and build alternatives. The spreadsheet used in this analysis is based on FHWA's 2006 MSAT guidance. Once speciation factors for naphthalene and POM have been established, a new spreadsheet will be developed that is capable of calculating a project's emissions for all seven MSATs.

---

[1]   As of February 2010, speciation factors were not available for naphthalene and POM.

**MSAT ANALYSIS RESULTS.** Table 3.13-20 presents an analysis of MSAT incremental emissions for each of the project alternatives compared with the 2008 existing conditions (baseline) for all study areas. Table 3.13-21 presents a similar comparative analysis of incremental emissions of each of the 2035 build alternatives compared to Alternative 1. As speciation factors are not available for naphthalene and POM, the emissions for these pollutants are not included in Tables 3.13-20 and 3.13-21 However, as with benzene, 1,3-butadiene, acrolein, and formaldehyde, these pollutants are a subset of TOG. Therefore, the future with and without project naphthalene and POM emissions would have a similar increase or decrease as the other MSATs.

In every instance (all project alternatives, all study areas [SCAB, I-710 AOI, and I-710]), decreases in incremental MSAT emissions compared to 2008 were calculated. Reductions in DPM (the main risk driver) were approximately 78 percent (SCAB), 77 percent to 81 percent (AOI), and 38 percent to 76 percent along I-710. Compared to 2008, reductions were greatest for Alternative 6B with Alternative 6C, Alternative 1, Alternative 5A, and Alternative 6A, following in descending order.

In 2035, compared to Alternative 1, DPM emissions (the main health risk concern) increased for Alternative 6A in all study areas, whereas Alternative 5A DPM emissions were similar in the SCAB and increased within the AOI and along I-710. Alternative 6B and Alternative 6C DPM emissions decreased compared to Alternative 1 in all study areas, with the greatest decreases in Alternative 6B.

**ZEE Design Option.** Implementing the ZEE Design Option for Alternative 6B would reduce the alternative's DPM emissions, within the I-710 region, by a further 20 lbs/day to 480 lbs/day less than the Alternative 1 conditions. The ZEE Design Option for Alternative 6B would not change the results of the remaining MSAT pollutants.

Implementing the ZEE Design Option for Alternative 6C would reduce the alternative's DPM emissions within the I-710 region, by a further 10 lbs/day to 440 lbs/day less than the Alternative 1 conditions. The ZEE Design Option for Alternative 6C would not change the results of the remaining MSAT pollutants.

Figures 5 and 6 (Appendix R) present the incremental gridded emission maps for DPM emissions for Alternative 6B and Alternative 6C, respectively; reductions in incremental DPM emissions for the ZEE Design Option can be seen north of the northern terminus of the freight corridor.

A62

I-710 Corridor Project EIR/EIS

**Table 3.13-20  Comparison of Incremental Air Toxics Emissions for All Project Alternatives Compared to 2008 for all Study Areas[1]**

| Mobile Source Air Toxic Name | Study Area | 2008 Baseline Emissions (lbs/day) | Comparison to 2008 | | | | |
|---|---|---|---|---|---|---|---|
| | | | 2035 Alt 1 vs. 2008 (lbs/day) | 2035 Alt 5A vs. 2008 (lbs/day) | 2035 Alt 6A vs. 2008 (lbs/day) | 2035 Alt 6B vs. 2008 (lbs/day) | 2035 Alt 6C vs. 2008 (lbs/day) |
| Diesel Particulate Matter | SCAB | 30,000 | -23,000 | -23,000 | -23,000 | -23,000 | -23,000 |
| | AOI | 6,900 | -5,500 | -5,400 | -5,400 | -5,600 | -5,600 |
| | I-710 | 610 | -390 | -350 | -230 | -460 | -430 |
| | I-710 Post | 840 | -570 | -530 | -410 | -660 | -630 |
| Benzene | SCAB | 3,400 | -3,000 | -3,000 | -3,000 | -3,000 | -3,000 |
| | AOI | 850 | -760 | -760 | -760 | -760 | -760 |
| | I-710 | 24 | -22 | -21 | -21 | -21 | -21 |
| | I-710 Post | 21 | -19 | -19 | -18 | -18 | -18 |
| Acetaldehyde | SCAB | 650 | -600 | -600 | -600 | -600 | -600 |
| | AOI | 160 | -150 | -150 | -150 | -150 | -150 |
| | I-710 | 4.7 | -5 | -4 | -4 | -4 | -4 |
| | I-710 Post | 4.2 | -4 | -4 | -4 | -4 | -4 |
| Formaldehyde | SCAB | 2600 | -2,300 | -2,300 | -2,300 | -2,300 | -2,300 |
| | AOI | 640 | -580 | -580 | -580 | -580 | -580 |
| | I-710 | 18 | -17 | -16 | -16 | -16 | -16 |
| | I-710 Post | 16 | -15 | -14 | -14 | -14 | -14 |
| 1,3- butadiene | SCAB | 790 | -700 | -700 | -700 | -700 | -700 |
| | AOI | 200 | -180 | -180 | -180 | -180 | -180 |
| | I-710 | 5.6 | -5 | -5 | -5 | -5 | -5 |
| | I-710 Post | 5.0 | -4 | -4 | -4 | -4 | -4 |
| Acrolein | SCAB | 180 | -160 | -160 | -160 | -160 | -160 |
| | AOI | 46 | -41 | -41 | -41 | -41 | -41 |
| | I-710 | 1.3 | -1 | -1 | -1 | -1 | -1 |
| | I-710 Post | 1.1 | -1 | -1 | -1 | -1 | -1 |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study*, February 2012.
[1]  The emissions for naphthalene and POM are not included because speciation factors are not available for use with EMFAC2007

Alt = Alternative                                   I-710 Post = Post-Processed Traffic Data
AOI = Area of Interest                          POM = polycyclic organic matter
lbs/day = pounds per day                      SCAB = South Coast Air Basin

A63

**Table 3.13-21  Comparison of Incremental Air Toxics Emissions for All Project Alternatives Compared to Alternative 1 (No Build) for all Study Areas[1,2]**

| Mobile Source Air Toxic Name | Study Area | 2035 Alt 1 Baseline Emissions (lbs/day) | Comparison to 2035 Alternative 1 (No Build) | | | |
|---|---|---|---|---|---|---|
| | | | 2035 Alt 5A vs. Alt 1 (lbs/day) | 2035 Alt 6A vs. Alt 1 (lbs/day) | 2035 Alt 6B vs. Alt 1 (lbs/day) | 2035 Alt 6C vs. Alt 1 (lbs/day) |
| Diesel Particulate Matter | SCAB | 6600 | 0 | 96 | -140 | -94 |
| | AOI | 1400 | 27 | 110 | -130 | -82 |
| | I-710 | 210 | 44 | 160 | -71 | -38 |
| Benzene | SCAB | 440 | 0 | 0 | 0 | 0 |
| | AOI | 96 | 0 | -1.4 | -1.4 | -1.3 |
| | I-710 | 2.5 | 0.4 | 0.6 | 0.6 | 0.6 |
| Acetaldehyde | SCAB | 50 | 0 | 0 | 0 | 0 |
| | AOI | 11 | 0 | -0.2 | -0.2 | -0.1 |
| | I-710 | 0.29 | 0.04 | 0.06 | 0.06 | 0.06 |
| Formaldehyde | SCAB | 280 | 0 | 0 | 0 | 0 |
| | AOI | 61 | 0 | -0.9 | -0.9 | -0.8 |
| | I-710 | 1.6 | 0.3 | 0.4 | 0.4 | 0.4 |
| 1,3- butadiene | SCAB | 97 | 0 | 0 | 0 | 0 |
| | AOI | 21 | 0 | -0.3 | -0.3 | -0.3 |
| | I-710 | 0.56 | 0.09 | 0.1 | 0.1 | 0.1 |
| Acrolein | SCAB | 24 | 0 | 0 | 0 | 0 |
| | AOI | 5.2 | 0 | -0.07 | -0.07 | -0.07 |
| | I-710 | 0.14 | 0.02 | 0.03 | 0.03 | 0.03 |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study*, February 2012.

[1]   Numbers rounded to two significant figures. Emission changes of 1 percent or smaller are presented as zero emission changes.

[2]   The emissions for naphthalene and POM are not included because speciation factors are not available for use with EMFAC2007

Alt = Alternative                                    POM = polycyclic organic matter
AOI = Area of Interest                          SCAB = South Coast Air Basin
lbs/day = pounds per day

ADDITIONAL ANALYSES. The I-710 Corridor Project is a cooperative venture of several agencies responsible for both transportation and goods movement in the greater Los Angeles area. Therefore, additional analyses were conducted because of the unique goods movement component of the project and the stated purpose of the project to improve air quality.

CRITERIA POLLUTANT TRAFFIC EMISSIONS. Mass emissions of criteria pollutants and/or their precursors ($NO_x$, volatile organic compounds [VOC], $PM_{10}$, $PM_{2.5}$, CO, $SO_2$) from traffic were calculated for the I-710 mainline to determine the impact of the proposed project on the surrounding area. In addition, the SCAB mass emissions and mass emissions for the AOI were also evaluated to determine the impact of the proposed I-710 Corridor Project on a

A64

regional scale. The AQ/HRA Protocol describes the methodology for calculating traffic-related mass emissions. The method for calculating regional emissions impacts from the project alternatives is summarized below.

**REGIONAL EMISSION IMPACT METHODOLOGY.** The vehicle activity data was obtained from I-710 Traffic Model, which is based on the SCAG regional traffic model. Four different peak time periods were evaluated in the model: AM (6:00 a.m.–9:00 a.m.), Midday (9:00 a.m.–3:00 p.m.), PM (3:00 p.m.–7:00 p.m.) and Nighttime (7:00 p.m.–6:00 a.m.). The I-710 Traffic Model is composed of a series of traffic links that represent the flow of traffic from one geographic point to another. The output of the I-710 Traffic Model is in the form of traffic flows and an average speed for each traffic link amongst other parameters. This model output data is hereinafter referred to as "The I-710 Traffic model data."

EMFAC2007 Version 2.3 was used to develop emission factors for the various criteria pollutants. The EMFAC model was run for both baseline year 2008 and build-out year 2035. (Details of how EMFAC was used are included in the AQ/HRA Protocol and AQ/HRA Technical Study [February 2012].) EMFAC2007 does not account for rules and regulations enacted by the California Air Resources Board after 2007. Two notable regulations not captured in EMFAC are those designed to reduce $NO_x$ and DPM. The Statewide Bus and Truck Rule and Drayage Truck Rule will require fleets to reduce DPM and $NO_x$ emissions. Additionally, the Ports of Los Angeles and Long Beach have enacted the Clean Trucks Program (CTP), mandating trucks that operate within the Ports to reduce DPM and $NO_x$ emissions by meeting set standards during phase in years (2008–2012). Adjustments were made to EMFAC emission factors to account for the Statewide Bus and Truck Rule and CTP. Based on a comparison made between the CTP and the Drayage Rule, it was determined that the CTP is more stringent that the Drayage Rule, and hence, no adjustments were made for Drayage Rule.

**SUMMARY OF REGIONAL TRAFFIC EMISSION IMPACTS.** The incremental emissions of criteria pollutants for SCAB, AOI, and I-710 as compared to 2008 existing conditions and Alternative 1 (2035 No Build) are presented in Tables 3.13-22 and 3.13-23, respectively. These comparisons are performed for each of the criteria pollutants and for the three project study areas (SCAB, I-710 Study AOI, and I-710, which includes the freight corridor under Alternatives 6A/B/C).

Each of the alternatives will result in lower $NO_x$, CO, $PM_{2.5}$ (except Alternative 6A along I-710) and reactive organic gas (ROG) emissions for all study areas when compared to 2008. The greatest reductions from 2008 occur in Alternatives 6B and 6C, which include a zero-emission freight corridor component.

I-710 Corridor Project EIR/EIS

**Table 3.13-22  Comparison of Incremental Criteria Pollutant Emissions for All Alternatives compared to 2008, for all Study Areas[1,2]**

| Pollutant | Study Area | 2008 Baseline Emissions | Comparison with 2008 Baseline | | | | | SCAQMD CEQA Mass Emission Thresholds[2] (lbs/day increase) |
|---|---|---|---|---|---|---|---|---|
| | | | 2035 Alt.1 vs. 2008 (lbs/day) | 2035 Alt 5A vs. 2008 (lbs/day) | 2035 Alt 6A vs. 2008 (lbs/day) | 2035 Alt 6B vs. 2008 (lbs/day) | 2035 Alt 6C vs. 2008 (lbs/day) | |
| $NO_x$ | SCAB | 103,4982 | -870,000 | -870,000 | -870,000 | -880,000 | -880,000 | 55 |
| | AOI | 238,709 | -200,000 | -200,000 | -200,000 | -200,000 | -200,000 | |
| | I-710 | 18,050 | -13,000 | -13,000 | -11,000 | -15,000 | -14,000 | |
| | I-710 Post | 24,212 | -18,000 | -17,000 | -16,000 | -20,000 | -20,000 | |
| CO | SCAB | 2,860,036 | -2,000,000 | -2,000,000 | -2,000,000 | -2,000,000 | -2,000,000 | 550 |
| | AOI | 688,363 | -510,000 | -510,000 | -510,000 | -510,000 | -510,000 | |
| | I-710 | 26,234 | -19,000 | -17,000 | -16,000 | -18,000 | -18,000 | |
| | I-710 Post | 26,939 | -19,000 | -17,000 | -16,000 | -18,000 | -18,000 | |
| $PM_{10}$ (Total) | SCAB | 154,589 | 23,000 | 23,000 | 24,000 | 23,000 | 23,000 | |
| | AOI | 36,992 | 1,800 | 1,900 | 2,100 | 1,800 | 1,800 | |
| | I-710 | 1,893 | 230 | 580 | 1,300 | 1,000 | 920 | |
| | I-710 Post | 2,345 | 120 | 400 | 1,100 | 800 | 680 | |
| $PM_{10}$ (Exhaust) | SCAB | 58,876 | -9,500 | -9,400 | -9,400 | -9,800 | -9,700 | 150 |
| | AOI | 36,992 | -3,400 | -3,400 | -3,300 | -3,600 | -3,600 | |
| | I-710 | 868 | -300 | -190 | -10 | -330 | -290 | |
| | I-710 Post | 1,105 | -470 | -360 | -190 | -540 | -500 | |
| $PM_{10}$ (Entrained) | SCAB | 95,713 | 33,000 | 33,000 | 33,000 | 33,000 | 33,000 | |
| | AOI | 23,024 | 5,200 | 5,300 | 5,400 | 5,500 | 5,400 | |
| | I-710 | 1,025 | 530 | 770 | 1,300 | 1,400 | 1,200 | |
| | I-710 Post | 1,240 | 590 | 800 | 1,300 | 1,300 | 1,200 | |
| $PM_{2.5}$ (Total) | SCAB | 67,381 | -2,300 | -2,300 | -2,200 | -2,500 | -2,400 | 55 |
| | AOI | 16,115 | -2,000 | -1,900 | -1,900 | -2,100 | -2,100 | |
| | I-710 | 942 | -170 | -40 | 230 | 0 | 0 | |
| | I-710 Post | 1,201 | -320 | -190 | 70 | -190 | -200 | |

Page 3.13-36

A66

I-710 Corridor Project EIR/EIS

**Table 3.13-22  Comparison of Incremental Criteria Pollutant Emissions for All Alternatives compared to 2008, for all Study Areas[1,2]**

| Pollutant | Study Area | 2008 Baseline Emissions | Comparison with 2008 Baseline | | | | | SCAQMD CEQA Mass Emission Thresholds[2] (lbs/day increase) |
|---|---|---|---|---|---|---|---|---|
| | | | 2035 Alt.1 vs. 2008 (lbs/day) | 2035 Alt 5A vs. 2008 (lbs/day) | 2035 Alt 6A vs. 2008 (lbs/day) | 2035 Alt 6B vs. 2008 (lbs/day) | 2035 Alt 6C vs. 2008 (lbs/day) | |
| $PM_{2.5}$ (Exhaust) | SCAB | 43,888 | -10,000 | -10,000 | -10,000 | -11,000 | -11,000 | |
| | AOI | 10,464 | -3,200 | -3,200 | -3,200 | -3,400 | -3,400 | |
| | I-710 | 690 | -300 | -230 | -90 | -340 | -300 | |
| | I-710 Post | 895 | -460 | -390 | -260 | -520 | -490 | |
| $PM_{2.5}$ (Entrained) | SCAB | 23,493 | 8,100 | 8,100 | 8,100 | 8,100 | 8,100 | |
| | AOI | 5,651 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | |
| | I-710 | 252 | 130 | 190 | 320 | 330 | 300 | |
| | I-710 Post | 306 | 150 | 200 | 320 | 330 | 290 | |
| ROG | SCAB | 23,4677 | -170,000 | -160,000 | -170,000 | -170,000 | -170,000 | 55 |
| | AOI | 58,803 | -43,000 | -43,000 | -44,000 | -44,000 | -44,000 | |
| | I-710 | 2,204 | -1,500 | -1,500 | -1,300 | -1,600 | -1,600 | |
| | I-710 Post | 2,482 | -1,700 | -1,700 | -1,500 | -1,800 | -1800 | |
| $SO_2$ | SCAB | 3,867 | 1,300 | 1,300 | 1,300 | 1,200 | 1,300 | 150 |
| | AOI | 934 | 160 | 160 | 160 | 140 | 150 | |
| | I-710 | 39 | 15 | 23 | 36 | 13 | 15 | |
| | I-710 Post | 41 | 17 | 24 | 37 | 12 | 14 | |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study*, February 2012.
[1]   Numbers rounded to two significant figures. Emission changes of 1 percent or smaller are presented as zero-emission changes.
[2]   The SCAQMD significance thresholds are presented for information only. Caltrans has not adopted these thresholds.

Alt = Alternative
AOI = Area of Interest
CEQA = California Environmental Quality Act
CO = carbon monoxide
I-710 = Interstate 710
I-710 Post = Post-Processed Traffic Data
lbs/day = pounds per day

$NO_x$ = nitrogen oxide
$PM_{2.5}$ = particulate matter less than 2.5 microns in diameter
$PM_{10}$ = particulate matter less than 10 microns in diameter
ROG = reactive organic gases
SCAB = South Coast Air Basin
SCAQMD = South Coast Air Quality Management District
$SO_2$ = sulfur dioxide

A67

I-710 Corridor Project EIR/EIS

**Table 3.13-23  Comparison of Incremental Criteria Pollutant Emissions for All Build Alternatives compared to Alternative 1 (No Build), for all Study Areas[1]**

| Pollutant | Study Area | 2035 Alt 1 Baseline Emissions | Comparison with 2035 Alternative 1 | | | |
|---|---|---|---|---|---|---|
| | | | Alt 5A vs. Alt 1 (lbs/day) | Alt 6A vs. Alt 1 (lbs/day) | Alt 6B vs. Alt 1 (lbs/day) | Alt 6C vs. Alt 1 (lbs/day) |
| NOx | SCAB | 16,2816 | 0 | 0 | -4,600 | -3,600 |
| | AOI | 42,848 | 0 | 0 | -4,000 | -3,200 |
| | I-710 | 5,111 | 300 | 2,000 | -2,000 | -1,500 |
| CO | SCAB | 855,260 | 0 | 0 | 0 | 0 |
| | AOI | 180,695 | 0 | 0 | -1,900 | 0 |
| | I-710 | 7,579 | 1,400 | 2,900 | 650 | 930 |
| PM10 (Total) | SCAB | 177,994 | 0 | 0 | 0 | 0 |
| | AOI | 38,787 | 0 | 0 | 0 | 0 |
| | I-710 | 2,120 | 360 | 1,100 | 790 | 690 |
| *PM10 (Exhaust)* | *SCAB* | *49,400* | *0* | *0* | *0* | *0* |
| | *AOI* | *10,569* | *0* | *0* | *-240* | *-170* |
| | *I-710* | *569* | *110* | *290* | *-35* | *9* |
| *PM10 (Entrained)* | *SCAB* | *128,593* | *0* | *0* | *0* | *0* |
| | *AOI* | *28,217* | *0* | *0* | *0* | *0* |
| | *I-710* | *1,552* | *250* | *780* | *830* | *680* |
| PM2.5 (Total) | SCAB | 65,099 | 0 | 0 | 0 | 0 |
| | AOI | 14,148 | 0 | 0 | 0 | 0 |
| | I-710 | 771 | 130 | 400 | 170 | 160 |
| *PM2.5 (Exhaust)* | *SCAB* | *33,535* | *0* | *0* | *0* | *0* |
| | *AOI* | *7,222* | *0* | *0* | *-200* | *-140* |
| | *I-710* | *391* | *74* | *210* | *-37* | *0* |
| *PM2.5 (Entrained)* | *SCAB* | *31,564* | *0* | *0* | *0* | *0* |
| | *AOI* | *6,926* | *0* | *0* | *0* | *0* |
| | *I-710* | *381* | *61* | *190* | *200* | *170* |

A68

I-710 Corridor Project EIR/EIS

**Table 3.13-23  Comparison of Incremental Criteria Pollutant Emissions for All Build Alternatives compared to Alternative 1 (No Build), for all Study Areas[1]**

| Pollutant | Study Area | 2035 Alt 1 Baseline Emissions | Comparison with 2035 Alternative 1 | | | |
|---|---|---|---|---|---|---|
| | | | Alt 5A vs. Alt 1 (lbs/day) | Alt 6A vs. Alt 1 (lbs/day) | Alt 6B vs. Alt 1 (lbs/day) | Alt 6C vs. Alt 1 (lbs/day) |
| ROG | SCAB | 69,613 | 0 | 0 | 0 | 0 |
| | AOI | 15,431 | 0 | -220 | -530 | -470 |
| | I-710 | 688 | 30 | 190 | -110 | -82 |
| $SO_2$ | SCAB | 5,144 | 0 | 0 | 0 | 0 |
| | AOI | 1,098 | 0 | 0 | -24 | -19 |
| | I-710 | 53 | 8 | 21 | -2 | 1 |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study,* February 2012.
[1]    Numbers rounded to two significant figures. Emission changes of 1 percent or smaller are presented as zero-emission changes.

Alt = Alternative
AOI = Area of Interest
CEQA = California Environmental Quality Act
CO = carbon monoxide
I-710 = Interstate 710
lbs/day = pounds per day
$NO_x$ = nitrogen oxide

$PM_{2.5}$ = particulate matter less than 2.5 microns in diameter
$PM_{10}$ = particulate matter less than 10 microns in diameter
ROG = reactive organic gases
SCAB = South Coast Air Basin
SCAQMD = South Coast Air Quality Management District
$SO_2$ = sulfur dioxide

A69

Total traffic-related PM emissions consist of exhaust emissions (which include direct brake and tire wear) and entrained dust emissions (particulate matter from roadways lifted into the air by vehicle motion). For entrained PM emissions, this study used the latest EPA methodology (January 2011) with local inputs. This methodology increases entrained emissions as a direct function of VMT. Thus, each of the 2035 alternatives show an increase (approximately 34 percent) in entrained PM emissions compared to 2008. This increase offsets reductions in exhaust PM emissions in future years (as engine and control technology outpaces the effect of the increase in VMT). For $PM_{2.5}$, exhaust emission decreases are great enough that total $PM_{2.5}$ emissions still decrease for all study areas (except for Alternative 6A along I-710). For $PM_{10}$, calculated increases in entrained emissions are much greater than exhaust $PM_{10}$ reductions, resulting in large calculated increases in $PM_{10}$ emissions in all study areas for all 2035 alternatives compared to 2008.

It should be noted that after the I-710 Corridor Project emission calculations were completed, SCAQMD proposed a modified methodology for entrained PM emissions[1] as part of its 2012 AQMP development, consistent with their approach used in the 2007 AQMP. In SCAQMD's proposed methodology, 2008 $PM_{10}$ and $PM_{2.5}$ estimates will be lower, particularly $PM_{2.5}$ estimates. Most importantly, future year entrained PM will remain constant unless the roadway is lengthened. Thus, actual PM impacts for the project alternatives (compared to 2008) will be more similar to the exhaust PM impacts reflected in Tables 3.13-22 and 3.31-23 than the results presented for total PM impacts.

Exhaust $PM_{2.5}$ and $PM_{10}$ emissions decrease for each of the project alternatives in each study area, compared to 2008. The greatest decreases are in Alternative 6B, followed by Alternative 6C and Alternative 1 having similar decreases, then Alternative 5A and Alternative 6A having the least decreases.

Incremental $SO_2$ emissions for each alternative increase in the SCAB (compared to the 2008 baseline); the greatest increase is along I-710 and the smallest increase in the AOI. Alternative 6A has the greatest increase along I-710. This increase results from forecasted increases in VMT; the 2008 baseline already reflects the requirement for trucks to use ultralow sulfur diesel fuels in California that was adopted before 2008. $SO_2$ emissions for all project alternatives show similar increases of about 0.65 tons/day. It should be noted that the SCAQMD has recently adopted amendments to its sulfur oxides $(SO_x)$ RECLAIM rule that will further reduce $SO_x$ emissions by about 5.4

---

[1]    See www.aqmd.gov/gb_comit/stmpradvgrp/2012AQMP/meetings/2011/dec15/PavedRoadDust.pdf.

A70

tons/day. In addition, implementation of ARB rules and the Ports' CAA Plan is projected to reduce $SO_x$ emissions from other goods movement sources (e.g., oceangoing vessel) over 20 tons/day. Most $SO_x$ RECLAIM and oceangoing vessel emission reductions will occur upwind of the I-710 Study AOI.

The comparison of the build alternatives to Alternative 1 for 2035 conditions is presented in Table 3.13-23. In this comparison, the impacts of general VMT increases from 2008 are eliminated, although smaller VMT differences among the project alternatives remain.

For the SCAB and AOI, the incremental impacts of Alternative 5A and Alternative 6A for ALL pollutants compared to Alternative 1 for 2035 conditions is essentially zero (less than a 1 percent difference). $NO_x$, $PM_{10}$ exhaust, and $PM_{2.5}$ exhaust generally decrease in Alternatives 6B and 6C (compared to Alternative 1) in these study areas, but in general, the differences are small or less than 1 percent. $SO_x$ emissions, which increased in all project alternatives compared to 2008, are essentially the same for the build alternatives compared to Alternative 1.

Along I-710 (including the freight corridor, if applicable), only Alternative 6B and Alternative 6C show decreases in emissions (mostly $NO_x$ and ROG) compared to Alternative 1 for 2035 conditions. Otherwise, all build alternatives have increased emissions along I-710 compared to Alternative 1 for 2035 conditions, with the greatest increases for Alternative 6A and then Alternative 5A.

> **ZEE Design Option.** Implementing the ZEE Design Option for Alternative 6B would reduce the alternative's $NO_x$, CO, $PM_{10}$ (total), $PM_{2.5}$ (total), ROG, and $SO_2$ emissions, within the I-710 region, by a further 500, 230, 20, 20, 50, and 2.6 lbs/day, respectively.

> Implementing the ZEE Design Option for Alternative 6C would reduce the alternative's $NO_x$, CO, $PM_{10}$ (total), $PM_{2.5}$ (total), ROG, and $SO_2$ emissions, within the I-710 region, by a further 400, 180, 20, 10, 38, and 2 lbs/day, respectively.

> Implementing the ZEE Design Options would not change the conclusions for the regional emissions analysis for Alternatives 6B or 6C.

CRITERIA POLLUTANT TRAFFIC EMISSION CONCENTRATIONS. Emissions released from traffic are mixed and diluted in ambient air and ultimately transported away from the traffic. The simulation of the release and transport of emissions from traffic in order to estimate the concentrations of the criteria pollutants at specified locations (called receptors) is conducted through air dispersion modeling.

Modeling of the quantities and effects of project traffic-related air pollution was performed using emissions data calculated only for the I-710 mainline (and the freight corridor for Alternatives 6A/B/C), using post processed traffic data, as described above. The modeling results do not, therefore, reflect changes in emissions on the other nearby freeways, local arterials, and other local roadways. Based on the emissions analysis of the build alternatives, emissions of criteria pollutants generally decrease on these nearby freeways, arterials, and roadways as traffic shifts to the I-710. The detailed modeling methodology and results are presented in the AQ/HRA. The modeling results presented are conservative in that they account for impacts from increased traffic on the I-710 for the build alternatives but do not account for any decreases in ambient concentrations related to reduced traffic on nearby freeways, arterials, and roadways for the build alternatives as mobility improves on I-710.

For this study, the EPA's AERMOD dispersion model was used to model the criteria pollutant concentrations that would result from traffic-related emissions on I-710 and the freight corridor. Freeway traffic emissions were represented in AERMOD as a series of volume sources, which is accepted practice for modeling mobile sources in a dispersion model (ENVIRON, 2006b,c,d,e,f,g, 2007a,b, 2008). Appropriately sized and positioned volume sources were placed along the I-710 Corridor using geographic information system (GIS) tools. Hourly resolution meteorological surface data such as wind speed, direction, and upper air data were also employed in the AERMOD analysis of pollutant transport and dispersion. A unique aspect of the I-710 Corridor Project is that I-710 is 18 miles in length, and meteorological conditions vary by location over that distance. Therefore, a "Sphere of Influence" approach was used, and the I-710 Corridor was broken into four reasonably representative meteorological zones. Meteorological data for a station in each zone was processed using AERMET, the EPA meteorological preprocessor program for AERMOD.

As guidance to lead agencies, the SCAQMD has established CEQA significance thresholds for concentration impacts for $NO_2$ (one-hour and annual average), CO (one-hour and eight-hour), $PM_{10}$ (24-hour and annual average), and $PM_{2.5}$ (24-hour average). Therefore, the concentration impacts for only these criteria pollutants and corresponding averaging periods were calculated and reported. In this section SCAQMD's CEQA significance thresholds are presented for information purposes only; the air quality analysis for CEQA is provided in Chapter 4.0 of this EIR/EIS.

Tables 3.13-24 through 3.13-28 provide the calculated maximum incremental concentration impacts for the project alternatives as compared to 2008 for the criteria pollutants. The CO and $NO_2$ incremental impacts decrease for all project alternatives (except for Alternative 6A)

**Table 3.13-24  Incremental Concentration Impacts from the I-710 Freeway Mainline for Alternative 1 as compared to 2008**

| Project Increment + Background[a] | | | | | |
|---|---|---|---|---|---|
| Pollutant | Averaging Time | Incremental Impact (µg/m$^3$) | Maximum (Incremental + Background) Concentration Impact (µg/m$^3$) | SCAQMD CEQA Threshold[b] (µg/m$^3$) | National Ambient Air Quality Standards[b] (µg/m$^3$) |
| NO$_2$ | 1-hour | -81.2 | 145 | 339 | 188 |
| | Annual | -0.6 | 55.6 | 56.0 | 100 |
| CO | 1-hour | -211 | 8,950 | 23,000 | 40,000 |
| | 8-hour | -36 | 7,300 | 10,000 | 10,000 |

| Project Incremental Impact[a] | | | |
|---|---|---|---|
| Pollutant | Averaging Time | Maximum Incremental Impact (µg/m$^3$) | SCAQMD CEQA Threshold[b] (µg/m$^3$) |
| PM$_{10}$ | 24-hour | 19.6[b] | 2.5 |
| | Annual | 13.9[b] | 1.0 |
| PM$_{2.5}$ | 24-hour | 0.036 | 2.5 |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study*, February 2012.
Notes:
[a]   Incremental impacts from the project plus background pollutant concentrations are presented. PM$_{10}$ and PM$_{2.5}$ are incremental impacts, consistent with the SCAB's nonattainment status and, therefore, only the incremental impacts from the project are presented. PM$_{2.5}$ and PM$_{10}$ emissions include AP 42 estimates of entrained road dust; actual incremental impacts would be lower using the recent SCAQMD/ARB methodology.
[b]   SCAQMD thresholds presented for information purposes only; see Chapter 4 for the CEQA air quality analysis. Impacts above the SCAQMD's threshold levels are in areas close (300 meters or less) to the mainline and/or freight corridor. Maximum impacts occur within 50 meters.

CEQA = California Environmental Quality Act        PM$_{2.5}$ = particulate matter less than 2.5 microns in diameter
CO = carbon monoxide                              PM$_{10}$ = particulate matter less than 2.5 microns in diameter
I-710 = Interstate 710                            SCAB = South Coast Air Basin
µg/m$^3$ = micrograms per cubic meter             SCAQMD = South Coast Air Quality Management District
NO$_2$ = nitrogen dioxide

**Table 3.13-25  Incremental Concentration Impacts from the I-710 Freeway Mainline for Alternative 5A as compared to 2008**

| Project Increment + Background[a] | | | | | |
|---|---|---|---|---|---|
| Pollutant | Averaging Time | Incremental Impact ($\mu g/m^3$) | Maximum (Incremental + Background) Concentration Impact ($\mu g/m^3$) | SCAQMD CEQA Threshold[b] ($\mu g/m^3$) | National Ambient Air Quality Standards[b] ($\mu g/m^3$) |
| $NO_2$ | 1-hour | -79.4 | 146 | 339 | 188 |
| | Annual | -0.6 | 55.7 | 56.0 | 100 |
| CO | 1-hour | -203 | 8,960 | 23,000 | 40,000 |
| | 8-hour | -34 | 7,300 | 10,000 | 10,000 |

| Project Incremental Impact[a] | | | |
|---|---|---|---|
| Pollutant | Averaging Time | Maximum Incremental Impact ($\mu g/m^3$) | SCAQMD CEQA Threshold[b] ($\mu g/m^3$) |
| $PM_{10}$ | 24-hour | 60.5 [b] | 2.5 |
| | Annual | 35.6 [b] | 1.0 |
| $PM_{2.5}$ | 24-hour | 15.5 [b] | 2.5 |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study,* February 2012.

Notes:

[a]  The thresholds for $NO_2$ and CO are combined thresholds and, therefore, incremental impacts from the project plus background pollutant concentrations are presented. The thresholds for $PM_{10}$ and $PM_{2.5}$ are incremental and, therefore, only the incremental impacts from the project are presented. $PM_{2.5}$ and $PM_{10}$ emissions include AP 42 estimates of entrained road dust; actual incremental impacts would be lower using the recent SCAQMD/ARB methodology.

[b]  SCAQMD thresholds presented for information purposes only; see Chapter 4 for the CEQA air quality analysis. Impacts above the SCAQMD's threshold levels are in areas close (300 meters or less) to the mainline and/or freight corridor. Maximum impacts occur within 50 meters.

CEQA = California Environmental Quality Act
CO = carbon monoxide
I-710 = Interstate 710
$\mu g/m^3$ = micrograms per cubic meter
$NO_2$ = nitrogen dioxide

$PM_{2.5}$ = particulate matter less than 2.5 microns in diameter
$PM_{10}$ = particulate matter less than 2.5 microns in diameter
SCAB = South Coast Air Basin
SCAQMD = South Coast Air Quality Management District

A74

I-710 Corridor Project EIR/EIS

**Table 3.13-26  Incremental Concentration Impacts from the I-710 Freeway Mainline for Alternative 6A as compared to 2008**

| Project Increment + Background[a] | | | | | |
|---|---|---|---|---|---|
| Pollutant | Averaging Time | Incremental Impact ($\mu g/m^3$) | Maximum (Incremental + Background) Concentration Impact ($\mu g/m^3$) | SCAQMD CEQA Threshold[b] ($\mu g/m^3$) | National Ambient Air Quality Standards[b] ($\mu g/m^3$) |
| $NO_2$ | 1-hour | -70.1 | 156 | 339 | 188 |
|  | Annual | 4.8 | 62.4 | 56.0 | 100 |
| CO | 1-hour | -241 | 8,920 | 23,000 | 40,000 |
|  | 8-hour | -37 | 7,300 | 10,000 | 10,000 |

| Project Incremental Impact [a] | | | |
|---|---|---|---|
| Pollutant | Averaging Time | Maximum Incremental Impact ($\mu g/m^3$) | SCAQMD CEQA Threshold[b] ($\mu g/m^3$) |
| $PM_{10}$ | 24-hour | 78.7[b] | 2.5 |
|  | Annual | 44.4[b] | 1.0 |
| $PM_{2.5}$ | 24-hour | 21.0[b] | 2.5 |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study,* February 2012.
Notes:
[a]   The thresholds for $NO_2$ and CO are combined thresholds and, therefore, incremental impacts from the project plus background pollutant concentrations are presented. The thresholds for $PM_{10}$ and $PM_{2.5}$ are incremental and, therefore, only the incremental impacts from the project are presented. $PM_{2.5}$ and $PM_{10}$ emissions include AP 42 estimates of entrained road dust; actual incremental impacts would be lower using the recent SCAQMD/ARB methodology.
[b]   SCAQMD thresholds presented for information purposes only; see Chapter 4 for the CEQA air quality analysis. Impacts above the SCAQMD's threshold levels are in areas close (300 meters or less) to the mainline and/or freight corridor. Maximum impacts occur within 50 meters.

| | |
|---|---|
| CEQA = California Environmental Quality Act | $PM_{2.5}$ = particulate matter less than 2.5 microns in diameter |
| CO = carbon monoxide | $PM_{10}$ = particulate matter less than 2.5 microns in diameter |
| I-710 = Interstate 710 | SCAB = South Coast Air Basin |
| $\mu g/m^3$ = micrograms per cubic meter | SCAQMD = South Coast Air Quality Management District |
| $NO_2$ = nitrogen dioxide | |

**Table 3.13-27  Incremental Concentration Impacts from the I-710 Freeway Mainline for Alternative 6B as compared to 2008**

| Project Increment + Background[a] | | | | | |
|---|---|---|---|---|---|
| Pollutant | Averaging Time | Incremental Impact (µg/m³) | Maximum (Incremental + Background) Concentration Impact (µg/m³) | SCAQMD CEQA Threshold[b] (µg/m³) | National Ambient Air Quality Standards[b] (µg/m³) |
| NO₂ | 1-hour | -84.5 | 141 | 339 | 188 |
| | Annual | -0.7 | 55.6 | 56.0 | 100 |
| CO | 1-hour | -254 | 8,910 | 23,000 | 40,000 |
| | 8-hour | -40 | 7,290 | 10,000 | 10,000 |

| Project Incremental Impact[a] | | | |
|---|---|---|---|
| Pollutant | Averaging Time | Maximum Incremental Impact (µg/m³) | SCAQMD CEQA Threshold[b] (µg/m³) |
| PM₁₀ | 24-hour | 74.4 [b] | 2.5 |
| | Annual | 42.5 [b] | 1.0 |
| PM₂.₅ | 24-hour | 15.3 [b] | 2.5 |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study,* February 2012.

Notes:

[a]   The thresholds for NO₂ and CO are combined thresholds and, therefore, incremental impacts from the project plus background pollutant concentrations are presented. The thresholds for PM₁₀ and PM₂.₅ are incremental and, therefore, only the incremental impacts from the project are presented. PM₂.₅ and PM₁₀ emissions include AP 42 estimates of entrained road dust; actual incremental impacts would be lower using the recent SCAQMD/ARB methodology.

[b]   SCAQMD thresholds presented for information purposes only; see Chapter 4 for the CEQA air quality analysis. Impacts above the SCAQMD's threshold levels are in areas close (300 meters or less) to the mainline and/or freight corridor. Maximum impacts occur within 50 meters.

CEQA = California Environmental Quality Act
CO = carbon monoxide
I-710 = Interstate 710
µg/m³ = micrograms per cubic meter
NO₂ = nitrogen dioxide

PM₂.₅ = particulate matter less than 2.5 microns in diameter
PM₁₀ = particulate matter less than 2.5 microns in diameter
SCAB = South Coast Air Basin
SCAQMD = South Coast Air Quality Management District

I-710 Corridor Project EIR/EIS

**Table 3.13-28  Incremental Concentration Impacts from the I-710 Freeway Mainline for Alternative 6C as compared to 2008**

| Project Increment + Background[a] | | | | |
|---|---|---|---|---|
| Pollutant | Averaging Time | Incremental Impact ($\mu g/m^3$) | Maximum (Incremental + Background) Concentration Impact ($\mu g/m^3$) | SCAQMD CEQA Threshold[b] ($\mu g/m^3$) | National Ambient Air Quality Standards[b] ($\mu g/m^3$) |
| $NO_2$ | 1-hour | -83.9 | 142 | 339 | 188 |
| | Annual | -0.7 | 55.6 | 56.0 | 100 |
| CO | 1-hour | -254 | 8,910 | 23,000 | 40,000 |
| | 8-hour | -39 | 7,290 | 10,000 | 10,000 |

| Project Incremental Impact[a] | | | |
|---|---|---|---|
| Pollutant | Averaging Time | Maximum Incremental Impact ($\mu g/m^3$) | SCAQMD CEQA Threshold[b] ($\mu g/m3$) |
| $PM_{10}$ | 24-hour | 64.2 [b] | 2.5 |
| | Annual | 34.9 [b] | 1.0 |
| $PM_{2.5}$ | 24-hour | 13.1 [b] | 2.5 |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study,* February 2012.
Notes:
[a]   The thresholds for $NO_2$ and CO are combined thresholds and, therefore, incremental impacts from the project plus background pollutant concentrations are presented. The thresholds for $PM_{10}$ and $PM_{2.5}$ are incremental and, therefore, only the incremental impacts from the project are presented. $PM_{2.5}$ and $PM_{10}$ emissions include AP 42 estimates of entrained road dust; actual incremental impacts would be lower using the recent SCAQMD/ARB methodology.
[b]   SCAQMD thresholds presented for information purposes only; see Chapter 4 for the CEQA air quality analysis. Impacts above the SCAQMD's threshold levels are in areas close (300 meters or less) to the mainline and/or freight corridor. Maximum impacts occur within 50 meters.

| | |
|---|---|
| CEQA = California Environmental Quality Act | $PM_{2.5}$ = particulate matter less than 2.5 microns in diameter |
| CO = carbon monoxide | $PM_{10}$ = particulate matter less than 2.5 microns in diameter |
| I-710 = Interstate 710 | SCAB = South Coast Air Basin |
| $\mu g/m^3$ = micrograms per cubic meter | SCAQMD = South Coast Air Quality Management District |
| $NO_2$ = nitrogen dioxide | |

A77

as compared to 2008. The 2035 ambient concentration levels calculated by adding the incremental impacts to existing background concentrations were found to be below the California Ambient Air Quality Standards (CAAQS) and the NAAQS for most alternatives. Only the calculated annual $NO_2$ ambient concentration for Alternative 6A exceeds the CAAQS level, and at only one receptor, which is approximately 10 meters from the center of the freight corridor. Several studies have shown that AERMOD predictions tend to be high at receptors this close to the emission source (in this case I-710). Other factors/assumptions that contribute to the exceedance of the CAAQS at this receptor include (1) an annual average background concentration (57.6 $\mu g/m^3$) greater than the CAAQS level (56 $\mu g/m^3$); (2) a conservative assumption that all $NO_x$ is converted to $NO_2$; (3) overlooking the reductions in $NO_x$ occurring due to reduced traffic on local roadways and nearby freeways, and 4) impossibility of long-term exposure (one year) immediately adjacent to the freight corridor.

Figures 4.2 through 4.6, from the AQ/HRA, and provided in Appendix R of this EIR/EIS, show the change in $NO_X$ emissions for build alternatives as compared to the 2008 baseline and Alternative 1. These gridded mass emission figures have been plotted by adding the $NO_X$ emissions from links or part of links present in a grid size of 0.25 mile by 0.25 mile. The $NO_X$ emissions for all 2035 alternatives as compared to the 2008 baseline, decrease on the freeways, arterials, and roadways in the AOI in spite of the increase in the VMT. This occurs due to the improvement in vehicle technology driven by state and local programs/ regulations.

A comparison of the $NO_X$ emissions for Alternatives 6A/B/C to Alternative 1 (Figures 4.4 to 4.6) shows additional reductions in emissions on I-605, I-105, I-110 and SR-91 due to shifting of trucks from these freeways to the I-710 freight corridor. However, fewer reductions in $NO_X$ emissions for these alternatives in the northern section of I-710 and SR-60 where the freight corridor ends and trucks move off I-710 were observed. The comparison of Alternative 6A to Alternative 1 (Figure 4.4) shows a lower level of $NO_X$ emission reductions (compared to 2008) along I-710 due to increased flow of trucks with the introduction of the freight corridor. This effect disappears for Alternatives 6B and 6C when the freight corridor is restricted to zero-emission vehicles.

Figures 4.7 to 4.11 (Appendix R) of the AQ/HRA, present gridded mass emission plots for total and exhaust $PM_{2.5}$ emissions. These plots were made following the methodology described above for the $NO_X$ mass emission plots. Total $PM_{2.5}$ emissions are a sum of the vehicle exhaust emissions[1] and entrained dust emissions. The comparison of total $PM_{2.5}$

---

[1]   Vehicle OM exhaust emissions include break and tire wear also.

A78

mass emissions in the project alternatives to the 2008 baseline shows decreases in emissions on the freeways, arterials, and local roadways near I-710. These emissions also decrease on I-710 for all project alternatives except Alternative 6A. As described earlier for Alternative 6A, the increase in the $PM_{2.5}$ entrained dust emissions as compared to the 2008 baseline far exceeds the decreases seen in the exhaust $PM_{2.5}$ emissions along I-710. The exhaust $PM_{2.5}$ mass emissions of the project alternatives compared to the 2008 baseline show decreases on I-710 as well. These follow a trend similar to those for $NO_X$.

Total $PM_{2.5}$ emissions for the build alternatives compared to Alternative 1 show an increase in emissions on I-710. This is due to the increased mobility and capacity of the freeway, which results in increased exhaust and entrained dust emissions. For Alternatives 6A/B/C, there are decreases in emissions on sections of nearby freeways, particularly I-605 due to shifting of the trucks to I-710 with the introduction of the freight corridor. As in the case of $NO_X$ emissions, emissions on SR-60 and the northern section of I-710 are greater for Alternatives 6A/B/C compared to Alternative 1, as the freight corridor terminates and trucks transition onto the mainline of these two freeways; however, compared to 2008, there are decreases in total and entrained $PM_{2.5}$ on SR-60.

Figures 4.12 through 4.16, Figures 4.17 through 4.21, and Figures 4.22 through 4.26 (Appendix R) of the AQ/HRA show annual $PM_{10}$ isopleths, 24-hour $PM_{10}$ bubble plots and 24-hour $PM_{2.5}$ bubble plots, respectively, for the comparison of project alternatives to 2008. Each of these figures show plots for both exhaust and total PM impacts. The bubble plots present the maximum 24-hour concentration recorded at each of the modeling grid points over the entire year. The maximum 24-hour concentration at one modeling point may not occur on the same day as the maximum 24-hour concentration on another modeling point. All the build alternatives show an increase in the total $PM_{10}$ and total $PM_{2.5}$ impacts as compared to 2008 that are greater than the SCAQMD incremental thresholds at several receptors. However, it should be noted that the total PM mass emissions were calculated as a sum of the exhaust and entrained dust emissions. EPA's AP-42 methodology was used to estimate the entrained dust emissions, which assumes an infinite volume of silt reservoir. As discussed previously, the SCAQMD 2007 AQMP approach would show no increases due to VMT increases (finite silt reservoir). Therefore, the number of modeling points above the SCAQMD threshold would decrease if a more realistic finite silt reservoir were assumed. A look at the incremental impact isopleths and bubble plots for exhaust PM only impacts are below the SCAQMD's significance threshold for almost all modeling grid points. Those grid points which do exceed the SCAQMD significance threshold are in very close proximity to the I-710 mainline or the freight corridor. All the build alternatives show an increase in impacts compared to Alternative 1. This occurs due to the increased mobility and capacity of I-710 in the build alternatives as compared to Alternative 1, which in turn results in more

A79

traffic and greater mass emissions. Alternatives 6B and 6C show the lowest increase (compared to 2035 No Build) in impacts amongst the build alternatives because of the operation of the freight corridor as a zero-emission roadway. Figures 4.27 through 4.30, Figures 4.31 through 4.34, and Figures 4.35 through 4.38, in Appendix R show annual $PM_{10}$ isopleths, 24-hour $PM_{10}$ bubble plots, and 24-hour $PM_{2.5}$ bubble plots, respectively, for the comparison of build alternatives to Alternative 1. These figures show a side-by-side comparison of the calculated impacts for exhaust PM and total PM. As in the case of the comparison to 2008, the number of modeling grid points above the SCAQMD significance threshold for exhaust PM is less than the number of modeling grid points above SCAQMD significance threshold for total PM.

**ZEE Design Option.** There would be no significant change in incremental emissions for the I-710 freeway between the ZEE Design Option and the original analysis for both Alternatives 6B and 6C, although emissions decrease 10% to 88% on the I-710 mainline north of the northern terminus of the freight corridor compared to the Original Analysis. The incremental criteria pollutant exhaust emissions (compared to Alternative 1) from the entire I-710 freeway decreased by 2% to 15% in the ZEE Design Option; the largest decreases of 11% to 15% were observed in the $NO_X$ emissions.

Figures 1 through 4 (Appendix R) present a comparison of the incremental emission impacts for the ZEE Design Option and the Original Analysis. Figures 1 and 2 present the incremental (vs. 2008 and vs. Alternative 1) gridded mass emission figures of $NO_X$ emissions for Alternatives 6B and 6C, respectively. Figures 3 (3A and 3B) and 4 (4A and 4B) present similar gridded mass emission figures for $PM_{10}$ (total and exhaust) and $PM_{2.5}$ (total and exhaust) emissions. Exhaust emissions decrease for the ZEE Design Option as compared to the Original Analysis.

Figures 7 through 10, from the ZEE Design Option Addendum (Appendix R) show the maximum 24-hr $PM_{10}$ concentration impacts in Meteorological Zone 4 for the ZEE Design Option and the results of Alternatives 6B/6C in the AQ/HRA Technical Study as compared to 2008 baseline and Alternative 1 (No Build). The figures include total (infinite road dust reservoir) and the exhaust-only incremental PM impact results. Figures 11 through 14 (Appendix R) present similar plots for the maximum 24-hr $PM_{2.5}$ concentration impacts. Figures 15 through 22 (Appendix R) present the maximum annual $PM_{10}$ and $PM_{2.5}$ concentration impacts in Meteorological Zone 4 compared to the 2008 baseline and Alternative 1 (for exhaust-only and total emissions). An appreciable decrease in the exhaust $PM_{10}$ and $PM_{2.5}$ impacts can be seen in these figures for the ZEE Design Option (Alternative 6B/6C vs. Alternative 1) as compared to the AQ/HRA Technical Study in the area north of the northern terminus of the freight corridor.

I-710 Corridor Project EIR/EIS

Entrained PM emissions, which form a major portion of the total PM emissions, do not change for the ZEE Design Option as compared to the AQ/HRA Technical Study. Therefore, the total $PM_{10}$ and $PM_{2.5}$ impacts do not show an appreciable decrease for the ZEE Design Option.

In general, the air quality impacts (relative to the 2035 No Build Alternative) north and south of the rail yards are relatively similar for the ZEE Design Option, in contrast to the greater adverse impacts seen north of the rail yards for Alternatives 6B/C without the Zee Design Option in the original analysis.

### 3.13.3.2  PUBLIC HEALTH CONSIDERATIONS

As with criteria air pollutants, the greatest air toxic emission impacts occur along I-710. This occurs as the increased VMT (all alternatives) and increased capacity (build alternatives) increase emissions along I-710, although improved mobility and less traffic on local roadways can decrease emissions in the larger AOI and SCAB study areas. To address this, incremental health risk impacts (cancer risk and non-cancer acute and chronic hazard indices) resulting from emissions from the project alternatives were modeled.

Table 3.13-29 compares maximum relative health impacts between each of the project alternatives and the 2008 base year.

All project alternatives compared to 2008 show decreases in cancer risk (including 6A for residential areas) and hazard indices far below the SCAQMD's significance thresholds. Cancer risk and hazard indices decrease throughout the study areas for all project alternatives except for Alternative 6A in nonresidential areas in close proximity to I-710 (mainline and/or freight corridor).

All build alternatives have increases in cancer risk in certain locations along I-710 compared to Alternative 1. Figures 4.44 through 4.48 in Appendix R (February 2012) show that Alternative 5A and Alternative 6A have large areas with greater cancer risk (compared to Alternative 1), including very large increases right along I-710 (mainline and/or freight corridor). Some of these increases are due to shifting of the I-710 mainline or addition of the freight corridor; this can be seen when areas of greater and lower incremental impacts are seen in the same location such as in Figure 4.46 (e.g., paired increases/decreases around the I-710/Washington Blvd. and the I-710/I-5 interchanges). Alternative 6B and Alternative 6C (compared to Alternative 1) generally show lower levels of cancer risk until the freight corridor terminates near the rail yards. This is due to the analysis assuming that trucks leaving the zero-emissions freight corridor switch from zero-emissions technologies to conventional technologies (albeit cleaner than the 2008 truck

A81

**Table 3.13-29  Comparison of Incremental MSAT Health Risk Impacts for All Alternatives Compared to 2008**

| Health Impact | Alt 1 vs. 2008 | Alt 5A vs. 2008 | Alt 6A vs. 2008 | Alt 6B vs. 2008 | Alt 6C vs. 2008 | SCAQMD Significance Threshold[1] |
|---|---|---|---|---|---|---|
| Cancer Risk (Risk in 1 million) | -6 | -6 | 462[2] | -7 | -7 | 10 in 1 million |
| Chronic Non-Cancer Hazard Index (unitless) | -0.004 | -0.004 | 0.280 | -0.005 | -0.005 | 1.0 (Hazard Index) |
| Acute Non-Cancer Hazard Index (unitless) | -0.017 | -0.016 | 0.079 | 0.102 | -0.0001 | 1.0 (Hazard Index) |

Source: *I-710 Corridor Project Air Quality and Health Risk Assessments Technical Study*, February 2012.
Note: All analyses based on worst-case residential scenario impacts.
[1]   The SCAQMD significance thresholds are presented for information only.
[2]   Only 15 grid points show incremental increases above ten in a million. These grid points are not in residential areas and are generally located very near the freight corridor. The incremental cancer risk and incremental hazard indices decreased at all sensitive receptors in the modeling domain.

Alt = Alternative                                    SCAQMD = South Coast Air Quality Management District
MSAT = Mobile Source Air Toxics

fleet). Impacts in those areas would be reduced (compared to Alternative 1) if the trucks continued to use zero-emissions technologies.

**ZEE Design Option.** Figures 23 and 24 (Appendix R) show comparisons of the incremental cancer risks (residential risk scenario for all areas, which is conservative) for the ZEE Design Option and the Original Analysis for Alternatives 6B/6C as compared to the 2008 baseline and Alternative 1 in Meteorological Zone 4.

Compared to 2008, there is little difference in incremental cancer risk between the ZEE Design Option and the Original Analysis (see the left-hand sides of Figures 23 and 24). Compared to 2035 Alternative 1 (No Build), the incremental cancer risks for Alternatives 6B/6C decrease at all of the modeling grid points in the area of the ZEE Design Option OCS when compared with the original analysis. Incremental cancer risk (compared to the 2035 No Build Alternative) decreases both north and south of the rail yards for the ZEE Design Option, in contrast to increases in incremental cancer risk (compared to 2035 No Build) north of the rail yards when the zero-emission extension was not present.

**PM MORTALITY AND MORBIDITY.** Respirable particulate matter (RPM) is a public health concern as it is known to impact both the respiratory and cardiovascular systems. RPM deposition in the lungs and penetration into the bloodstream (for the smallest particles) triggers a range of inflammation responses and exacerbates health problems such as asthma and chronic

A82

I-710 Corridor Project EIR/EIS

bronchitis. Individuals susceptible to higher health risks from exposure to airborne PM include children, the elderly, smokers, and people of all ages with low pulmonary/cardiovascular function. Information about the biological mechanisms by which exposure to ambient particles adversely affects the respiratory and cardiovascular systems may be found in an ARB 2002 review.[1]

Numerous published epidemiological reports substantiate a correlation between the inhalation of ambient PM and increased cases of mortality/morbidity from heart and/or lung diseases. The Office of Environmental Health Hazard Assessment (OEHHA) is in the process of developing guidance on assessing health impacts from PM exposure. In recent studies,[2,3,4,5] ARB reviewed and summarized the nontoxic health effects (i.e., mortality and morbidity) of PM exposure and presented a health effect model attempting to quantify these impacts based on concentration-response functions.[6] This ARB model has been used, for example, to estimate the number of cases of disease and premature deaths linked to PM and ozone exposure from ports and goods movement activity in California.

Although the ARB model has also been used to quantitatively assess project-specific incremental levels of public mortality and morbidity (see for example Chapter 3.2 of the POLB

─────────────────────

[1]   California Air Resources Board (ARB), 2002b, Air Resources Board Staff Report: Public Hearing to Consider Amendments to the Ambient Air Quality Standards for Particulate Matter and Sulfates, May 3, 2002.

[2]   California Air Resources Board (CARB), 2002b, Air Resources Board Staff Report: Public Hearing to Consider Amendments to the Ambient Air Quality Standards for Particulate Matter and Sulfates, May 3, 2002.

[3]   California Air Resources Board (CARB), 2006h, Diesel Particulate Matter Exposure Assessment Study for the Ports of Los Angeles and Long Beach – Final Report.

[4]   California Air Resources Board (CARB), 2006i, Proposed Emission Reduction Plan for Ports and Goods Movement in California – Appendix A – Quantification of the Health Impacts and Economic Valuation of Air Pollution from Ports and Goods Movement in California.

[5]   California Air Resources Board (CARB), 2009, Methodology for Estimating Premature Deaths Associated with Long-term Exposure to Fine Airborne Particulate Matter in California, Staff report, December 7, (hhttp://www.arb.ca.gov/research/health/pm-mort/pm-mort_final.pdf).

[6]   That is, concentration-response functions are used to predict the effect of changes in ambient PM concentrations on health effects such as premature deaths, cardiac and respiratory hospitalizations, asthma, and other lower respiratory symptoms, lost work/school days, etc.

Middle Harbor Redevelopment Project EIR, POLB 2009), such calculations are subject to significant uncertainty. Sources of uncertainty include emission estimates, population exposure estimates, concentration-response functions,[1] baseline rates of mortality and morbidity that are entered into concentration response functions, and occurrence of additional not-quantified adverse health effects. It should be noted that the nature of PM as a complex mixture of various pollutants, as well as the health effects of pollutants such as $SO_2$, $NO_2$, CO, and $O_3$ that tend to co-occur with PM in ambient air, greatly increase the complexity of deriving accurate PM concentration-response functions. Health risk estimates derived in the presence of significant uncertainty tend to rely on very conservative assumptions that may greatly overestimate the potential adverse health effects. As stated by ARB in a 2006 study of DPM exposure from ports and goods movement in California (ARB 2006a): "Risk assessment has various uncertainties in the methodology and is therefore deliberately designed so that risks are not under predicted. Risk assessment is thus best understood as a tool for comparing risks from various sources, usually for purposes of prioritizing risk reduction, and not as literal prediction of the community incidence of disease from exposure"[2].

In light of the uncertainty in quantifying PM mortality and morbidity (particularly for a freeway project such as the I-710 Corridor Project), the analysis of PM mortality and morbidity for this project is a qualitative assessment based on comparative analysis of total $PM_{2.5}$ emissions for the various alternatives. In other words, for the purpose of this qualitative assessment, total $PM_{2.5}$ emissions are used as a potential surrogate for PM exposure. Calculations show that, in general, total I-710 $PM_{2.5}$ emissions (sum of exhaust and entrained road dust emissions) are expected to be lower for each of 2035 Alternatives (1, 5A, 6A, 6B and 6C) than 2008 baseline emissions (except for some quarter-mile areas along I-710 itself); the same is true for total $PM_{2.5}$ emissions within the SCAB. Consequently, the public's exposure within the AOI to PM-related morbidity and mortality health risks should decrease relative to the 2008 baseline, with the greatest risk reductions in 2035 under Alternatives 6B and 6C. As seen in Figures 4.22 through 4.26 (maximum 24-hour average) and Figures 4.49 through 4.53 (annual average)(Appendix R), incremental total $PM_{2.5}$ concentration impacts from I-710 (and the freight corridor under Alternatives 6A/B/C) for all of the 2035 alternatives compared to 2008 impacts are below the

---

[1]   Concentration-response functions may be location-specific, since the composition of particulate matter varies significantly by region, and not all types of particulate matter are expected to have the same health effects. Therefore, the application of concentration-response functions obtained from epidemiologic studies conducted (e.g., outside of California) may introduce significant errors in estimating impacts in the South Coast Air Basin.

[2]   Additional discussion and explanation of the sources and level of uncertainty in health risk assessments are provided by OEHHA in a 2003 report (OEHHA 2003)

I-710 Corridor Project EIR/EIS

SCAQMD's significance threshold levels; the exceptions are the areas next to the freight corridor (model grids less than about 50 meters from the corridor) with increases above the SCAQMD's significance threshold levels. As can be seen in those figures, these very near-roadway increases are solely because of increases in entrained roadway dust from the 2008 baseline. If those increases in roadway dust are an artifact of the analytical methodology, then the impacts would be more similar to those shown in the exhaust $PM_{2.5}$ Figures. Figures 4.35 through 4.38 (maximum 24-hour average) and Figures 4.54 through 4.57 (annual average) (Appendix R) show that I-710 near-roadway total $PM_{2.5}$ concentrations compared to the 2035 Alternative 1 were about the same for Alternative 5A, were lower than Alternatives 6A, 6B and 6C, with Alternative 6A having greater near-roadway concentrations than the other alternatives compared to Alternative 1. Similar to the comparisons to the 2008 baseline, the appreciable adverse impacts occurred along the roadways (less than 100 meters) and almost all were due to increases in entrained road dust. The near-roadway modeling confirms the conclusion of the emissions analyses for the AOI: the exposure of people along I-710 to PM-related morbidity and mortality health risks should decrease relative to the 2008 baseline with the exception of some locations near the roadways (particularly for Alternative 6A). To the extent that increases in entrained road dust in the 2035 alternatives may be overestimated, the exposure would be even lower for those very near to the roadways (see discussion of ultrafine particulates below, which uses exhaust $PM_{2.5}$ [rather than total $PM_{2.5}$] as a surrogate).

**ULTRAFINE PARTICULATES – QUALITATIVE ANALYSIS.** As scientific studies and environmental regulations are expanding, their focus on the smaller particles in ambient air (total suspended particulate to $PM_{10}$ to $PM_{2.5}$) has grown. An increasing interest in particles of size less than 0.1 microns, referred to as ultrafine particulate matter or ultrafine particulates (UFP or UFPs) is also developing. Although UFPs generally contribute to a small mass fraction of ambient PM, they are orders of magnitude more numerous than $PM_{10}$ and $PM_{2.5}$ particles. Their number concentrations range from 10 to $40 \times 10^3$ UFPs/$cm^3$ in urban air and 40 to $1000 \times 10^3$ UFPs/$cm^3$ near highways. UFPs are not currently regulated in the U.S. However, the SCAQMD recommended in its 2007 AQMP that UFPs be specifically addressed in PM and air toxics control strategies.

Fuel combustion in motor vehicles is a major source of UFP, and consequently UFP emissions are concentrated near highways and other roadways. Studies have shown that UFP number concentrations decrease sharply with distance from emission sources as a result of particle growth and accumulation processes; for instance Zhu et al. (Zhu 2002) reported that UFP concentration measurements were equal to background concentrations 300 meters downwind of I-405 near the Los Angeles National Cemetery. Thus, high ambient UFP levels are very localized and exhibit large geographical and temporal variations. Concerns about public exposure to UFPs (especially in areas near freeways) are due to the fact that UFPs and the

contaminants they contain are relatively easily transported into the body. This is because (i) smaller particles can be inhaled and deposited deeper into the lungs than larger particles, and (ii) the high surface area/mass ratio of UFPs can facilitate adsorption and result in higher content of trace metals and other toxic organic compounds.

There has been increasing interest among the scientific community in roadway impacts to air quality specific to I-710 (Kozawa et al, 2009, Arhami et al 2009, Moore et al 2009). SCAQMD also conducted a series of near roadway ambient air monitoring studies, which examined traffic impacts on concentrations of a host of pollutants, including UFPs.[12] On February 18, 2010, the AQMD reported preliminary findings of a study conducted along I-710. AQMD collected ambient air samples along I-710 in two one-month intensive campaigns (February–March 2009 and July–August 2009). Samples were collected from one background location upwind of the freeway and two locations downwind of the freeway at 15 meters and 80 meters. Air pollutant species measured included UFPs count, black carbon (BC), $PM_{10}$, $PM_{2.5}$, $NO_x$, CO, TSP, lead, and VOC. Preliminary results indicate that ambient air near I-710 (15 meters) was enriched in UFP. Similar to the results published by Zhu et al, UFP was significantly higher at the monitoring site closest (15 meters) to the roadway and dropped off with distance (80 meters). Both downwind monitoring sites were significantly higher than the upwind background measurement site. There was no significant difference in UFP count during winter vs. summer.

Information on UFP is limited at this time and is an area of active research. For example, physical transient behaviors, such as particle growth and accumulation, complicate the task of elucidating UFP concentration-response functions. Also, the existing state of knowledge does not yet support the derivation of reliable UFP emission models that account for the particulate growth and accumulation phases. Dispersion modeling of UFPs would also require additional information on the rate of UFP coagulation and absorption so that concentrations can be calculated. Given the lack of information to quantify emissions, dispersion, exposure, and health response to exposure, UFP emissions could not be quantified from the proposed project. However, a qualitative analysis has been conducted by using $PM_{2.5}$ exhaust emissions, and

---

[1]   Ospital, J, "Health Studies & Near Roadway Issues," South Coast Air Quality Management District, December 2009.

[2]   SCAQMD. Presentation to the I-710 Corridor Project Community Advisory Committee (CAC). "Preliminary Results from the AQMD I-710 Air Monitoring Study," South Coast Air Quality Management District, February 18, 2010, www.metro.net/projects_studies/I710/images/AQMD-I-710-Air-Monitoring-Study-to-CAC-February-2010.pdf.

I-710 Corridor Project EIR/EIS

exposure as a surrogate for UFP exposure.[1] The I-710 $PM_{2.5}$ exhaust emissions in 2035 are expected to be lower for each of Alternatives 1, 5A, and 6A/B/C compared to the 2008 baseline emissions; the same is true for $PM_{2.5}$ exhaust emissions within the SCAB. Consequently, we expect that the public's exposure to UFP in 2035 would decrease relative to the 2008 baseline. In addition, because the project (mainline and freight corridor) $PM_{2.5}$ exhaust emissions are lower for Alternatives 6B and 6C than for Alternative 1, it is also expected that implementation of the Project under Alternatives 6B and/or 6C would decrease the public's health risk due to UFP, relative to Alternative 1. As seen in Figures 4.22 through 4.26 (maximum 24-hour average) and Figures 4.49 through 4.53 (annual average) in Appendix R, exhaust $PM_{2.5}$ concentration impacts from the project (and freight corridor, if applicable) are lower than 2008 impacts for all 2035 alternatives (with the exception of 5 modeled grid points immediately adjacent to the freight corridor in Alternative 6A). Figures 4.35 through 4.38 (maximum 24-hour average) and Figures 4.54 through 4.57 (annual average) show that I-710 near-roadway exhaust $PM_{2.5}$ concentrations for Alternatives 6B and 6C were generally higher than Alternative 1, which was lower than incremental concentration impacts in Alternatives 5A and 6A. The near-roadway modeling confirms the conclusion of the emissions analyses: the implementation of the project under Alternatives 6B and/or 6C would decrease the public's health risk due to UFP, relative to the Alternative 1, even near I-710 and the freight corridor.

Lastly, some technical analyses have used CO concentrations as a surrogate for UFP particle number impacts. As seen in Tables 4.3a through 4.3c, calculated CO emissions for all of the 2035 Alternatives decrease more sharply than exhaust $PM_{2.5}$ emissions in the AOI and along I-710 compared to the 2008 baseline. Near-roadway modeling of I-710 (and the freight corridor under Alternatives 6A/B/C) shows no increases in 1-hour or 8-hour CO concentrations in any 2035 alternative compared to the 2008 baseline. The relative reductions among the 2035 alternatives are essentially the same as for exhaust $PM_{2.5}$, although all reductions are proportionally larger. Therefore, use of CO as a surrogate for UFP particle number impacts would be similar to those when exhaust $PM_{2.5}$ is used as a surrogate, only public exposure to UFP would decrease even further compared to 2008, even for those in close proximity to I-710 and/or the freight corridor.

### 3.13.4   AVOIDANCE, MINIMIZATION AND/OR MITIGATION MEASURES

As discussed above, and as shown in the maps and plots provided in Appendix R, the build alternatives will improve air quality and reduce public health risk in the SCAB and the I-710 AOI.

---

[1]    The rationale for this choice is that both UFP and $PM_{2.5}$ emissions are primarily the result of internal combustion processes.

Along I-710, air quality will be improved and public health risk will be reduced at most locations, but there are some near-roadway locations where there will be an increase in emissions and an increase in cancer risk. Alternatives 6B and 6C have the fewest areas with these near-roadway impacts. The near-roadway impacts are generated by the on-road vehicles, the emissions of which are controlled by ARB and EPA. There are no feasible mitigation measures to reduce these localized near-roadway impacts; therefore, these localized near-roadway impacts would be unavoidable adverse impacts.

Caltrans is committed to working with SCAQMD, ARB, and EPA to continue to develop data in the I-710 Corridor that will contribute to improved air quality planning and project design in the future. As part of that commitment, the I-710 Corridor Project will provide funding for four new air quality monitoring stations within the I-710 Corridor, per Measure AQ-1 below. This measure would apply to any of the build alternatives:

**AQ-1**     Within two years of the approval of a Record of Decision for an I-710 Corridor Project build alternative, the California Department of Transportation (Caltrans_ shall make a funding contribution to the South Coast Air Quality Management District (SCAQMD) to provide funding for the design and construction of four new air quality monitoring stations within the I-710 Corridor. The new stations will provide for monitoring meteorology (temperature, relative humidity, pressure, wind speed and direction, and rain) and monitoring the following pollutants: ozone ($O_3$), nitrogen oxide (NO), nitrogen dioxide ($NO_2$), particulate matter less than 2.5 microns in diameter ($PM_{2.5}$), particulate matter less than 10 microns in diameter ($PM_{10}$), and carbon monoxide (CO).

### 3.13.5   CLIMATE CHANGE

Climate change is analyzed in detail in Chapter 4. Neither the EPA nor the FHWA has disseminated explicit guidance or methodology to conduct project-level GHG analysis. As stated on FHWA's climate change website (http://www.fhwa.dot.gov/hep/climate/index.htm), climate change considerations should be integrated throughout the transportation decision-making process—from planning through project development and delivery. Addressing climate change mitigation and adaptation up front in the planning process will facilitate decision-making and improve efficiency at the program level, and will inform the analysis and stewardship needs of project level decision-making. Climate change considerations can easily be integrated into many planning factors, such as supporting economic vitality and global efficiency, increasing safety and mobility, enhancing the environment, promoting energy conservation, and improving the quality of life.

A88

I-710 Corridor Project EIR/EIS

Because there have been more requirements set forth in California legislation and executive orders regarding climate change, the issue is addressed in detail in the CEQA chapter of this environmental document and may be used to inform the NEPA decision. The four strategies set forth by FHWA to lessen climate change impacts do correlate with efforts that the State has undertaken and is undertaking to deal with transportation and climate change; the strategies include improved transportation system efficiency, cleaner fuels, cleaner vehicles, and reduction in the growth of vehicle hours traveled.

A89

**This page intentionally left blank**

## Declaration

I, Candi CdeBaca,  declare as follows:

1. I am over the age of 21 and competent to testify to all matters contained heriein.
2. I am a member of Cross Community Coalition. The Cross Community Coalition is a Registered Neighborhood Organization of Swansea and Elyria. which are neighborhoods of north Denver adjacent to the I-70 right-of-way.
3. I reside at 4301 Thompson Court, Denver, CO 80216.
4. My home is three blocks south of the current Interstate 70 in the area of the proposed *Central 70* or *I-70 East* project. The Final Environmental Impact Statement for the I-70 East Project explains that four more travel lanes will be added to expand the highway from 6 to 10 travel lanes, and will add four frontage road lanes. If the highway is expanded, my home will be two blocks from the completed highway.
5. Living with me intermittently is my seven year old niece.
6. I have lived at this location since I was four years old in 1990. My siblings and I attended Swansea Elementary School which is located 1 blocks north of the current I-70. After I-70 is expanded, the school will be less than one block from the highway.
7. I suffer from coughing athsma known to be linked to fine particle pollution.
8. I believe this health condition is related to being exposed to pollution from I-70 because I moved out of state in 2004 to a residence not near a major highway and my asthma went away. I returned in 2006 to a family home where I grew up and the condition returned and worsened. I moved away again in 2009 and my condition went away. I returned in 2014 and again my athsma returned and worsened. I do not smoke and have not been exposed to second hand smoke in my family home.
9. This athsma condition has limited my ability to engage in physical activities including spending time walking or playing with my niece in our local park. On a larger scale, this condition prohibited me from pursuing a lifelong goal and career as a pilot in the air force. I am forced to keep an inhaler on me at all times and frequently suffer with extended bouts of bronchitis. During my childhood while we could not afford insurance I suffered without medication and incurred emergency room costs when the bronchitis was unbearable. I had to incur thousands of dollars in home repair costs for new windows and a new HVAC system and duct cleaning to decrease the severity of my condition during summer months in my current home.
10. I expect that my condition will be exacerbated if the highway is expanded because traffic is expected to increase about 30%, emissions will increase, and our exposure to fine particles will increase.
11. Specifically, I will be harmed by the change in EPA's Guidance because it will allow emissions from the I-70 Project to increase the number of days when pollutant levels will be above the level of the national ambient air quality standard (NAAQS) for PM10. EPA has determined that when pollutant levels are above the level of the standard, we are not protected from premature death and hospitalization and medical care caused by the diseases of air pollution.

I declare, subject to the penalty of perjury under the laws of the United States, that the foregoing is true and correct to the best of my understanding and belief.

Executed at Denver, Colorado, this 15th day of May, 2016:

Candi CdeBaca

## Declaration of Eric Diesel

I, Eric Diesel, declare as follows:

(1)     My name is Eric Diesel. I am over 18 years of age and competent to give this declaration.

(2)     I am a member of the Sierra Club. The Sierra Club is a nationwide non-profit environmental membership organization, which has its purpose to explore, enjoy, and protect the wild places of the earth; to practice and promote the responsible use of the earth's ecosystems and resources; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives. I joined the Sierra Club because I study lichens, plants, and natural science, and enjoy being in natural areas.

(3)     I have a home in Los Angeles, located at 346 Vermont St. I spend approximately 10 days per month in Los Angeles.

(4)     I have lived here since 2004.

(5)     I enjoy riding my bike on the Los Angeles River Bicycle Path, which runs right alongside Interstate 710 for more than 15 miles from Los Angeles to the Aquarium of the Pacific in Long Beach. The trail travels along river segments beginning at the headwaters of the Los Angeles River, all the way to the Pacific Ocean, running at a very easy grade that is perfect for cycling. I ride my bike for

1

A92

study, recreation, exercise, because it is frequently the most convenient way for me to commute, and because I have advised the LA River Commission and others on restoration of the LA River.

(6)    I use the Los Angeles River Bicycle Path four to five times per month. I often cycle from downtown Los Angeles to go to the Aquarium of the Pacific and the beach in Long Beach, and to monitor the river's remaining natural features.

(7)    I am aware that there is a proposal to expand an 18-mile stretch of I-710 between the Port of Long Beach and downtown Los Angeles.

(8)    The Draft EIS for the I-710 Corridor Project published in 2012 informed me that  (a) Los Angeles is a non-attainment area for $PM_{2.5}$, fine particulate matter pollution; (b) the I-710 corridor project described in the Regional Transportation Plan would increase the number lanes from 8 to 14, including four lanes dedicated to trucks; (c) diesel trucks traveling that route daily are expected to increase from 42,000 in 2008 to at least 80,000, and up to 93,000 by 2035; (d) the Project was determined to be a "project of air quality concern" which triggers a "quantitative hot-spot analysis" under EPA's Hot-spot rule and Guidance.

(9)    No quantitative hot-spot analysis has yet been released for public comment, but is expected in early 2017.

(10)    I am concerned about the potential increase in air pollution that could result from various project alternatives, and how it would impact my health when I

2

bike on the trail next to the freeway. I remember times on bad pollution days when it was very painful to take a breath. I am concerned that being exposed to more pollution from the proposed I-710 expansion would negatively impact my health and would cause me to ride my bike less to avoid exposure to these pollutants, in addition to destroying lichens and other natural features that I study and enjoy.

(11) Specifically, I will be harmed by the change in EPA's Guidance because it will allow emissions from the interstate to increase the number of days when pollutant levels are above the level of the national ambient air quality standard for $PM_{2.5}$.

(12) EPA has determined that when pollutant levels are above the level of the standard, we are at increased risk of suffering respiratory and cardiovascular disease symptoms, hospitalization, and even premature death caused by air pollution.

I declare, subject to penalty of perjury under the laws of the United States, that the foregoing is true and correct to the best of my understanding and belief.

October 10, 2016

Eric Diesel

3

## Declaration

I, Luis Fundora, declare as follows:

1) I am over the age of 21 and competent to testify to all matters contained

   herein.

2) I am a member of:

   a. The Elyria and Swansea Neighborhood Association, a Denver

      Registered Neighborhood Organization in NE Denver dedicated to the

      representation of residents and property owners in Elyria and

      Swansea.

   b. The Cross Community Coalition, a Denver Registered Neighborhood

      Organization is a group for community members interested in

      participating Elyria & Swansea's revival. With the many changes

      coming, The Cross Community Coalition takes an active role in

      demanding that the current community's interests are centered in all

      efforts to revitalize this historic and traditionally underserved

      community.

   c. The Sierra Club, and organization committed to explore, enjoy and

      protect the planet. To practice and promote the responsible use of the

      earth's ecosystems and resources to educate and enlist humanity to

A95

protect and restore the quality of the natural and human environment;

and to use all lawful means to carry out those objectives.

3) I reside at: 4600 Clayton, Denver, CO 80216.

4) No one in our home is a smoker and no one ever smokes inside our home.

5) Our home is immediately next to [and essentially a few feet north of and almost below] Interstate 70 in the area of the proposed Central 70 or I-70 East project. It is located to the North of the present highway. The final Environmental Impact Statement for the I-7o East Project explains that 4 more travel lanes (toll lanes) will be added to expand the highway from 6 to 10 travel lanes and will add four frontage road lanes.

6) If the highway is expanded, our home will be demolished. We will be required to move.

7) We experience noise from the highway inside and outside of our home 24 hours each day, 7 days each week.

8) In warmer weather, we leave our doors and windows open.

9) Living with me are my daughter & my wife. My daughter is 13 years old.

10)    We have lived at this location since 2008.

11)    My daughter, Valeria, attended Swansea Elementary School, which is located less than 1 block from I-70, on the north side of the freeway. She

A96

now attends Bruce Randolph Middle School, which is less than a half-mile on the south side of I-70.

12)     My daughter has asthma.

13)     The asthma aggravates an unrelated heart murmur.

14)     My daughter was first diagnosed with asthma at 11 years of age, while in 5th grade, when she had a major asthma attack, requiring emergency medical attention. She had problems for a few years before that, but she suffered in silence for years.

15)     When we travel to the mountains, my daughter's asthma is less-bad.

16)     My daughter currently uses an inhaler. She was using a breathing machine, but the inhaler works better.

17)     While in elementary school, she walked 3 blocks to school. She often played on the school playground which is much less than 1/2 block away from I-70. In warmer weather, the school's gym doors and windows are open.

18)     She has a bicycle which she loved to ride, but, now is unwilling to ride because of her asthma.

19)     Because of the asthma she cannot run, bike or do any kind of exertion. She has limited ability to do gym activities. These activities scare her because of her inability to breath normally.

A97

20)     My daughter has a depressed immune system & therefore is susceptible to many illnesses.

21)     When she had Medicaid, the costs were covered for inhalers. There was a one-time $75 payment.

22)     We've taken her for emergency care at least 10 times. She continues to use at least 7 inhalers. One is kept at school at all times.

23)     Most of the time she prefers to stay in the house. This limits her social interactions kids usually have.

24)     I expect that my daughter's condition will worsen if the highway is expanded because traffic is expected to increase about 30%, emissions will increase, and our exposure to find particles will increase.

25)     Specifically, we will be harmed by the change in EPA's Guidance because it will allow emissions from the I-70 Project to increase the number of days when pollutant levels will be above the level of the national ambient air quality standard (NAAQS) for PM10. EPA has determined that when pollutant levels are above the level of the standard, we are not protected from premature death and hospitalization and medical care caused by the diseases of air pollution.

A98

I declare, subject to penalty of perjury under the laws of the United States, that the foregoing is true and correct to the best of my understanding and belief.

Executed at Denver, Colorado, this 22nd day of May, 2016.

Luis Fundora

# Declaration

I, Maxine Ichikawa, declare as follows:

1. I am over the age of 21 and competent to testify to all matters contained herein.

2. I am a member of:

   a. The Elyria and Swansea Neighborhood Association, a Denver Registered Neighborhood Organization in NE Denver dedicated to the representation of residents and property owners in Elyria and Swansea.

   b. The Sierra Club, and organization committed to explore, enjoy and protect the planet. To practice and promote the responsible use of the earth's ecosystems and resources to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives.

   c. The Cross Community Coalition, a Denver Registered Neighborhood Organization is a group for community members interested in participating Elyria & Swansea's revival. With the many changes coming, The Cross Community Coalition takes an active role in demanding that the current community's interests are centered in all

A100

efforts to revitalize this historic and traditionally underserved community.

3. I reside at 4711 Elizabeth.

4. Living with me is my son.

5. We live in a home with no smokers.   No one smokes inside of our home.

6. Our home is 1½ blocks north of the current Interstate 70 in the area of the proposed Central 70 or I-70 East project. The Final Environmental Impact Statement for the I-70 East Project explains that four more travel lanes will be added to expand the highway from 6 to 10 travel lanes and an additional four frontage road lanes will be added. If the highway is expanded, our home will be less than one block from the completed highway.

7. We have lived at this location since 1967. The I-70 freeway was completed and open when we moved here.

8. I suffer from asthma, heart disease & COPD.

9. I take these medications: Alendronate Sodium, Beclomethasone Dip, Carvedilol, Diltiazen, Furosemide, Lisinopril, Rovaroxaban, Spiromolactone, Tiotropium.

10. I am a non-smoker.  In my life I have smoked fewer than 15 total cigarettes. The last one was about 35 years ago.

11. I am on oxygen nearly-continuously [every day, sometimes most of the day].

12. I believe my health conditions are related to pollution from I-70 because I live so close to the highway. When I leave this area I know that I feel and breathe better.

13. My son has asthma. He was diagnosed when he was six years old.

14. My son has lived at this location since he was 6 months old.

15. My son often played outside when growing-up.

16. My son uses inhalers at the present time. He and I both believe his condition is related to exposure to pollution from the highway because he lives so close to the highway.

17. My son feels & breathes better when away from this area.

18. I'm unable to work because my breathing has gotten worse and I am on oxygen nearly-continuously [every day].

19. My insurance covers some expenses but, I must pay the donut hole expenses [gap/deductible] that's pretty darned high. Its in the hundreds of dollars.

20. My son has been on Medicare & Medicaid.

21. I expect that my son's condition & mine will get worse if the highway is expanded because traffic is expected to increase about 30%, emissions will increase & our exposure to fine particles will increase. Specifically, we will be harmed by the change in EPA's Guidance because it will allow emissions from the I-70 Project to increase the number of days when pollutant levels

will be above the level of the national ambient air quality standard

(NAAQS) for PM10. EPA has determined that when pollutant levels are

above the level of the standard, we are not protected from premature death

and hospitalization and medical care caused by the diseases of air pollution.

I declare, subject to the penalty of perjury under the laws of the United States, that

the foregoing is true and correct to the best of my understanding and belief.

Executed at Denver, Colorado, this 22nd day of May, 2016:

Maxine Ichikawa

## Declaration

I, Jean L. Ramsay, declare as follows:

1. I am age 91, and competent to testify to all matters contained herein.
2. I am a member of Sierra Club, which is the nation's largest and most influential grassroots environmental organization, with more than two million members and supporters.
1. I reside at 16825 South 34th Street, Phoenix, Arizona 85048.
2. I live with my son, his wife, and my grandson. I have resided in this location since June, 2013, and my son and his family has lived in this home since 1993. My grandsons attended Kyrene De Los Lagos Elementary School ("Lagos") which is located immediately adjoining Pecos Road, just north of the proposed SMF, and Desert Vista High School ("Desert Vista"), which is located one block north of the proposed SMF.
3. Our home is within 1,000 feet north of the Loop 202 South Mountain Freeway ("SMF") alignment as proposed by the Arizona Department of Transportation ("ADOT"). The Final Environmental Impact Statement for the SMF explains that eight travel lanes will comprise the SMF.
4. I have been diagnosed with COPD (Chronic Obstructive Pulmonary Disease), and I take prescription medication to relieve symptoms of this condition. My breathing is adversely affected on "poor air quality" days as designated by the Arizona Department of Environmental Quality ("ADEQ"). I do not smoke, and there are no smokers residing in our home.
5. I reside in a quiet residential neighborhood that I feel has low levels of air pollution. However, I believe that the intrusion of the SMF, and upwards of the 190,000 cars and heavy trucks that ADOT projects would travel the freeway and adjoining roads daily, would add significantly more measurable particulate pollution, specifically PM2.5 and PM10, directly into our neighborhood and the surrounding geographical area, and as a result my COPD would be adversely affected.
6. Specifically, we will be harmed by the change in EPA's Guidance because it will allow emissions from the SMF to noticeably increase the number of days when pollutant levels will be above the level of the national ambient air quality standard (NAAQS) for PM10. EPA has determined that when pollutant levels are above the level of the standard, we are not protected from premature death and hospitalization and medical care caused by the diseases of air pollution.

I declare, subject to the penalty of perjury under the laws of the United States, that the foregoing is true and correct to the best of my understanding and belief.

Executed at Phoenix, Arizona this 4th day of July, 2016:

_Jean L. Ramsay_
Jean L. Ramsay
[NAME OF DECLARANT]

DECLARATION

I, San Juana Romero, declare as follows:

1.   I am over the age of 21 and competent to testify to all matters contained

herein.

2.   I am a member of:

a.   The Elyria and Swansea Neighborhood Association, a Denver Registered

Neighborhood Organization in NE Denver dedicated to the representation

of residents and property owners in Elyria and Swansea.

b.   The Cross Community Coalition, a Denver Registered Neighborhood

Organization is a group for community members interested in participating

Elyria & Swansea's revival. With the many changes coming, The Cross

Community Coalition takes an active role in demanding that the current

community's interests are centered in all efforts to revitalize this historic

and traditionally underserved community.

c. The Sierra Club, and organization committed to explore, enjoy and protect

the planet. To practice and promote the responsible use of the earth's

ecosystems and resources to educate and enlist humanity to protect and

A105

restore the quality of the natural and human environment; and to use all lawful means to carry out those objectives.

3.    My family and I reside at 4635 Fillmore St, Denver, CO 80216.

4.    Our home is 1/3 of a block north of the current Interstate 70 in the area of the proposed Central 70 or I-70 East project. The Final Environmental Impact Statement for the I-70 East Project ("FEIS") explains that four more travel lanes will be added to expand the highway from 6 to 10 travel lanes, and will also add four frontage road lanes. If the freeway is expanded, our home will be the second house away from the freeway.

5.    Living with me are my husband and 2 children. My children are ages 1 and 6. I am expecting a third child in December.  No one in my family smokes and never has smoked.  No one in our family is exposed to smoking in the home.

6.    We have lived in this location since 2009. Each of my children have lived here for their entire lives.

7.    My oldest child has asthma and my youngest has not yet been diagnosed, but has respiratory problems.

A106

8.  I believe my children's asthma health conditions are related to being exposed to pollution from I-70 because we have lived here for 7 years and both of my sons were born healthy and then developed the respiratory problems as their lungs developed.

9.  My oldest son has lived in this location since birth. He was diagnosed with asthma when he was about 7 months old.

10. My oldest son plays in our backyard and has done so since he was young. No one ever warned us about this pollution.

11. My oldest son misses school very often, sometimes up to a week because of his asthma. This year was better but only because his Flovent medication was increased. This has greatly interfered with his school performance. His whole immune system is weak and compromised.

12. My youngest son was first seen for respiratory condition at 3 months of age. I believe his condition is related to exposure to pollution from the highway because he was born in good health and this developed within 3 months.

13. My sons are covered by Medicaid. Without this we could not afford medications.

14. My oldest son is on the following medications for his asthma:  •Albuterol nebulizer solution that is put in a nebulizer machine for home treatment when he has a cough or difficulty breathing.

•Flovent HFA inhaler on a daily basis 2 puffs twice a day to help him get through the day.

•Albuterol inhaler this is his emergency inhaler incase he has an asthma attack or starts wheezing.

15. I expect that both of my son's conditions will be exacerbated if the highway is expanded because traffic is expected to increase about 30%, emissions will increase and our exposure to fine particles will increase.

16. Specifically, we will be harmed by the change in EPA's Guidance because it will allow emissions from the I-70 Project to increase the number of days when pollutant levels will be above the level of the national ambient air quality standard (NAAQS) for PM10. EPA has determined that when pollutant levels are above the level of the standard, we are not protected from premature death and hospitalization and medical care caused by the diseases of air pollution.

A108

I, declare, subject to the penalty of perjury under the laws of the United States,

that the fore going is true and correct to the best of my understand and belief.

Executed at Denver, Colorado this 16th day of May, 2016

San Juana Romero

A109

**Declaration**

I, John P. Sanders, declare as follows:

1. I am over the age of 21 and competent to testify to all matters contained herein.
2. I am a member of Sierra Club, which is the nation's largest and most influential grassroots environmental organization, with more than two million members and supporters.
1. I reside at 16602 South Magenta Road, Phoenix, Arizona 85048.
2. Our home is 897 feet off the Loop 202 South Mountain Freeway ("SMF") as proposed by the Arizona Department of Transportation ("ADOT"). The Final Environmental Impact Statement for the SMF explains that eight travel lanes will comprise the SMF. If the highway is constructed, our home will be 0.17 miles, or 897 feet, from the completed freeway.
3. Living with me are my wife and two children.  My children are ages 19 years old and 5 months old.
4. We have lived at this location since 2004.  My older child attended Kyrene De La Sierra Elementary School ("Sierra") which is located two blocks north of the proposed SMF.  Further, my older child also attended Desert Vista High School ("Desert Vista") which is located one block north of the proposed SMF.  My youngest child would attend the same schools upon reaching the appropriate ages.
5. My wife suffers from asthma.  This condition is exacerbated on "poor air quality" days as designated by the Arizona Department of Environmental Quality ("ADEQ").  ADEQ issues a daily Air Quality Forecast, which we monitor closely and on those days where a High Pollution Advisory is issued, my wife limits her outdoor activities.  We also limit our five month old daughter's outdoor exposure on such days.  No one smokes in our home.
6. I believe these health conditions would be exaggerated by being exposed to more pollution from the proposed SMF because such freeway would add significantly more ozone, PM2.5 (respirable particles) and PM-10 (inhalable particles) pollutants directly into our geographical area.  These additional pollutants would be present at both our residence and our daughters' schools, as all are in close proximity to the proposed SMF.  In particular, we are concerned about our five month old daughter's lungs developing properly with her being exposed to vastly increased and frequently unhealthy levels of pollutants (as designated by ADEQ).
7. I expect that my wife's condition will be significantly exacerbated if the proposed SMF is constructed because per ADOT's own research, they project between 117,000 and 190,000 vehicles will utilize the SMF daily.  Consequently, emissions and pollutant concentrations will greatly increase, and our exposure to PM2.5 (fine particles), PM-10 and ozone will also increase significantly.
8. Specifically, we will be harmed by the change in EPA's Guidance because it will allow emissions from the SMF to noticeably increase the number of days when pollutant levels will be above the level of the national ambient air quality standard (NAAQS) for PM10. EPA has determined that when pollutant levels are above the level of the standard, we are not protected from premature death and hospitalization and medical care caused by the diseases of air pollution.

I declare, subject to the penalty of perjury under the laws of the United States, that the foregoing is true and correct to the best of my understanding and belief.

Executed at Phoenix, Arizona this 2nd day of July, 2016:

_____

John P. Sanders

## § 7505a. Maintenance plans

### (a) Plan revision

Each State which submits a request under section 7407(d) of this title for redesignation of a nonattainment area for any air pollutant as an area which has attained the national primary ambient air quality standard for that air pollutant shall also submit a revision of the applicable State implementation plan to provide for the maintenance of the national primary ambient air quality standard for such air pollutant in the area concerned for at least 10 years after the redesignation. The plan shall contain such additional measures, if any, as may be necessary to ensure such maintenance.

### (b) Subsequent plan revisions

8 years after redesignation of any area as an attainment area under section 7407(d) of this title, the State shall submit to the Administrator an additional revision of the applicable State implementation plan for maintaining the national primary ambient air quality standard for 10 years after the expiration of the 10-year period referred to in subsection (a) of this section.

### (c) Nonattainment requirements applicable pending plan approval

Until such plan revision is approved and an area is redesignated as attainment for any area designated as a nonattainment area, the requirements of this part shall continue in force and effect with respect to such area.

### (d) Contingency provisions

Each plan revision submitted under this section shall contain such contingency provisions as the Administrator deems necessary to assure that the State will promptly correct any violation of the standard which occurs after the redesignation of the area as an attainment area. Such provisions shall include a requirement that the State will implement all measures with respect to the control of the air pollutant concerned which were contained in the State implementation plan for the area before redesignation of the area as an attainment area. The failure of any area redesignated as an attainment area to maintain the national ambient air quality standard concerned shall not result in a requirement that the State revise its State implementation plan unless the Administrator, in the Administrator's discretion, requires the State to submit a revised State implementation plan.

(July 14, 1955, ch. 360, title I, § 175A, as added Pub. L. 101–549, title I, § 102(e), Nov. 15, 1990, 104 Stat. 2418.)

## § 7506. Limitations on certain Federal assistance

### (a), (b) Repealed. Pub. L. 101–549, title I, § 110(4), Nov. 15, 1990, 104 Stat. 2470

### (c) Activities not conforming to approved or promulgated plans

(1) No department, agency, or instrumentality of the Federal Government shall engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not conform to an implementation plan after it has been approved or promulgated under section 7410 of this title. No metropolitan planning organization designated under section 134 of title 23, shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title. The assurance of conformity to such an implementation plan shall be an affirmative responsibility of the head of such department, agency, or instrumentality. Conformity to an implementation plan means—

(A) conformity to an implementation plan's purpose of eliminating or reducing the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and

(B) that such activities will not—

(i) cause or contribute to any new violation of any standard in any area;

(ii) increase the frequency or severity of any existing violation of any standard in any area; or

(iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

The determination of conformity shall be based on the most recent estimates of emissions, and such estimates shall be determined from the most recent population, employment, travel and congestion estimates as determined by the metropolitan planning organization or other agency authorized to make such estimates.

(2) Any transportation plan or program developed pursuant to title 23 or chapter 53 of title 49 shall implement the transportation provisions of any applicable implementation plan approved under this chapter applicable to all or part of the area covered by such transportation plan or program. No Federal agency may approve, accept or fund any transportation plan, program or project unless such plan, program or project has been found to conform to any applicable implementation plan in effect under this chapter. In particular—

(A) no transportation plan or transportation improvement program may be adopted by a metropolitan planning organization designated under title 23 or chapter 53 of title 49, or be found to be in conformity by a metropolitan planning organization until a final determination has been made that emissions expected from implementation of such plans and programs are consistent with estimates of emissions from motor vehicles and necessary emissions reductions contained in the applicable implementation plan, and that the plan or program will conform to the requirements of paragraph (1)(B);

(B) no metropolitan planning organization or other recipient of funds under title 23 or chapter 53 of title 49 shall adopt or approve a transportation improvement program of projects until it determines that such program provides for timely implementation of transportation control measures consistent with schedules included in the applicable implementation plan;

(C) a transportation project may be adopted or approved by a metropolitan planning organization or any recipient of funds designated

under title 23 or chapter 53 of title 49, or found in conformity by a metropolitan planning organization or approved, accepted, or funded by the Department of Transportation only if it meets either the requirements of subparagraph (D) or the following requirements—

(i) such a project comes from a conforming plan and program;

(ii) the design concept and scope of such project have not changed significantly since the conformity finding regarding the plan and program from which the project derived; and

(iii) the design concept and scope of such project at the time of the conformity determination for the program was adequate to determine emissions.

(D) Any project not referred to in subparagraph (C) shall be treated as conforming to the applicable implementation plan only if it is demonstrated that the projected emissions from such project, when considered together with emissions projected for the conforming transportation plans and programs within the nonattainment area, do not cause such plans and programs to exceed the emission reduction projections and schedules assigned to such plans and programs in the applicable implementation plan.

(E) The appropriate metropolitan planning organization shall redetermine conformity of existing transportation plans and programs not later than 2 years after the date on which the Administrator—

(i) finds a motor vehicle emissions budget to be adequate in accordance with section 93.118(e)(4) of title 40, Code of Federal Regulations (as in effect on October 1, 2004);

(ii) approves an implementation plan that establishes a motor vehicle emissions budget if that budget has not yet been determined to be adequate in accordance with clause (i); or

(iii) promulgates an implementation plan that establishes or revises a motor vehicle emissions budget.

(3) Until such time as the implementation plan revision referred to in paragraph (4)(C)[1] is approved, conformity of such plans, programs, and projects will be demonstrated if—

(A) the transportation plans and programs—

(i) are consistent with the most recent estimates of mobile source emissions;

(ii) provide for the expeditious implementation of transportation control measures in the applicable implementation plan; and

(iii) with respect to ozone and carbon monoxide nonattainment areas, contribute to annual emissions reductions consistent with sections 7511a(b)(1) and 7512a(a)(7) of this title; and

(B) the transportation projects—

(i) come from a conforming transportation plan and program as defined in subparagraph (A) or for 12 months after November 15, 1990, from a transportation program found to conform within 3 years prior to November 15, 1990; and

(ii) in carbon monoxide nonattainment areas, eliminate or reduce the severity and number of violations of the carbon monoxide standards in the area substantially affected by the project.

With regard to subparagraph (B)(ii), such determination may be made as part of either the conformity determination for the transportation program or for the individual project taken as a whole during the environmental review phase of project development.

(4) CRITERIA AND PROCEDURES FOR DETERMINING CONFORMITY.—

(A) IN GENERAL.—The Administrator shall promulgate, and periodically update, criteria and procedures for determining conformity (except in the case of transportation plans, programs, and projects) of, and for keeping the Administrator informed about, the activities referred to in paragraph (1).

(B) TRANSPORTATION PLANS, PROGRAMS, AND PROJECTS.—The Administrator, with the concurrence of the Secretary of Transportation, shall promulgate, and periodically update, criteria and procedures for demonstrating and assuring conformity in the case of transportation plans, programs, and projects.

(C) CIVIL ACTION TO COMPEL PROMULGATION.—A civil action may be brought against the Administrator and the Secretary of Transportation under section 7604 of this title to compel promulgation of such criteria and procedures and the Federal district court shall have jurisdiction to order such promulgation.

(D) The procedures and criteria shall, at a minimum—

(i) address the consultation procedures to be undertaken by metropolitan planning organizations and the Secretary of Transportation with State and local air quality agencies and State departments of transportation before such organizations and the Secretary make conformity determinations;

(ii) address the appropriate frequency for making conformity determinations, but the frequency for making conformity determinations on updated transportation plans and programs shall be every 4 years, except in a case in which—

(I) the metropolitan planning organization elects to update a transportation plan or program more frequently; or

(II) the metropolitan planning organization is required to determine conformity in accordance with paragraph (2)(E); and

(iii) address how conformity determinations will be made with respect to maintenance plans.

(E) INCLUSION OF CRITERIA AND PROCEDURES IN SIP.—Not later than 2 years after August 10, 2005, the procedures under subparagraph (A) shall include a requirement that each State include in the State implementation plan criteria and procedures for consultation required by subparagraph (D)(i), and enforcement and enforceability (pursuant to sections 93.125(c) and 93.122(a)(4)(ii) of title 40, Code of Federal Regulations) in accordance with the Administrator's criteria and procedures for consultation, enforcement and enforceability.

---

[1] See References in Text note below.

(F) Compliance with the rules of the Administrator for determining the conformity of transportation plans, programs, and projects funded or approved under title 23 or chapter 53 of title 49 to State or Federal implementation plans shall not be required for traffic signal synchronization projects prior to the funding, approval or implementation of such projects. The supporting regional emissions analysis for any conformity determination made with respect to a transportation plan, program, or project shall consider the effect on emissions of any such project funded, approved, or implemented prior to the conformity determination.

(5) APPLICABILITY.—This subsection shall apply only with respect to—

(A) a nonattainment area and each pollutant for which the area is designated as a nonattainment area; and

(B) an area that was designated as a nonattainment area but that was later redesignated by the Administrator as an attainment area and that is required to develop a maintenance plan under section 7505a of this title with respect to the specific pollutant for which the area was designated nonattainment.

(6) Notwithstanding paragraph 5,[2] this subsection shall not apply with respect to an area designated nonattainment under section 7407(d)(1) of this title until 1 year after that area is first designated nonattainment for a specific national ambient air quality standard. This paragraph only applies with respect to the national ambient air quality standard for which an area is newly designated nonattainment and does not affect the area's requirements with respect to all other national ambient air quality standards for which the area is designated nonattainment or has been redesignated from nonattainment to attainment with a maintenance plan pursuant to section 7505a[1] of this title (including any pre-existing national ambient air quality standard for a pollutant for which a new or revised standard has been issued).

(7) CONFORMITY HORIZON FOR TRANSPORTATION PLANS.—

(A) IN GENERAL.—Each conformity determination required under this section for a transportation plan under section 134(i) of title 23 or section 5303(i) of title 49 shall require a demonstration of conformity for the period ending on either the final year of the transportation plan, or at the election of the metropolitan planning organization, after consultation with the air pollution control agency and solicitation of public comments and consideration of such comments, the longest of the following periods:

(i) The first 10-year period of any such transportation plan.

(ii) The latest year in the implementation plan applicable to the area that contains a motor vehicle emission budget.

(iii) The year after the completion date of a regionally significant project if the project is included in the transportation improvement program or the project requires approval before the subsequent conformity determination.

(B) REGIONAL EMISSIONS ANALYSIS.—The conformity determination shall be accompanied by a regional emissions analysis for the last year of the transportation plan and for any year shown to exceed emission budgets by a prior analysis, if such year extends beyond the applicable period as determined under subparagraph (A).

(C) EXCEPTION.—In any case in which an area has a revision to an implementation plan under section 7505a(b) of this title and the Administrator has found the motor vehicles emissions budgets from that revision to be adequate in accordance with section 93.118(e)(4) of title 40, Code of Federal Regulations (as in effect on October 1, 2004), or has approved the revision, the demonstration of conformity at the election of the metropolitan planning organization, after consultation with the air pollution control agency and solicitation of public comments and consideration of such comments, shall be required to extend only through the last year of the implementation plan required under section 7505a(b) of this title.

(D) EFFECT OF ELECTION.—Any election by a metropolitan planning organization under this paragraph shall continue in effect until the metropolitan planning organization elects otherwise.

(E) AIR POLLUTION CONTROL AGENCY DEFINED.—In this paragraph, the term "air pollution control agency" means an air pollution control agency (as defined in section 7602(b) of this title) that is responsible for developing plans or controlling air pollution within the area covered by a transportation plan.

(8) SUBSTITUTION OF TRANSPORTATION CONTROL MEASURES.—

(A) IN GENERAL.—Transportation control measures that are specified in an implementation plan may be replaced or added to the implementation plan with alternate or additional transportation control measures—

(i) if the substitute measures achieve equivalent or greater emissions reductions than the control measure to be replaced, as demonstrated with an emissions impact analysis that is consistent with the current methodology used for evaluating the replaced control measure in the implementation plan;

(ii) if the substitute control measures are implemented—

(I) in accordance with a schedule that is consistent with the schedule provided for control measures in the implementation plan; or

(II) if implementation plan date for implementation of the control measure to be replaced has passed, as soon as practicable after the implementation plan date but not later than the date on which emission reductions are necessary to achieve the purpose of the implementation plan;

(iii) if the substitute and additional control measures are accompanied with evidence of adequate personnel and funding and

---

[2] So in original. Probably should be "paragraph (5),".

authority under State or local law to implement, monitor, and enforce the control measures;

(iv) if the substitute and additional control measures were developed through a collaborative process that included—

(I) participation by representatives of all affected jurisdictions (including local air pollution control agencies, the State air pollution control agency, and State and local transportation agencies);

(II) consultation with the Administrator; and

(III) reasonable public notice and opportunity for comment; and

(v) if the metropolitan planning organization, State air pollution control agency, and the Administrator concur with the equivalency of the substitute or additional control measures.

(B) ADOPTION.—(i) Concurrence by the metropolitan planning organization, State air pollution control agency and the Administrator as required by subparagraph (A)(v) shall constitute adoption of the substitute or additional control measures so long as the requirements of subparagraphs (A)(i), (A)(ii), (A)(iii) and (A)(iv) are met.

(ii) Once adopted, the substitute or additional control measures become, by operation of law, part of the State implementation plan and become federally enforceable.

(iii) Within 90 days of its concurrence under subparagraph (A)(v), the State air pollution control agency shall submit the substitute or additional control measure to the Administrator for incorporation in the codification of the applicable implementation plan. Nothwithstanding[3] any other provision of this chapter, no additional State process shall be necessary to support such revision to the applicable plan.

(C) NO REQUIREMENT FOR EXPRESS PERMISSION.—The substitution or addition of a transportation control measure in accordance with this paragraph and the funding or approval of such a control measure shall not be contingent on the existence of any provision in the applicable implementation plan that expressly permits such a substitution or addition.

(D) NO REQUIREMENT FOR NEW CONFORMITY DETERMINATION.—The substitution or addition of a transportation control measure in accordance with this paragraph shall not require—

(i) a new conformity determination for the transportation plan; or

(ii) a revision of the implementation plan.

(E) CONTINUATION OF CONTROL MEASURE BEING REPLACED.—A control measure that is being replaced by a substitute control measure under this paragraph shall remain in effect until the substitute control measure is adopted by the State pursuant to subparagraph (B).

(F) EFFECT OF ADOPTION.—Adoption of a substitute control measure shall constitute rescission of the previously applicable control measure.

(9) LAPSE OF CONFORMITY.—If a conformity determination required under this subsection for a

transportation plan under section 134(i) of title 23 or section 5303(i) of title 49 or a transportation improvement program under section 134(j) of such title 23 or under section 5303(j) of such title 49 is not made by the applicable deadline and such failure is not corrected by additional measures to either reduce motor vehicle emissions sufficient to demonstrate compliance with the requirements of this subsection within 12 months after such deadline or other measures sufficient to correct such failures, the transportation plan shall lapse.

(10) LAPSE.—In this subsection, the term "lapse" means that the conformity determination for a transportation plan or transportation improvement program has expired, and thus there is no currently conforming transportation plan or transportation improvement program.

**(d) Priority of achieving and maintaining national primary ambient air quality standards**

Each department, agency, or instrumentality of the Federal Government having authority to conduct or support any program with air-quality related transportation consequences shall give priority in the exercise of such authority, consistent with statutory requirements for allocation among States or other jurisdictions, to the implementation of those portions of plans prepared under this section to achieve and maintain the national primary ambient air quality standard. This paragraph extends to, but is not limited to, authority exercised under chapter 53 of title 49, title 23, and the Housing and Urban Development Act.

(July 14, 1955, ch. 360, title I, § 176, as added Pub. L. 95–95, title I, § 129(b), Aug. 7, 1977, 91 Stat. 749; amended Pub. L. 95–190, § 14(a)(59), Nov. 16, 1977, 91 Stat. 1403; Pub. L. 101–549, title I, §§ 101(f), 110(4), Nov. 15, 1990, 104 Stat. 2409, 2470; Pub. L. 104–59, title III, § 305(b), Nov. 28, 1995, 109 Stat. 580; Pub. L. 104–260, § 1, Oct. 9, 1996, 110 Stat. 3175; Pub. L. 106–377, § 1(a)(1) [title III], Oct. 27, 2000, 114 Stat. 1441, 1441A–44; Pub. L. 109–59, title VI, § 6011(a)–(f), Aug. 10, 2005, 119 Stat. 1878–1881.)

REFERENCES IN TEXT

Paragraph (4) of subsec. (c), referred to in subsec. (c)(3), was amended by Pub. L. 109–59, title VI, § 6011(f), Aug. 10, 2005, 119 Stat. 1881, to redesignate subpar. (C) as (E), strike it out, and add new subpars. (C) and (E). See 2005 Amendment notes below.

Section 7505a of this title, referred to in subsec. (c)(6), was in the original "section 175(A)" and was translated as reading "section 175A", meaning section 175A of act July 14, 1955, which is classified to section 7505a of this title, to reflect the probable intent of Congress.

The Housing and Urban Development Act, referred to in subsec. (d), may be the name for a series of acts sharing the same name but enacted in different years by Pub. L. 89–117, Aug. 10, 1965, 79 Stat. 451; Pub. L. 90–448, Aug. 1, 1968, 82 Stat. 476; Pub. L. 91–152, Dec. 24, 1969, 83 Stat. 379; and Pub. L. 91–609, Dec. 31, 1970, 84 Stat. 1770, respectively. For complete classification of these Acts to the Code, see Short Title notes set out under section 1701 of Title 12, Banks and Banking, and Tables.

CODIFICATION

In subsecs. (c)(2) and (d), "chapter 53 of title 49" substituted for "the Urban Mass Transportation Act [49 App. U.S.C. 1601 et seq.]" and in subsec. (c)(4)(F) substituted for "Federal Transit Act" on authority of Pub. L. 103–272, § 6(b), July 5, 1994, 108 Stat. 1378 (the first section of which enacted subtitles II, III, and V to X of

---

[3] So in original. Probably should be "Notwithstanding".

Title 49, Transportation), and of Pub. L. 102–240, title III, §3003(b), Dec. 18, 1991, 105 Stat. 2088, which provided that references in laws to the Urban Mass Transportation Act of 1964 be deemed to be references to the Federal Transit Act.

#### Amendments

2005—Subsec. (c)(2)(E). Pub. L. 109–59, §6011(a), added subpar. (E).

Subsec. (c)(4). Pub. L. 109–59, §6011(f)(1)–(3), inserted par. (4) and subpar. (A) headings, in first sentence substituted "The Administrator shall promulgate, and periodically update," for "No later than one year after November 15, 1990, the Administrator shall promulgate", designated second sentence as subpar. (B), inserted heading, substituted "The Administrator, with the concurrence of the Secretary of Transportation, shall promulgate, and periodically update," for "No later than one year after November 15, 1990, the Administrator, with the concurrence of the Secretary of Transportation, shall promulgate", designated third sentence as subpar. (C), inserted heading, substituted "A civil action" for "A suit", and redesignated former subpars. (B) to (D) as (D) to (F), respectively.

Subsec. (c)(4)(B)(ii). Pub. L. 109–59, §6011(b), amended cl. (ii) generally. Prior to amendment, cl. (ii) read as follows: "address the appropriate frequency for making conformity determinations, but in no case shall such determinations for transportation plans and programs be less frequent than every three years; and".

Subsec. (c)(4)(E). Pub. L. 109–59, §6011(f)(4), added subpar. (E) and struck out former subpar. (E) which read as follows: "Such procedures shall also include a requirement that each State shall submit to the Administrator and the Secretary of Transportation within 24 months of November 15, 1990, a revision to its implementation plan that includes criteria and procedures for assessing the conformity of any plan, program, or project subject to the conformity requirements of this subsection."

Subsec. (c)(7) to (10). Pub. L. 109–59, §6011(c)–(e), added pars. (7) to (10).

2000—Subsec. (c)(6). Pub. L. 106–377 added par. (6).

1996—Subsec. (c)(4)(D). Pub. L. 104–260 added subpar. (D).

1995—Subsec. (c)(5). Pub. L. 104–59 added par. (5).

1990—Subsecs. (a), (b). Pub. L. 101–549, §110(4), struck out subsec. (a) which related to approval of projects or award of grants, and subsec. (b) which related to implementation of approved or promulgated plans.

Subsec. (c). Pub. L. 101–549, §101(f), designated existing provisions as par. (1), struck out "(1)", "(2)", "(3)", and "(4)" before "engage in", "support in", "license or", and "approve, any", respectively, substituted "conform to an implementation plan after it" for "conform to a plan after it", "conform to an implementation plan approved" for "conform to a plan approved", and "conformity to such an implementation plan shall" for "conformity to such a plan shall", inserted "Conformity to an implementation plan means—" followed immediately by subpars. (A) and (B) and closing provisions relating to determination of conformity being based on recent estimates of emissions and the determination of such estimates, and added pars. (2) to (4).

1977—Subsec. (a)(1). Pub. L. 95–190 inserted "national" before "primary".

#### Regulations

Pub. L. 109–59, title VI, §6011(g), Aug. 10, 2005, 119 Stat. 1882, provided that: "Not later than 2 years after the date of enactment of this Act [Aug. 10, 2005], the Administrator of the Environmental Protection Agency shall promulgate revised regulations to implement the changes made by this section [amending this section]."

### § 7506a. Interstate transport commissions

#### (a) Authority to establish interstate transport regions

Whenever, on the Administrator's own motion or by petition from the Governor of any State, the Administrator has reason to believe that the interstate transport of air pollutants from one or more States contributes significantly to a violation of a national ambient air quality standard in one or more other States, the Administrator may establish, by rule, a transport region for such pollutant that includes such States. The Administrator, on the Administrator's own motion or upon petition from the Governor of any State, or upon the recommendation of a transport commission established under subsection (b) of this section, may—

(1) add any State or portion of a State to any region established under this subsection whenever the Administrator has reason to believe that the interstate transport of air pollutants from such State significantly contributes to a violation of the standard in the transport region, or

(2) remove any State or portion of a State from the region whenever the Administrator has reason to believe that the control of emissions in that State or portion of the State pursuant to this section will not significantly contribute to the attainment of the standard in any area in the region.

The Administrator shall approve or disapprove any such petition or recommendation within 18 months of its receipt. The Administrator shall establish appropriate proceedings for public participation regarding such petitions and motions, including notice and comment.

#### (b) Transport commissions

##### (1) Establishment

Whenever the Administrator establishes a transport region under subsection (a) of this section, the Administrator shall establish a transport commission comprised of (at a minimum) each of the following members:

(A) The Governor of each State in the region or the designee of each such Governor.

(B) The Administrator or the Administrator's designee.

(C) The Regional Administrator (or the Administrator's designee) for each Regional Office for each Environmental Protection Agency Region affected by the transport region concerned.

(D) An air pollution control official representing each State in the region, appointed by the Governor.

Decisions of, and recommendations and requests to, the Administrator by each transport commission may be made only by a majority vote of all members other than the Administrator and the Regional Administrators (or designees thereof).

##### (2) Recommendations

The transport commission shall assess the degree of interstate transport of the pollutant or precursors to the pollutant throughout the transport region, assess strategies for mitigating the interstate pollution, and recommend

### § 93.101 Definitions.

Terms used but not defined in this subpart shall have the meaning given them by the CAA, titles 23 and 49 U.S.C., other Environmental Protection Agency (EPA) regulations, or other DOT regulations, in that order of priority.

*Applicable implementation plan* is defined in section 302(q) of the CAA and means the portion (or portions) of the implementation plan, or most recent revision thereof, which has been approved under section 110, or promulgated under section 110(c), or promulgated or approved pursuant to regulations promulgated under section 301(d) and which implements the relevant requirements of the CAA.

*CAA* means the Clean Air Act, as amended.

*Cause or contribute to a new violation* for a project means:

(1) To cause or contribute to a new violation of a standard in the area substantially affected by the project or over a region which would otherwise not be in violation of the standard during the future period in question, if the project were not implemented, or

(2) To contribute to a new violation in a manner that would increase the frequency or severity of a new violation of a standard in such area.

*Control strategy implementation plan revision* is the applicable implementation plan which contains specific strategies for controlling the emissions of and reducing ambient levels of pollutants in order to satisfy CAA requirements for demonstrations of reasonable further progress and attainment (CAA sections 182(b)(1), 182(c)(2)(A), 182(c)(2)(B), 187(a)(7), 189(a)(1)(B), and 189(b)(1)(A); and sections 192(a) and 192(b), for nitrogen dioxide).

*Control strategy period* with respect to particulate matter less than 10 microns in diameter ($PM_{10}$), carbon monoxide (CO), nitrogen dioxide ($NO_2$), and/or ozone precursors (volatile organic compounds and oxides of nitrogen), means that period of time after EPA approves control strategy implementation plan revisions containing strategies for controlling $PM_{10}$, $NO_2$, CO, and/or ozone, as appropriate. This period ends when a State submits and EPA approves a request under section 107(d) of the CAA for redesignation to an attainment area.

*Design concept* means the type of facility identified by the project, e.g., freeway, expressway, arterial highway, grade-separated highway, reserved right-of-way rail transit, mixed-traffic rail transit, exclusive busway, etc.

*Design scope* means the design aspects which will affect the proposed facility's impact on regional emissions, usually as they relate to vehicle or person carrying capacity and control, e.g., number of lanes or tracks to be constructed or added, length of project, signalization, access control including approximate number and location of interchanges, preferential treatment for high-occupancy vehicles, etc.

*DOT* means the United States Department of Transportation.

*EPA* means the Environmental Protection Agency.

*FHWA* means the Federal Highway Administration of DOT.

*FHWA/FTA project*, for the purpose of this subpart, is any highway or transit project which is proposed to receive funding assistance and approval through the Federal-Aid Highway program or the Federal mass transit program, or requires Federal Highway Administration (FHWA) or Federal Transit Administration (FTA) approval for some aspect of the project, such as connection to an interstate highway or deviation from applicable design standards on the interstate system.

*FTA* means the Federal Transit Administration of DOT.

*Forecast period* with respect to a transportation plan is the period covered by the transportation plan pursuant to 23 CFR part 450.

*Highway project* is an undertaking to implement or modify a highway facility or highway-related program. Such an undertaking consists of all required phases necessary for implementation. For analytical purposes, it must be defined sufficiently to:

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

(2) Have independent utility or significance, i.e., be usable and be a reasonable expenditure even if no additional transportation improvements in the area are made; and

A116

**Environmental Protection Agency** §93.101

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

*Horizon year* is a year for which the transportation plan describes the envisioned transportation system according to §93.106.

*Hot-spot analysis* is an estimation of likely future localized CO and $PM_{10}$ pollutant concentrations and a comparison of those concentrations to the national ambient air quality standards. Pollutant concentrations to be estimated should be based on the total emissions burden which may result from the implementation of a single, specific project, summed together with future background concentrations (which can be estimated using the ratio of future to current traffic multiplied by the ratio of future to current emission factors) expected in the area. The total concentration must be estimated and analyzed at appropriate receptor locations in the area substantially affected by the project. Hot-spot analysis assesses impacts on a scale smaller than the entire nonattainment or maintenance area, including, for example, congested roadway intersections and highways or transit terminals, and uses an air quality dispersion model to determine the effects of emissions on air quality.

*Incomplete data area* means any ozone nonattainment area which EPA has classified, in 40 CFR part 81, as an incomplete data area.

*Increase the frequency or severity* means to cause a location or region to exceed a standard more often or to cause a violation at a greater concentration than previously existed and/or would otherwise exist during the future period in question, if the project were not implemented.

*ISTEA* means the Intermodal Surface Transportation Efficiency Act of 1991.

*Maintenance area* means any geographic region of the United States previously designated nonattainment pursuant to the CAA Amendments of 1990 and subsequently redesignated to attainment subject to the requirement to develop a maintenance plan under section 175A of the CAA, as amended.

*Maintenance period* with respect to a pollutant or pollutant precursor means that period of time beginning when a

State submits and EPA approves a request under section 107(d) of the CAA for redesignation to an attainment area, and lasting for 20 years, unless the applicable implementation plan specifies that the maintenance period shall last for more than 20 years.

*Metropolitan planning organization (MPO)* is that organization designated as being responsible, together with the State, for conducting the continuing, cooperative, and comprehensive planning process under 23 U.S.C. 134 and 49 U.S.C. 1607. It is the forum for cooperative transportation decision-making.

*Milestone* has the meaning given in sections 182(g)(1) and 189(c) of the CAA. A milestone consists of an emissions level and the date on which it is required to be achieved.

*Motor vehicle emissions budget* is that portion of the total allowable emissions defined in a revision to the applicable implementation plan (or in an implementation plan revision which was endorsed by the Governor or his or her designee, subject to a public hearing, and submitted to EPA, but not yet approved by EPA) for a certain date for the purpose of meeting reasonable further progress milestones or attainment or maintenance demonstrations, for any criteria pollutant or its precursors, allocated by the applicable implementation plan to highway and transit vehicles. The applicable implementation plan for an ozone nonattainment area may also designate a motor vehicle emissions budget for oxides of nitrogen ($NO_X$) for a reasonable further progress milestone year if the applicable implementation plan demonstrates that this $NO_X$ budget will be achieved with measures in the implementation plan (as an implementation plan must do for VOC milestone requirements). The applicable implementation plan for an ozone nonattainment area includes a $NO_X$ budget if $NO_X$ reductions are being substituted for reductions in volatile organic compounds in milestone years required for reasonable further progress.

*National ambient air quality standards (NAAQS)* are those standards established pursuant to section 109 of the CAA.

*NEPA* means the National Environmental Policy Act of 1969, as amended (42 U.S.C. 4321 *et seq.*).

237

**§ 93.101**                                            **40 CFR Ch. I (7–1–96 Edition)**

*NEPA process completion*, for the purposes of this subpart, with respect to FHWA or FTA, means the point at which there is a specific action to make a determination that a project is categorically excluded, to make a Finding of No Significant Impact, or to issue a record of decision on a Final Environmental Impact Statement under NEPA.

*Nonattainment area* means any geographic region of the United States which has been designated as nonattainment under section 107 of the CAA for any pollutant for which a national ambient air quality standard exists.

*Not classified area* means any carbon monoxide nonattainment area which EPA has not classified as either moderate or serious.

*Phase II of the interim period* with respect to a pollutant or pollutant precursor means that period of time after the effective date of this rule, lasting until the earlier of the following: submission to EPA of the relevant control strategy implementation plan revisions which have been endorsed by the Governor (or his or her designee) and have been subject to a public hearing, or the date that the Clean Air Act requires relevant control strategy implementation plans to be submitted to EPA, provided EPA has notified the State, MPO, and DOT of the State's failure to submit any such plans. The precise end of Phase II of the interim period is defined in §93.128.

*Project* means a highway project or transit project.

*Protective finding* means a determination by EPA that the control strategy contained in a submitted control strategy implementation plan revision would have been considered approvable with respect to requirements for emissions reductions if all committed measures had been submitted in enforceable form as required by Clean Air Act section 110(a)(2)(A).

*Recipient of funds designated under title 23 U.S.C. or the Federal Transit Act* means any agency at any level of State, county, city, or regional government that routinely receives title 23 U.S.C. or Federal Transit Act funds to construct FHWA/FTA projects, operate FHWA/FTA projects or equipment, purchase equipment, or undertake other services or operations via contracts or agreements. This definition does not include private landowners or developers, or contractors or entities that are only paid for services or products created by their own employees.

*Regionally significant project* means a transportation project (other than an exempt project) that is on a facility which serves regional transportation needs (such as access to and from the area outside of the region, major activity centers in the region, major planned developments such as new retail malls, sports complexes, etc., or transportation terminals as well as most terminals themselves) and would normally be included in the modeling of a metropolitan area's transportation network, including at a minimum all principal arterial highways and all fixed guideway transit facilities that offer an alternative to regional highway travel.

*Rural transport ozone nonattainment area* means an ozone nonattainment area that does not include, and is not adjacent to, any part of a Metropolitan Statistical Area or, where one exists, a Consolidated Metropolitan Statistical Area (as defined by the United States Bureau of the Census) and is classified under Clean Air Act section 182(h) as a rural transport area.

*Standard* means a national ambient air quality standard.

*Submarginal area* means any ozone nonattainment area which EPA has classified as submarginal in 40 CFR part 81.

*Transit* is mass transportation by bus, rail, or other conveyance which provides general or special service to the public on a regular and continuing basis. It does not include school buses or charter or sightseeing services.

*Transit project* is an undertaking to implement or modify a transit facility or transit-related program; purchase transit vehicles or equipment; or provide financial assistance for transit operations. It does not include actions that are solely within the jurisdiction of local transit agencies, such as changes in routes, schedules, or fares. It may consist of several phases. For analytical purposes, it must be defined inclusively enough to:

238

**Environmental Protection Agency**                    **§ 93.102**

(1) Connect logical termini and be of sufficient length to address environmental matters on a broad scope;

(2) Have independent utility or independent significance, i.e., be a reasonable expenditure even if no additional transportation improvements in the area are made; and

(3) Not restrict consideration of alternatives for other reasonably foreseeable transportation improvements.

*Transitional area* means any ozone nonattainment area which EPA has classified as transitional in 40 CFR part 81.

*Transitional period* with respect to a pollutant or pollutant precursor means that period of time which begins after submission to EPA of the relevant control strategy implementation plan which has been endorsed by the Governor (or his or her designee) and has been subject to a public hearing. The transitional period lasts until EPA takes final approval or disapproval action on the control strategy implementation plan submission or finds it to be incomplete. The precise beginning and end of the transitional period is defined in §93.128.

*Transportation control measure (TCM)* is any measure that is specifically identified and committed to in the applicable implementation plan that is either one of the types listed in §108 of the CAA, or any other measure for the purpose of reducing emissions or concentrations of air pollutants from transportation sources by reducing vehicle use or changing traffic flow or congestion conditions. Notwithstanding the above, vehicle technology-based, fuel-based, and maintenance-based measures which control the emissions from vehicles under fixed traffic conditions are not TCMs for the purposes of this subpart.

*Transportation improvement program (TIP)* means a staged, multiyear, intermodal program of transportation projects covering a metropolitan planning area which is consistent with the metropolitan transportation plan, and developed pursuant to 23 CFR part 450.

*Transportation plan* means the official intermodal metropolitan transportation plan that is developed through the metropolitan planning process for the metropolitan planning area, developed pursuant to 23 CFR part 450.

*Transportation project* is a highway project or a transit project.

[58 FR 62235, Nov. 24, 1993, as amended at 60 FR 57184, Nov. 14, 1995]

**§93.102   Applicability.**

(a) *Action applicability.* (1) Except as provided for in paragraph (c) of this section or §93.134, conformity determinations are required for:

(i) The adoption, acceptance, approval or support of transportation plans developed pursuant to 23 CFR part 450 or 49 CFR part 613 by an MPO or DOT;

(ii) The adoption, acceptance, approval or support of TIPs developed pursuant to 23 CFR part 450 or 49 CFR part 613 by an MPO or DOT; and

(iii) The approval, funding, or implementation of FHWA/FTA projects.

(2) Conformity determinations are not required under this rule for individual projects which are not FHWA/FTA projects. However, §93.129 applies to such projects if they are regionally significant.

(b) *Geographic applicability.* (1) The provisions of this subpart shall apply in all nonattainment and maintenance areas for transportation-related criteria pollutants for which the area is designated nonattainment or has a maintenance plan.

(2) The provisions of this subpart apply with respect to emissions of the following criteria pollutants: ozone, carbon monoxide, nitrogen dioxide, and particles with an aerodynamic diameter less than or equal to a nominal 10 micrometers ($PM_{10}$).

(3) The provisions of this subpart apply with respect to emissions of the following precursor pollutants:

(i) Volatile organic compounds and nitrogen oxides in ozone areas;

(ii) Nitrogen oxides in nitrogen dioxide areas; and

(iii) Volatile organic compounds, nitrogen oxides, and $PM_{10}$ in $PM_{10}$ areas if:

(A) During the interim period, the EPA Regional Administrator or the director of the State air agency has made a finding that transportation-related

239

A119

§ 93.123                                                                 **40 CFR Ch. I (7–1–11 Edition)**

(ii) Included in the conforming transportation plan (even if it is not specifically included in the latest conforming TIP) with design concept and scope adequate to determine its contribution to the transportation plan's regional emissions at the time of the transportation plan's conformity determination, and the design concept and scope of the project is not significantly different from that described in the transportation plan.

(3) A conformity determination that relies on paragraph (g) of this section does not satisfy the frequency requirements of § 93.104(b) or (c).

[62 FR 43801, Aug. 15, 1997, as amended at 69 FR 40080, July 1, 2004]

**§ 93.123   Procedures for determining localized CO, PM$_{10}$, and PM$_{2.5}$ concentrations (hot-spot analysis).**

(a) *CO hot-spot analysis.* (1) The demonstrations required by § 93.116 ("Localized CO, PM$_{10}$, and PM$_{2.5}$ violations") must be based on quantitative analysis using the applicable air quality models, data bases, and other requirements specified in 40 CFR part 51, Appendix W (Guideline on Air Quality Models). These procedures shall be used in the following cases, unless different procedures developed through the interagency consultation process required in § 93.105 and approved by the EPA Regional Administrator are used:

(i) For projects in or affecting locations, areas, or categories of sites which are identified in the applicable implementation plan as sites of violation or possible violation;

(ii) For projects affecting intersections that are at Level-of-Service D, E, or F, or those that will change to Level-of-Service D, E, or F because of increased traffic volumes related to the project;

(iii) For any project affecting one or more of the top three intersections in the nonattainment or maintenance area with highest traffic volumes, as identified in the applicable implementation plan; and

(iv) For any project affecting one or more of the top three intersections in the nonattainment or maintenance area with the worst level of service, as identified in the applicable implementation plan.

(2) In cases other than those described in paragraph (a)(1) of this section, the demonstrations required by § 93.116 may be based on either:

(i) Quantitative methods that represent reasonable and common professional practice; or

(ii) A qualitative consideration of local factors, if this can provide a clear demonstration that the requirements of § 93.116 are met.

(3) DOT, in consultation with EPA, may also choose to make a categorical hot-spot finding that (93.116(a) is met without further hot-spot analysis for any project described in paragraphs (a)(1) and (a)(2) of this section based on appropriate modeling. DOT, in consultation with EPA, may also consider the current air quality circumstances of a given CO nonattainment or maintenance area in categorical hot-spot findings for applicable FHWA or FTA projects.

(b) *PM$_{10}$ and PM$_{2.5}$ hot-spot analyses.* (1) The hot-spot demonstration required by § 93.116 must be based on quantitative analysis methods for the following types of projects:

(i) New highway projects that have a significant number of diesel vehicles, and expanded highway projects that have a significant increase in the number of diesel vehicles;

(ii) Projects affecting intersections that are at Level-of-Service D, E, or F with a significant number of diesel vehicles, or those that will change to Level-of-Service D, E, or F because of increased traffic volumes from a significant number of diesel vehicles related to the project;

(iii) New bus and rail terminals and transfer points that have a significant number of diesel vehicles congregating at a single location;

(iv) Expanded bus and rail terminals and transfer points that significantly increase the number of diesel vehicles congregating at a single location; and

(v) Projects in or affecting locations, areas, or categories of sites which are identified in the PM$_{10}$ or PM$_{2.5}$ applicable implementation plan or implementation plan submission, as appropriate, as sites of violation or possible violation.

**Environmental Protection Agency**                                §93.124

(2) Where quantitative analysis methods are not available, the demonstration required by §93.116 for projects described in paragraph (b)(1) of this section must be based on a qualitative consideration of local factors.

(3) DOT, in consultation with EPA, may also choose to make a categorical hot-spot finding that §93.116 is met without further hot-spot analysis for any project described in paragraph (b)(1) of this section based on appropriate modeling. DOT, in consultation with EPA, may also consider the current air quality circumstances of a given $PM_{2.5}$ or $PM_{10}$ nonattainment or maintenance area in categorical hot-spot findings for applicable FHWA or FTA projects.

(4) The requirements for quantitative analysis contained in this paragraph (b) will not take effect until EPA releases modeling guidance on this subject and announces in the FEDERAL REGISTER that these requirements are in effect.

(c) *General requirements.* (1) Estimated pollutant concentrations must be based on the total emissions burden which may result from the implementation of the project, summed together with future background concentrations. The total concentration must be estimated and analyzed at appropriate receptor locations in the area substantially affected by the project.

(2) Hot-spot analyses must include the entire project, and may be performed only after the major design features which will significantly impact concentrations have been identified. The future background concentration should be estimated by multiplying current background by the ratio of future to current traffic and the ratio of future to current emission factors.

(3) Hot-spot analysis assumptions must be consistent with those in the regional emissions analysis for those inputs which are required for both analyses.

(4) CO, $PM_{10}$, or $PM_{2.5}$ mitigation or control measures shall be assumed in the hot-spot analysis only where there are written commitments from the project sponsor and/or operator to implement such measures, as required by §93.125(a).

(5) CO, $PM_{10}$, and $PM_{2.5}$ hot-spot analyses are not required to consider construction-related activities which cause temporary increases in emissions. Each site which is affected by construction-related activities shall be considered separately, using established ''Guideline'' methods. Temporary increases are defined as those which occur only during the construction phase and last five years or less at any individual site.

[58 FR 62235, Nov. 24, 1993, as amended at 71 FR 12510, Mar. 10, 2006; 73 FR 4441, Jan. 24, 2008]

**§93.124   Using the motor vehicle emissions budget in the applicable implementation plan (or implementation plan submission).**

(a) In interpreting an applicable implementation plan (or implementation plan submission) with respect to its motor vehicle emissions budget(s), the MPO and DOT may not infer additions to the budget(s) that are not explicitly intended by the implementation plan (or submission). Unless the implementation plan explicitly quantifies the amount by which motor vehicle emissions could be higher while still allowing a demonstration of compliance with the milestone, attainment, or maintenance requirement and explicitly states an intent that some or all of this additional amount should be available to the MPO and DOT in the emissions budget for conformity purposes, the MPO may not interpret the budget to be higher than the implementation plan's estimate of future emissions. This applies in particular to applicable implementation plans (or submissions) which demonstrate that after implementation of control measures in the implementation plan:

(1) Emissions from all sources will be less than the total emissions that would be consistent with a required demonstration of an emissions reduction milestone;

(2) Emissions from all sources will result in achieving attainment prior to the attainment deadline and/or ambient concentrations in the attainment deadline year will be lower than needed to demonstrate attainment; or

A121

Y 4.P 96/10:
S.PRT.103-38/ V.1

| 103d Congress 1st Session | COMMITTEE PRINT | S. Prt. 103-38 Vol. I |
|---|---|---|

# A LEGISLATIVE HISTORY OF THE CLEAN AIR ACT AMENDMENTS OF 1990

TOGETHER WITH

## A SECTION-BY-SECTION INDEX

PREPARED BY THE

ENVIRONMENT AND NATURAL RESOURCES POLICY DIVISION

OF THE

CONGRESSIONAL RESEARCH SERVICE

OF THE

LIBRARY OF CONGRESS

FOR THE

COMMITTEE ON ENVIRONMENT AND PUBLIC WORKS U.S. SENATE

## VOLUME I



NOVEMBER 1993

## 1001

### CLEAN AIR CONFERENCE REPORT

#### NONATTAINMENT

#### DESIGNATION AND CLASSIFICATION

One of the more unique aspects of the new legislation is the classification of nonattainment areas and specifications of control strategies based upon the severity of the air pollution problem. In order to assure timely implementation of control measures, it is important that the Environmental Protection Agency classify nonattainment areas in a timely and accurate manner. It is our intent that states work with EPA in using designations in effect at the time of enactment, and classifications as are appropriate using air quality data from 1987, 1988 and 1989.

The provision also allows for an adjustment in the classification for areas whose design value is within five percent of a higher or lower classification. We intend this adjustment to be primarily one of "upward" classification for those areas, particularly Marginal, that may have a low design value but experience a large number of exceedances. Adjustment of area classifications "downward" should be a rare occurrence reserved only for areas which demonstrate to the Administrator that the control measures called for in the initial classification are clearly not necessary for the attainment and maintenance of the standards.

#### EXPANDED GEOGRAPHIC COVERAGE

Title I expands the geographic coverage of the control program to include the Metropolitan Statistical Area (MSA) or the Consolidated Metropolitan Statistical Area (CMSA). This was done in recognition of the significant role that transported air pollution and community patterns play in the formation of ozone and other pollutants. If we are serious about ameliorating the air pollution problems plaguing our nations' cities, then we must begin regulating sources located outside of the control region whose emissions are also contributing to this problem. Both stationary sources that have escaped controls in the past and motor vehicles that have not been subjected to Inspection and Maintenance programs must be included in the program. Although the legislation allows areas to petition to exclude a portion of their CMSA, it is our intent that this test be a difficult one to pass.

#### REGULATION OF SMALLER SOURCES

The legislation also lowers the size threshold defining which sources are subject to the control requirements. In particular, the threshold is lowered to 50 tons for Serious areas, 25 tons for Severe areas, and 10 tons for Extreme areas. This action was necessary in light of the substantial emissions that are produced from sources below 100 tons. In fact, many states have already recognized the contribution from these smaller sources and are regulating sources emitting as few as three tons per year. This provision clearly provides states and localities with the ability to continue regulating sources smaller than the federal minimum levels specified in the legislation.

A123

## 1009

Concerning the "adequate access" provision in section 179 and sections 182(c)(5), 182(d)(1) and 182(e), the inclusion of the term "adequate" is intended to make clear that appropriate transportation air quality control measures may be undertaken even if they have an access effect; the term makes clear that complete access by a particular transportation mode such as by automobile is not required as long as basic and adequate access remains available. The sponsors recognize that there are many ways to provide access and that even if vehicular access is affected, adequate access can be assured by availability of other transportation modes or means to affected areas.

## TRIP REDUCTION ORDINANCES

The conferees adopted the Senate provisions on employee vehicle occupancy programs for severe and extreme ozone areas and serious carbon monoxide areas with one exception: the provision in the Senate bill allowing employers to satisfy the requirements by expenditures of money equal to or greater than the cost of providing employees with parking spaces at the location of the workplace has been eliminated. This means that, if employers do not meet the requirements of this provision, they are subject to the penalties of the Act.

The bill requires that, in affected areas, major employers—those with more than 100 employees—achieve a reduction of 25 percent improvement in commuting vehicle occupancy above a baseline in the affected area for ridership on all such trips.

Affected employers will have complete flexibility in the types of incentive programs, services and facilities to encourage employees to share commuting trips. Some examples which have been successful at California companies where these programs have been instituted include: ride-matching services, vehicles provided for use during the day for employees who ride-share, rides home in the event of an emergency, ride-matching services, parking assistance for carpoolers, preferential parking for carpools, passes for transit users, and local shuttle services.

Another important way to comply with the requirement will be to encourage greater use of mass transit (which counts as an increase in the occupancy of the transit vehicle), thereby decreasing the number of cars on the road. One of the incentives which employers may choose to use to encourage employees not to drive to work is to provide mass transit passes as alternatives to parking spaces.

## CONFORMITY

The experience of the last 13 years has shown that it is necessary to do more than simply consider applicable control measures. They need to be implemented, as well. This is an area in which the law has failed to achieve the expected progress. The amendments added by this bill should go a long way to overcoming these deficiencies in carrying out current law.

The most important of these changes are included in the amendments to the "conformity" requirements of Section 176. In 1977, Congress added a requirement that any activity approved by a federal agency "conform" to the applicable implementation plan. We offered

A124

## 1010

little guidance regarding the application of this requirement and, unfortunately, it has largely been ignored by the agencies required to apply it.

One of the potentially most important applications of this provision is with regard to the review and approval of regional transportation plans by the Secretary of Transportation. Regional transportation plans are required under both the Federal-Aid Highway Act (Title 23, U.S. Code) and the Urban Mass Transportation Act (Title 49, U.S. Code). Beginning in 1970, the Highway Act required "consistency" between transportation projects developed for a region and requirements in applicable implementation plans under the Clean Air Act. This provision was implemented by guidance adopted jointly by EPA and the Federal Highway Administration (FHWA) in 1975. That guidance required that regional transportation plans and projects be measured against ambient air standards. If emissions from mobile sources in an urban area would contribute to violations of ambient standards, or delay attainment of standards, the regional plan and transportation projects were not to be approved.

The intent of the "conformity" provision added to the Clean Air Act in 1977 was to give clear legislative authority for the application of air quality criteria to the review and approval of transportation plans as well as projects in accordance with the DOT/EPA joint 1975 guidance. But no transportation plan has ever been disapproved under this provision, even in cities where mobile source emission growth is a major factor in preventing attainment of the NAAQS.

In 1980, EPA and FHWA supplemented their earlier guidance with more detailed requirements regarding the implementation of specific projects in state implementation plans. This supplemental guidance was partly in response to the requirement for priority funding for transportation projects enacted in Subsection (d) of Section 176. This provision has also been largely ignored.

The amendments to Section 176 are intended to provide more specific criteria for the review and approval of transportation plans, programs and projects authorized under Title 23. The long-range transportation planning process established by section 134, Title 23, the "3-C process," must become part of an effective framework for making basic choices about how to control mobile source emissions. The amendment to the conformity section will require transportation planning agencies to view their task as the development of a transportation system that meets multiple needs, including both mobility needs and air quality objectives. Traditionally, regional transportation plans have been developed to handle expected vehicle volumes without regard to the limit on how many vehicle emission sources can be accommodated in an urban air shed and still meet air quality standards. This legislation makes clear that it is time to develop transportation plans and programs that also serve as part of the pollution control strategy for the metropolitan area.

Los Angeles, the most severely polluted urban area in the United States, is demonstrating how this can be done in areas with the worst problems. The South Coast Air Quality Management District has adopted as part of the air quality plan for the area of "mobility plan" developed by the Southern California Association of Governments. This plan is designed to reduce VMT growth in the South Coast Air Basin by 60 percent over the next 20 years compared to what it would be if current vehicle miles traveled (VMT) growth rates

## 1011

continue. This reduction in vehicle use is an essential element of achieving air quality standards in southern California.

The sponsors do not intend that the federal government make the control choices for a community or strike the balance between the amount of emission reduction to be required from mobile sources compared to stationary sources. This is the choice that each community must make, unless the state or metropolitan area fails to act. But we do intend that when the state designs a plan for a non-attainment area, the amount of emission of each non-attainment pollutant allocated to mobile sources must be specified for each of the milestone periods considered in demonstrating reasonable further progress and for the attainment year. Mobile sources are to be treated like stationary sources in that emissions from mobile sources in a metropolitan area or relevant sub-region are to be expressed as total allowable emissions and not simply an unspecified remainder.

The purpose of the new "conformity" requirement is to ensure that the transportation system choices made by the community and incorporated into the regional transportation plan required by Title 23, U.S. Code, and by the Urban Mass Transportation Act, Title 49, are consistent with achieving the allowable emission targets for each pollutant assigned to mobile sources in the SIP. No transportation plan or program may be accepted by the Secretary of Transportation under Title 23 unless the metropolitan planning organization for the non-attainment area can demonstrate a "fit" between emissions expected to result from implementation of the transportation plan and the mobile source emission allocation in the SIP for the milestone year, the attainment year, and the maintenance period.

To implement this requirement of the Act, a number of specific provisions have been added to the Act. For ozone nonattainment areas, the bill requires that the same values be used by the air quality planning agency and the transportation planning agency. For the purpose of determining emissions from mobile sources, the assumptions regarding VMT, congestion levels, and other parameters used to develop the implementation plan or the most recent update of such data must be used. Thus the initial inventory required by Section 182 must be based on measured VMT and congestion, to the extent such data are available.

If the attainment demonstration requires reductions in mobile source emissions compared to those that would be expected to result from implementation of the existing transportation plan, then the transportation plan must be modified to achieve the emission targets for mobile sources in the SIP. For ozone, this will probably require future reductions in the growth of daily VMT, unless other measures can be shown to achieve the required emission reductions.

Until such time as an implementation plan is approved or promulgated that establishes the ceilings on mobile source emissions in the non-attainment area, interim requirements apply under section 176(c)(3). The sponsors recognize that implementation plans adopting emission ceilings for mobile sources are not required under the bill for three years. During the interim, three criteria will govern the adoption of transportation plans and programs by the MPOs and the review of such plans and programs by the Secretary of Transportation.

First, the conformity review for transportation plans and programs must be based on the use of the most current estimates of emissions for mobile sources. EPA has recently issued a revision of its MOBILE model based on the emission performance of recent model year

A126

## 1012

vehicles, but this model may need to be reviewed based on the tighter emission requirements added by the bill. EPA will identify the emission factors to be used in the review of plans and programs as part of the regulations required by this section.

Second, transportation plans and programs must provide for the expeditious implementation of transportation control measures. Many implementation plans adopted under the 1977 Amendments to the Act included transportation control measures that have yet to be implemented. All measures were required to be implemented by 1987 in order to meet the statutory attainment deadline. Transportation plans and programs may not be approved after the date of enactment unless they provide for expeditious implementation of such measures. "Expeditious" means as soon as practicable, but in no event longer than the project or program would have taken to implement under the original SIP schedule from commencement of the project to completion. If the control measure can be implemented more quickly than originally scheduled, the plan or program should so provide.

Third, plans and programs adopted for areas that are nonattainment for ozone or carbon monoxide during the interim period shall contribute to annual emission reductions consistent with the emission reduction schedules adopted in the bill for such areas. Section 182(b)(1) requires a percentage reduction in regional emissions during the first five years after enactment as a requirement for the implementation plan in each moderate, serious, severe, and extreme ozone non-attainment area. Until an implementation plan is adopted, however, there is no basis for determining the amount of the percentage reduction that will be allocated to mobile source emissions. Rather than wait for the final adoption of an implementation plan, the sponsors intend that the mobile source contribution to overall emissions in the non-attainment areas by reduced annually at the same percentage rate that would apply for the development of a SIP. Thus, during the period when the implementation plan is being adopted, emission reductions from mobile sources will be achieved. Without such a requirement, mobile source emissions could increase before an implementation plan takes effect thus undermining the objective of making reasonable progress toward attainment. Section 187(a)(7) requires that annual emission reductions be determined for carbon monoxide non-attainment areas. Since these reductions are based on the difference between the NAAQS and the design value for an area (with the Administrator determining the design value for an area in order to determine its non-attainment status), the annual percentage reduction required for carbon monoxide non-attainment areas should be available for the review of transportation plans and programs.

During the interim period, transportation projects may be found in conformity only if they are included in a transportation plan and program that has been reviewed and been found to conform to the criteria in 176(c)(3)(A) and reduce or eliminate the number NAAQS violations in carbon monoxide non-attainment areas. Of course, under the savings clause, such projects must also comply with any conformity requirements in implementation plans that were in effect prior to enactment of these amendments and existing court decisions in interpreting the SIPs. States are also free under section 116 to continue to apply any more stringent project review criteria in effect under state or local law. The criteria in section 176(c)(3) are merely the additional federal criteria that must be met to quality for federal

A127

## 1013

approval or funding of transportation projects, programs, and plans prior to the date when a revised implementation plan takes effect under these amendments.

The conferees recognize that a short period of time will be required for MPOs, DOT, and EPA to obtain the data and perform the analyses needed to carry out these interim requirements. Except in the sanction situation, to allow time for these efforts to be completed, the bill allows projects to proceed to construction if they have already been approved as part of a transportation improvement program that was found to conform to requirements in effect during the three years prior to enactment. These projects must also meet the requirements for carbon monoxide non-attainment areas in 176(c)(3)(B)(ii).

Once an applicable implementation plan is in effect under these Amendments, all the criteria for conformity review will apply to the development by MPOs, and the review by the Secretary of Transportation, of regional transportation plans developed under section 134, Title 23, U.S. Code, and the Urban Mass Transportation Act, Title 49, U.S. Code, transportation improvement programs under section 105, Title 23, U.S. Code, and transportation projects requiring federal approvals or funding. The general criteria for conformity review of any activity requiring federal action, approval, or funding in section 176(c)(1) (A) and (B) apply to transportation plans, programs, and projects as well. But in addition, the criteria required by paragraph 176(c)(2) and such further criteria as are adopted by the Administrator and the State under paragraph 176(c)(4) also apply.

For transportation plans and transportation improvement programs, section 176(c)(2)(A) requires a determination that emissions expected from the implementation of such plans and programs will be consistent with estimates of emissions from motor vehicles and necessary emission reductions contained in the applicable implementation plans. Estimates for emissions shall be made based on the Administrator's guidance regarding emission factors for various types of vehicles operating under traffic conditions found in the non-attainment area. These estimates should, of course, take into account the effectiveness of any inspection/maintenance program in effect in the area, the extent to which vehicles may be using alternative fuels to reduce emissions, and other factors that may affect vehicle emissions such as transportation control measures required under the applicable implementation plan. Using these factors to estimate emissions, the plan must demonstrate that it will achieve the levels of vehicle use in the metropolitan area necessary to achieve the emission reductions for mobile sources contained in the applicable implementation plan. Section 176(c)(1)(B)(iii) requires that the comparison should be with the emission reductions required for each interim period established as a milestone for demonstrating reasonable further progress, as well as with the reductions required by the attainment deadline. To the extent that the transportation plan includes a period that extends beyond the attainment deadline for any area, section 176(c)(1)(B)(i) also requires that mobile sources not cause violations of a NAAQS during the maintenance period.

Traditionally, regional transportation plans have been limited to identifying the projects that will make up the regional transportation network, including highways, fixed guideway systems, and restricted access facilities such as busways or high occupancy vehicle lanes. Since 1978, section 134 of the Federal-Aid Highway Act has directed that "the planning process shall include an analysis of alternative transportation system management and investment strategies to make more efficient use of existing transportation facilities. The

A128

## 1014

process shall consider all modes of transportation and shall be continuing, cooperative, and comprehensive . . ." This mandate requires more than simply identifying the comprehensive transportation system for a metropolitan area; it also directs that MPOs consider strategies and options that extend beyond the limited identification of transportation projects. Programs designed to reduce vehicle use or increase the passenger-carrying capacity of highways, such as pricing strategies, time-of-day access limitations, parking management programs, van and car pool programs, employer incentive programs, off-highway bicycle paths, and trip reduction programs are all within the options and alternatives available to MPOs that can "make more efficient use of existing transportation facilities," and also achieve the emission reduction requirements of an implementation plan. MPOs and the Secretary of DOT are expected to undertake a more comprehensive consideration of alternatives and perform a much more careful analysis of options that can contribute toward achieving the air quality objectives of the Clean Air Act.

To the extent the MPO adopts policies or programs other than traditional transportation projects that are designed to reduce emissions by reducing vehicle use, the MPO may rely upon such measures for determining conformity of the transportation plan if they are included in the applicable implementation plan as enforceable control measures.

Transportation plans are normally adopted for 20-year periods, or even longer. However, this does not mean that a metropolitan area can rely on its existing plan if it fails to conform to the mobile source emission allocation in the new SIP. The procedure for obtaining federal funding of transportation projects in an open area requires that a transportation improvement program, including the annual funding element, be submitted to the Federal Highway Administration for approval each year (or in some areas, semiannually). Section 176(c)(2)(C) prohibits the approval of any project for funding unless it comes from a conforming plan and program, unless it qualifies for an exception from this general requirement under 176(c)(2)(D).

Section 176(c)(2)(A) requires that the transportation improvement program as well as the regional plan be found to be in conformity with the emission reductions required by the SIP. Thus, this comparison of the plan and program with the SIP will be required during the first funding cycle after adoption of the SIP to ensure continued conformity.

The requirement to compare the expected emission effects of implementing the regional transportation plan with the emission targets in the SIP will also be closely tied to the triennial review of the SIP to determine whether emission reduction targets have been met. Section 182(c)(5) requires that measured VMT, congestion levels and other parameters be measured against the SIP. If VMT, congestion or other parameters do not conform to the projections used in the SIP, then both the transportation control measures in the SIP and the transportation plan and program will have to be revised to make up shortfalls in the emission reduction schedule for the area.

To ensure that the transportation plan remains coordinated with the applicable implementation plan, the Administrator is directed to require the review of transportation plans at least every three years. Section 176(c)(4)(B)(ii). Mobile source emissions are required to be reviewed every three years under section 182(c)(5) to determine if the emission reductions planned for the preceding three year period have actually been achieved. If emission reductions as scheduled in the implementation plan are not achieved,

A129

## 1015

a SIP revision is required within 18 months. Once the implementation plan has been shown to be inadequate, it can no longer serve as an adequate basis for determining whether the transportation plan for the region is adequate to contribute to attainment of NAAQS. The three year review of conformity for a transportation plans and programs will guarantee that, if the implementation plan is required to be revised, the transportation plan will also be revised if necessary to carry out the mobile source emission reductions required under a revised implementation plan.

To the extent the SIP requires the implementation of transportation control measures to meet mobile source emission targets in the SIP, such measures must meet the requirements of Section 110(a)(2)(E)(i), including the requirement that the state demonstrate adequate funding to carry out such measures. The failure to show how such measures will be funded, or to include commitments from the authorized funding sources, will preclude approval of the state's plan. EPA is not authorized to approve plans containing measures that are speculative because of the lack of funding commitments.

Thus, where a state relies on the construction of highway projects to avoid congestion and thereby prevent carbon monoxide "hot spots", the state will have to provide assurances that such funds will be available on schedule to complete the highway projects within the time needed to prevent the congestion levels that can cause carbon monoxide levels to exceed the NAAQS. Projects identified in the SIP that qualify for federal funding under Titles 23 or 49 are to be given priority, including priority funding, by the metropolitan planning organization or other recipient of federal funds, such as a state or county transportation department or transit district when preparing transportation improvement programs (Section 176(c)(2)(B)). Any project not contained in the SIP may not be funded until projects contained in the SIP are funded in accordance with the schedule for completion of such projects. In addition, the transportation improvement program shall provide for timely implementation of other transportation control measures contained in the applicable implementation plan.

Projects may be adopted or approved as part of a plan or program by a metropolitan planning organization or any recipient of funds designated under Title 23 or the Urban Mass Transportation Act or be found in conformity by a metropolitan planning organization or approved, accepted or funded by the Department of Transportation only if certain criteria are met. The criteria in paragraph 176(c)(2)(C) include requirements that the project comes from a conforming plan or program, that the design concept and scope of such project have not changed since the conformity finding regarding the plan and program from which the project derived, and that the design concept and scope were adequate for the purpose of determining emissions. These criteria are intended to ensure that projects included in a regional plan at the time a conformity determination is made are characterized with sufficient specificity to allow emissions from the projects and the regional plan to be quantified. This means that the general corridor of a project be identified, and that the characteristics of a project which affect emissions such as whether it is limited access, grade separated, the number of lanes, location of interchanges, whether lanes are to be restricted to high occupancy vehicles, and other factors affecting vehicle carrying capacity be described. If a project is significantly modified after its inclusion in a regional transportation plan, it shall not be found in conformity, approved or funded unless the plan is revised to take

A130

## 1016

account of the revisions to the project or the project qualifies under paragraphs 176(c)(2)(D).

Paragraph 176(c)(2)(D) allows a project which does not come from a conforming plan or program to be found in conformity if it is demonstrated that the projected emissions from the project, when considered together with emissions projected for the conforming transportation plans and programs within the nonattainment area, do not cause the plans and programs for the area to exceed the emission reduction projections and schedules assigned to such plans and programs in the applicable implementation plan. A project may qualify for this exception only if the regional plans and programs are in conformity at the time the project is reviewed, the emissions from the project are adequately characterized, and the project emissions are considered together with all emissions expected in the region from the conforming plans and programs. The cumulative impact of the project, taken together with the approved plans and programs, may not cause the emissions to exceed the emission ceilings set for the years after the project will begin service. Any project found to conform under this provision that was not included in a plan at the time of such determination would have to be incorporated into the plan at the time of the next periodic review of the plan required under 176(c)(4)(A)(ii).

To resolve the conflicting interpretation of the conformity provision in the 1977 law that has stalemated effective transportation and environmental planning coordination, the bill specifically assigns to EPA the authority to issue regulations establishing conformity criteria and procedures with the concurrence of the Secretary of Transportation. Such regulations will provide guidance to the states for the adoption of conformity requirements in each SIP and will govern the conformity decisions of federal agencies and MPOs required to make conformity decisions. Federal agencies will also have to comply with applicable provisions of the SIP if stronger than the underlying basic federal regulations.

The regulations to be promulgated by the Administrator will constitute an important part of the implementation of these Amendments and must be adopted in a timely fashion to ensure that the criteria to be applied by the MPOs are clearly defined by the time the conformity determinations are required under applicable implementation plans. In the absence of such regulations, the MPOs and the DOT will still be required to make conformity determinations. To ensure the application of uniform criteria and procedures nationwide under this section, the sponsors urge the Administrator and Secretary to act expeditiously to issue timely regulations.

The sponsors intend that the Secretary's decision on whether or not to concur with the Administrator's regulations shall be based on the provisions and requirements of this Act and the corresponding intention of the sponsors.

If the regulations required by this provision are not issued within the deadline established by the Act, both the Administrator and the Secretary shall be subject to the jurisdiction of any court reviewing the failure to perform the duty to promulgate regulations. The court will determine whether the cause for agency delay is justified and fashion a remedy designed to cure the failure of agency action.

If the Administrator has proposed rules and obtained the concurrence of the Secretary, but fails to take final agency action, the court will be faced with a case of agency delay. If the Administrator, however, issues proposed regulations in a timely fashion but received no

## 1017

response from the Secretary within the time allowed for comments, the court should infer that the Secretary's silence constitutes concurrence because no objections have been made, and thereby require final action by the Administrator.

If the Administrator has proposed rules within a timely fashion and the Secretary submits objections to EPA and refuses to concur within the time allowed for comments, the court shall decide any legal issues in dispute and issue an order setting forth a schedule for final agency action to ensure timely implementation of the regulations.

### TRANSPORTATION SANCTIONS

The bill also makes a major change in the transportation sanction requirement that applies when a state fails to submit an adequate plan, fails to submit a required plan revision or fails to implement its plan. Under the 1977 law, the Administrator was required to withhold highway funding from a state if it failed to comply with the Act or implement its SIP. The bill modifies this authority by allowing funding under Title 23 to be allocated to projects that reduce vehicle use.

The bill would treat federal transportation funding as a pollution control strategy rather than simply as a penalty. If a state fails to timely submit a plan that meets the requirements of the Act, a required plan revision or implement its plan, as detailed in section 179 (a), the bill provides that federal transportation funding is still available to the state, but only for projects that either reduce vehicle use or reduce emissions from vehicles on the highway as defined in section 179(b)(1)(B). As defined in the provision, it may not be used for projects that promote single occupancy vehicle use. To the extent that transportation projects are contained in the SIP, the SIP establishes a priority for funding of projects when the sanction is applied. If no SIP has been approved, or projects are not prioritized in the SIP, then the Administrator and the Secretary of Transportation in cooperation with the affected state would have discretion to determine which projects would receive priority.

The provision in subsection 179 (b)(1)(A) precluding Secretarial "approval . . . of any projects" is intended to include Secretarial approvals at all stages of project development, including approval of a project EIS, a project location approval, and approval of a project's plans, specifications and estimates. The provision is intended to reach capital and design project approvals, not the ongoing planning process.

The sponsors intend that the maximum flexibility be afforded state and local officials in the use of funds authorized under Title 23 for the purposes listed and specified under 179(b)(1)(B). The Secretary of Transportation is directed to develop expedited procedures for considering revisions to transportation plans and programs for the purpose of advancing such pollution-reducing projects in non-attainment areas. In order that non-attainment areas and states move toward compliance and do not lose substantial transportation funds, the sponsors intend that the Secretary, promptly after passage of this Act, undertake a review, in full cooperation with states and areas facing compliance problems, of pollution reducing projects that could be adopted in such areas and for which Title 23 funds could be made available. It is the intent that careful planning and consideration be undertaken by the Secretary beginning shortly after enactment, with states and localities, on using transportation funds as flexibility as possible to implement pollution-reducing projects so

A132



UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

NOV   8 1988

Honorable Robert E. Farris
Administrator
Federal Highway Administration
Department of Transportation
Washington, D.C. 20590

Dear Mr. Farris:

The attached comments from the U.S. Environmental
Protection Agency (EPA) are sent in response to the Notice of
Proposed Rulemaking (NPRM), appearing in the September 9, 1988
Federal Register and dealing with Section 176 of the Clean Air
Act (CAA).

Some EPA Regional Offices with experience and perspectives
on Section 176 issues prepared separate comments for FHWA
Docket No. 88-13. These Regional Office comments are attached
to this submittal. This entire package represents the Agency's
complete response to FHWA Docket #88-13.

EPA's comments have resulted from agency-wide consultation
that included every regional office and several headquarters'
offices. While EPA has commented on past FHWA draft NPRMs
dealing with Section 176--primarily in 1986--these comments to
Docket No. 88-13 represent the Agency's updated position on the
issues raised by the NPRM. Just as FHWA bases its NPRM on
"experience gained over the past eight years", EPA's comments
are similarly based on the Agency's experiences and problems in
the field over the past eight years in implementing Section 176
procedures--and on EPA's interpretation of Section 176
statutory language and intent.

EPA has reviewed FHWA's NPRM in accordance with our
responsibilities under Section 309 of the CAA. As currently
proposed, EPA believes that this regulation would have
environmentally unacceptable results. Accordingly, pursuant to
the procedures established for pre-decision referrals to the
Council on Environmental Quality (CEQ) (40 CFR Part 1504),
unless a satisfactory agreement is reached on the significant
unresolved issues prior to the publication of the regulation,

A133

-2-

this regulation is a candidate for referral to CEQ by the
Administrator pursuant to his authority under Section 309 of
the CAA. In view of the significant issues raised by the NPRM,
we request that final rulemaking be delayed until EPA and FHWA
have an opportunity to discuss FHWA's response to our comments
in an effort to avoid referral to CEQ.

EPA has determined the NPRM to be Environmentally Unsatis-
factory because:

(1)     Changes proposed to Section 176(a) by FHWA would
significantly reduce the effectiveness of highway sanctions and
could nullify this essential CAA provision.     The changes of
greatest concern deal with:     (1) broadening exemptions for
highway projects on the basis of invalid and incomplete
analytical procedures that would improperly exempt many
highways as air quality improvement projects and (2) reducing
or eliminating explicit requirements calling for FHWA to
consult with EPA prior to finalizing project exemption
decisions.

EPA's experience in requiring inspection and
maintenance (I/M) programs mandated by the CAA has repeatedly
shown that imposition--or the threat--of highway sanctions is
the single most significant factor causing the establishment of
I/M programs. The importance of highway sanctions continues to
be recognized by Congress because every draft clean air bill in
both the Senate and House not only preserves but expands the
use of such sanctions for the post 1987 nonattainment era.
Because I/M is the single most effective measure for
controlling in-use vehicular emissions, with programs in 64
urban areas in 33 states, EPA opposes weakening highway
sanctions that are needed to insure the implementation and
continued operation of I/M programs.

(2)     Changes proposed to conformity are fundamentally
inconsistent with CAA intent and would render Section 176(c)
procedures ineffective.  FHWA's narrow definition of conformity
would allow both projects causing violations and transportation
programs exceeding SIP emission reduction targets and
Reasonable Further Progress (RFP) schedules to be found in
conformance.

EPA disagrees with the following FHWA positions:     (1)
conformity of transportation plans and programs is determined
only by their contribution to reasonable progress in
implementing State Implementation Plan (SIP) Transportation
Control Measures (TCMs), (2) project level air quality analysis

-3-

is not required to determine conformity, (3) compliance with
project level conformity requirements can be accomplished
through the National Environmental Policy Act (NEPA) process--a
process that does not include Section 176(c) sanctions and does
not mandate the delay of nonconforming projects until they are
modified to be in conformance, and (4) the burden is on state
environment agencies or EPA to revise the SIP, e.g., with more
stringent stationary source controls, if transportation
projects or programs worsen or cause standard violations or
slow attainment.

EPA has consistently maintained that determinations of
project or program conformity with the SIP intrinsically
require that the transportation project or program not just
narrowly conform with, or be compared to, SIP measures, but
also conform with the SIP's primary purpose or goal of
achieving clean air standards. Therefore, the definition of
conformity and conformity procedures must effectively address
the primary purpose of SIPs which is attainment of the
standards.

In other words, both the Transportation Improvement
Program (TIP) and transportation plans, as well as projects,
should be reviewed for their impact on the air quality
standards. If they cause or contribute to existing or new
standard violations, or delay attainment, they should not be
found in conformity. EPA's definition of conformity is
basically the same definition as that contained in the
Consistency Guidelines of 1975 which were jointly issued by EPA
and FHWA in response to Section 109(j) of the Federal-Aid to
Highway Act. EPA also believes that the burden should be on
Metropolitan Planning Organizations (MPOs) and FHWA to
demonstrate that changes to transportation programs and
projects do not adversely affect air quality, not on the State
or EPA to revise the SIP if such programs or projects cause air
quality problems.

While EPA opposes FHWA's unilateral changes to policies and
procedures previously issued jointly by DOT and EPA for the
reasons discussed in the attachment, we intend to work with
FHWA in an attempt to find mutually acceptable resolutions to
the issues identified in our comments. We first recommend a
renewed effort by FHWA and EPA to jointly issue an NPRM for

-4-

Section 176(a) only because remaining disagreements between the two agencies on highway sanction procedures do not appear insurmountable.

Sincerely,

Jennifer Joy Wilson
Assistant Administrator
for External Affairs

Don R. Clay
Acting Assistant Administrator
for Air and Radiation

Attachment

cc   FHWA Docket No. 88-13
     Federal Highway Administration
     Room 4232, HCC-10
     400 Seventh Street, S.W.
     Washington, D.C. 20590

A136

ATTACHMENT:  EPA COMMENTS TO FHWA DOCKET NO.88-11

1.   **General:**   The NPRM indicates that "DOT has discussed this rulemaking effort with EPA."   This statement should be eliminated because it could be misinterpreted to suggest that EPA agrees with the proposed amendments.   Alternatively, the statement could be left in and new language added that specified EPA's disagreements with the NPRM.

2.   **Section 176(a) - Overview:**

2.1  **Agreement with FHWA:**  EPA supports the FHWA amendments that clarify and update the original highway sanction procedures (e.g., making the procedures consistent with current FHWA Urban Transportation Planning regulations or including safety exemptions that FHWA and EPA Regional Offices have already endorsed through interagency agreements).   We also support eliminating references to 1979 and 1982 SIP activities.

2.2  **Insufficient Justification for Substantive Changes:**  The stated purpose of FHWA's NPRM is to "streamline and simplify" existing requirements, and to "reduce red tape."   But the NPRM lacks sufficient justification to support substantive changes to existing requirements.   Problems with existing highway sanction procedures that would justify changes are not explained.   Some of the proposed changes are inconsistent with the stated objectives of the NPRM and those changes that reduce FHWA/EPA consultation on project exemption decisions will, as noted below, worsen the problems of greatest concern to EPA.

2.3  **Opposition to Unilateral Issuance:**  EPA opposes FHWA's unilateral changes to policies and procedures issued jointly by DOT and EPA in the 4/10/80 Federal Register.   Needed revisions should be jointly issued.   Government policies and procedures adopted by two agencies and subsequently rescinded, in part, by only one agency are more likely to complicate rather than simplify existing procedures.

2.4  **Recommendation for Joint Issuance:**  EPA recommends a renewed effort by FHWA and EPA to jointly issue an NPRM for only Section 176(a) because remaining disagreements between the two agencies on highway sanction procedures do not appear insurmountable.   (Unfortunately the same cannot be said for conformity.)   FHWA's consolidation of two different CAA requirements into one NPRM does not really simplify procedures because highway sanctions and conformity are not related.   Those subjected to highway sanctions in the future will benefit more from Section 176(a) procedures jointly issued by FHWA and EPA than from FHWA's unilateral NPRM which combines unrelated highway sanction and conformity procedures.

A137

-2-

## ATTACHMENT:   EPA COMMENTS TO FHWA DOCKET NO.88-13

2.5   **Elimination of Critical Information:**   EPA objects to FHWA's removal of language from existing procedures that describes EPA's actions in determining when sanctions apply. This removes the description of a tightly scheduled sequence of steps involving EPA, DOT, State and local agencies--it eliminates essential details on how sanctions would be applied and on how sanctions may be avoided.

2.6   **Complications for State and Local Officials:**   Because of FHWA's unilateral issuance and removal of EPA activities, those subjected to sanctions in the future would have to jump back and forth between two different Federal Registers to get the whole picture of how the entire sanction process would work. This result does not simplify, streamline, and consolidate existing procedures or cut red tape (the main objectives of the FHWA NPRM), but rather complicates the efforts of State and local officials to comply. The reasons for joint issuance in 1980 remain valid today and the stated objectives of FHWA's NPRM are better met with a joint issuance.

2.7   **Needed FHWA/EPA Consultation on Project Exemption Decisions:**   EPA opposes amendments that reduce or eliminate explicit requirements calling for FHWA to consult with EPA prior to finalization of project exemption decisions.   The majority of FHWA amendments concern the project exemption process and it is precisely this process--especially the interaction of EPA and FHWA leading to final exemption decisions--that caused EPA the most problems over the years.   As EPA indicated in a May 14, 1987 letter to FHWA, these problems were greatest in areas such as Albuquerque.

## 3.   Section 176(a) - Section-by-Section Comments:

3.1   **Supplementary Information Section:**   DOT indicates its belief that highway sanctions are not available after 12/31/87 without new clean air legislation.   DOT's disagreement with EPA on the current availability of sanctions should not be included in the NPRM.   Those reviewing the NPRM would wonder why DOT is now issuing new rules to implement highway sanctions if DOT questions the legitimacy of imposing sanctions at this time. This sends a mixed, confusing signal that should be avoided.

Several other parts of the NPRM seem inconsistent with DOT's highlighting the disagreement on sanction availability: (1) DOT indicates that both houses of Congress have introduced legislation that would amend the CAA to re-authorize the use of highway sanctions, (2) DOT states in Section 770.104 that "...it is FHWA policy to ensure that the requirements of Section 176(a) of the CAA are met...", and (3) Section 770.108 indicates that

A138

-3-

## ATTACHMENT:  EPA COMMENTS TO FHWA DOCKET NO.88-13

"Imposition of highway sanctions is an EPA responsibility..."  In accordance with the latter point, DOT should not comment on the availability of sanctions after 12/31/87.

3.2    Section 770.100:  EPA disagrees with the deletion of language emphasizing that regional offices have "some discretion and flexibility to develop, in consultation with affected agencies more specific procedures for review and resolution of issues at the regional level."  This deleted language is consistent with the stated objectives of FHWA's NPRM--i.e., to provide "more flexibility to State and local agencies..." and therefore should not be eliminated.  EPA's experience in implementing sanctions has shown, in nearly every case, that the delegation of discretion and flexibility results in more effective and efficient implementation of Section 176(a) procedures.

3.3    Section 770.104:  In both the Section-By-Section Analysis and regulation parts of the NPRM, the underscored language is unnecessary and should be eliminated:

> This section proposes to add a new policy statement. It states that it is FHWA policy to ensure that the requirements of Section 176(a) of the CAA are met where the EPA Administrator makes a finding pursuant to Section 176(a) and limitations on Title 23, U.S.C., funds are applicable.

Where the Administrator makes a finding, fund limitations are applicable.  Once the finding is made, which is EPA's call, the imposition of sanctions is automatic, unconditional, and nondiscretionary.

3.4    Section 770.108:  Regarding the FHWA Regional Administrator providing information on exempt projects, the Section-By-Section portion indicates that "procedures for this notification should be jointly negotiated by FHWA Regional/Division Administrators and EPA."  However, this important sentence on negotiating procedures for notification is dropped from the regulation portion of the NPRM.  It should not be.

The sentence on negotiating procedures should be included in the regulation portion of the NPRM because the regulation itself carries far more weight than the Section-By-Section Analysis part in determining how Section 176(a) requirements will be carried out.  If FHWA is concerned with the overall length of the NPRM and wants to include this sentence only once, then it should be placed in the regulation portion.

A139

-4-

## ATTACHMENT:  EPA COMMENTS TO FHWA DOCKET NO.88-13

The sentence should also be modified and expanded as
follows (new wording is <u>underscored</u>):

> Procedures for this notification <u>will</u> be jointly
> negotiated by FHWA Regional/Division Administrators and
> EPA <u>to insure adequate consultation prior to final</u>
> <u>project exemption decisions.</u>

Such wording could significantly reduce the possibility of the
kinds of problems EPA encountered in Albuquerque.  Point #2.7
above summarizes the importance of EPA recommended changes to
Section 770.108.

3.5   <u>Section 770.112(a)(3)</u>:  The NPRM would allow EPA only
30 days to review and submit negative comments on TIP projects
identified as air quality improvement projects.  Based on EPA's
experiences in implementing sanctions in Albuquerque, 60 days
should be allowed for EPA comments.  This is necessary because
exemption decisions often lack complete documentation and require
additional information gathering by EPA.  Also, additional time
is needed when information on specific projects is not located in
the same city as the EPA Regional Office.

3.6   <u>Section 770.112(a)(3)</u>:   This section causes major
problems.   Project exemptions would be increased on the basis of
limited and inappropriate analytical procedures that would impro-
perly exempt many highways as air quality improvement projects.

The shorter and more simplified approach in the
"Transportation Improvement Projects Related to Air Quality
Improvement or Maintenance" section of the original, jointly
issued 4/10/80 <u>Federal Register</u> should be maintained.   The
following modified language from the FHWA 9/9/88 NPRM should be
added:

> The scope and complexity of air quality analyses for
> air quality improvement projects should be determined
> after consultation among FHWA, EPA, State, and local
> transportation and environment agencies.     This
> consultation should insure that air quality analyses
> are not limited to microscale CO analyses that
> include intersection analyses.   The air quality
> analyses should also address, on the proper geographic
> scale over the near and long term, all  significant
> pollutant problems which could include areawide carbon
> monoxide, hydrocarbons, NOx emissions, and other
> vehicular pollutants.

> It is the Agency's position that EPA should be

-5-

## ATTACHMENT: EPA COMMENTS TO FHWA DOCKET NO.88-13

consulted on all project exemption decisions--e.g., safety and
especially air quality improvement projects. After consulting
with EPA, FHWA should have primary say on safety exemptions.
However, as the agency responsible for regulation of air quality,
EPA should have primary say on exemptions for air quality
improvement projects.

3.7 **Section 770.112(a)**: EPA recommends the removal of the
following sentence from the Section-By-Section Analysis: "The
FHWA will issue a guidance document on a suggested methodology to
evaluate highway air quality improvement projects in sanctioned
areas." This statement incorrectly and prematurely suggests the
eventual emergence from ongoing FHWA/EPA technical discussions of
"a suggested methodology". It also implies a unilateral
endorsement and issuance by FHWA, when a joint FHWA/EPA guidance
document is far more appropriate and useful.

3.8 **Section 770.112(b)**: Regarding consultation between
FHWA/EPA Regional Administrators on exempt projects, the Section-
By-Section Analysis part of the NPRM indicates that:

> For projects in this category [those that do not
> clearly fall into one of the exemption categories in
> Section 770.112(a)] the FHWA Regional Administrator
> should consult with the EPA Regional Administrator, as
> appropriate, before making a final decision.

First, the language should be changed to indicate that the FHWA
Regional Administrator **will**--not "should"--consult with EPA.
Second, this very important sentence on consultation prior to
final exemption decisions is dropped from the regulation part of
the NPRM. It should not be for the reasons discussed above in
point #6.5. If this sentence is only to appear once, it should
be placed in the regulation portion of the NPRM.

### 4. Sections 176(c)(d) - Overview

EPA's overview comments include the following in
addition to those presented in Item (2) of the cover letter:

4.1 **Issuance of NPRM Contradicts FHWA's Commitment**:
As a result of FHWA's intervention into the issuance of EPA's
proposed Post 1987 Nonattainment Policy of last November, EPA and
FHWA jointly developed the following language:

> The EPA and DOT **will** discuss the joint updating and
> revision of the 1980 Conformity Agreement. Any changes
> to the 1980 Agreement, **following these discussions**,

A141

-6-

## ATTACHMENT: EPA COMMENTS TO FHWA DOCKET NO.88-13

will be reflected in a separate rulemaking action by
DOT...[Emphasis added]

This language, appearing in the November 24, 1987 Federal
Register, resulted from consultation between EPA and FHWA just
prior to issuance of EPA's proposed policy.

FHWA's 9/9/88 NPRM on conformity appeared without any
discussion with EPA on the EPA/DOT 1980 Conformity Agreement, as
jointly agreed to late November by both agencies. According
to the Federal Register language, FHWA rulemaking would follow
such discussions and reflect changes to the jointly issued 1980
Agreement which presumably would be agreed upon by both Agencies.

FHWA's failure to follow through on its commitment to joint
discussions in advance of rulemaking is indicative of FHWA's
unilateral approach to these issues which are equally important
to EPA and FHWA. Even though FHWA did not consult with EPA since
November 1987, EPA remains willing to work with FHWA and search
for mutually acceptable solutions consistent with the last
paragraph of the cover letter. As indicated by the above
language from the Agency's proposed Post 1987 Policy and as EPA
has indicated previously in past correspondence dating back to
1981, discussions on conformity must begin with the EPA/DOT
Conformity Agreement of 1980 because EPA and FHWA hold
fundamentally different interpretations of the 1980 Agreement and
its relationship to the 1975 EPA/FHWA Consistency Guidelines.

4.2    Application of EPA's Conformity Approach for Post 1987
Areas to DOT:    EPA recommended a conformity approach for post
1987 nonattainment areas in the November 24, 1987 Federal
Register.    In that Federal Register EPA excluded DOT, at that
time, from the proposed conformity approach, pending discussions
with FHWA which never took place.    However, on the basis of
comments received on our proposed Post-1987 Policy and our review
of FHWA's 9/9/88 NPRM, the Agency believes that the conformity
approach proposed in November 1987 should be included in future
SIP revisions and should apply to FHWA.

4.3    Statutory Basis for EPA's Conformity Approach for Post
1987 Nonattainment Areas:    The statutory basis for EPA's
inclusion of conformity provisions in the proposed Post 1987
Policy can be found in Section 110(a)(2)(B) of the CAA which
states that SIPs must include "such other measures as may be
necessary to insure attainment..."    EPA interprets this clause to
require, among other things, procedures to insure that emissions
from highway projects and programs do not interfere with the
expeditious attainment and maintenance of the standards.

A142

-7-

## ATTACHMENT: EPA COMMENTS TO FHWA DOCKET NO.88-13

FHWA has an affirmative responsibility--as specified in the Act--to assure conformity. But EPA has back-up or supplemental authority, under Section 110, to require SIPs to contain conformity procedures, where existing conformity procedures--such as those in FHWA's NPRM--do not insure that transportation projects and programs will avoid causing or contributing to existing or new standard violations or delaying attainment.

EPA's position on the statutory basis for conformity was contained in a 25 July 1986 letter from the EPA Administrator to the former FHWA Administrator.

## 5.  Sections 176(c)(d) - Section-by-Section Comments:

5.1  Supplementary Information Section - 1980 Conformity Agreement: EPA does not agree with the proposal to supersede the June 12, 1980 DOT/EPA Conformity Agreement. FHWA cannot unilaterally supersede an Agreement previously issued jointly by EPA and DOT. Also, as noted in point #2.3 above, EPA believes that this unilateral action complicates rather than simplifies existing procedures.

As noted in point #4.1 above, FHWA committed in EPA's 24 November 1987 Federal Register on the proposed Post 1987 Nonattainment Policy to discuss with EPA the joint updating and revision of the 1980 Agreement. The Agreement should not be superseded given that no discussions between FHWA and EPA have taken place since last November.

The 1980 Agreement and FHWA's January 26, 1981 rulemaking (based on the 1980 Agreement) both contain essential information covering EPA activities during conformity deliberations. Because the NPRM eliminates this essential information, EPA opposes supersession of FHWA's 1981 rulemaking --and especially the 1980 Conformity Agreement that EPA jointly issued with DOT.

5.2  Supplementary Information Section - Section 109(j): EPA disagrees that the NPRM meets FHWA's obligation under 23 U.S.C. 109(j)--specifically as those obligations are spelled out in the FHWA/EPA 1975 Consistency Guidelines. The NPRM narrowly and incorrectly bases a conformity finding only on whether transportation plans and programs contribute to reasonable progress in implementing SIP TCMs--and not on the impact that transportation programs have on the standards. As noted in the cover letter:

A143

-8-

## ATTACHMENT: EPA COMMENTS TO FHWA DOCKET NO.88-13

> ...both the Transportation Improvement Program (TIP) and transportation plans, as well as projects, should be reviewed for their impact on the air quality standards. If they cause or contribute to existing or new standard violations, or delay attainment, they should not be found in conformity. EPA's definition of conformity is basically the same definition as that contained in the consistency Guidelines of 1975 which were jointly issued by EPA and FHWA in response to Section 109(j) of the Federal-Aid to Highway Act.

5.3  Section 770.202 - CEs:  Although the 1980 Conformity Agreement and the 1/26/81 FHWA Conformity rulemaking provide for some exclusions after a nonconformity finding, Section 176(c) statutory language does not provide for exclusions.  EPA opposes further unilateral increases to existing exclusions by FHWA-- e.g., use of Categorical Exclusions (CEs) as part of conformity procedure modification--without consultation with EPA.    When provided sufficient information on CEs, EPA could disagree with certain CEs and, more importantly, with FHWA procedures that allow expansion of CEs on a case-by-case basis without EPA review and comment.

5.4  Section 770.204 - Policy:  FHWA's conformity policy should aim to "preserve and enhance air quality".  Such language is not only consistent with the intent of Section 176(c), but also with the definition of consistency in the 1975 FHWA/EPA Consistency Guidelines.  EPA disagrees with the deletion of the following underscored language from FHWA's original 1/26/81 conformity rulemaking:

> It is the policy of FHWA...that...<u>adequate consideration is given to preservation and enhancement of air quality.</u>

5.5  Section 770.206 - Applicability - UTPP TCMs:  EPA opposes limiting conformity/priority determinations to TCMs developed, programmed, and implemented through the UTPP.  This limitation is too restrictive because federal funding decisions on TCMs originating outside UTPP should be subject to conformity determinations.  Measures such as Better Air Campaign rideshare activities in Denver and the Trip Reduction Ordinance in the Los Angeles area originated outside the UTPP but then subsequently became eligible for federal dollars.  Decisions on funding such measures should be subject to conformity findings.

5.6  Section 770.206 - 109(j):  Conformity procedures under the NPRM do not satisfy 23 U.S.C. 109(j) requirements.  See comment #5.2 above.

-9-

## ATTACHMENT: EPA COMMENTS TO FHWA DOCKET NO.88-13

5.7  Section 770.208 - Self-Certification:  Because federal certifications are no longer done, EPA disagrees that FHWA can carry out its affirmative responsibility to assure conformity through the self-certification process.  The CAA emphasizes the importance of conformity by assigning the assurance of conformity to the head of federal agencies.  This responsibility should not be delegated, made more remote from federal oversight, and buried with numerous other self-certification check-off requirements. EPA Regional Offices should have an explicit opportunity for review and comment on the conformity parts of self-certification.

5.8  Section 770.208 - Conformity Philosophy:  For the many reasons expanded upon in point (2) of the cover letter and elsewhere in these comments, EPA totally disagrees that conformity is determined solely by insuring that "transportation plans and programs contribute to reasonable progress in implementing SIP TCMs".  This narrow, vague, and subjective criterion does not address or directly relate to the:    (1) primary purpose of the CAA and SIPs which is to prevent standard violations and achieve expeditious attainment of the standards, (2) statutory language of Section 176(c) which requires project conformity determinations, and (3) the FHWA/EPA Consistency Guidelines of 1975.

5.9  Section 770.208 - Limited Program Approvals After A Nonconformity Finding:  EPA questions whether any approvals are allowed by the statutory language when a nonconformity finding is made.   The CAA does not link Section 176(a) exemptions to Section 176(c) limited approvals as FHWA does.  EPA could agree that air quality beneficial projects exempted under Section 176(a) could possibly advance under Section 176(c) if Section 770.112(a)(3) is modified as EPA suggests in point #3.6 above.

5.10  Section 770.208 - Project Conformity:  As noted in point (2) of the cover letter, EPA disagrees that project level air quality analysis is not required to determine conformity. Section 176(c) statutory language explicitly requires that projects conform.

FHWA's approach that project conformity can be demonstrated merely by showing that the project comes from a conforming TIP sidesteps the intent of Section 176(c) as it relates to project conformity.  Accurate and informed conformity determinations for TIPs cannot usually be made because of insufficient information on specific projects.   FHWA should consult with EPA in identifying such incompletely defined projects.   Final conformity determinations for such projects should be delayed until sufficient information exists to make an informed determination.

A145

-10-

## ATTACHMENT:   EPA COMMENTS TO FHWA DOCKET NO.88-13

The TIP conformity finding--and the NEPA process--are not a substitute for project level conformity determinations. Again, under Section 176(c), projects must be reviewed for their impact on the air quality standards. If they cause or contribute to existing or new standard violations or delay attainment, they should not be found in conformance.

5.11   Section 770.208 - Project Conformity/TIP Requirements: A project exempt from TIP requirements is not automatically in conformance. First, such projects could be subject to applicable State/local conformity procedures--and the NPRM should state this. Second, if any aspect of the planning, construction, and operation of such projects are subject to federal approval or eligible for federal dollars, the conformity determinations should be made as outlined in Item #5.10 above. Third, comment #5.5 above may also apply because TCMs originating outside the UTPP and not included in the TIP should be subject to conformity determinations if such projects subsequently become eligible for federal funding.

5.12   Section 770.208 - Project Conformity/CEs:   EPA's problems with CEs are explained in point #5.3 above. The central issue is whether CEs could cause standard violations or delay attainment.   As noted in the cover letter EPA disagrees with FHWA's position that "no significant impact on the environment" is proven simply by showing that exempted projects "would not adversely affect the TCMs in the SIP."

5.13   Section 770.208 - NEPA:   As noted in the cover letter, EPA disagrees that compliance with project level conformity requirements can be accomplished through the NEPA process--a process that does not include Section 176(c) sanctions that require the delay of nonconforming projects until they are modified to be in conformance.

The only way that the NEPA process could substitute for Section 176(c) project conformity requirements is if Section 176(c) sanctions applied--i.e., an EIS project assessment showing a standard violation would be found in nonconformance and therefore, in accordance with Section 176(c), would not be allowed to proceed until brought into conformance.   But the NEPA process does not include Section 176(c) sanctions and therefore is not a substitute for Section 176(c).   FHWA is not carrying out its affirmative responsibility to assure conformity by simply announcing that:   "It is the policy of FHWA and UMTA that compliance with project level environmental requirements should be undertaken and completed as part of the National Environmental Policy Act (NEPA) process..."

A146

-11-

## ATTACHMENT: EPA COMMENTS TO FHWA DOCKET NO.88-13

5.14 Section 770.208 - Conformity Reviews During SIP Revisions: EPA agrees with FHWA that the approach in the 1980 Conformity Agreement to handle conformity during SIP revisions has not been followed and needs modification--especially the requirement calling for the delay of a contingency list of projects during SIP revisions. We do not, however, agree that "the original administrative procedures were developed in the belief that SIPs would require frequent adjustments."

The original procedures were designed to insure that conformity findings would become more difficult for TIPs during SIP revisions and that conformity determinations would recognize that: (1) the SIP being revised is obviously not adequate to attain the standards and (2) the revised SIP would contain additional emission reduction strategies. These new strategies could include changes to TIPs and highway projects--especially if the SIP was being revised due to increases in emissions from transportation sources.

Therefore, consistent with EPA's definition, conformity during SIP revisions is demonstrated by insuring that transportation programs and projects do not violate standards or delay attainment. At a minimum, the conformity determinations during SIP revisions should demonstrate that SIP emission reduction targets for transportation sources are being achieved or exceeded. The emission reduction burden on transportation sources should be even greater if the cause of the SIP revision is due to emission growth by transportation sources.

EPA also notes that FHWA provides no reason for eliminating conformity review for projects that have not begun within three years of final EIS approval. We do not believe that this conformity requirement should be eliminated because the nonattainment situation within the vicinity of the project and the overall urban area could change significantly during three years--to a degree that would require a new conformity determination.

5.15 Section 770.208 - Information on EPA Activities: EPA opposes elimination of this material--and FHWA's unilateral issuance--for the same reasons noted in points #2.3 - 2.5. FHWA is eliminating needed information on how the entire conformity process would work during SIP revisions. Areas potentially affected by nonconformity findings in the future would be required to refer to two Federal Registers covering the activities of FHWA and EPA. This complicates rather than simplifies existing procedures.

5.16 Section 770.210 - Priority: EPA opposes elimination

-12-

## ATTACHMENT:  EPA COMMENTS TO FHWA DOCKET NO.88-13

of "internal DOT/EPA interactions" (Section 770.11(d)(e)(A)) for
the reasons described above in point #5.15.  Again the entire
priority process is presented in an incomplete way that will
unnecessarily raise questions about how priority works, rather
than simplifying existing procedures.  Also, references to the
1978 DOT-EPA MOU are useful and should be retained.  We also
oppose the deletion because--based on our experience--
consultation requirements among FHWA, UMTA, and EPA should be
made more--not less--explicit, as explained above in the cover
letter and points #2.7, 3.4, and 3.8.

    5.17    Section 770.212 - Construction:   EPA would have a
problem with the proposed elimination of the "redundant"
consultation on construction specifications as part of these
conformity procedures, if the consultation that already occurs
does not explicitly include discussion of Section 176(c)
requirements.

    5.18   Related Regulations - NEPA and Conformity:  As noted
above in points #5.10 and 5.13, project level air quality
analysis is required to determine conformity and NEPA cannot
substitute for project conformity determinations.

A148

ATTACHMENT TO EPA COMMENTS
TO FHWA DOCKET NO. 88-13

SUMMARY OF RATING DEFINITIONS
AND FOLLOW-UP ACTION*

Environmental Impact of the Action

LO—Lack of Objections
The EPA review has not identified any potential environmental impacts requiring substantive changes to the proposal. The review may have suggested opportunities for application of mitigation measures that could be accomplished with no more than minor changes to the proposal.

EC—Environmental Concerns
The EPA review has identified environmental impacts that should be avoided in order to fully protect the environment. Corrective measures may require changes to the preferred alternative or application of mitigation measures that can reduce the environmental impact. EPA would like to work with the lead agency to reduce these impacts.

EO—Environmental Objections
The EPA review has identified significant environmental impacts that must be avoided in order to provide adequate protection for the environment. Corrective measures may require substantial changes to the preferred alternative or consideration of some other project alternative (including the no action alternative or a new alternative). EPA intends to work with the lead agency to reduce these impacts.

EU—Environmentally Unsatisfactory
The EPA review has identified adverse environmental impacts that are of sufficient magnitude that they are unsatisfactory from the standpoint of public health or welfare or environmental quality. EPA intends to work with the lead agency to reduce these impacts. If the potential unsatisfactory impacts are not corrected at the final EIS stage, this proposal will be recommended for referral to the CEQ.

Adequacy of the Impact Statement

Category 1—Adequate
EPA believes the draft EIS adequately sets forth the environmental impact(s) of the preferred alternative and those of the alternatives reasonably available to the project or action. No further analysis or data collection is necessary, but the reviewer may suggest the addition of clarifying language or information.

Category 2—Insufficient Information
The draft EIS does not contain sufficient information for EPA to fully assess environmental impacts that should be avoided in order to fully protect the environment, or the EPA reviewer has identified new reasonably available alternatives that are within the spectrum of alternatives analyzed in the draft EIS, which could reduce the environmental impacts of the action. The identified additional information, data, analyses, or discussion should be included in the final EIS.

Category 3—Inadequate
EPA does not believe that the draft EIS adequately assesses potentially significant environmental impacts of the action, or the EPA reviewer has identified new, reasonably available alternatives that are outside of the spectrum of alternatives analyzed in the draft EIS, which should be analyzed in order to reduce the potentially significant environmental impacts. EPA believes that the identified additional information, data, analyses, or discussions are of such a magnitude that they should have full public review at a draft stage. EPA does not believe that the draft EIS is adequate for the purposes of the NEPA and/or Section 309 review, and thus should be formally revised and made available for public comment in a supplemental or revised draft EIS. On the basis of the potential significant impacts involved, this proposal could be a candidate for referral to the CEQ.

*From EPA Manual 1640 Policy and Procedures for the Review of Federal Actions Impacting the Environment.*

A149



THE SECRETARY OF TRANSPORTATION

WASHINGTON, D.C. 20590

June 22, 1989

The Honorable John D. Dingell
Chairman, Subcommittee on
  Oversight and Investigations
Committee on Energy and Commerce
House of Representatives
Washington, D.C.  20515

'89  JUL 31  19:38

Dear Mr. Chairman:

This is in further response to your request for information on the Department
of Transportation's (DOT's) proposed rule concerning policies and procedures
under Section 176 of the Clean Air Act (CAA). We previously acknowledged
your letter on April 10 with a promise to respond with a more complete record
of our actions in the development of this regulation.

The regulation, which was published as a Notice of Proposed Rulemaking (NPRM)
in the September 9, 1988, Federal Register, is titled "Air Quality Procedures
for Use in Federal-Aid Highway and Federally Funded Transit Programs." The
purpose of the regulation is to consolidate and update into a single
regulation existing air quality requirements for highway and transit
projects. The regulation consists of two parts. The first part updates the
process for determining which safety, mass transit, and air quality
improvement projects can be exempt from highway funding sanctions in
accordance with Section 176(a) of the CAA. The second part updates the
process for assuring that transportation plans, programs, and projects
conform to an approved or promulgated air quality implementation plan, and
that the transportation control measures in these plans are given priority
consideration.

The basic procedures that are contained in the proposed regulation are the
same as those the DOT and the Environmental Protection Agency (EPA)
previously agreed were appropriate. In our opinion, this regulation does not
significantly change the existing guidance. It will not weaken the highway
funding sanctions procedures, if they are reauthorized through amendments of
the CAA, but rather will more clearly define the types of projects that have
been and can be justifiably exempted from the highway funding sanctions
provision contained in Section 176(a). Our conformity procedures are
consistent with those contained in the original DOT and EPA conformity
agreement, dated June 12, 1980, and the subsequent Federal Highway
Administration (FHWA) and Urban Mass Transportation Administration (UMTA)
interim final rule on conformity, dated January 26, 1981. While the NPRM
proposes technical amendments and updates the conformity agreement and
interim final rule, it does not alter the fundamental approach to conformity
these documents establish.

A150

2

We are in the process of developing a draft of the final rule. While we
believe the NPRM is consistent with the requirements and objectives of the
CAA, we are making changes to the rule in response to the comments we
received from EPA, as well as other commenters. Our agency will continue to
coordinate with EPA officials in an attempt to resolve their concerns, and
will seek its comments on the draft final rule before sending it to the
Office of Management and Budget for clearance prior to publication in the
Federal Register.

The 1975 Consistency Guidelines that the EPA mentioned were developed in
response to the 1970 Federal-Aid Highway Act, which added Section 109(j) to
Title 23. This section required the DOT to develop guidelines to insure
that highways constructed under Title 23 were consistent with an approved air
quality plan. These guidelines, however, were superceded by both the 1980
DOT and EPA conformity agreement, and the 1981 FHWA and UMTA interim final
rule on conformity, developed in response to the 1977 CAA Amendments. Both
of these documents indicate that the conformity requirements set out in the
1977 amendments would also meet the 23 U.S.C. 109(j)'s consistency
requirements.

I appreciate this opportunity to more fully explain the purpose of DOT's
proposed regulation. Please rest assured that the Department is committed to
coordinating with the EPA, and State and local transportation and air
quality officials to seek out cost-effective solutions to the Nation's
complex transportation and air quality problems, and to comply with the
provisions of the CAA. I am enclosing a more detailed explanation of these
issues along with responses to your specific questions and copies of
requested correspondence with EPA.

Sincerely,

Samuel K. Skinner

2 Enclosures

A151