# Exhibit 18


cover

March 31, 2009

***Via Electronic & Hand Delivery (to CDOT)***

James Bemelen
Colorado Department of Transportation
2000 South Holly Street
Denver, CO 80222

Chris Horn
Federal Highway Administration
12300 West Dakota Avenue, Suite 180
Lakewood, CO 80228

> **Re:    The Draft Environmental Impact Statement and Draft Section 4(f)
> Evaluation for the I-70 East Project**

Dear Mr. Bemelen and Mr. Horn:

The Environmental Law Clinic at the University of Denver Sturm College of Law ("DU ELC") is writing to provide comments on behalf of Groundwork Denver,[1] WildEarth Guardians,[2] Elyria Neighborhood Association,[3] and their members regarding the Draft Environmental Impact Statement ("DEIS") and Draft Section 4(f) Evaluation

---

[1] Groundwork Denver is a non-profit organization that seeks to bring about the sustained improvement of the physical environment and promote health and well-being through community-based partnerships and actions. Groundwork Denver's work is focused on low-income communities within Denver where the residents typically endure greater negative environmental impacts.

[2] WildEarth Guardians is a non-profit organization that seeks to protect and restore the wildlife, wild places and wild rivers of the American West. WildEarth Guardians and its members also seek to ensure that development of government infrastructure is done in a manner that will address concerns regarding climate change and energy consumption while ensuring that negative impacts do not impact urban communities.

[3] The Elyria Neighborhood Association represents the residents and property owners living in the general area of the Elyria neighborhood, which is located just North of I-70 and would be one of the primary neighborhoods affected by the highway improvement proposals.  The purpose of this association is to collectively address issues and interests common to the area in order to represent the interests and welfare of the local residents.

for the I-70 East project.  Additionally, we are commenting in support of the hundreds of residents living in the affected neighborhoods who have been involved in this process through comments, public meetings and petitions.[4]

We are writing due to concerns regarding deficiencies in the DEIS, recently promulgated in a joint effort by Colorado Department of Transportation ("CDOT"), Federal Highway Administration ("FHWA"), the Regional Transportation District ("RTD"), the Federal Transit Administration ("FTA"), and the City and County of Denver ("CCD").[5]  However, initially we would like to state our general support of the decision to improve the I-70 East Corridor of the highway.  This area of I-70 forms the transportation "backbone" for east-west travel in the state, and it is necessary that a highway serving such a large population of our community is safe and structurally sound. *See* DEIS at S-1. Further, it is clear that transportation demands are increasing and improvements to I-70 would ensure the highway would not only meet such demands, but also ensure that increased traffic does not impose safety concerns.

With that said, we would like to express our concerns regarding the alternatives for highway improvements currently being considered, and more specifically, the impacts these choices will have on the surrounding communities.  The neighborhoods surrounding the I-70 East Corridor suffer from high poverty rates, deteriorated infrastructure, and lack of economic viability, which can be largely attributed to the original implementation of I-70 in the 1960s.  *See* DEIS at 5.2-15.  Notably, the original highway imposed physical barriers in the neighborhoods and brought the highway in close proximity to the neighborhoods, leading to decreased community cohesion and increased negative impacts on public health.  The DEIS recognizes many of these problems in the neighborhoods and addresses them in Chapter 5, Affected Environment, Environmental Consequences, and Mitigation, of the DEIS, citing many studies that implicate the highway as a main cause of a the deterioration of the communities' character and health.

Moreover, there is now compelling and unambiguous scientific evidence that demonstrates that air pollutants from trucks and motor vehicles (including diesel particulate matter ("DPM"), fine and ultrafine particulate matter) cause an increased risk of asthma, heart disease and cancer in those living immediately adjacent to interstate highways.  This impact to the communities near the project area are left wholly unanalyzed in the DEIS. Contrary to the arguments in the DEIS, using available data and reliable models, the agency could readily quantify these health risks.  In particular, such quantitative risk assessments have already been completed for a number of projects similar to the proposed I-70 East, demonstrating the widespread availability and compelling nature of the scientific information needed to undertake the analysis we request.

---

[4] *See eg.* Attachment A, Elyria Neighborhood Association's "Petition to Underground I-70."

[5] In this comment, CDOT, FHWA, RTD, FTA, and CCD will collectively be known hereinafter as "the agency."

There is still plenty of opportunity to remedy the inequalities imposed on communities undeserving of such hardships.  However, the current draft of the DEIS does nothing to remedy the situation.  Rather, the DEIS either prematurely dismisses or fails to consider at all certain reasonable alternatives that could potentially remove physical barriers in these communities or separate the residents of these communities from the harmful air pollution generated by the project area.  To the contrary, the current alternatives only reinforce the hardships originally imposed on the surrounding communities by establishing more barriers to a socially cohesive neighborhood as well as maintaining a highway location that continues to inflict damaging effects on the communities' health.

Again, we do not oppose improvements to the highway; we agree that something needs to be done in order to ensure the highest levels of safety are employed, guaranteeing safe highway use.  Nonetheless, we want to emphasize the necessity of choosing an alternative that not only considers the infrastructure and safety demands of the highways users, but also considers the effects the highway has on the surrounding communities.  Currently, the DEIS does not do this.  We are asking for the agency to re-evaluate the alternatives to the highway improvements, and to find a solution that considers all affected people.  This is not an impossible feat; rather, it is one that can be accomplished by listening to the concerns of the people, looking at *all* relevant studies and statistics, and contemplating more than just economic concerns.  Hopefully, with the extra time allotted to the project and further consideration of the following concerns, the local communities working alongside the agency can find a solution that improves the safety and infrastructure of the highway while also remedying many of the wrongs done to these communities by the original I-70 implementation.

## SUMMARY OF COMMENTS

- The original implementation of I-70 deeply impacted the make-up, health, and character of the neighboring communities.  While the current DEIS acknowledges the past impacts of I-70 on the neighborhoods of Globeville, Swansea and Elyria, it provides no discussion on how realignment of the highway will further impact these neighborhoods.

- The current DEIS analysis of highway alternatives is inadequate because it lacks sufficient analysis of social cohesion and health issues that clearly impact neighboring communities.

  - The DEIS lacks an adequate assessment of neighborhood cohesion issues for each alternative, including the direct and indirect impacts each proposed alternative would have on social cohesion issues in the area.

3

o Additionally, DEIS lacks an adequate analysis of the direct, indirect, and cumulative impacts on air quality, especially as it relates to the health of those living immediately adjacent (< 400 m) to the highway.

- In light of the availability of both data detailing the negative health impacts of DPM, and scientific modeling tools, the I-70 expansion needs to include a quantitative analysis of the public health risks that DPM from this project poses.

- The DEIS impacts analysis fails to acknowledge or address the DPM hotspots that are well known to exist around interstate highways. These Hot spots are thus a reasonably foreseeable result of the expanded I-70 highways (and increased traffic). As such, the agency is under a duty to provide the public with information about them, and to fully evaluate them in the DEIS.

- Before the EIS is finalized, the agency must quantify the increased incidence of asthma, heart disease and cancer in those who will live, work and recreate immediately adjacent (< 400m) to the various proposed alternatives, as a result of being exposed to elevated levels of air pollutants from vehicles on I-70 East.

- The DEIS impacts analysis is insufficient because it fails to adequately take into account the cumulative effects of the proposed highway project

  - The area is highly populated with children, highly exposed to existing industrial development, and some neighborhoods exist at the confluence of both I-70, I-25, as well as rail-yards.

  - A more comprehensive assessment of the cumulative health impacts in many of the neighborhoods is clearly warranted to give a better understanding of the health risk each alternative poses to the local communities.

o The DEIS is also inadequate because it fails to provide alternatives and/or mitigation measures that would address both the community cohesion concerns and the impact the highway has on public health in the surrounding area. Such mitigation could include, but not be limited to: use of below grade construction (like the I-25 corridor in south Denver); the use of tunnels, parkway type construction; to include open space, greenways, bike and pedestrian paths; increased local road over-passes; and making the structure more aesthetically pleasing.

o The stated purpose and need of the project is too narrow in scope, as it failed to take into account the needs of the surrounding communities, and resulted in an inadequate alternatives screening process. To fully evaluate the impacts of the I-70 East Project, and to address the impact on the communities of Globeville,

Elyria, and Swansea, continued planning of the project should be done in coordination with the City of Denver and the affected community-based organizations, and should be done in conjunction with ongoing neighborhood planning efforts.

o   The Section 4(f) Analysis is insufficient because it fails to justify that there are no prudent and feasible alternatives to using 4(f) land and also failed to identify the least harmful alternatives.

OVERVIEW OF NATIONAL ENVIRONMENTAL POLICY ACT REQUIREMENTS

The National Environmental Policy Act of 1969 ("NEPA") is our nation's basic charter for environmental protection.  NEPA "was enacted in recognition of the profound impact of man's activity on the interrelations of all components of the natural environment" and "the critical importance of restoring and maintaining environmental quality." *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1130-31 (10th Cir. 2006).  One of the goals of NEPA is to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings." 42 U.S.C. § 4331(b)(2).  While NEPA does not require a particular outcome, it does contain "action forcing" provisions that require federal agencies to examine and report on the environmental impacts of federal actions. 40 C.F.R. § 1500.1; *Baltimore Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 97 (1993).  NEPA requires meaningful analysis, thorough review, and adequate consideration of reasonable alternatives. *Id.*

Congress enacted NEPA for two central purposes. *Baltimore Gas & Elec. Co.*, 462 U.S. at 97 (discussing NEPA's twin aims).  First, Congress sought to ensure that all federal agencies examine the environmental impacts of their actions before acting. *Id.* (citing *Vermont Yankee Nuclear Power Corp. v. Natural Res. Def. Council*, 435 U.S. 519, 553 (1978)); 42 U.S.C. § 4331.  Second, Congress sought to provide the public with a statutory means for being informed about and commenting on the environmental impacts of proposed agency action. *Id.*; *see also Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989).  Agencies fulfill NEPA's twin aims by complying with certain procedures before "taking any action or making any decision that could significantly affect the quality of the human environment." *Colorado Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1171 (10th Cir. 1999).  Thus, NEPA requires that an acting agency must prepare a detailed environmental impact statement ("EIS") for federal action that significantly affects the quality of the human environment. 42 U.S.C. § 4332(2)(C).

There are three criteria for determining the adequacy of an EIS: (1) whether the agency has taken an objective, good-faith, hard look at environmental consequences of the proposed action and alternatives; (2) whether the agency provides sufficient detail to allow those who did not participate in preparing the EIS to understand and consider pertinent environmental influences involved; and (3) whether the agency includes an explanation of alternatives in the EIS that sufficiently permits a reasoned choice among different courses of action. *Mississippi River Basin Alliance v. Westphal*, 230 F.3d 170,

174 (5th Cir. 2000). It is this last criterion - the alternatives analysis - that is considered the heart of an EIS. 40 C.F.R. § 1502.14.  The alternatives analysis should present the environmental impacts in comparative form, thus sharply defining important issues and providing the public and the decision-maker with a clear basis of choice. *Id.*

Above all, the NEPA process is intended to aid agencies in making decisions based on sound environmental analysis and to guide them to "take actions that protect, restore, and enhance the environment."  40 C.F.R. § 1500.1(c).  This analysis should focus on the issues that are "truly significant to the action in question" and cannot ignore effects that will result from that action, whether direct, indirect, or cumulative. 40 C.F.R. § 1500.1(b).  NEPA requires no substantive outcome, but without meaningful and thorough review of all reasonable alternatives and their impacts the process falls short of its obligation.

## OVERVIEW OF U.S. DEPT. OF TRANSPORTATION ACT SECTION 4(F) REQUIREMENTS

Section 4(f) of the United States (U.S.) Department of Transportation Act of 1966 ("Transportation Act") declares that "[it is] the policy of the United States Government that special effort should be made to preserve the natural beauty of the countryside and public park and recreation lands, wildlife and waterfowl refuges, and historic sites." 49 U.S.C. § 303.  Section 4(f) prohibits the Department of Transportation from using public land of significance unless it demonstrates there is no "feasible and prudent alternative," or that the impact is *de minimis*.  If property use meets one of these standards, the Department of Transportation may only approve the use of the property if the project will adopt the least harmful alternative.[6]

---

[6] The least overall harm is determined by balancing the following factors: (i) The ability to mitigate adverse impacts to each Section 4(f) property (including any measures that result in benefits to the property); (ii) The relative severity of the remaining harm, after mitigation, to the protected activities, attributes, or features that qualify each Section 4(f) property for protection; (iii) The relative significance of each Section 4(f) property; (iv) The views of the official(s) with jurisdiction over each Section 4(f) property; (v) The degree to which each alternative meets the purpose and need for the project; (vi) After reasonable mitigation, the magnitude of any adverse impacts to resources not protected by Section 4(f); and (vii) Substantial differences in costs among the alternatives. 23 C.F.R. § 774.3

SPECIFIC COMMENTS

I.   **The DEIS is insufficient because it fails to satisfy specific NEPA requirements and more specifically fails to fully evaluate how the proposed highway project will affect neighborhood cohesion and public health in the affected communities.**

While certain impacts of the various alternatives on social, environmental, and economic resources are identified in a broad range of categories in the DEIS, it does not furnish sufficient information with regards to two key impacts.  First, the DEIS lacks an adequate assessment of how each alternative affects neighborhood cohesion.  In this regard, the DEIS needs to take into account existing cohesion issues and the developing neighborhood plans[7] in an effort to truly evaluate the impacts this project will have on cohesion.  Second, the DEIS lacks an adequate analysis of the impacts on air quality associated with the expansion of I-70, particularly because of the inadequate assessment of the levels of direct and cumulative risks associated with the emission of DPM to those immediately adjacent (< 400m) of the highway project.

A.   **The DEIS is insufficient because it fails to adequately evaluate all of the impacts the highway improvement will have on neighborhood cohesion and fails to adequately explore reasonable alternatives and/or mitigation measures to reduce these impacts on local neighborhoods.**

1.   **The DEIS is insufficient because it fails to adequately evaluate all of the impacts on neighborhood cohesion.**

It is well documented in the DEIS that the original construction of I-70 in the 1960's resulted in social, economic, and physical deterioration of the surrounding neighborhoods of Elyria, Swansea and Globeville.  *See* DEIS at 5.2-16.  Specifically, the DEIS describes Globeville as a "residential island surrounded by industry" and admits that there "are substantial barriers to neighborhood cohesion" as a result of the current placement of the highway.  DEIS 5.2-16.  Additionally, I-70 has had significant negative impacts on the current community character of Elyria and Swansea.  *Id.*  Both of these neighborhoods have had to deal with a highway bisecting their neighborhoods, as well as significant industry growth due to highway proximity.  Because of these ongoing harms these neighborhoods have had to endure, this project should be seen as an opportunity to rectify the harm done by the original construction of I-70.

_____

[7] While the DEIS has "considered" the existing neighborhood plans in its analysis, many of these plans are extremely outdated and in the process of being revised or recreated. *See* http://www.denvergov.org/Planning_Services/SmallAreaPlans/tabid/428096/Default.aspx.

The building of I-70 in the 1960s, prior to NEPA, was done without any public environmental review and as a result it was completed with little consideration for protecting local social and health conditions.  As a consequence, it is clear that the surrounding communities have suffered significant ongoing negative impacts.  The agency is aware of these problems and discussed them in the Affected Environmental Consequences section of the DEIS.  However, the agency needs to do more than just recognize the current problems in the area; they need to see this project as an opportunity to rectify harms done to the community by the original implementation of I-70 as well as prevent further negative impacts as a result of the proposed improvements.

The obvious effects of bisecting a neighborhood are clear - barriers disrupt community cohesion.  The DEIS defines social conditions as a combination of various factors that contribute to a neighborhood's "distinct personality."  DEIS at 5.2-15.  Specifically, neighborhood cohesion is the actual interaction or the potential interaction between the people living in the community.  The DEIS identifies a significant number of communities that potentially could be affected by the impacts of the project, including Globeville, Swansea, and Elyria.  *See* DEIS at 5.2-16-21.

A lack of neighborhood cohesion "discourages neighborhood interaction . . . [and] physically isolate[s] one section of a neighborhood from the remainder."  DESI at 5.2-15.  Fragmenting a community can have debilitating and irreparable effects on the ability of a neighborhood to thrive.  For example, dividing the neighborhoods in Globeville, Swansea, and Elyria removes the ability of the people to freely associate, discuss, and debate; therefore, they are unable to generate a common vision of how their neighborhood should develop and grow.  Without the ability to develop common ideas, the community lacks the capability to articulate certain values and ensure issues like diversity and equality are addressed in the neighborhood.

Further, if the people in the area are unable to develop some sort of commonality, tensions and resentment can develop.  Bisecting the area inserts tangible barriers in the neighborhoods that only inhibit the ability of the people to communicate and create relationships.  *See Facilities Development Manual, Wisconsin Department of Transportation*, http://roadwaystandards.dot.wi.gov/standards/fdm/25-05-005.pdf.  Barriers promote intolerance and can increase anti-social behavior.  People thrive on a sense of belonging and community; the insertion of more barriers in the area will only further isolate people, and in particular, affect low income, elderly, and minority populations.  *Id.*

Cohesive communities are a necessary part of our culture.  By creating an inclusive neighborhood, communities are able to identify their needs, rights and responsibilities; plan, organize, take action; and assess the effects of any actions taken.  Building a cohesive community is necessary to improving people's quality of life and enabling them to achieve their goals.  Inserting barriers in the neighborhoods of Globeville, Swansea, and Elyria is essentially discouraging positive growth and community health.  This will effectively remove the ability of the community to be a community.

While the DEIS acknowledged past impacts to these neighborhoods associated with the construction of I-70, *it completely fails to disclose and thoroughly discuss that realignment of the highway under any of the proposed alternatives not only fails to correct the cohesion concerns*, but will in all likelihood exasperate the problem.  This is contrary to NEPA.  40 C.F.R 1508.7.  Accordingly, we request that the agency go back and provide additional analysis on how the realignment of I-70 will further exacerbate community cohesion issues in these neighborhoods.

> ### 2.   The DEIS is insufficient because it fails to consider reasonable alternatives to address the impacts on neighborhood cohesion.

NEPA explicitly requires that *all reasonable alternatives* be considered and weighed *in an environmental impact statement* ("EIS").  40 C.F.R. § 1506.1 (2009) (stating that no reasonable alternative may be eliminated before signing of the record of decision); 40 C.F.R. § 1502.14(a) (requiring that an agency must rigorously explore and objectively evaluate all reasonable alternatives); *Utahns for Better Transp. v. U.S. Dep't of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002); *see also*, *Ress. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1993) (holding that the existence of a viable but unexamined alternative renders an EIS inadequate).  The I-70 DEIS comprehensively analyzes the remaining proposed alternatives as they relate to the stated purpose and need of the project.  However, the DEIS falls short of satisfying its NEPA mandate because it fails to fully explore and evaluate all reasonable alternatives and summarily rejects others.

In reality, the DEIS contains only two alternatives.  The No Action alternative is admittedly inappropriate because it is not an option to do nothing given safety concerns over the exiting structure.  This leaves Alternatives 1 and 3, which are essentially the same and Alternatives 4 and 6, which are also essentially the same option.[8]  Because the DEIS does not include a true range of reasonable alternatives, the DEIS falls short of being a meaningful document.  The existence of viable, yet unexplored alternatives renders an EIS inadequate. *See Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273, 1286 (1st Cir. 1996). By ignoring this requirement, the agency lacks the information necessary to make an informed choice because it did not take into consideration the community needs regarding safety, cost, accessibility, and community health.  Furthermore, by removing viable options prior to the DEIS the public has been stripped of its right to make a meaningful contribution to this process.

A large highway project such as this one has huge implications for the surrounding communities.  By not fully addressing these implications in the alternatives analysis and allowing public comment, the agency lacks the information and community input necessary to make a meaningful choice in the end.  This could have far-reaching and devastating effects on people's lives, not only because it will affect the character and

---

[8] Options 1 and 3, as well as 4 and 6, have the same actual on-the-ground footprint; they just contain different lane-type options.  DEIS, Exhibit S-3.

cohesion of the community, but also because it could affect the quality and the longevity of their lives. The agency has a responsibility to ensure all measures have been taken to prevent these potential devastating effects on a community. We are not advocating for a particular alternative; rather, we ask that the agency conduct a more meaningful alternative selection and evaluation process.

In assessing the particular alternatives that remain in the DEIS for the I-70 East Project, it is clear that all considered alternatives, including the No Action Alternative, do nothing to remedy the current social cohesion problems. Further, they seem to only exacerbate the problems by inserting more barriers into the communities, affecting the neighborhoods of Swansea, Elyria, and Globeville significantly. As an initial matter, it is clear that the result of the temporary construction and street closure would impact neighborhood cohesion, but that is not our primary concern. The long-lasting negative effects of the project is what we are seeking to prevent, particularly due to the fact that these neighborhoods have had to deal with community cohesion issues for the past 40 years.

All of the alternatives analyzed in the DEIS will have some long lasting effects on the neighborhood. Even if the No Action Alternative were chosen, the highway would still bisect the neighborhoods and result in no change in the fragmented makeup of the communities. Further, Alternatives 1 and 3 would increase the barrier between the Swansea and Elyria neighborhoods as well as remove a middle school from the community. Alternatives 4 and 6 fare no better; although these alternatives would remove one barrier in the neighborhood, in turn, they would construct new barriers in another location in the same neighborhood. Additionally, all of these alternatives would remove important underpasses and roads connecting the neighborhoods, leading to further loss of neighborhood cohesion.

The impacts of the project are clear: every remaining alternative will in some way bisect the neighborhoods, construct barriers, and/or remove important thoroughfares. The alternatives directly impact the social conditions of the surrounding communities by isolating the communities and eliminating access to the neighborhoods. Swansea, Elyria, and Globeville are all too familiar with community barriers inflicting a sense of loss in the community morale and cohesion. The proposed project is only going to amplify the problem.

We think that more can be done and it starts with broader consideration of reasonable alternatives that would begin to reduce the impact this highway has had on local communities. The agency should take a more holistic approach to this project and the impacts it will have on the surrounding human environment. The current I-70 East planning process offers a valuable opportunity to rectify the neighborhood cohesion problems that the original construction caused. Transportation planners must stop looking only at where I-70 needs to go; the current DEIS should evaluate how to design a highway that will rectify past mistakes and address the impending environmental, social, aesthetic and health impacts on the surrounding communities from this project.

Numerous alternatives exist that would help alleviate many of the current cohesion issues and give the agency an opportunity to eliminate or reduce future cohesion impacts resulting from this project, such as the use of below grade construction (like the I-25 corridor in south Denver); use of tunnels; or parkway type construction that include open space, greenways, bike and pedestrian paths; increased local road over-passes; or making the structure more aesthetically pleasing.

Indeed, the FHWA and other state transportation planning agencies have recognized in many other contexts the need to develop urban highway projects in a way that matches the scale of the project to the character of the community.  *See, e.g.*, *Report of the Community Coordinating Committee for the Design of the I-26 Connector through Asheville, TN, available at* www.-26group.org/modules/content/print.php?id=3; *see also Context Sensitive Solutions: Understanding Flexibility in Highway Design* (January 2005), *available at* http://www.wsdot.wa.gov/publications/folio/ContextSensitiveSolutions.pdf.  Indeed, some of the innovative highway projects (both urban and rural) in recent years have strived to address the need to protect the character of the highway's surroundings.  These include:

- **The Henley Street Connector project**.  This project provides access to and from the central business district, Interstates 40 and 75, and US-441.  Cooperation between business and historical groups, the City of Knoxville, and the Tennessee Department of Transportation resulted in numerous measures to preserve the historical and architectural integrity of the areas adjoining the project.  Those measures, coupled with effective design and extensive landscaping, produced a beautiful, highly functional project, which also enhances its historical surroundings.  *See* http://www.fhwa.dot.gov/EIHD/henley.htm.



- **The I-405 Corridor in Washington Puget Sound Area**. The primary focus of this corridor-wide effort is to develop a context sensitive design, which is integrated with the natural environment.  Washington is known for its green landscapes and for this reason bridge designs include major structural elements containing green pigments.  Decorative fencing will also be placed

along bridge sidewalks.  These will be developed to follow a scallop pattern. Walls on the project will be designed with a ripple effect reminiscent of the oscillating effect seen along the surface of water bodies.  Bridge piers will be patterned after the tulip flower.  Street art will be included on some of the surrounding communities' local streets as well as Sound Transit modal interchange locations.  Extensive use of trees and native vegetation is planned throughout the corridor. *See* http://www.wsdot.wa.gov/publications/folio/ContextSensitiveSolutions.pdf





- **The Ted Williams Tunnel**.  Designed to double Boston's traffic capacity under Boston Harbor to Logan Airport from four lanes to eight.  When the connection to the Massachusetts Turnpike was finished the tunnel completed 1-90 from coast to coast. *See* http://www.fhwa.dot.gov/EIHD/henley.htm



- **US Route 23/Future Interstate 26, Unicoi County, Tennessee**. Exceptional care and planning went into the design and construction of US Route 23.  The resulting 24 km (15 mile) highway preserves the natural integrity of the landscape, while providing economic, social and aesthetic benefits to the surrounding community and visiting motorists.  Gracefully winding through the mountains, the highway features two overlook/rest areas and two wildlife crossing structures.  The overlooks, constructed of indigenous stone, provide breathtaking views and access to hiking trails.  The habitat crossings were built to allow bears and other native wildlife to move safely across the corridor. Special efforts also were taken to control erosion along the corridor's cuts and fills.  *See* http://www.fhwa.dot.gov/eihd/us23.htm.



In addition to inadequately considering important aspects during the alternatives selection and evaluation process, the agency also prematurely removed certain alternatives that adequately considered impacts on neighborhood cohesion.  For example, an alternative that realigned the highway further north of the current alternatives would serve to reunite these broken communities and remedy past cohesion impacts.  Similarly, the use of a tunnel, which is common in many urban communities, was dismissed with no evaluation.

Although agencies are not required to consider an infinite number of alternatives, the agency must include all reasonable alternatives in its analysis.  *See Utahns for Better Transp. v. U.S. Dept. of Transp.*, 305 F.3d 1152, 1166 (10th Cir. 2002).  The removal of the tunnel and below grade alternatives prior to a comprehensive analysis in the DEIS was premature because both of these alternatives serve the purpose of not only addressing the issues of access, safety, and increased transportation capacity, they also best comply with the goals and objectives of the project to remedy past and avoid future cohesion impacts.  It is unclear why these alternatives were removed in light of how well they comply with the stated goals of the project, even more so than some of the remaining alternatives. Because the DEIS lacks clarity in this regard, we ask the agency to reconsider these alternatives as they are reasonable choices for the I-70 project.

Given this project has no imminent start date, we urge the agency to take the time to do a full and adequate impact assessment, re-evaluating certain alternatives that may

have been initially dismissed, and considering new alternatives that will make this project better for surrounding communities. By analyzing the full breadth of impacts each alternative will have on social cohesion, the agency can ensure that the chosen alternative not only addresses the various safety and infrastructure concerns but also truly aligns itself with the goal to create a more unified and cohesive community. Most importantly, the additional analysis of the project should be done in coordination with the City of Denver and the affected neighborhood associations, and in conjunction with ongoing neighborhood planning efforts. Indeed, this project and its impact on the community should be treated on par with the I-25 TREX project completed in Denver earlier this decade, which was highly touted for both its innovation and neighborhood collaboration. *See The T-REX Megaproject: Denver's Showcase for Innovation and Collaboration*, *available at* http://thepublicmanager.org/cs/blogs/featured/archive/2008/09/10/the-t-rex-megaproject-denver-s-showcase-for-innovation-and-collaboration.aspx.

3.     **The DEIS is insufficient because it fails to discuss possible mitigation measures for the impacts on neighborhood cohesion associated with the proposed alternatives.**

A similar failing of the DEIS is the lack of any discussion of possible mitigation measures to reduce impacts on neighborhood cohesion that may occur as the result of selection of any one of the alternatives that are currently under consideration by the agency. Under NEPA regulations, where mitigation measures are available, the agency must give them full consideration. *See* 40 C.F.R. § 1502.14(f) ("mitigation measures not already included in the proposed action or alternatives"). While NEPA contains no substantive requirement that a formal mitigation plan be adopted and implemented, NEPA does require the agency to take a hard look at all possible mitigating measures to reduce adverse environmental impacts. *See* 40 C.F.R. § 1502.16(h); *Okanogan Highlands Alliance v. Williams*, 2000, 236 F.3d 468, 473. It is not enough to merely list possible mitigation measures. 40 C.F. R. § 1502.16(h). [9]

Admittedly, the DEIS contains substantial mitigation measures. However, similarl to our discussion above regarding the lack of reasonable alternatives, nothing is

---

[9] The CEQ regulations have defined "mitigation" broadly and courts require a mitigation discussion to be "'reasonably complete' in order to 'properly evaluate the severity of the adverse effects' of a proposed project prior to making a final decision." *Colorado Envtl. Coal v. Dombeck*,185 F.3d 1162, 1173 (10th Cir. 1999) (quoting *Methow Valley*, 490 U.S. at 352 (1989)). "Mitigation" includes: (a) Avoiding the impact altogether by not taking a certain action or parts of an action. (b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation. (c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment. (d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action. (e) Compensating for the impact by replacing or providing substitute resources or environments. 40 C.F.R. § 1508.20.

being proposed to address the likely continued impacts on the cohesion and quality of life in communities neighboring the project.  Indeed, the DEIS contains little information on the actual design build of any of the alternatives.  Because of this, it is impossible for the reader to determine what, if any features, might be included in the highway construction that would address cohesion issues.  Again, we think that more can be done.  The following is a list of possible mitigation measures that would help alleviate many of the current cohesion issues and give the agency an opportunity to mitigate future cohesion impacts resulting from this project:

- Consider alignments that serve low income and minority populations without severing community cohesion;
- Create a transportation corridor incorporating auto, rail, etc. into one cohesive system;
- Create over/underpasses to facilitate community connectedness;
- Integrate the project with new, updated neighborhood plans;
- Incorporate safe and accessible bike/pedestrian paths, facilities and bridges across the highway; and/or
- Accomplish purpose and need, but also make it aesthetically pleasing (much like I-25 through the South Denver/Wash Park area).

The possible mitigation measures we suggest to combat social cohesion issues are in no way an exhaustive list, but are relevant and reasonable mitigation measures that could improve this project.  Regardless of which alternative is ultimately selected, this project should focus on mitigating the impacts on the surrounding human environment.  This is an opportunity to remedy the wrongs that these communities have suffered for decades as a result of the existing highway.  We urge the agency to consider these mitigation measures and to work to ensure the community endures the least amount of negative impacts resulting from the highway improvement.

**B.     The DEIS is insufficient because it fails to adequately evaluate all of the direct, indirect and cumulative impacts of air pollution as well as possible mitigation factors to reduce these impacts.**

**1.     The DEIS inappropriately relies on a lack of information to avoid a quantitative analysis of the health impacts to those living immediately adjacent to interstate highways.**

The DEIS correctly asserts that direct effects are those that occur within the immediate vicinity of the project and/or within the same timeframe as project construction or operation.  Indirect effects are those that occur later in time and/or in a different location, but are still reasonably foreseeable and related to the project.  *See* DEIS at 5.2-35; 40 C.F.R. 1508.25(c).

The agency has provided a qualitative analysis of Mobile Source Air Toxic ("MSAT") emissions relative to the various alternatives.  In doing so, and in order to forego a more complete quantitative analysis, the agency has relied on an apparent lack

of national consensus on acceptable levels of risk and information associated with diesel particulate matter ("DPM"). *See* DEIS at 5.10-8, 9. In addition, the agency questions the reliability of available technical tools to predict with confidence the project-specific health impacts of the emission changes associated with the evaluated alternatives in this DEIS. DEIS at 5.10-9. As a consequence, the DEIS fails to quantify the well known increased risk of asthma, heart disease and cancer to those living and working immediately adjacent (within 400m) to the various proposed I-70 East alternatives. Instead, the DEIS casts aside significant questions of DPM with merely conclusory statements; addresses the negative impacts with vagueness; and provides no supporting data for its dismissal of DPM as a major health risks.

There is now compelling and unambiguous scientific evidence that demonstrates that diverse air pollutants from trucks and motor vehicles (including diesel particulate matter, fine and ultrafine particulate matter) cause an increased risk of asthma, heart disease and cancer in those living immediately adjacent to interstate highways. Moreover, contrary to the arguments in the DEIS Air Quality Technical Report, using available data and reliable models, the agency could readily quantify these health risks, and compare the alternatives with respect to them. Such quantitative risk assessments have already been completed for a number of projects and pollutants like those of the proposed I-70 East (as detailed below), demonstrating the availability of the scientific information and tools needed to undertake the analysis. Accordingly, we request that before the I-70 East EIS is finalized, the agency quantify the increased incidence of asthma, heart disease and cancer in those who will live, work and recreate immediately adjacent (< 400m) to the various proposed alternatives, as a result of being exposed to elevated levels of air pollutants from vehicles on I-70 East.[10]

_____

[10] The DEIS makes the common, but nevertheless incorrect, assumption that because NAAQS standards are theoretically set at a level to protect human health, an EIS that confirms that these standards will not be exceeded constitutes an adequate analysis of "no significant impact" with regards to public health. The DEIS asserts that planning for transportation systems conforms with state air quality plans for attaining and maintaining the health-based NAAQS. DEIS at 5.10-7. This suggests a threshold approach that narrowly focuses on whether concentrations are below the NAAQS or above it. However, this approach fails to take into account the existence of hotspots of DPM associated with highways and other large DPM emissions sources. Though the DEIS acknowledges "[s]ome recent studies have reported that proximity to roadways is related to adverse health outcomes – particularly respiratory problems," it dismisses these studies as flawed. *See* DEIS, Air Quality Technical Report at 18. (citing SCAQM District, Multiple Air Toxic Exposure Study-II (2000); Multiple Air Toxic Exposure Study-III (2007); Highway Health Hazards, The Sierra Club (2004); NEPA's Uncertainty in the Federal Legal Scheme Controlling Air Pollution from Motor Vehicles, Environmental Law Institute, 35 ELR 10273 (2005)). In reality, however, these studies have adequately shown the causality between DPM hotspots and increased levels of health risks. Perhaps more perplexing is the acknowledgement that technical studies conducted by Thomas and Debra Bain (2007) concluded that micro scale monitoring studies can be used to accurately assess impacts of MSATs from nearby roadways. DEIS,

    **a.**    **The DEIS violates NEPA because it fails to quantify the increased risk of mortality and morbidity in those living immediately adjacent to the proposed alternatives.**

The DEIS fails to adequately analyze, using readily available data and methodologies, a key environmental harm - there will be elevated concentrations of air pollution immediately adjacent (< 400m) to I-70 East, causing increased mortality and morbidity in those who live, work, travel and recreate on or immediately adjacent to the various proposed alternatives.

It is well established that those living immediately adjacent (< 400m) to major roads suffer increased mortality and morbidity, especially an increased incidence of asthma, heart disease and lung cancer, caused by the air pollution generated by traffic. For example, the report *Analyzing, Documenting and Communicating the Impacts of Mobil Source Air Toxic Emissions in the NEPA Process* (Carr et al. 2007) approvingly cites the conclusions of a report by Johns Hopkins School of Public Health to the effect that "[a] substantial and growing body of evidence from epidemiological studies indicates that residence in close proximity to roadways with high traffic density is associated with increased risk of a broad spectrum of health outcomes in adults and children." *See* Carr, E.L. et al. 2007; *see also* Johns Hopkins School of Public Health. (2004). The DEIS fails to analyze this well known direct public heath impact of the various I-70 East alternatives, in clear violation of 40 CFR 1502.16(a) & 1508.8. Likewise, the DEIS also violates 40 CFR 1502.16(g), requiring a discussion of "urban quality, historic and cultural resources, and the design of the built environment . . ." in that it fails to quantify the public health impact of the proposed design on the neighborhoods immediately adjacent (< 400m) to the proposed highway. *See* 40 CFR 1502.16(g).

---

Air Quality Technical Report at 19. Then, the agency admits that quantitative assessments are indeed possible for larger projects. *Id.* But, the agency fails to adequately explain that if the capability exists for larger projects, why it does not similarly exist for smaller projects. A quantitative assessment of DPM hotspots around major federal highways would overcome much of the scientific uncertainty that serves as the basis for inaction in the DEIS. Not only would it give the agency a clearer picture as to the direct impacts of DPM, but would provide a more meaningful analysis from which conclusions about DPM could be drawn. More specifically, it would give the agency a much clearer picture of the extent to which MSATs contribute to toxic air pollution, at least in close proximity to highways or in hotspots.

      **b.**     **The DEIS fails to use readily available information to quantify how many people live, work and recreate immediately adjacent to the various proposed alternatives.**

The agency has ready access to GIS data showing the number of residences that are currently within various distances of the proposed alternatives. Analysis of such data could easily be combined with census information to estimate the total number of individuals who will be living within 50, 100, 200 and 400m of the various proposed alternatives. Similarly, the agency has ready access to data on the number of schools, convalescent homes, hospitals, parks, playgrounds and recreation areas within 50, 100, 200 and 400m of the various proposed alternatives. Such information is especially important, since as detailed below, air pollution has especially pronounced impacts on children, the elderly, the infirm and those exercising. Had the agency undertaken the analysis detailed in the present paragraph, it would have provided key information necessary to quantify the excess health risks associated with the various alternatives.

The failure of the DEIS to obtain and use this readily available data to determine the number of residences, schools, convalescent homes, hospitals, parks, playgrounds and recreation areas immediately adjacent to the proposed alternatives violates 40 CFR 1502.22(a) which provides: "[i]f the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." 40 CFR 1502.22(a). Moreover, failure to undertake this analysis is explicitly contrary to the conclusion of the guidance document *Analyzing, Documenting, and Communicating the Impacts of Mobile Source Air Toxic Emissions in the NEPA Process*, which states on pg. 19 that "[t]he weight of the current evidence indicates that it is reasonable to use proximity to a transportation facility as a screening tool in NEPA evaluations of MSATs." Carr et al. (2007).

Moreover, the DEIS fails to provide any explanation whatsoever as to why this sensible first step analysis, using readily available data, was not undertaken. This failure is particularly striking because such data often has very low uncertainty. *See* Carr et al. (2007) (Table 2). Importantly, such exposure data would be quite informative even if no such steps are taken to obtain actual quantitative risk estimates. *Id*. at 30.

      **c.**     **METHOD I:  The DEIS fails to use readily available relative risk values to evaluate the cumulative health risks faced by those living immediately adjacent to the various proposed I-70 East alternatives.**

The DEIS fails to exploit and combine two types of information that could together be readily used to evaluate the cumulative health risks faced by those living immediately adjacent to the various proposed I-70 East alternatives: (1) information on

the number of houses, schools, hospitals, parks, playgrounds and recreation areas within 50, 100, 200 and 400m of the proposed alternatives;[11] and (2) studies in the scientific literature that contain estimates of the relative risk ("RR") of living next to a major road. These studies are quite diverse, spanning a range of health endpoints (e.g. mortality, cancer, heart disease, asthma, etc). By combining these RR values with information on the number of individuals who live, work and recreate near the proposed I-70 East alternatives, the agency could readily, and at little cost, evaluate the adverse public health consequences of this project on those living immediately adjacent to it.

A number of scientific studies take the simple and direct approach of comparing disease incidence in those living near high traffic and major roads as compared to those living farther away, while accounting for potential confounders. These studies do not identify the particular pollutants responsible for the increased mortality and morbidity, but rather look at the cumulative impacts of all pollutants. Study designs that measures mortality and morbidity as a function of distance from a major road (or closely related proxy variable) are advantageous because: (1) they avoid the difficulty of attributing disease outcomes to specific pollutants, which may be much harder to quantify than the effects of all pollutants combined; (2) correlations can be treated with a presumption of causality if components of the mixture have been individually associated with mortality or morbidity;[12] and (3) results stated in terms of risk within a certain buffer distance around a major roadway (e.g. within 400m), combined with basic demographic data for residential neighborhoods, can be used to quickly assess the public health risk associated with the proposed I-70 East alternatives, as developed immediately above. The present DEIS fails to use these studies to estimate the cumulative effect of all pollutants emitted by I-70 East on those living immediately adjacent to the proposed alternatives, as required by 40 CFR 1502.16(a)(b) & 1508.8.

> i. *The Relative Risk of those living immediately adjacent to a major road (or closely related proxy variable), as compared to 'background' levels.*

A number of studies estimate an explicit RR for various mortality and morbidity endpoints, for those living immediately adjacent to a major road, as compared to those living further away, or at background levels. *See* Beelen et al. (2008); English et al. (1999); Garshick et al. (2003); Gauderman et al. (2005); Hoek et al. (2002); Hoffman et al. (2006); Hoffman et al. (2007); Janssen et al. (2003); Jerrett et al. (2005); Kim et al. (2004); Kim et al. (2008); Lin et al. (2002); Medina-Ramon et al. (2008); McConnell et al. (2006); Morganstern et al. (2007); Nitta et al. (1993); Ryan et al. (2005); Toone et al. (2007); Venn et al. (2001); Vineis et al. (2006); Wilhelm et al. (2008)*; see also* reviews by Brugget et al. (2007); Salam et al. (2008). These and similar studies provide the agency with a great diversity of variables that measure traffic (e.g. distance from road, traffic density, quartile comparisons, etc), with the opportunity to choose those traffic

---

[11] This point is developed further in the immediately preceding section (b).

[12] For example, the comprehensive literature showing harmful health effects of $PM_{2.5}$ helps justify this approach

variables most easily and suitably applied to I-70 East.  It should also be noted that in many of these studies, the background level of air pollution is substantially elevated above zero, making it likely that the RRs estimated by these studies often underestimate the true risk of living immediately adjacent to a major road.

Together, these scientific studies provide a solid basis for quantifying the health risks associated with living immediately adjacent to an interstate highway.  This literature shows not only an increased mortality and morbidity for the general population, but also demonstrates that specific subgroups that are especially sensitive to air pollution (e.g. children and heart disease patients) also suffer elevated disease incidence near major roads.

ii.   *Mortality, lung cancer and myocardial infarction increase near major roads.*

Significantly increased mortality rates have been observed in those living close to major roads.  *See* Jerrett et al. (2005). Hoek et al. (2002) conducted a prospective cohort analysis in the Netherlands.  Among study subjects residing within 100 meters of a freeway or 50 meters of a major road for the whole 10-year follow-up period, and controlling for age, sex, education, body density, occupation, smoking, and socioeconomic status, the relative risk of all-cause mortality was 1.53 (95% CI 1.01-2.33).  This result was slightly lower after two more years of follow-up and using slightly different exposure variables. Beelen et al. (2008); *see also* Finkelstein  et al. (2004); Jerrett et al. (2005); Toone et al. (2007).

More generally, a number of papers link traffic or a closely related variable (such as $PM_{2.5}$ concentration) to lung cancer, myocardial infarction, atherosclerosis and other serious conditions. *See e.g.,* Filleul et al. (2005); Kunzli et al. (2005); Miller et al. (2007); Nafstad et al. (2003); Nafstad et al. (2004); Peters et al. (2004).

iii.   *Asthma increases near major roads.*

Studies using distance from roads, traffic density, and other traffic exposure methods consistently show a relationship between asthma and residential proximity to major roads.  *See* Delfino et al. (2002); Brugge et al. (2007); Salam et al. (2008).

The DEIS failed to take a hard look at potential risks posed to near-highway children.  As discussed elsewhere in the present letter, a straightforward assessment of potential childhood asthma risk in light of these studies would entail quantifying the number of children living within 50, 100, 200 and 400m of current and proposed roads.  Relative risk estimates could then be used to estimate the number of potentially affected children.  This would provide the community with a valuable illustration at a very small analytical cost.

iv.  *Evidence showing harm to unborn children whose mothers live near major roads or those that are exposed to air pollution.*

There is now comprehensive evidence showing that living near a major road, or near high traffic, harms pregnant women, their unborn children, and infants.  *See* Brauer et al. (2008); Ghosh et al. (2007); Leem et al. (2006); Maroziene and Grazuleviciene (2002); Ritz et al. (2002); Ritz and Wilhelm (2008); Sram et al. (2005); Slama et al. (2007); Windham and Fenster (2008); Wilhelm and Ritz (2003).

v.  *Leukemia and Other Childhood Cancer Rates.*

Knox concludes that "[c]hild cancer initiations are strongly determined by prenatal or early postnatal exposures to engine exhaust gases, probably through maternal inhalation and accumulation of carcinogens over many months.  Knox (2006) (following up on his earlier analysis conducted in 2005).  He further concludes that "[t]he main active substance is probably 1,3-butadiene." *Id.*   The available studies consistently, but not always, find an elevated RR of childhood leukemia and other cancers associated with distance-weight traffic density, traffic density, or a suitable proxy variable.  *See* Crosignani et al. (2004); Feychting et al. (1999); Langholz et al. (2002); Pearson et al. (2000); Raaschou-Nielsen et al. (2001); Reynolds et al. (2002); Reynolds et al. (2004); Savitz and Feingold (1989); von Behren et al. (2008); *see also* Buffler et al. (2005). Although the elevated RRs seen in most of these studies is not statistically significant, this needs to be evaluated in light of the fact that motor vehicle exhaust contains several indisputable carcinogens, including benzene and 1,3-butadiene, providing a plausible mechanism, and that these studies are very comprehensive.  *But see* Pearson et al. (2000) (from Denver).

vi.  *Compelling scientific literature demonstrates that automobile air pollution contains numerous toxic compounds that are more concentrated immediately adjacent to major roads, increasing the risk of asthma, heart disease and cancer.*

There is compelling evidence that the cause of the elevated RR values reviewed immediately above is air pollution from traffic, and not some confounding variable.  It is widely understood that air pollution from traffic contains numerous toxic compounds that cause asthma, heart disease and cancer.  *See* SCAQMD (2000); Brunekreef and Holgate (2002); Elliott et al. (2007); Glantz (2002); Heinrich et al. (2005); Jerrett et al. (2009); Kampa and Castanas (2008); Kuna-Dibbert and Krzyzanowski (2005); Nafstad et al. (2003); NRC (2002); Pope et al. (2009); Steib et al. (2002); Vedal et al. (2003); WHO (2005).

Moreover, there is a large and convincing scientific literature showing that the concentration of most air pollutants is elevated near major roadways.  *See* Adgate et al.

(2002); Basrur (2003); Clougherty et al. (2008); Colome (1992); Dor et al. (1995); Funasaka et al. (2000); Heinrich et al. (2005); Hoek et al. (2002); Illgen et al. (2001); Kingham et al. (2000); KTl (2004); Kousa et al. (2002); Koushki et al. (1992); Levesque et al. (1990); Linden et al. (2007); Molnar (2007); Nakai et al. (1995); Nethery et al. (2008); Reponen et al. (2003); Roorda-Knappe et al. (1998); Sanderson et al. (2005); van Roosbroeck et al. (2006); Viala (1994); Wilson (2006); Wilson et al. (2005); Wilson and Suh (1997); Zhu et al. (2002); Zhou and Levy (2007) (providing a nice summary of the typical distances from roads where air pollution levels are typically elevated).

> *vii.*  *How this risk assessment could be undertaken, and how scientific uncertainty could readily be quantified.*

The available scientific studies that estimate the RR of living next to a major road have been undertaken for diverse endpoints (e.g. mortality, asthma, cancer, etc) for roads with different traffic volume and traffic characteristics.  This provides the agency an opportunity to select those studies that most closely represent the circumstances of I-70 East.  Additionally, the range of circumstances underlying the RR values in the scientific literature provides the agency a further opportunity to present a quantitative risk assessment that encompasses both best and worst case scenarios.  That is, there is no need for the agency to undertake this analysis for only one single RR value.  In this way, the agency could readily proceed in a way that would inform and educate the public, even in the face of incomplete information.  As such, there is ready methodology available to the agency to actually quantify the uncertainty in this analysis.

> **d.**  **METHOD II: The DEIS fails to use available scientific data and methodologies to quantify the increased health risks associated with DPM to those living immediately adjacent (< 400m) to the proposed alternatives.**

For DPM, the scientific and technical literature provides good estimates of unit risk factors (characterizing how mortality and morbidity increase with increasing dose).  There is also good information available showing how emissions of these pollutants increases with increasing traffic volume; and reliable air dispersion models are available to estimate concentrations of these pollutants on or near I-70 East.  Thus, to quantify the overall risk that those living immediately adjacent to the various alternatives have from exposure to elevated levels of diesel particulate matter, this information would be combined with readily available GIS data to determine the number of homes, schools, playgrounds, convalescent hospitals that are within 50, 100, 200 and 400m of the various alternatives.  This would quantify the health risks that those living immediately adjacent to the proposed I-70 East alternatives face from exposure to diesel particulate matter.

      *i.   Numerous examples of quantitative assessments of DPM risk exist at the local level.*

In requesting that the agency undertake this analysis for DPM, we are asking nothing more than simply meeting the established standard.  Numerous quantitative assessments of DPM at the local level have in fact been carried out. *See* Tran et al. (2006); Castaneda et al. (2008); Cutts et al. (2008); Pingkuan et al. (2008); *see also* CARB (2009). For example, Appendix C of Pingkuan (2008) contains figures that show isopleths of cancer risk from diesel particulate matter, at a local scale.  For an example of DMP health risk assessment for a highway, see the *Health Risk Assessment for the Schuyler Heim Bridge Replacement and SR-47 Expressway Project* (Caltrans 2008). Moreover, the methodology for undertaking such risk assessments has now been standardized. *See* CARB (2006d); OEHHA (2000); OEHHA (2002); OEHHA (2003). There is no reason why the agency could not employ the same methodology in the present circumstance.

      *ii.   Unit risk factor for diesel particulate matter.*

The DEIS Air Quality Technical Report makes it appear that these uncertainties are larger than they really are when it states "the uncertainties in the unit risk value for diesel PM are exceptionally large . . ." DEIS, Air Quality Technical Report at 13.  The Air Quality Technical Report also incorrectly states that "there is little-to-no documentation as to precisely how the CARB unit risk value for diesel PM was obtained, nor precisely on what it is based." *Id.*

Contrary to this assertion, pages B-426 to B-473 of OEHHA (2005) provides a 48 page discussion of how the California Air Resources Board ("CARB") obtained their estimate of the unit risk factor for diesel particulate matter, and there is also a lengthy earlier justification by CARB. *See* CARB (1998c).  Other studies also demonstrate that there is abundant evidence to support the derivation of a unit risk factor for DMP. *See* Biwer & Butler (1999).

The DEIS cannot justify its failure to undertake a quantitative assessment of DMP risk by pointing to the differences between the CARB and EPA approach.  Instead, the agency must supply a rational explanation for why they choose the EPA's position over California's position.  The stated rationale in the DEIS for discounting the CARB unit risk value of DPM is simply wrong.

      **e.   The Air Quality Technical Report of the DEIS fails to fully disclose the strong scientific connection between diesel exhaust exposure and adverse health effects.**

Summarizing available studies, the EPA concluded that "[a]vailable evidence indicates that there are human health hazards associated with exposure to DE.  The hazards include acute exposure-related symptoms, chronic exposure related non-cancer

respiratory effects, and lung cancer." *Health Assessment Document for Diesel Engine Exhaust*, EPA (2002) (*available at* http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=36319) [hereinafter EPA 2002]. Moreover, the EPA has stated that "[c]hronic respiratory effects are the principal non-cancer hazard to humans from long-term environmental exposure to diesel engine exhaust, or emissions (DE)." *Integrated Risk Information System*, E.P.A., Diesel engine exhaust, I.B.2 (2003), *available at* http://www.epa.gov/IRIS/subst/0642.htm [hereinafter IRIS 2003]. Indeed, EPA has concluded that "[t]he available evidence indicates that chronic inhalation of DE is likely to pose a lung cancer hazard to humans" EPA 2002 at 9-11; *see also* (CARB 1998c). Finally, the Air Quality Technical Report fails to make it clear that the evidence linking diesel exhaust and particulate matter to lung cancer consists not only of the epidemiological studies, but also animal experiments and molecular and mode-of-action studies. *See* EPA 2002, at Sections 7-2 to 7-5.

> i. *The Air Quality Technical Report does not fairly summarize the totality of the evidence linking diesel exhaust and particulate matter to lung cancer.*

The DEIS cherry-picks the technical literature on the harmful health consequences of diesel exhaust and particulate matter, overstating the scientific uncertainty. It asserts: "epidemiological studies of diesel engine exhaust do not consistently find that the exposure to DPM causes cancer (cohorts of underground miners exposed to the highest concentrations of diesel PM, for example, appear to have no excess risk of lung cancer)." DEIS, Air Quality Technical Report, at 13. This assertion is simply wrong. For example, 18 of the 22 studies on lung cancer and diesel exhaust reviewed by the EPA found an increased incidence of lung cancer with increased diesel exposure, albeit not always statistically significant. EPA 2002 at 9-11. Moreover, the DEIS fails to mention the problems with confounding by silica and radon in the miner studies. *See e.g.,* Bhatia et al. (1998); EPA 2002 at Section 7-2.

> ii. *The Air Quality Technical Report fails to incorporate the most recent scientific evidence on the harmful health consequences of diesel exhaust and fails to use tools available to estimate DPM concentrations immediately adjacent to the proposed alternatives.*

The DEIS cites EPA (2003) prominently in explaining its failure to quantify the health risks of diesel exhaust and particulate matter. In so doing, the DEIS omits consideration of the scientific literature on DMP and human health published since 2003. *See* Arlt (2005); Arlt et al. (2006); Garshick (2004); Hart et al. (2006); Monforton (2006); Wichmann (2007); Laden et al. (2006); Laden et al. (2007); Garshick et al. (2008); Ono et al. (2008); Hill and Gooch (2007).

The DEIS also asserts that the available tools for estimating DPM concentrations immediately adjacent to the proposed alternatives are inadequate. However, this

assertion is explicitly contradicted by the fact that hot spot analyses of DMP are, in fact, regularly undertaken. *See Health Risk Assessment for the Schuyler Heim Bridge Replacement and SR-47 Expressway Project* (Caltrans 2008); *see also* CARB (2006d); OEHHA (2000); OEHHA (2002); OEHHA (2003); Tran et al. (2006); Castaneda et al. (2008); Cutts et al. (2008); Pingkuan et al. (2008); CARB (2009). Moreover, at no point does the DEIS provide an explicit discussion of why the agency is unable to use the same modeling tools regularly used in other circumstances to estimate DPM concentrations immediately adjacent to DPM sources.

### f.   The DEIS overstates the uncertainty inherent in assessing the health risks of diesel particulate matter.

The DEIS erroneously concludes that adequate assessment of diesel exhaust risks is impossible and misapplies 40 CFR §1502.22(b). The scientific data clearly demonstrates that diesel exhaust creates significant adverse impacts on the human environment. Yet, the DEIS states:

> In FHWA's view, the lack of a national consensus on an acceptable level of risk and other air quality criteria assumed to protect the public health and welfare, as well as the reliability of available technical tools do not enable us to predict with confidence the project-specific health impacts of the emission changes associated with the alternatives evaluated in this EIS. The outcome of such an assessment would be influenced more by the uncertainty introduced into the process by the assumptions made rather than any real insight into the actual health impacts from MSAT exposure directly attributable to the proposed action.

DEIS, Air Quality Technical Report at 12. While courts accept, and indeed require, a discussion of scientific uncertainty in EIS documents, they "reject any attempt by agencies to shirk their responsibilities under NEPA by labeling any and all discussion of future environmental effects as 'crystal ball inquiry.'" *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973). The agency's position in the DEIS shirks its responsibility to evaluate the risks of diesel exhaust, despite strong evidence of its connection to conditions ranging from asthma to cancer, and the potential for those risks to be imposed on Denver residents.

### 2.   The DEIS must conduct original research necessary to make a reasonable choice among alternatives, by placing monitoring devices in the project area immediately adjacent to I-70 East.

If uncertainties exist in data pertinent to the specific project area, NEPA requires agencies to compile existing research and conduct original research to close the gaps. As the Ninth Circuit Court of Appeals has noted, "[i]f the information relevant to adverse impacts is essential to a reasoned choice among alternatives and is not known and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement." *Save Our Ecosystems v. Clark*, 747 F.2d 1240, 1249 (9th Cir. 1984).

Determining the levels of carcinogenic diesel exhaust, other MSAT in residential neighborhoods in the project is essential to a reasoned choice among alternatives. This is especially so, in that the project area lies within an industrial zone, which may be expected to have elevated background levels of MSATs.

As Thomas et al. (2007) states:

> Historically ambient air toxics monitors have not been sited close to major roadways. Only one Denver monitor falls within 50 m distance from a major highway, with approximately 25, 000 vehicles per day passing the site. Targeted monitoring campaigns within short distances both upwind and downwind of specific roadways are needed, preferably coinciding with dispersion model assessments. The results from the combined assessments could provide the public and policy makers with increased confidence in modeled results, which tend to be the predominant tool used to identify mobile source 'hotspots.'

Thomas, G. et al. 2007, *Going one step beyond: A neighborhood scale air toxics assessment in North Denver* (The Good Neighbor Project) (2007) *available at* http://www.dot.state.co.us/Publications/PDFFiles/goodneighbor.pdf.  Observe that the estimated traffic volume on I-70 East exceeds 125,000 vehicles per day, so from this perspective, not even the monitor located near a 25,000 vehicle per day major highway provides realistic data on the air pollution concentrations immediately adjacent to I-70 East.

We request that the agency design and undertake a program to monitor concentrations of Criteria Air Pollutants, MSATs and ultrafine particles immediately adjacent to I-70 East, in an effort to validate and support emissions and air dispersion modeling efforts.  The failure of the DEIS to do this violates 40 C.F.R. 1502.22(a).

> **3.  The DEIS impacts analysis is insufficient because it fails to adequately take into account the cumulative effects of MSATS associated with the proposed highway project.**

The DEIS itself makes a strong argument for a more comprehensive DPM assessment in light of the risks that already exist, and risks that will likely increase. Specifically, it states that I-70 traffic will increase substantially, carrying from 120,000 and 267,000 vehicles per day for some sections by 2030, of which 7 to 14 percent of the traffic on I-70 is estimated to be truck traffic.  *See* DEIS at *Executive Summary*. Moreover, the I-70 East project is within and near an industrial zone.  Importantly, those living and working near the proposed I-70 East will be exposed not only to air pollutants from traffic, but also to emissions from industrial facilities and rail facilities in this area. Indeed, Union Pacific Rail Road ("UPRR") and Burlington Northern Santa Fe ("BNSF") railway operate several rail storage and transfer facilities, lead tracks, and industry spur tracks in the I-70 project area.  *See* DEIS at 4-38.

At the same time, the DEIS also states that the project area contains roughly 28,045 children (32 percent of the population based on 2000 study), and that the project area has 90 elementary schools (including five Kindegarten-8 schools), 20 middle schools, 14 high schools, and 12 charter schools; with a total enrollment at approximately 72,500 students. DEIS at 5.2-7, 13.

For too long the neighborhoods in the project area have been exposed to a multitude of risks, necessitating a renewed need for responsible planning and development to minimize these risks.  As suggested earlier in our comment letter, the DEIS recognizes that actions in the past on I-70 were undertaken with little or no study of the impacts to the proximate neighborhoods.  The area is highly populated with children, highly exposed to existing industrial development, and some neighborhoods exist at the confluence of both I-70, I-25, as well as rail-yards.  The agency needs to quantify the cumulative impact of traffic, industrial and rail emissions on those living in near the proposed I-70 East.  This cumulative analysis is required under 40 C.F.R. 1502.16(a)(b), 1508.7 and 40 C.F.R. 1508.8.

### 4. The DEIS fails to propose adequate mitigation for the disparate impacts of this project on low income and minority populations.

The DEIS does take certain steps required by both Executive Order 12898 and the Environmental Protection Agency's Title VI Guidance for determining a disparate impact.  When the agency compared the general population of the Denver, Colorado area, and the population within the project area, the agency discovered that this project would have a disparate impact on the minority and low-income populations, and that this disparate impact is apparent regardless of the alternative.

The main deficiency with the DEIS is its failure to propose adequate mitigation for these disparate impacts.  One of the fundamental environmental justice principles set forth by Executive Order 12898 is to "avoid, minimize, or mitigate disproportionately high and adverse human health and environmental effects, including social and economic effects on minority populations and low-income populations."

Under all of the scenarios there will be a right of way (ROW) taking by the agency.  Depending on which construction option the agency chooses, the number of residential displacements will range from 18-93 and the number of business displacements will range from 16-73.  This could lead to the agency requiring a substantial number of people to move.  The agency argues that all people who it displaces through ROW will be justly compensated in accordance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 and Uniform Relocation Act Amendments of 1987 ("Uniform Act").  However, The Uniform Act and the DEIS's mitigation plan is unlikely to be effective in today's economic environment and housing market.  Since the housing bubble popped, the value of homes around the nation, including Denver, have gone down.  To fairly compensate those who lose their homes, the agency should give the homeowners fair market value for their property as of 2007, before the collapse of the housing market.

Every alternative discussed in the DEIS entails a loss of several businesses. Small businesses take a lot of time to develop and become profitable. The businesses that will lose their property because of the proposed construction will face a near impossible situation of successfully starting up a new one in the current economic climate. The DEIS argues that the displaced businesses will receive several reimbursements with regards to moving expenses and the businesses will also receive assistance in finding a desirable location to start up a new business. However, it may be near impossible to reestablish these small businesses elsewhere.

The DEIS suggests measures to be taken to prevent extreme amounts of dust build up in the air during the anticipated five summers of construction, but it does not set out a plan for those residents without air conditioning who would normally ventilate by opening windows. Considering the climate of Denver, and the added expense that air conditioners cost both in the actual machine and electricity costs, it is unlikely that many residents in the affected area will have air conditioning. Considering the average temperatures in the summer months are well into the eighties, many residents will want to open their windows, but will opt not to in order to prevent dust from entering their dwellings. The agency should help purchase either fans or air conditioners for those residents that cannot afford them or do not already have them. The agency should also offer subsidies for the additional electricity that will be consumed by those residents who already have fans or air conditioners, and those who were forced to get them because of the construction project. This would help ensure more equitable treatment of the low income and minority residents in the project area.

### 5.    Miscellaneous Errors in the Air Quality Technical Report

####     a.    *Criteria Pollutants Overview (DEIS, Section 5.2.1.1)*

The assertion that "EPA is mainly concerned with pollutants that are or could be harmful to people. EPA defines this set of air pollutants as criteria pollutants" is flatly wrong. DEIS, Air Quality Technical Report, on 5. Under the Clean Air Act, any list of air "pollutants that are or could be harmful to people" must include not only the Criteria Air Pollutants, but also the Hazardous Air Pollutants and the Mobil Source Air Toxics.

####     b.    *Harmful health effects of air pollutants not included (DEIS, Table 2: Criteria Pollutants Overview).*

The present DEIS fails to disclose all of the known health effects of the air pollutants listed in Table 2. To cite a just few examples of harmful health effects of air pollutants omitted from Table 2: (1) Jerrett et al. (2009) link ozone to increased mortality from respiratory causes; (2) Wilhelm and Ritz (2005) and Leem et al. (2006) demonstrate an effect of $NO_2$, $SO_2$ and/or CO on pre-term births; (3) The meta-analysis of Stieb et al. (2002) shows that acute exposure to $NO_2$, $SO_2$ and CO increases mortality; see also Moolgavkar (2003) and Samoli et al. (2007); and (4) Sunyer et al. (2003) show an association of $SO_2$ with cardiovascular hospital admissions.

c.      *Existing Conditions (DEIS, Section 5.0)*

This section only discusses existing air quality conditions of CO, $PM_{10}$ and ozone. In failing to discuss existing conditions of other criteria air pollutants (NO2, SO2, Pb, $PM_{2.5}$), the agency has implicitly assumed that simply meeting the NAAQS for these pollutants is protective of public health. Yet, there is abundant evidence that, for example PM2.5 levels are elevated near highways, and as discussed elsewhere in this letter, no Denver monitoring stations are near a major highway.

d.      *Mobile Source Air Toxics (DEIS, Section 5.2.2 & Figure 2).*

This section and figure are explicitly and entirely inconsistent with a key recommendation of the report *Analyzing, Documenting, and Communicating the Impacts of Mobile Source Air Toxic Emissions in the NEPA Process*, which states that:

> [m]any MSAT analyses show a decline in emissions over time regardless of the project, and the difference between future alternatives is typically much less than the overall secular reduction. *However this does not relieve the study from characterizing differences among the project alternatives, even in the presence of uncertainty*.
> Carr et al. (2007) (emphasis added).

Yet, the final two paragraphs on page 11 of the Air Quality Technical Report do precisely what Carr et al. (2007) says should not be done, by citing this projected future secular decline in MSATs as the reason that the DEIS does not undertake any quantitative analysis of the harmful health impacts of  MSATs from the I-70 East project. The DEIS also fails to provide any discussion or rationale for deviating from the recommendations of Carr et al. (2007).

e.      *Alcohol and cancer dose-response threshold*

The paragraph on alcohol and cancer on pages 16 and 17 of the Air Quality Technical Report makes a number of bald and scientifically incorrect assertions, yet is not supported by a single citation to the scientific literature.  This entire paragraph should be deleted.  First, the sentence "[i]ndeed, the exposure-response data, interestingly enough, show a 'J-shaped' dose response relation, such that people consuming 1 drink per day are significantly less likely to die of cancer than those who drink no alcoholic beverages" is simply wrong. DEIS at 5.10-14.  While a J-shaped dose response curve has been seen for alcohol consumption and coronary heart disease, it has not been observed for alcohol consumption and cancer.  *See* Room et al. (2005).  Second, the sentence "but there is neither evidence nor reason to suppose that, for example, 1 or 0.5 drinks per day also increase people's risk of cancer death" is also simply wrong. DEIS, Air Quality Technical Report, at 17 (however, see especially the meta-analysis of Key et al. (2006) showing increased risk of breast cancer at low doses of alcohol consumption, but also see

Bagnardi et al. (2001), Ellison et al. (2001), Lewis et al. (2008) and Smith-Warner et al. (1998)). Third, the assertion "if one were to make the standard 'regulatory style' assumption about low-level exposure to alcohol, one would both vastly overestimate the cancer risk" is simply wrong, for reasons detailed above. DEIS, Air Quality Technical Report, at 17. Indeed, for many types of cancer, risk decreases with decreasing alcohol consumption, as summarized by Lewis et al. (2008). Fourth, the following assertion is deceptive:

> "this is not to say, of course, that very low-level exposures to MSAT emissions prevent cancer; nor is it to assert that such exposures are demonstrably or obviously safe. It is only to point out that extrapolation beyond observable exposures and responses are at best an uncertain business and become increasingly uncertain the farther one strays from the empirical data."

DEIS, Air Quality Technical Report, at 17. The quoted abstract proposition is simply not relevant to the need for the DEIS to quantify the risks of diesel particulate matter. There is, in fact, abundant evidence that near ambient levels of diesel particulate matter harm human health. Indeed, it was EPA's concern with these harms that led them to issue the Mobil Source HAP rule (EPA 2007a). EPA's Fact Sheet for this rule states:

> "MSATs are known or suspected to cause cancer or other serious health or environmental effects. Benzene is of particular concern because it is a known carcinogen and most of the nation's benzene emissions come from mobile sources. *People who live or work near major roads, or spend a large amount of time in vehicles, are likely to have higher exposures and higher risks"* (US EPA 2007b) (emphasis added).

> f.    *The DEIS needs to focus on the relative risk of alternatives, not the absolute risk.*

The sentence on page 17 of the Air Quality Technical Report states that "because of these shortcomings, any calculated differences in health impacts between alternatives is likely to be much smaller than the uncertainties associated with calculated the impacts," which completely misses the point that what we are ultimately interested in is the comparative risk of the I-70 East alternatives. DEIS, Air Quality Technical Report at 17. The report *Analyzing, Documenting, and Communicating the Impacts of Mobile Source Air Toxic Emissions in the NEPA Process* states that "[a] large uncertainty range in MSAT results does not automatically invalidate their use in comparing alternatives. Relative (not absolute) differences among alternatives, when calculated by consistent methodology, are generally valid for purposes of ranking alternatives" Carr et al. (2007) at 12. The DEIS fails to state why it was unable to undertake such a comparative analysis of relative risks.

> g.    *The analysis of traffic volume and risk on pages 13 and 14 of the Air Quality Technical Report fails to disclose that*

> *under the screening guidelines of Carr et al. (2007), a quantitative risk assessment of MSATs is required for this project.*

The document *Analyzing, Documenting, and Communicating the Impacts of Mobile Source Air Toxic Emissions in the NEPA Process* (Carr et al. 2007) lays out guidelines (page 121 ff.) for deciding when a quantitative analysis of MSAT is appropriate. Importantly, the AADT for the present project is above 125,000 (Traffic Technical Report, Table 15), and as such a "Qualitative Air Toxic Assessment" is not appropriate for the present project. See also Appendix C of Carr et al. (2007), and Figure C-1 (showing the relation between "annual average vehicles per day", and "cancer risk per million"). As such, the present project clearly requires a quantitative analysis of MSAT risk (Level 3, 4 or 5, see Figure 39 of Carr et al. [2007]). Yet, at no point in the discussion on pages 13 and 14 of the Air Quality Technical Report does the DEIS ever come out and explicitly state that under the screening guidelines of Carr et al. (2007), a quantitative risk assessment of MSATs is required.

The discussion of the Carr et al. (2007) report on pages 13-14 of the Air Quality Technical Appendix also suffers from the following problems. Specifically, the discussion fails to acknowledge that Carr et al. (2007) had developed a screening criteria, and that under their criteria, a quantitative MSAT analysis is required for the present project. Further, the assertion on lines 4 and 5 of page 14 of the Air Quality Technical Report that a "100 in 1 million risk level" is "generally considered unacceptable" is simply not true. In fact, the 1 in 1 million risk level is widely used as a threshold between what is acceptable and what is not. The discussion on pages 13 and 14 of the Air Quality Technical Report is strained and implausible because it attempts to apply the 100 in 1 million screening criteria, yet cites the analysis of Carr et al. (2007) who themselves used a 1 in a million screening criteria.

The failure of the DEIS to state clearly and unambiguously that a quantitative risk assessment of MSATs is required under the guidelines of Carr et al. (2007) has thwarted public participation in the NEPA process, violating CEQ regulations that require full and honest disclosure of relevant information.

6.   **The DEIS is insufficient because it lacks a complete discussion of possible mitigation measures for the impacts on public health associated with diesel particulate matter.**

As mentioned above, NEPA requires agencies to identify and include in the EIS all relevant and reasonable mitigation measures that could improve the action. The following are some possible mitigation measures that could help reduce the public health impacts resulting from the proposed highway project:

- Develop a comprehensive strategy for reducing air pollution from all mobile sources in the project area;[13]
- Incorporate open space and/or greenways possibly on top of the structure;
- Use tolling to discourage motor vehicle use, particularly single occupancy vehicles;
- Include alternatives that do not increase SOV capacity, especially during peak periods; and/or
- Maximize light rail transit.

Again, this list is in no way meant to be exhaustive, but we do view these as relevant and reasonable mitigation measures that could improve this project and lessen the impacts on the public health of the affected communities.

## II.   The stated purpose and need is too narrow in scope and resulted in an inadequate alternatives screening process.

NEPA requires that the agency identify the purpose and need of the project, as well as identify and analyze alternatives that are intended to meet that defined purpose and need. *See Dubois v. U.S. Dept. of Agriculture*, 102 F.3d 1273 (1st Cir. 1996).  In the DEIS, the agency identified the purpose of the project as implementing a transportation solution that improves the "safety, access, and mobility and address the congestion on I-70."  Further, the agency identified several issues encompassing the need for the project: increase of transportation demand, limited transportation capacity, safety concerns such as increase crash rates, and transportation infrastructure deficiencies.

Although the DEIS's defined purpose and need sufficiently addresses the question of how to fix the basic transportation issues, it is too narrowly constrained and fails to address the larger picture of this project.  The agency should have incorporated the concepts of the "Goals and Objectives" Section of the DEIS in the actual purpose and need of this project.  In the goals and objective section of the DEIS, the agency more

---

[13] This could really include working cooperatively to move the rail yards out of the affected area. CDOT, in cooperation with UPRR and BNSF railroads, has conducted various studies to examine the possibility of diverting the majority of heavy freight traffic from the Front Range communities and possibly opening up the Joint Line for inter-city passenger rail service.  The results of these studies suggest that there would be sufficient public benefits related to such rail infrastructure improvements to warrant further evaluation of a public/private partnership.  The purpose of the most recent study, the Colorado Rail Relocation Implementation Study, was to determine what steps need to be taken to form a public/private partnership, to define and finalize the project scope and costs, to determine how costs should be shared based on both public and private benefits and related factors, and to develop strategies for carrying out the necessary environmental analysis.  As a result, a more comprehensive analysis of the proposed railroad bypass east of the Front Range communities is going to be conducted. *See CDOT Rail Relocation Implementation*, *available at* http://www.dot.state.co.us/railroadstudy/default.asp.

thoroughly identified the need for this the project, including considerations regarding the health, environment, and cohesion of the local surrounding communities. Had these concerns been incorporated into the purpose and need, the result would have created a more valuable and meaningful set of alternatives available for public comment.

These identified goals and objectives provide a more balanced holistic approach to the DEIS alternatives analysis because they give the agency an opportunity to identify certain alternatives that not only looks at where this highway will go, but the effect it will have on the surrounding areas. As previously stated, the original construction of I-70 in the 1960s significantly impacted nearby neighborhoods, specifically contributing to the lack of neighborhood cohesion, high poverty rates, and public health problems such as high rates of cancer. This project is an opportunity for the agency to address some of the problems these communities have endured because of the original construction of the highway. However, these effects on the human environment were never stated in the DEIS's purpose and need section.

Further, by analyzing the full breadth of impacts each alternative will have on the community, the agency can ensure the project is aligned with both the stated needs of the project as well as with the objective to create a more cohesive and unified community. Because of the extra time allotted, the analysis of the alternatives should be done in conjunction with ongoing local neighborhood planning efforts and the City of Denver, as previously suggested in the comment. By approaching the highway project with a more collaborative mentality, the agency can rectify past mistakes, meet their infrastructure and highway safety goals, as well as appease the concerns of the community. Previous Denver highway projects have successfully been able to execute projects that included community needs into project planning and implementation; I-25 TREX is a prime example of a project that was able to meet both the community and project needs by employing a holistic approach incorporating community communication and collaboration. *See The T-REX Megaproject: Denver's Showcase for Innovation and Collaboration*, *available at* http://thepublicmanager.org/cs/blogs/featured/archive/2008/09/10/the-t-rex-megaproject-denver-s-showcase-for-innovation-and-collaboration.aspx).

If the agency *had* addressed these issues in the purpose and need section, the agency could have ensured that the alternative analysis took into consideration cohesion and health impacts on the nearby communities. Additionally, by expanding the purpose and need, the agency can contribute to positive changes in the neighborhood, providing an opportunity for the city to correct some of the wrongs originally done to this neighborhood by the 1960s construction of the highway.[14]

---

[14] The DEIS states that the purpose, need, goals and objectives identified were used to develop the screening criteria for evaluating and selecting the remaining alternatives. DEIS at 3-2. However, when actually applied, the DEIS falls short. After a closer look at the DEIS alternatives analysis, it is clear the analysis only encompassed considerations identified in the purpose and need. The claim that the goals and objectives played a part in the selection process is unfounded and the DEIS shows little

## III.   The Section 4(f) Analysis is insufficient because it fails to justify that there are no prudent and feasible alternatives.

The remaining proposed alternatives (1,3,4 and 6), with their large footprints of impacted land, will result in the use of many parcels of historic and parkland protected under Section 4(f). *See* DEIS, Chapter 7.  The Transportation Act imposes a stringent test for using 4(f) property.  For more than three decades, courts have understood the 4(f) mandate to impose a "plain and explicit bar to the use of federal funds for construction of highways through parks-only the most unusual situations are exempted." *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 411 (1971).  The DEIS acknowledges the many pieces of 4(f) eligible land the project will potentially "use" (DEIS, Exhibits 7.1-31 to 7.1-33) but it does not adequately support its claim that there are no feasible or prudent alternatives.

Due to the scope of this project, we acknowledge that it may be difficult to avoid all 4(f) resources.  However, Section 4(f) properties are to be given paramount consideration and the FHWA must ensure that it has fully explored all prudent and feasible alternatives if it does intend to use a 4(f) resource.  As admitted in the DEIS, there may be alternatives no longer being considered that may avoid the use of certain known 4(f) resources (DEIS at 7.3-1), but then goes on to say that it would be "difficult to locate unknown 4(f) resources outside of the vicinity of the remaining DEIS alternatives under evaluation." *Id*.  We caution the Secretary to remember that he has an independent duty to evaluate alternatives that are prudent and feasible.  If such alternatives do exist, the Secretary cannot ignore those alternatives just because they are not included within the DEIS.   Considering Section 4(f) requires "the problems encountered by proposed alternatives to be 'truly unusual' or [to] 'reach extraordinary magnitudes' if parkland is taken," the DEIS should at least attempt to disclose what unusual circumstances require the exact proposed placement of the existing DEIS alternatives.  *Comm. to Preserve Boomer Lake Park v. U.S. Dep't of Transp.,* 4 F.3d 1543, 1550 (10th Cir. 1993).

---

evidence of this.  The DEIS illustrated its analysis of the alternatives through the use of charts that explained why various alternatives were eliminated.  *See* DEIS, Exhibit 3-2.  Most of these reasons for elimination revolved around issues of cost, access, and transportation problems.  Although these issues are in line with the currently articulated purpose and need of the project, the evaluation does not sufficiently consider the goals and objectives of the project, which incorporate many of the community driven concerns.  By not including the goals of community cohesion and public health in the purpose and need section, the agency was not compelled to give them adequate consideration in the alternatives analysis.

3

Overall, the 4(f) section of the DEIS lacks the information necessary to elicit valuable and informed public comment because it contains little information to justify its finding that there are no prudent and feasible alternatives.  The DEIS does not examine other alternatives that may meet the purpose and need – and therefore might be prudent and feasible – while impacting *fewer* public park and historic resources.  Section 4(f) requires analysis of these less-harm alternatives, however, because "the protection of parkland is of paramount importance."  *Id*.

Relying on the current purpose and need and range of alternatives also improperly limits the consideration of alternatives.  As these comments emphasize, the current purpose and need statement fails to include considerations regarding the health, environment, and neighborhood cohesion of the surrounding communities.  As a result, alternatives that may meet needs that the DEIS does not identify, and which minimize harm to Section 4(f) resources, should be adequately explored.

Even if there were no prudent and feasible alternative for the proposed action that would not use 4(f) land, the Department of Transportation cannot approve the project without planning to minimize its adverse impact on protected places.  Courts have established that the test for the least harm alternative "requires a simple balancing process which totals the harm caused by each alternate route to Section 4(f) areas and selects the option which does the least harm."  *Concerned Citizens Alliance, Inc. v. Slater*, 176 F.3d 686, 694 (3rd Cir. 1999) (citing *Druid Hills Civic Ass'n v. Federal Highway Admin.,* 772 F.2d 700, 716 (11th Cir.1985)).  Whether an alternative meets the prudent and feasible standard is irrelevant to this analysis.  *Id*.

However, to properly conduct this balancing, there must be a legitimate range of alternatives with varying adverse impacts to compare.  In *Davis v. Mineta*, the Tenth Circuit rejected a 4(f) analysis that examined only two alternatives and "summarily rejected…secondary avoidance alternatives such as "minor alignment shifts." 302 F.3d 1104, 1114 (10th Cir. 2002).  Similarly, the DEIS 4(f) section summarily dismisses changes that would lessen the existing alternatives' impact, by assuming none would meet the purpose and need, and essentially considers only two alternatives – a widening of the existing alignment and a realignment.  DEIS at 7.0-3 to 7.0-4.

The Section 4(f) analysis provides little information with which to judge the ultimate project impact on public parks and historic places.  Because of the need for public input on adverse use of these protected places, the EIS should include a legitimate analysis of least harm alternatives that would meet the asserted – or hopefully amended – project purpose and need.

CONCLUSION

For the foregoing reasons we ask that the DEIS and Draft Section 4(f) Evaluation for the I-70 East project, be revised and re-circulated.

Dated: March  31, 2009                        Sincerely,


                                              Katie Johnston
                                              Sarah April
                                              Sean Cumberlege
                                              Student Attorneys

                                              &
                                              Professor Michael Harris
                                              Assistant Professor of Law &
                                              Director of the Environmental Law Clinic
                                              University of Denver Sturm College of
                                              Law
                                              2255 E. Evans Avenue
                                              Denver, Colorado 80208
                                              303-871-6140 (Office)
                                              Email: mharris@law.du.edu

                                              &

                                              Craig M. Pease[15]
                                              Professor of Science and Law
                                              Vermont Law School

---

[15] Professor Pease thanks the students in the spring 2009 Risk Assessment class at Vermont Law School for their valuable assistance: Greg Berck, Caitlin Callaghan, Jacob Durell, Anna Ellis, Matthew Gerke, Elizabeth Henderson, Patrick Joy, Matt Keister, Victoria Lloyd, Abel Russ, Reed Sirak, and Nisha Swinton.

Appendix A

| Table 1. Studies of population distances from a road and adverse end points | | | | |
|---|---|---|---|---|
| | < 50 M | 50-100 M | 100-400 M | General Adverse Effects |
| **END POINTS** | | | | |
| **Sensitive Populations** | | | | |
| **Children** | | | | |
| Respiratory Distress | Brunekreef at al. 1997 Van Vliet et al 1997 | Brunekreef at al. 1997 Van Vliet et al 1997 Venn et al. 2001 | Brunekreef at al. 1997 Janssen et al. 2003 Van Vliet et al 1997 | Am. Academy of Pediatrics Policy Statement 2004 |
| Asthma | Morganstern et al. 2007 Van Vliet et al 1997 | Kim et al 2008 McConnell et al. 2006 Van Vliet et al 1997 Zhou and Levy 2007 | Gauderman et al. 2005 Janssen et al. 2003 Willhelm et al. 2008 Van Vliet et al 1997 Zhou and Levy 2007 | |
| Leukemia | Crosignani et al. 2004 | | | |
| **Adults** | | | | |
| Maternal | | | | Am. Academy of Pediatrics Policy Statement 2004 |
| Heart Failure | | Madina-Ramon et al. 2008 Tonne et al 2007 | | |
| **General Population** | | | | |
| Respiratory Distress | Nakai et al. 1999 Nitta et al. 1993 Garshick et al. 2003 | Nitta et al. 1993 Zhou and Levy 2007 | Zhou and Levy 2007 | |
| Heart Failure | | Madina-Ramon et al. 2008 Tonne et al 2007 | | |
| Mortality | | Madina-Ramon et al. 2008 Tonne et al 2007 | | |

# Appendix B[16]

## LITATURE CITED

Adgate, J.L. et al. 2002. Spatial and temporal variability in outdoor, indoor, and personal
PM2.5 exposure. Atmospheric Environment 36: 3255-3265.

American Academy of Pediatrics Committee on Environmental Health. 2004. Ambient
Air Pollution: Health Hazards to Children. Pediatrics 114: 1699-1707.

Anderson, Z.J. et al. 2008. Size distribution and total number of concentration of
ultrafine and accumulation mode particles and hospital admissions in children and
the elderly in Copenhagen, Denmark. Occupational and Environmental Medicine
65: 458-466.

Araugo, J.A. et al. 2008. Ambient particulate pollutants in the ultrafine range promote
early atherosclerosis and systemic oxidative stress. Circulation Research 102:
589.

Arlt, V.M. 2005. 3-nitrobenzanthrone, a potential human cancer hazard in diesel exhaust
and urban air pollution: a review of the evidence. Mutagenesis 20: 399-410.

Arlt, V.M. et al. 2006. Identification of three major DNA adducts formed by the
carcinogenic air pollutant 3-nitrobenzanthrone in rat lung at the C8 and $N^2$
position of guanine and at the $N^6$ position of adenine. International Journal of
Cancer 118: 2139-2146.

Bagnardi, V. et al. 2001. A meta-analysis of alcohol drinking and cancer risk. British
Journal of Cancer. 85: 1700-1705.

Barone, T.L. and Y. Zhu. 2008. The morphology of ultrafine particles on and near major
freeways. Atmospheric Environment 42: 6749-6758.

Basrur, S.V. 2003. Air pollution and physical activity: Examination of Toronto air data to
guide public advice on smog and exercise. Toronto Public Health. City of
Toronto. Toronto, Canada. June 2003.

Beckerman, B. et al. 2007. Correlation of nitrogen dioxide with other traffic pollutants
near a major expressway. Atmospheric Environment 42: 275-290.

Beelen, R. et al. 2008. Long-term effects of traffic-related air pollution on mortality in a
Dutch cohort (NLCS-AIR study). Environmental Health Perspectives 116:196-
202.

---

[16] Please note that we have included all the listed studies on CDs marked "Appendix C"

Bhatia, R. and T. Rivard. 2008. Assessment and mitigation of air pollutant health effects from intra-urban roadways: Guidance for land use planning and environmental review. San Francisco, CA. San Francisco Dept. of Public Health. Available at http://www.sfphes.org/publications/Mitigating_Roadway_AQLU_Conflicts.pdf.

Bhatia, R. et al. 1998. Diesel exhaust exposure and lung cancer. Epidemiology 9: 84-91.

Biwer, B. M. and J. P. Butler. 1999. Vehicle emission unit risk factors for transportation risk assessments. Risk Analysis 19: 1157-1171.

Brauer, M. et al. 2008. A cohort study of traffic-related air pollution impacts on birth outcomes. Environmental Health Perspectives 116: 680-686.

Brugge, D. et al. 2007. Near-highway pollutants in motor vehicle exhaust: A review of epidemiologic evidence of cardiac and pulmonary risks. Environ. Health 6:23.

Brunekreef, B. and S.T. Holgate. 2002. Air pollution and health. Lancet 360: 1233-1242.

Brunekreef, B. et al. 1995. Epidmiologic studies on short-term effects of low-levels of major ambient air-pollution components. Environmental Health Perspectives 103 (Suppl. 2):3-13. Available at http://www.ehponline.org/members/1995/Suppl-2/brunekreff-full.html.

Brunekreef, B. et al. 1997. Air pollution from truck traffic and lung function in children living near motorways. Epidemiology 8: 298-303.

Buffler, P.A. et al. 2005. Environmental and genetic risk factors for childhood leukemia: Appraising the evidence. Cancer Investigation 1: 69-75. Available online at http://superfund.berkeley.edu/pdfs/05_buffler_1.pdf.

California Air Resources Board 1998c. [CARB 1998c]. Part B. (Health Risk Assessment for Diesel Exhaust). Available at ftp://ftp.arb.ca.gov/carbis/regact/diesltac/partb.pdf.

California Air Resources Board. 1998a. [CARB 1998a]. Diesel Exhaust. Staff Report: Initial Statement of Reasons. Available at http://www.arb.ca.gov/toxics/dieseltac/staffrpt.pdf.

California Air Resources Board. 1998b. [CARB 1998b]. Part A (Exposure Assessment). Available at http://www.arb.ca.gov/toxics/dieseltac/part_a.pdf.

California Air Resources Board. 2009. [CARB 2009]. Rail yard health risk assessments and mitigation measures. Home page available at http://www.arb.ca.gov/railyard/hra/hra.htm.

Caltrans. 2008. Schuyler Heim Bridge Replacement and SR-47 Expressway Project. Supplemental Draft Environmental Impact Statement/Recirculated Draft Environmental Impact Report and Section 4(f) Evaluation. Available at http://www.acta.org/projects/pdf/RECIRCULATED_DRAFT_DRD2620_combined_.pdf. Also see other documents for this project at http://www.acta.org/projects/projects_planning_SR47.asp.

Carr, E.L. et al. 2007. Analyzing, Documenting, and Communicating the Impacts of Mobile Source Air Toxic Emissions in the NEPA Process. A report prepared for the American Association of State Highway and Transportation Officials, Standing Committee on the Environment.  Available at http://nepa.fhwa.dot.gov/ReNEPA/ReNepa.nsf/All+Documents/C7C0641ED6A6E570852572E3007BFCAA/$FILE/25-25(18)_FR.pdf

Castaneda, H. et al. 2008. Health risk assessment for the Union Pacific Railroad Oakland railyard. California Environmental Protection Agency. Air Resources Board.

Ciccone, G. et al. 1998. Road traffic and adverse respiratory effects in children SIDRIA Collaborative Group. Occup. Environ. Med. 55: 771-778.

Clougherty, J.E. et al. 2008. Land use regression modeling of intra-urban residential variability in multiple traffic-related air pollutants. Environmental Health, 7:17.

Colome, S.D. 1992. Indoor-outdoor air pollution relations: particulate matter less than 10 μm in aerodynamic diameter (PM2.5) in homes of asthmatics. Atmospheric Environment 26A: 2173-2178.

Crosignani, P. et al. 2004. Childhood leukemia and road traffic: A population-based case-control study. International Journal of Cancer 108: 596-599.

Cutts, S. et al. 2008. Health risk assessment for the Union Pacific City of Industry Railyard. California Environmental Protection Agency. Air Resources Board.

Delfino, R.J. 2002. Epidemiologic evidence for asthma and exposure to air toxics: Linkages between occupational, indoor, and community air pollution research. Environmental Health Perspectives 110: 573-589.

Diesel particulate matter studies cited by Bhatia (1998). We hereby incorporate into the present comment letter and administrative record all scientific studies on diesel exhaust or particulate matter cited by Bhatia (1998).

Diesel particulate matter studies cited by EPA 2002. We hereby incorporate into the present comment letter and administrative record all scientific studies on diesel exhaust or particulate matter cited by EPA 2002, and all scientific papers cited in "References for Chapter 7" and in "References for Chapter 9."

4

Dor, F.Y. et al. 1995. Exposure of city residents to carbon monoxide and monocyclic aromatic hydrocarbons during commuting trips in the Paris metropolitan area. Journal Air & Waste Management Association 45: 103-110.

Edwards, J. et al. 1994. Hospital admissions for asthma in preschool children: Relationship to major roads in Birmingham, United Kingdom. Arch. Environ. Health 49: 223-227.

Elder, A. et al. 2007. Effects of on-road highway aerosol exposures on autonomic responses in aged, spontaneously hypertensive rats. Inhalation Toxicology 19: 1-12.

Elliott, P. et al. 2007. Long-term associations of outdoor air pollution with mortality in Great Britain. Thorax 62: 1088-1094.

Ellison, R.C. et al. 2001. Exploring the relation of alcohol consumption to risk of breast cancer. American Journal of Epidemiology 154: 740-747.

English, P. et al. 1999. Examining associations between childhood asthma and traffic flow using a geographic information system. Environmental Health Perspectives 107: 761-767. Available at http://www.ehponline.org/members/1999/107p761-767english/english-full.html.

EPA 2002. Health Assessment Document for Diesel Engine Exhaust. Available at http://oaspub.epa.gov/eims/eimscomm.getfile?p_download_id=36319.

EPA 2007a. Control of Hazardous Air Pollutants from mobile sources. Federal Register 72: 8427-8570.

EPA 2007b. Fact sheet: Control of Hazardous Air Pollutants from mobile sources. Available at http://www.epa.gov/otaq/regs/toxics/420f07017.htm.

EPA Integrated Risk Information System. 2003 [IRIS 2003]. Diesel engine exhaust. Available at http://www.epa.gov/IRIS/subst/0642.htm.

Feychting, M. et al. 1999. Exposure to motor vehicle exhaust and childhood cancer. Scandanavian Journal of work, environment & health, 24(1) 8-11.

Filleul, L. et al. 2005. Twenty five year mortality and air pollution: results from the French PAARC survey. Occupational and Environmental Medicine 62: 453-460.

Finkelstein, M.M. et al. 2004. Traffic air pollution and mortality rate advancement periods. American Journal of Epidemiology 160: 173-177.

Funasaka , K.et al. 2000. Relationship between indoor and outdoor carbonaceous particulates in roadside households. Environmental Pollution 110: 127-134.

Garshick, E. et al. 2003. Residence near a major road and respiratory symptoms in U.S. veterans. Epidemiology 14(6):728-36.

Garshick, E. et al. 2004. Lung cancer in railroad workers exposed to diesel exhaust. Environmental Health Perspectives 112(5): 1539-1543.

Garshick, E. et al. 2006. Smoking imputation and lung cancer in railroad workers exposed to diesel exhaust. Am. J. Ind. Med. 49(9): 709-718.

Garshick, E. et al. 2008. Lung cancer and vehicle exhaust in trucking industry workers. Environmental Health Perspectives 116(10): 1327-1332.

Gauderman, W.J. et al. 2004. The effects of air pollution on lung development from 10 to 18 years of age. New England Journal of Medicine 351: 1057-1067. See also erratum at NEJM 352:1276.

Gauderman, W.J. et al. 2005. Childhood asthma and exposure to traffic and nitrogen dioxide. Epidemiology 16:737-43.

Ghosh, R. et al. 2007. Does the effect of air pollution on pregnancy outcomes differ by gender? A systematic review. Environmental Research 105: 400-408.

Glantz, S.A. 2002. Air pollution as a cause of heart disease: Time for action. Journal of the American College of Cardiology 39: 943-945.

Halonen, J.I. et al. 2009. Particulate air pollution and acute cardiorespiratory hospital admissions and mortality among the elderly. Epidemiology 20: 143-153.

Hart, J.E. et al. 2006. Chronic obstructive pulmonary disease mortality in diesel-exposed railroad workers. Environmental Health Perspectives 114: 1013-1017.

Heinrich, J. et al. 2005. Studies on health effects of transport-related air pollution. Chapter 4 of WHO (2005).

Henneberger, A. et al. 2005. Repolarizaton changes induced by air pollution in ischemic heart disease patients. Environmental Health Perspectives 113: 440-446.

Hoek, G. et al. 2002. Association between mortality and indicators of traffic-related air pollution in the Netherlands: A cohort study. Lancet 360: 1203-1209.

Hoek, G. et al. 2002. Spatial variability of fine particle concentrations in three European areas. Atmospheric Environment 36: 4077-4088.

Hoffman, B. et al. 2006. Residence close to high traffic and prevalence of coronary heart disease. European Heart Journal 27(22): 2696-2702.

Hoffman, B. et al. 2007. Residential exposure to traffic is associated with coronary atherosclerosis. Circulation 116(5) 489-496.

Hoffmann, B. and K.-H. Jockel. 2006. Diesel exhaust and coal mine dust. Annals of the New York Academy of Sciences 1076: 253-265.

Illgen et al. 2001.Aromatic hydrocarbons in the atmospheric environment: part 1. Indoor versus outdoor sources, the influence of traffic. Atmospheric Environment 35: 1235-1252.

Janssen, N.A.H. et al. 2003. The relationship between air pollution from heavy traffic and allergic sensitization, bronchial hyperresponsiveness, and respiratory symptoms in Dutch schoolchildren. Environmental Health Perspectives 111: 1512-1518.

Jerrett, M. et  al. 2009. A cohort study of traffic-related air pollution and mortality in Toronto, Canada. Environmental Health Perspectives.

Jerrett, M. et al. 2005. Spatial analysis of air pollution and mortality in Los Angeles. Epidemiology 16: 727-736.

Jerrett, M. et al. 2009. Long-term ozone exposure and mortality. New England Journal of Medicine 360: 1085-1095.

Johns Hopkins School of Public Health. 2004. Traffic Proximity and Density Related Health Effects: Summary of Recent Research. Workshop on Traffic, Health, and Infrastructure Planning. February 1-3, 2004.. Baltimore, Maryland. Available at http://www.jhsph.edu/RiskSciences/Research/TrafficProximity.html.

Kampa, M. and E. Castanas. 2008. Human health effects of air pollution. Environ. Pollut. 151(2): 362-367.

Kettunen, J. et al. 2007. Associations of fine and ultrafine particulate air pollution with stroke mortality in an area of low air pollution levels. Stroke  38: 918-922.

Key, J. et al. 2006. Meta-analysis of studies of alcohol and breast cancer with consideration of methodological issues. Cancer Causes and Control 17: 759-770.

Kim, J. et al. 2004. Traffic-related air pollution and respiratory health: East Bay Children's Respiratory Health Study. American Journal of Respiratory and Critical Care Medicine 170: 520-526.

Kim, J.J. et al. 2008. Residential traffic and children's respiratory health. Environmental Health Perspectives 116:1274-79.

Kingham, S. et al. 2000. Spatial variations in the concentrations of traffic-related pollutants in indoor and outdoor air in Huddersfield, England. Atmospheric

Environment 34: 905-916.

Kleinman, M.T. 2000. Carbon monoxide: Evaluation of current California Air Quality Standards with respect to protection of children. Prepared for California Air Resources Board California Office of Environmental Health Hazard Assessment.

Knox, E.G. 2005. Childhood cancers and atmospheric carcinogens. Journal of Epidemiology and Community Health 59: 101-105.

Knox, E.G. 2006. Roads, railways, and childhood cancers. Journal of Epidemiology and Community Health. 60: 136-141.

Kousa, A. et al. 2002. A model for evaluating the population exposure to ambient air pollution in an urban area. Atmospheric Environment. 36: 2109-2119.

Koushki, P.A. et al. 1992. Vehicle occupant exposure to carbon monoxide. J. Air & Waste Management Association 42: 1603-1608.

Kreyling, W. G. et al. 2006. Ultrafine particle-lung interactions: Does size matter? Journal of Aerosol Medicine 19: 74-83.
Kreyling, W.G. 2004. Dosimetry and toxicology of ultrafine particles. Journal of Aerosol Medicine 17: 140-152.
Krivoshto, I.N. et al. 2008. The toxicity of diesel exhaust: Implications for primary care. Journal of the American Board of Family Medicine 21(1): 55-62.

KTL. 2004. EXPOLIS—air pollution exposure distributions of adult urban populations in Europe. Helsinki, National Public Health Institute. Available online at http://www.ktl.fi/expolis/.

Kuna-Dibbert, B. and M. Krzyzanowski. 2005. Health risk assessment of transport-related air pollution. Chpt. 5 In WHO (2005).

Kunzli, N. et al. 2005. Ambient air pollution and atherosclerosis in Los Angeles. Environmental Health Perspectives 113: 201-206.

Laden, F. et al. 2006. Historical estimation of diesel exhaust exposure in a cohort study of U.S. railroad workers and lung cancer. Cancer Causes and Control 17: 911-919.

Laden, F. et al. 2007. Cause-specific mortality in the unionized U.S. trucking industry. Environmental Health Perspectives 115(8): 1192-1196.

Langholz, B. et al. 2002. Traffic density and the risk of childhood leukemia in a Los Angeles case-control study. Ann. Epidemiology 12(7): 482-487.

Leem, J. H. et al. 2006. Exposures to air pollutants during pregnancy and preterm

delivery. Environmental Health Perspectives 114: 905-910.

Levesque, B.E. et al. 1990. Carbon monoxide in indoor ice skating rinks: Evaluation of absorption by adult hockey players. Amer. J. Pub. Health 80: 594-598.

Lewis, S. et al. 2008. Alcohol as a cause of cancer. Cancer Institute NSW. Available online through http://www.cancerinstitute.org.au/cancer_inst/publications/index.html.

Lin, S. et al. 2002. Childhood asthma hospitalization and residential exposure to state route traffic. Environ. Research 88: 73-81.

Linden, J. et al. 2007. Carbon monoxide in Ouagadougou, Burkina Faso --- A comparison between urban background, roadside and in-traffic measurements. Water, Air & Soil Pollution 188: 345-353.

Lipsett, M. and S. Campleman. 1999. Occupational exposure to diesel exhaust and lung cancer: a meta-analysis. American Journal of Public Health 89(7): 1009-1017.

Maroziene, L. and R. Grazuleviciene. 2002. Maternal exposure to low-level air pollution and pregnancy outcomes: A population-based study. Environmental Health 1: 6.

McConnell et al. 2006. Traffic, susceptibility, and childhood asthma. Environmental Health Perspectives 114(5): 766-772.

McGrath, J.J. et al. 1993. Carboxyhemoglobin levels in humans: Effects of altitude. Inhalation Toxicology 5: 241-249.

Medina-Ramon, M. et al. 2008. Residential exposure to traffic-related air pollution and survival after heart failure. Environmental Health Perspectives 116: 481-485.

Miller, K.A. et al. 2007. Long-term exposure to air pollution and incidence of cardiovascular events in women. New England Journal of Medicine 356: 447-458.

Molnar, P. 2007. Elemental composition of fine particles: exposure in the general population and influence from different sources. The Sahlgrenska Academy at Goteborg University. Institute of Medicine. Department of Public Health and Community Medicine. Thesis.

Monforton, C. 2006. Weight of the evidence or wait for the evidence? Protecting underground miners from diesel particulate matter. American Journal of Public Health 96: 271-276.

Moolgavkar, S.H. 2003. Air pollution and daily mortality in two U.S. counties: Season-specific analyses and exposure-response relationships. Inhalation Toxicology 15: 877-907.

Morgenstern, V. et al. 2007. Respiratory health and individual estimated exposure to traffic-related air pollutants in a cohort of young children. Occup. Environ. Med. 64:8-16.

Morris, R.D. 2000. Low-level carbon monoxide and human health. Chpt. 17 in D.G. Penney, ed. Carbon Monoxide Toxicity.

Nafstad, P. et al. 2003. Lung cancer and air pollution: a 27 year follow up of 16, 209 Norwegian men. Thorax 58: 1071-1078.

Nafstad, P. et al. 2004. Urban air pollution and mortality in a cohort of Norwegian men. Environmental Health Perspectives 112: 610-615.

Nakai, S. et al. 1995. Respiratory health associated with exposure to automobile exhaust. II. Personal $NO_2$ exposure levels according to distance from the roadside. Journal of Exposure Analysis and Environmental Epidemiology 5(2) 125-136.

Nakai, S. et al. 1999. Respiratory health associated with exposure to automobile exhaust. III. Results of a cross-sectional study in 1987, and repeated pulmonary function tests from 1987 to 1990. Archives of Environmental Health 54:26-33.

National Research Council, Committee on Estimating the Health-Risk-Reduction Benefits of Proposed Air Pollution Regulations. [NRC 2002]. "Estimating the Public Health Benefits of Proposed Air Pollution Regulations," National Academies Press, 2002.

Nethery, E. et al. 2008. From measures to models: An evaluation of air pollution exposure assessment for epidemiological studies of pregnant women. Occupational and Environmental Medicine 65: 579-586.

Ning Li, N. et al. 2003. Ultrafine particulate pollutants induce oxidative stress and mitochondrial damage. Environmental Health Perspectives 111: 455-460.

Nitta, H. et al. 1993. Respiratory health associated with exposure to automobile exhaust. I. Results of cross-sectional studies in 1979, 1982, and 1983. Archives of Environmental Health 48:53-58.

OEHHA. 2000. Air Toxics Hot Spot Program Risk Assessment Guidelines: Part IV-Technical Support Document for Exposure Analysis and Stochastic Analysis. Office of Environmental Health Hazard Assessment.

OEHHA. 2002. Air Toxics Hot Spot Program Risk Assessment Guidelines: Part II-Technical Support Document for Describing Available Cancer Potency Factors. Office of Environmental Health Hazard Assessment.

OEHHA. 2003. Air Toxics Hot Spots Program Risk Assessment Guidelines: The Air Toxics Hot Spots Program Guidance Manual for Preparation of Health Risk Assessments. Office of Environmental Health Hazard Assessment.

OEHHA. 2005. Air Toxics Hot Spot Program Risk Assessment Guidelines: Part II-Technical Support Document for Describing Available Cancer Potency Factors. Office of Environmental Health Hazard Assessment. See especially the discussion of "Particulate Matter from Diesel-fueled engines" on pages B-426 to B-473. We hereby incorporate into the present comment letter and administrative record all of the scientific studies listed under "V. References" on pages B-466 to B-47

Ono, N. et al. 2008. Detrimental effects of prenatal exposure to filtered diesel exhaust on mouse spermatogenesis. Archives of Toxicology 82: 851-859.

Pearson, R.L. et al. 2000. Distance-weighted traffic density in proximity to a home is risk factor for leukemia and other childhood cancers. Journal of the Air & Waste Management Association 50: 175-180.

Pekkanen, J. et al. 2002. Particulate air pollution and risk of ST-Segment depression during repeated submaximal exercise tests among subjects with coronary heart disease: The exposure and risk assessment for fine and ultrafine particles in ambient air (ULTRA) Study. Circulation 106: 933-938.

Peters, A. et al. 2004. Exposure to traffic and the onset of myocardial infarction. New England Journal of Medicine 351: 1721-1730.

Pingkuan, D. et al. 2008. Diesel particulate matter health risk assessment for the West Oakland Community. Available at http://www.arb.ca.gov/ch/communities/ra/westoakland/westoakland.htm

Pope, C.A. et al. 2009. Fine-particulate air pollution and life expectancy in the United States. New England Journal of Medicine 360: 376-386.

Preller, L. et al. 2008. Occupational lung cancer risk among men in the Netherlands. Occupational and Environmental Medicine 65: 249-254.

Raaschou-Nielsen, O. et al. 2001. Air pollution from traffic at the residence of children with cancer. Am. J. Epidemiology 153: 433-443.

Reponen, T. et al. 2003. Concentration gradient patterns of aerosol particles near interstate highways in the Greater Cincinnati airshed. J. Environ. Monit. 5: 557-562.

Reynolds, P. et al. 2002. Traffic patterns and childhood cancer incidence rates in California, United States. Cancer Causes and Control 13: 665-673.

4

Reynolds, P. et al. 2004. Residential exposure to traffic in California and childhood cancer. Epidemiology 15(1): 6-12.

Ritz, B. and F. Yu 1999.The effect of ambient carbon monoxide on low birth weight among children born in southern California between 1989 and 1993. Environmental Health Perspectives 107: 17-25.

Ritz, B. and M. Wilhelm. 2008. Ambient air pollution and adverse birth outcomes: methodological issues in an emerging field. Basic & Clinical Pharmacology & Toxicology 102:182-190.

Ritz, B., et al. 2002. Ambient Air Pollution and Risk of Birth Defects in Southern California. American Journal of Epidemiology. 155: 17-25.

Room, R. et al. 2005. Alcohol and public health. Lancet  365: 519-530.

Roorda-Knappe, M.C. et al. 1998. Air pollution from traffic in city districts near major motorways. Atmospheric Environment 32: 1921-1930.

Ryan, P.H. et al. 2005. Is it traffic type, volume, or distance: Wheezing in infants living near truck and bus traffic. J. Allergy Clin. Immunol. 116(2): 279-284.

Salam, M.T. et al. 2008. Recent evidence for adverse effects of residential proximity to traffic sources of asthma. Current Opinion in Pulmonary Medicine 14: 3-8.

Samoli, E. et al. 2007. Short-term effects of carbon monoxide on mortality: An analysis within the APHEA project. Environmental Health Perspectives 115: 1578-1583.

Sanderson, E. et al. 2005. Human exposure to transport-related air pollution. Chpt. 3 in Health effects of transport-related air pollution. M. Krzyzanowski et al., eds. WHO. Available online at http://books.google.com/books?hl=en&lr=&id=b2G3k51rd0oC&oi=fnd&pg=PA85&ots=O42w8CCl8y&sig=eramASfbOxUX0loY0vns-0_4xDw#PPP3,M1.

Savitz, D.A. and L. Feingold. 1989. Association of childhood cancer with residential traffic density. Scand J. Work Environ. Health 15(5): 360-363.

Slama, R. et al. 2007. Traffic-related atmospheric pollutants levels during pregnancy and offspring's term birth weight: A study relying on a land-use regression exposure model. Environmental Health Perspectives 115: 1283-1292.

Smith-Warner, S. et al. 1998. Alcohol and breast cancer in women a pooled analysis of cohort studies. JAMA 279: 535-540.

South Coast Air Quality Management District. 2000. [SCAQMD 2000] Multiple Air Toxics Exposure Study in the South Coast Basin (MATES-II). March 2000.

http://www.aqmd.gov/matesiidf/matestoc.htm. See especially Appendix 1-A. List of toxic air pollutants.

Sram, R. J. et al. 2005. Ambient air pollution and pregnancy outcomes: A review of the literature. Environmental Health Perspectives 113(4): 375-382.

Steib, D.M. et al. 2002. Meta-analysis of time-series studies of air pollution and mortality: effects of gases and particles and the influence of cause of death, age and season. Journal of the Air and Waste Management Association 52: 470-484.

Sunyer, J. et al. 2003. The association of daily sulfur dioxide air pollution levels with hospital admissions for cardiovascular diseases in Europe (The Aphea-II study). European Heart Journal 24: 752-760.

Thomas, G. et al. 2007. Going one step beyond: A neighborhood scale air toxics assessment in North Denver (The Good Neighbor Project). Available at http://www.dot.state.co.us/Publications/PDFFiles/goodneighbor.pdf.

Timonen, K.L. 2006. Effects of ultrafine and fine particulate and gaseous air pollution on cardiac autonomic control in subjects with coronary artery disease: The ULTRA study. Journal of Exposure Science and Environmental Epidemiology 16: 332-341.

Toone, C. et al. 2007. A case-control analysis of exposure to traffic and acute myocardial infarction. Environmental Health Perspectives 115: 53.

Tran, H. et al. 2006. Appendix A. Quantification of the health impacts and economic valuation of air pollution from ports and goods movement in California. Available at http://www.scientificintegrityinstitute.org/GMERPAppA032106.pdf.

Transande, L. and G. Thurston. 2005 The role of air pollution in asthma and other pediatric morbidities . Journal of Allergy and Clinical Immunology 115(4):689-699.

Upadhyay, S. et al. 2008. Exposure to ultrafine carbon particles at levels below detectable pulmonary inflammation affects cardiovascular performance in spontaneously hypertensive rats. Particle & Fibre Toxicology 5: 19.

Valberg, P.A. and A.Y. Watson. 1996. Analysis of diesel-exhaust unit-risk estimates derived from animal bioassays. Regulatory Toxicology and Pharmacology 24: 30-44.

van Roosbroeck, S. et al. 2006. Long-term personal exposure to traffic-related air pollution among school children, a validation study. Science of the Total Environment 368: 565-573.

van Vliet, P. et al. 1997. Motor vehicle exhaust and chronic respiratory symptoms in children living near freeways. Environmental Research 74: 122-132.

Vedal, S. et al. 2003. Air pollution and daily mortality in a city with low levels of pollution. Environmental Perspectives 111(1) 45-51.

Venn et al. 2001. Living near a main road and the risk of wheezing illness in children. American Journal of Respiratory and Critical Care Medicine 164: 2177-2180.

Viala, A. 1994. Indoor air pollution and health: Study of various problems. Bulletin de L Academie Nationale de Med. 178: 57-66.

Vineis P, et al. 2006. Air pollution and risk of lung cancer in a prospective study in Europe. International Journal of Cancer 119: 169-174. http://dx.doi.org/10.1002/ijc.21801

Vinzents, P.S. et al. 2005. Personal exposure to ultrafine particles and oxidative DNA damage. Environmental Health Perspectives 113: 1485-1490.
von Behren, J. et al. 2008. Residential traffic density and childhood leukemia risk. Cancer Epidemiol Biomarkers Prev. 17(9): 2298-2301.

WHO. 2005. Health effects of transport-related air pollution. M. Krzyzanowski et al., eds. World Health Organization.

Wichmann, H.E. et al. 2000. Daily mortality and fine and ultrafine particles in Erfurt, Germany part 1: role of particle number and particle mass. Res. Rep. Health Eff. Inst. 98: 5-86.

Wilhelm, M. and B. Ritz. 2003. Residential proximity to traffic and adverse birth outcomes in Los Angeles County, California, 1994-1996. Environmental Health Perspectives 111: 207-216.
Wilhelm, M. and R. Ritz. 2005. Local variations in CO and particulate air pollution and adverse birth outcomes in Los Angeles County, California, USA. Environmental Health Perspectives 113: 1212-1221.

Wilhelm, M. et al. 2008. Environmental public health tracking of childhood asthma using California health interview survey, traffic, and outdoor air pollution data. Environmental Health Perspectives 116:1254-60.

Wilson, J.G. 2006. Spatial variability of intraurban particulate air pollution: Epidemiological implications and applications. University of Canterbury. Thesis.

Wilson, J.G. et al. 2005. A review of intraurban variations in particulate air pollution: Implications for epidemiological research. Atmospheric Environment 39: 6444-6462.

Wilson, W.E. and H.H. Suh. 1997. Fine particles and coarse particles: Concentration relationships relevant to epidemiologic studies. Journal of the Air & Waste Management Association 47: 1238-1249.

Windham, G. and L. Fenster. 2008. Environmental contaminants and pregnancy outcomes. Fertil. Steril. 89(2 Suppl):e111-6.

Zhou, Y. and J.I. Levy. 2007. Factors influencing the spatial extent of mobile source air pollution impacts: a meta-analysis. BMC Public Health 7:89. Available online at http://www.biomedcentral.com/1471-2458/7/89.

Zhu, Y.  et al. 2002. Study of ultrafine particles near a major highway with heavy-duty diesel vehicles. Atmospheric Environment 36: 4323-4335.

Zhu, Y. et al. 2002a. Concentration and size distribution of ultrafine particles near a major highway. Journal of Air & Waste Management Association 52: 1032-1042.

Zhu, Y. et al. 2007. In-cabin commuter exposure to ultrafine particles on Los Angeles freeways. Environmental Science & Technology  41: 2138-2145.