| Comments |
| --- |
| Source: Submittal    Document Number: 818    Name: Denver Auditor, Dennis Gallagher |

This side intentionally left blank.

## Responses to Comments

**V3** While time savings is part of the project's purpose, it is not the entire purpose. The purpose of the project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70.

Environmental justice considerations have been adequately addressed in the Final EIS. For information on impacts to the Environmental Justice communities and mitigation, please see EJ1 and EJ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**W3** The project team continues to use an extensive public involvement approach to communicate important project updates and allow the public to provide input on the EIS, cover amenities, and the alternatives under analysis in the EIS. For information on outreach for the project, please see OUT1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

Environmental justice considerations have been adequately addressed in the Final EIS. For information on Environmental Justice considerations, please see EJ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. For more information on Environmental Justice, see Section 5.3 of the Final EIS.

Discussions on greenhouse gases, which factor into climate change, are included in Section 5.10, Air Quality in the Final EIS.

| Comments | Responses to Comments |
|---|---|

**Source:** Submittal  **Document Number:** 818  **Name:** Denver Auditor, Dennis Gallagher

**W3**
mobility and accessibility for all. While I have heard CDOT tout its work on its public campaign for I-70, I request that CDOT demonstrate how it has addressed EPA's guidance.

Comment # 111: I request information on how CDOT has addressed climate justice, including reducing carbon and greenhouse gas emissions, transitioning away from fossil fuel reliance in moving people and goods, and ensuring that environmental justice communities are not disproportionately impacted by climate change.

**X3**
Comment # 112: I also request information regarding how residents of the environmental justice neighborhoods of Elyria and Swansea have been included in addressing the climate change impacts in their neighborhoods from CDOT's proposal?

**Y3**
CONCLUSION

CDOT's project focus needs to be first and foremost on making these environmental justice neighborhoods vibrant, healthy, and complete communities. Then how does a rehabilitated CDOT facility help to correct past damage and make Elyria and Swansea better places in which to live, work and play.

Comment # 113: To date, this process has been backwards – the environmental justice neighborhoods have been looked at as "clean slates" for CDOT engineers to come up with whatever moves cars. I request CDOT to reverse the process – by defining parameters that keep these environmental justice neighborhoods intact, and then have the engineers design a solution that fits within the neighborhood context, and results in better and healthier communities.

**X3** Discussions on greenhouse gases, which factor into climate change, are included in the Section 5.10, Air Quality in the Final EIS. The public has had the opportunity to provide feedback throughout the project on numerous topics, including climate change. For information on CDOT's public involvement, please see OUT1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**Y3** The purpose of the project is to implement a transportation solution that improves safety, access, and mobility and addresses congestion on I-70.

The concerns presented in this comment have been adequately addressed in the Final EIS.

For information on efforts to reduce the impacts from past actions, please see PA1 and PA2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on impacts in general as well as to the Environmental Justice communities, please see IMP1, EJ1, and EJ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

CDOT will continue to try to minimize impacts during final design and construction.

| Comments | Responses to Comments |
| --- | --- |
| Source: Public hearing transcript · Document Number: 275 · Name: Denver Auditor, Dennis Gallagher | |
| **A** I am opposed to the project, especially with 10 to 14 lanes plowing through Elyria, Swansea, and Globeville. In any language, most distressful at how socially, economically, environmentally negatively impacting these neighborhoods, the businesses, and especially the people. The cost is indefensible. I've been trying my best to talk common sense to the city and to the Colorado Department of Highways to lower the number of lanes. We don't need those lanes. And at today's price for an ounce of gold, I have figured you could pave the highway from Brighton Boulevard to Colorado Boulevard over 78 times at the same thickness we just paved the gold dome at the State Capital. And I want to promise you, I will not stand by while you crucify these neighborhoods on a highway of gold, to paraphrase William Jennings Bryan. We can do it. It's not too late, dear friends. It's not too late. We can do it. It's not too late to correct this mistake for a healthier neighborhood. But we've got to fight these too many lanes. We can do it. Let's do it. | **A** Comment noted. The justification of the number of lanes needed for the highway in the future has been discussed in the Final EIS. For information on widening the highway, please see GEN3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. |

EAR 0202

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 733 | Name: Globeville, Elyria, Swansea Organizers Group |
|---|---|---|

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**To: Colorado Department of Transportation**

This letter is an attachment to the list of mitigations and 185 resident signatures. This letter provides expanded justification for each mitigation based upon NEPA, Title VI, and Environmental Justice policy and law.

The expansion of I-70 as part of the I-70 East SDEIS will increase air pollution and noise pollution, reduce the ability to walk and bicycle safely on neighborhood streets, decrease connectivity to the rest of Denver, and displace homes and businesses, including food stores. The highway reduces neighborhood aesthetics and property values. Therefore, the following mitigations to the widening of I-70 must be made by CDOT and/ or the following amendments to the SDEIS must be made.

**AIR QUALITY**

**A**

The SDEIS does not conduct sufficient air quality analysis under NEPA. First, it does not analyze PM 2.5 or NO2, despite these being pollutants of concern for EPA. This is a very serious deficiency that must be rectified immediately through further analysis. Second, it does not analyze emissions or impacts beyond the year 2035, despite the fact that the project will most definitely endure beyond the year 2035.

**1.** Air monitoring before, during and after construction.

**B**

In order to protect the health of residents and school-children near the highway, CDOT must conduct monitoring prior to construction to establish baseline, during demolition and reconstructions, after construction for continued impact on air quality. Currently, CDOT only states it will monitor during construction. No baseline will be conducted, nor post-construction monitoring. Air pollution impacts from I-70 are of great concern to the communities adjacent to the highway currently, during its reconstruction period, and during its future operation. Suitable monitoring would provide real data to establish air pollution safety levels are maintained during construction and future operation and help assure the community that public health is protected. (AQ)

The SDEIS should indicate intent for an air quality monitoring station to be established at a nearby location as part of the project or it should offer that it could be done in collaboration with other governmental entities. Swansea School, location for previous CPDHE monitoring, may be a suitable location. Findings should be integrated with results from CDPHE's new 2nd near-road monitor on I-25 north of I-70.

Construction monitoring: Monitoring at Swansea School or elsewhere as appropriate during construction to ensure neighborhood protection against excessive levels of particulate matter (PM10 &/or PM2.5, as appropriate) including analysis/speciation for toxic metals content and/or other contaminants found to be present and against excessive off-road diesel emissions (NO2 and Black Carbon) from heavy equipment working on the project.

**2.** Monitoring all pollutants harmful to human health associated with the highway (full-spectrum monitoring) at Swansea School.

**C**

A monitoring station at Swansea School capable of providing information on a full suite of potential pollutants. This should be operational 6-12 months before construction to provide baseline; and monitor during construction into highway usage for the foreseeable future for the following parameters:

1

---

**A** Air Quality protocols were developed and agreed to by CDOT, FHWA, CDPHE, and EPA, and the Final EIS meets all the requirements of NEPA and the Clean Air Act. For more information on transportation-related pollutants, including PM2.5 and NO2, please see AQ2, AQ3, and AQ6 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**B** The concerns in this comment are adequately addressed in the Final EIS. For information on air quality monitoring and construction mitigation, please see AQ7, IMP4, and IMP7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**C** Early alert levels, or "triggers," are planned for the air monitors during construction to ensure that the contractor can implement BMPs or alter activities before any standards are exceeded. At this time, the early alert level planned is 15 ug/m3 below t

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 733 | Name: Globeville, Elyria, Swansea Organizers Group |
|---|---|---|

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

Air quality concerns are not limited to exposure to criteria pollutants. In addition to EPA criteria pollutants, there is danger from ultra-fine particulate matter has on the lungs of small children, and other pollutants. A robust monitoring program is necessary to protect the neighborhood. Add to the list of pollutants to be analyzed include:

- NOx (oxides of nitrogen);
- NO2 (nitrogen dioxide);
- PM2.5 (particulate matter 2.5 micrometers)
- PM10(particulate matter 10 micrometers)
- CO (carbon monoxide);
- Black Carbon (continuous monitored);
- BTEX (benzene-toluene-ethylbenzene-zylene);
- Ultrafine Particles or estimate thereof by correlation to Black Carbon;
- Meteorology.

**C**

The SDEIS should address the new primary annual PM2.5 NAAQS; review recent PM2.5 levels and forecast appropriate background levels of the project consistent with the revised PM2.5 NAAQS; and assess impacts of the project on maintaining PM2.5 attainment.

The statement that particulate matter is not a major component of emissions from gasoline-powered vehicles is misleading and does not recognize the significant negative impacts particulates and especially ultrafine particulate matters have on human health. Ultrafine particulate matter has negative health impacts. The main exposure is through inhalation where they are deposited in the lungs and have the ability to penetrate tissue or to be absorbed into the bloodstream. Although there is not a current federal standard for ultrafine particulates, over the past 30 years, a large body of scientific literature has emerged that provides evidence of associations between short-term and long-term exposures to ambient particulate matter and increased mortality and hospitalization from cardiovascular and respiratory diseases Motor vehicles, especially those powered by diesel engines have often been cited as a leading source of ambient UFP emissions and of human exposure. (Understanding the Health Effects of Ambient Ultrafine Particles, HEI Perspectives 3, January 13). The same report concludes that in urban areas, particularly in proximity to major roads, motor vehicle exhaust can be identified as the major contributor to UFP concentrations. Diesel vehicles have been found to contribute substantially, sometimes in disproportionate to their numbers in the vehicle fleet. (AQ)

3. Providing funds for a community-based organization to hire an air quality monitoring expert to report to and advise the community.

**D**

To assure residents of this Environmental Justice Community that best practices are being used to model, monitor and mitigate air quality impacts a third-party air quality monitoring expert responsible for a community-based organization must be retained. It is clear from CDOT's SDEIS, in which they did not analyze NOx or PM2.5, that an independent agency for public health and air quality must be hired by CDOT to assist the neighborhood in presenting their interests. (AQ)

4. Installing advanced air ventilation and filtrations systems at Swansea, Garden Place and home within 500 feet of highway. CDOT should continue to fund the maintenance and operational costs of these systems for the lifetime of the highway.

**E**

The most negative impacts occur within 500 feet of the roadway. To mitigate this impact Swansea School, Garden Place School and residents with 500 feet of the roadway must be provided air sealing, and advanced air ventilation and filtration systems with operational costs, maintenance and replacement as needed during the life of the highway. An energy efficiency program including retrofit of doors, window upgrades, insulation and sealing of the homes, and installation of heat recovery

2

---

**D**  CDOT will not retain a person as a third party monitor for air quality. For information on air quality monitoring, please see AQ7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on transportation-related pollutants, including PM2.5 and NO2, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**E**  For all alternatives in the Final EIS, CDOT will provide a new HVAC system, doors, and windows for Swansea Elementary to help mitigate the dust and noise expected during the construction period. The HVAC system will be designed to meet Swansea Elementary School's standards. CDOT will not provide operations and maintenance costs to the school for the system.

No air quality impacts from the project are expected at Garden Place Elementary because it is more than 500 feet from I-25 and I-70 and is located in a minimal construction area; see Section 5.10, Air Quality, of the Final EIS for more information on the analysis.

Mitigation specific to the Preferred Alternative will be to provide residents close to the highway construction—between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard—interior storm windows and two free portable or window-mounted air conditioning units with air filtration for dust and noise impacts during construction, and assistance for the potential additional utility costs during construction. CDOT will only provide operations and maintenance costs for the air conditioning units during the construction period.

For more information on air quality in the project area, please see AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 733 | Name: Globeville, Elyria, Swansea Organizers Group |
|---|---|---|

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**E**

ventilation within 500' and the two schools must be undertaken at no cost to the residents to reduce outdoor air infiltration.

The Garden Place School is not currently slated to receive any mitigation from CDOT. However, the school is within the impact area of both I-70 and I-25. The widening of I-70 which narrows again at Garden Place, will most certainly result in a bottle-neck at Garden Place school. The school has no air conditioning and the windows are left open many days, resulting in highway-related contaminants affecting the lungs of children on a daily basis. CDOT must air seal and install a filtration and HVAC system at the school to mitigate the increased air pollution caused by the bottle-neck that will negatively impact the students and teachers.

New heating, ventilation, air conditioning system, doors and windows to mitigate impact of the highway must be maintained by CDOT for the life of the project. The negative noise and air impacts do not cease when construction ends. Numerous near roadway studies and a 2013 large-scale review of air quality measures in vicinity of major roadways between 1978 and 2008 concluded that the pollutants with the steepest concentration of gradients in vicinities near roadways were CO, ultrafine particles, metals elemental carbon (EC), NO, NOx and several VOCs. The system installed must be sufficient to capture these pollutants. (Federal Register, Vol.78 No. 98, page 29837 quoting Karner, A.A; Eisnger, D.S.; Niemeier, DA (2010) Near-roadway air quality: synthesizing the findings from real world data. Environ Sci Tecl 44:5334-5335. (AQ)

**F**

**5.** Funding education programs about how to avoid contaminated air from entering homes and schools, which should be offered at least once per year, for the lifetime of the highway.

The life of this highway project is 100 years per CDOT's own admission ("Myths about the I-70 East EIS Project, CDOT publication"). The PM10 emissions will increase year by year every year of the project (SDEIS Air Quality Technical Report, Figure 9). Therefore, there must be on-going education for the school and other residents on how to protect themselves from exposure to highway pollutants. HVAC and filtration systems require proper operation and maintenance in order to work correctly. This education includes how to maintain these filters, how to operate doors and windows of the school, how to not open the doors and windows, especially during rush hour, etc. This education must be funded by CDOT every year during the life of the highway in order for the knowledge to be retained despite changes in school administration, home ownership, etc. (AQ)

**G**

**6.** Planting trees and other vegetation to up-take pollutants throughout the impact zone.

Trees and a healthy tree canopy provide long-term environmental, economic, and health benefits critical to vibrant and liveable cities. This includes benefits to improved air quality, especially in uptake of highway-related air pollutants. They also reduce urban heat island effect and result in energy savings. Installing vegetation on noise walls and other barriers will beautify the area, reduce vandalism and graffiti, and create a sense of ownership by community members towards their neighborhood and public property.

CDOT must work with City of Denver Urban Forestry and other organizations that implement and maintain vegetation and increase the tree canopy in the neighborhoods of GES, especially in those areas that can function as a buffer to the highway from the residential neighborhood. Consult with Denver Arts and Venues to create and maintain landscape and wall designs to enhance and beautify the area adjacent to the noise walls and other barriers  (DEV)

3

**F** CDOT will provide information to residents during construction regarding air quality and construction impacts as part of its public outreach process.

The MSAT and NAAQS air quality analysis performed for the Final EIS shows that overall emissions will decrease in the future because of improved mobility, reduced congestion, and cleaner vehicle emission standards. For more information on air quality, please see AQ3 and AQ6 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**G** CDOT plans to provide appropriate landscaping on the cover and reconstructed local roads to provide for an active community space for surrounding residents and neighborhoods, support social and pedestrian connections, and provide new space for the Swansea Elementary School.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 733 | Name: Globeville, Elyria, Swansea Organizers Group |
|---|---|---|

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**H**

**7.** Establishing triggers for immediate action if pollution levels are exceeded.

Triggers must be established for immediate action or additional mitigation when air quality reaches levels that pose any risk to human health. These trigger levels should be developed in collaboration with Denver Environmental Health and the community. (AQ)

**I**

**8.** To ensure that lead and arsenic are not disturbed and deposited in homes during the construction period, sampling for lead and arsenic in construction zones and homes should remediate any impacts by cleaning-up contaminated homes to state standards.

Sample air for lead and arsenic in the construction zone. If the daily average air samples exceed 1.5 microgram/m3 for lead, work stops and work practices should be altered to minimize dust. An action level for arsenic should be defined as well.

Lead must be included as a pollutant to be analyzed. Although lead from on-road vehicles is not a pollutant of concern there are other sources of lead, as well as arsenic, in this area as a result of past industrial activity and the lead deposited during I-70's long history.

Test window sills and window troughs for lead dust of homes nearest to construction site (1st and 2nd row of homes) where dust is being disturbed. If lead dust levels are above HUD residential standards, test next row of homes to identify how far the lead dust travelled. Homes that have been contaminated with lead dust should be cleaned to below lead dust clearance standards as per state regulation. (HEA)

**J**

**9.** Reducing the footprint of the highway by narrowing lanes and reducing lanes between Colorado Blvd and Brighton.

To protect the health of the neighborhood the footprint of the highway must be reduced. This can happen in a number of ways – narrowing lane, reducing number of lanes, providing east-west connectivity at other locations, removing on/off ramps by closure of Steele/Vasquez as proposed.

The basic option expands the footprint to within 65' of Swansea school. Many studies have demonstrated the adverse health impacts to those living within 500' of a major roadway. CDOT must demonstrate that expanding the edge of I-70 155 feet and the outside of 46th Ave 195 feet closer to the school will not have a negative health impact or fully mitigate this impact. (WID)

**K**

**10.** Providing alternative for trucks between 52nd and Vasquez at further north. Discouraging truck and all traffic out of the neighborhood by eliminating traffic out of the frontage roads and neighborhood streets. Especially near Swansea School.

What alternatives for improving local mobility were considered – routing truck traffic, improvements to local street network, additional transit in the corridor (beyond FasTracks)? (TT)

**L**

**11.** Studying the impact on community health and the environment of building full interchange at Colorado Blvd and removing Vasquez interchange.

Moving highway access at Steele St/Vasquez as proposed in the Modified Option of the Partial Lower Covered Alternative to a full interchange at Colorado Blvd. bears significant further study. It is believed that this action will reduce congestion and accidents attributed to having two interchanges within one-half mile of each other. It will also reduce the footprint of the project and proximity by removing auxiliary lanes. This is an important step to reduce air quality impacts. However, it is not known how the impact trucks will have if this action is followed. Therefore, further study is needed.

4

**H** Early alert levels, or "triggers," are planned for the air monitors during construction to ensure that the contractor can implement BMPs or alter activities before any standards are exceeded. At this time, the early alert level planned is 15 ug/m3 below the standard. For more information on air quality monitoring, please see AQ7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**I** This concern is adequately addressed in the Final EIS. For information on CDOT's plans for encountering hazardous materials within the project area, please see IMP6 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**J** The need for widening the highway has been adequately discussed in the Final EIS. For information on the need for 10 lanes, please see GEN3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. CDOT continues to look for ways to reduce the overall width of the highway while safely maintaining the necessary 10 lanes.

**K** Truck traffic was adequately addressed in the Final EIS. For more information on restricting truck traffic, please see TRANS8 and TRANS9 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**L** The Supplemental Draft EIS included analysis of the impacts of such an interchange, described in the document as the Partial Cover Lowered Alternative Modified Option. However, a split-diamond interchange is proposed for both of the Final EIS Build Alternatives. A split-diamond interchange is used where local streets are too close to each other to allow for safe operations of the entrance and exit ramps. Ramps are combined and a one-way frontage road is used between the local streets. Both Denver and Commerce City have requested that access to I-70 at both Steele street/ Vasquez Boulevard and Colorado Boulevard remain, and the impacts of the interchange described were analyzed. Specific truck routes can be coordinated with Denver to ensure impacts to the local neighborhoods are minimized.

The concerns presented in this comment have been adequately addressed in the Final EIS. For more information on truck traffic impacts on adjacent neighborhoods, please see TRANS9 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on air quality impacts on local residents, please see AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on noise impacts on adjacent neighborhoods after construction, please see IMP3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on Environmental Justice considerations, please see EJ1 and EJ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

**Source: Submittal**   **Document Number: 733**   **Name: Globeville, Elyria, Swansea Organizers Group**

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**[L]** The partial covered lowered Alternative Modified Option pushes the north edge of the highway 150 feet into the neighborhood. This must be mitigated and footprint narrowed to protect health of neighborhood and reduce air quality and noise impacts. The design variations in exhibits 3-24 and 3-25 do not achieve these results.

Elimination of the highway access at Steele/Vazquez should be pursued with our without a second cover. As discussed earlier, it is the right move for the air quality and noise mitigation. In addition, it is the only alternative that results in developable land. More development opportunities are achieved with the cover, however, approximately 20 acres of land will be available without the cover. The design variations in 3-24 and 3-25 do not achieve this result. They also deter pedestrian use.

CDOT has indicated (although it is not reflected in the SDEIS) the interchange will not be closed to accommodate truck traffic. How will keeping the interchange open for truck traffic benefit the residents? What is the anticipated traffic count for trucks? What is the analysis of impact on air quality? Will residents of an environmental justice community see a further deterioration in air quality and negative noise impacts? Is there an analysis of impact of providing trucks improved access to Colorado Blvd. on other streets? (VAS)

**[M]** **12.** Limiting truck access to I-70 and instead send trucks out of the inhabited areas by using signage and enforcement to route through trucks on to 270 & 76.

Semi-trucks are the biggest polluters. They should be routed away from the highly populated Globeville, Elyria, Swansea and Denver neighborhoods and re-directed into areas along 270 & 76 that are sparsely populated. The EIS does not consider viable alternatives to reduce air quality impacts, specifically, routing heavy truck traffic onto alternative highways to avoid the negative impact of these polluting vehicles on the health of residents living close to I-70. This is a failure to consider alternatives and mitigation strategies that can improve the health status of the communities, and that will at least be adequate to avoid any violations of the NAAQS for PM2.5 and NO2.

In addition to the alternatives and mitigation options discussed in EPA's 2008 comment letter, we believe that two alternatives should be considered to minimize emissions and pollutant exposures in the GES neighborhoods:

1) Re-signing I-70 to route the 40% of traffic that is "through" traffic out of the GES neighborhoods where dense urban development and elementary schools are located within a few hundred meters of I-70 onto I-76 and I-270; and

2) Routing all truck traffic off of the current alignment between Washington Street and Colorado Blvd which would require through truck traffic to use I-76 and I-270, and local truck traffic to disperse on local streets leading to their local destination rather than concentrating on the current alignment next to schools and houses along the highway. (TT)

**[N]** **13.** Establishing truck routes for local delivery and enforce them, limiting trucks on neighborhood streets and near schools.

The SDEIS should include working with the City of Denver Community Planning and Development department to coordinate and financially support of the implementation of improvements of truck routes away from residential areas. The EIS should include creating signage to discourage trucks coming into neighborhood on edges of residential streets, and agree to develop a good neighbor agreement during the construction period to define truck routes. Street design should be employed to encourage trucks to use proper routes and avoid residential and sensitive areas.

5

**[M]** CDOT conducted a heavy vehicle study to determine how many heavy vehicles travel between I-270 and I-76 in a continuous journey. Through heavy vehicles represent less than three percent of the average. For more information on restricting truck traffic along I-70, please see TRANS8 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**[N]** Truck traffic was adequately addressed by the Final EIS. For information on truck traffic impacts on adjacent neighborhoods, please see TRANS9 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

**Comments**

Source: Submittal   Document Number: 733   Name: Globeville, Elyria, Swansea Organizers Group

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

This is required because the highway is in large part the cause of the industrial nature of portions of the neighborhood. As the Health Impact Assessment done by the City of Denver in 2014 states, "The highway access brought more industrial activity into GES neighborhoods. Combined, the highway and industry resulted in increase public health risk due to decreased in air quality." (TT)

**14.** Paying for improvements to doors and windows of all homes, schools, and businesses within 500 feet of the highway within the study area. It is not sufficient to facilitate loans instead of paying for the improvements.

Construction-related traffic, light, glare, and noise will result in increased exposure to pollutants and stress factors in this environmental justice community for several years (5.2-29). The SDEIS also points out that diesel particulate matter is the primary Mobile Source Air Toxic (MSAT) of concern and that these are emitted from heavy diesel vehicles, such as freight/delivery trucks and construction equipment (p.5.10-3 sidebar). Exhibit 5.10-24 says that MSAT emissions could increase during construction.

In order to protect the health and safety of residents of this environmental justice community, CDOT must pay for improvements to doors and windows, home air sealing, and install ventilation and filtration systems with heat recovery, on all homes that are within 500 feet of the existing highway and within 500 feet of the widened highway in the study area. CDOT must also assist with operating costs for the installed systems.

There is significant concern that the construction vibration will damage the foundations of structures near the highway. CDOT must analyze the condition of these foundations prior to the beginning of construction, and reimburse owners for damage occurred due to construction.

Due to the low income nature of the community, providing loans will not be adequate because community lacks the resources to pay back loans. Therefore, residents will not install these protection measures on their houses because they cannot afford it. If CDOT does not pay for these improvements, then residents will suffer from these stressors and pollutants without mitigation.

Standard construction measures to control fugitive dust, storm water erosion and sediment controls to minimize spread of contaminated soil will be inadequate. The top priority is the health and welfare of residents. CDOT needs to commit to going beyond regulatory minimums to protect the residents. Elyria-Swansea community is 44% low income households, Globeville is 53% low income households (Environmental Justice Technical Report, EIS). According to the 2000 Census, 26.24% of Elyria Swansea families live in poverty, and 19.8% of Globeville families (www.piton.org). It is unreasonable for CDOT to state in the EIS that residents will pay for these improvements themselves or receive and payback loans. (OTH-ECON)

**RELOCATION / HOUSING**

**15.** Homes that were not 500 feet from I-70 before the widening, but become 500 feet from I-70, should be given re-location assistance.

The SDEIS does not deal with relocation options for residents within the 500 feet (45 - 47th Street) of the project who will be impacted by air, diminished property value, etc.; particularly those impacted as the highway moves towards them. (PROP)

6

**Responses to Comments**

**0** CDOT is proposing mitigation that is above and beyond the minimum requirements and above and beyond what is normally included in CDOT projects. For information on project mitigation measures, please see IMP1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. For information on Environmental Justice considerations, please see EJ1 and EJ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

Mitigation specific to the Preferred Alternative will be to provide residents close to the highway construction—between 45th Avenue and 47th Avenue from Brighton Boulevard to Colorado Boulevard—interior storm windows and two free portable or window-mounted air conditioning units with air filtration for dust and noise impacts during construction, and assistance for the potential additional utility costs during construction.

CDOT will provide new doors, windows, and HVAC system to Swansea Elementary School to minimize impacts from dust and noise during construction. For more information, see IMP4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

This project will abide by the appropriate city codes as they pertain to construction noise and vibration. If noise levels during construction are expected to exceed the limits from the city codes, the contractor must obtain the necessary ordinance variance, which typically includes additional mitigation measures. See the Final EIS, Attachment K, Traffic Noise Technical Report, under Section 6.4, Construction Noise, for further information.

For more information on dust impacts during construction, please see IMP7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For more information on noise impacts during construction, please see IMP8 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. For information on noise after construction, please see IMP3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on hazardous materials considerations during construction, please see IMP6 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For a full list of proposed mitigation measures for the Preferred Alternative, please see Chapter 9 of the Final EIS.

*Responses continue on the following page.*

| Comments | Responses to Comments |
|---|---|

Source: **Submittal**    Document Number: **733**    Name: **Globeville, Elyria, Swansea Organizers Group**

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**P**

SDEIS should provide relocation for residents who will be living within 500 feet of the highway, or provide other mitigation options such as window/door/HVAC ventilation replacement if they decide to stay. (PROP)

**Q**

**16.** Replace affordable housing with a 3:1 ratio. The SDEIS currently states 'replace some housing lost.' This is because you are replacing single-family housing with multi-family housing. Multi-family housing has higher density.

CDOT should include three for one (3:1) replacement housing for the number of units to be lost under the I-70 reconstruction in order to make the neighborhood viable. The neighborhood's viability was diminished during the initial I-70 construction and will be further diminished with the planned loss of additional housing units under any proposed option. Due to the lack of sufficient redevelopment opportunities for single-family homes, the replacement housing needs to be more dense multi-family development which will provide enough scale to protect the neighborhood's viability and also offer more affordable replacement housing options. All replacement housing should be at least 500 ft from the highway to protect the health of the occupants. (DEV)

**R**

**17.** Keep people in the neighborhood. Provide money for housing improvements to retain home-owners.

A large portion of Denver's low income and minority residents live within 500' of the area heavily impacted by the I-70 East reconstruction. This project must not negatively impact these residents' health, quality of life, or economic investment. All residents living within 500' of the highway reconstruction should have access to affordable home repair and improvement opportunities. Qualified housing improvements should increase air quality, noise reduction, affordable housing preservation, and resident retention rate. (PROP)

**AMENITIES**

**18.** New recreation center.

**S**

The DEIS mentions that diesel particulate matter is the greatest toxic concern emitted from heavy diesel vehicles and that these emissions could increase during construction (p.5.10-3 sidebar and Exhibit 5.10-24). Given the current conditions of air pollution in the area and the increase of air pollution that could stem from the construction, a regional recreation center would be beneficial for the community in that it would serve as a healthy option for residents to partake in physical exercise. A regional recreation center is recognized by the community as a mitigation effort for I-70, providing a space for residents and local employees to engage in physical activity that they would not necessarily be able to do on the streets due to the broken connectivity, traffic, and air pollution.

A new regional recreation center should be built in Elyria-Swansea to provide a space indoors with clean air for physical activity. The price of the Regional Rec Center should be affordable for all residents, and the opening of the center should not result in the closing of centers in nearby neighborhoods. (DEV)

**T**

**19.** New library

A library is another amenity that can serve as an outlet for residents to engage in activities that can help stimulate the mind while staying indoors to avoid the pollution. (DEV)

7

**P**   There are no significant impacts that are associated with the project itself that would justify this mitigation. This would be an expensive measure that would impair neighborhoods rather than improving them by displacing more people than the bare minimum necessary to safely meet the purpose and need. For information on relocation of residences that will not be acquired by the project, please see PROP4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**Q**   Funding will be provide to offset the loss of some residential units in the neighborhood. For more information on the replenishment of housing stock in the impacted neighborhood, please see PROP3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**R**   Adequate impact and mitigation analysis is included in the Final EIS. For more information on dust and noise during construction, please see IMP7 and IMP8 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The concerns regarding air quality have been adequately addressed in the Final EIS. For information on air quality and health, please see AQ1 through AQ6 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**S**   CDOT is not planning to include a regional recreation center as mitigation to the I-70 East project. There is currently a recreation center in the neighborhood and after construction, there will be additional community recreational space on the cover.

The concerns regarding air quality have been adequately addressed in the Final EIS. For information on air quality and health, please see AQ2 through AQ6 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**T**   CDOT is not planning to include a new library as mitigation to the I-70 East project. There is a library nearby and it is not being impacted by the project.

| Comments | Responses to Comments |
|---|---|
| Source: Submittal   Document Number: 733   Name: Globeville, Elyria, Swansea Organizers Group | |

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**U** **20.** New health center

There is a lack of Health-Wellness facilities in Globeville Elyria and Swansea and insufficient services for Medicaid/Medicare recipients. Facilities used in this regard are South of I-70 and residents will be challenged to get to these facilities, particularly during construction.  Provide or help establish a health and wellness center in Elyria-Swansea; partnering with health partners in the neighborhood and Denver Health.   (HEA)

**21.** New grocery store / Food Retail Space

The DEIS in 5.3.17 states that "Both options of the Partial Cover Lowered Alternative impact two local food markets: Stop N Shop and the Pilot Travel Center (numbers 3 and 5 in Exhibit 5.3-7). The neighborhoods along the corridor with a high concentration of low-income or minority populations are currently underserved by food retailers. The displacement of any community markets by the project alternatives will negatively impact the residents in the area. As stated in the EIS, because these stores are adjacent to the highway on the south side, The El Tepetate Market and El Rinconcito Mini Market do not have to be relocated with any options of the Partial Cover Lowered Alternative. Even though the total number of markets available to the Elyria and Swansea Neighborhood is reduced, this alternative avoids displacing the two markets that cater to the minority population in the neighborhood."

**V** However, this fails to mention that the 5-year construction period will significantly reduce resident access to El Tepetate and El Rinconcito by residents on the north side of the highway for 5 years. Even if CDOT provides signage, etc., this will not mitigate the closing of north-south connections. In addition, it may result in the closing of these stores which will have a longer than 5-year impact on the community. CDOT must therefore provide a food retail space of equal or greater square footage, as well as seed funding to establish food retail, for the neighborhood to mitigate the negative outcome of limiting access and driving out of business of the existing food stores that the community relies on for healthy food access. This retail space must be easily accessible by foot, bike, and bus throughout the construction process, and should be made available to resident-run businesses first. (DEV)

**W** **22.** Not doing construction during school hours

A deficiency of the SDEIS is that it does not analyze the noise impacts of the construction process. The entire noise analysis in section 5.12 concentrates on traffic noise. However, the project will be built over a period of five years, within 50 feet of Swansea Elementary School and many houses. What will be the noise impact during construction? This must be analyzed in the SDEIS. If noise will be increased, it must be mitigated. For example, construction can be limited during school hours or sleeping hours, depending on the sensitive use and the results of the analysis. (CONST, SES)

**X** **23.** Noise – post-construction.

Section 5.3.17 states that "Results of the analysis show that the Partial Cover Lowered Alternative will cause noise to exceed the NAC at various locations, including Swansea Elementary School." Therefore, the noise control elements must be paid for to be maintained for the length of the project. The PCL Modified Option will require aesthetically pleasing sound walls (with neighborhood input) that will also mitigate air quality emissions impacts from the increased traffic on I-70.  This should not be left to a study to determine if they are needed or not.  The concern is that it will be pushed to a back burner and become another unfulfilled promise made to the community.  (NOI)

**Y** **24.** Do not exceed the maximum NAC (noise) threshold.

In the City of Denver's Health Impact Assessment for the Neighborhood Plans, PG 15-16 Existing noise levels from traffic in areas near I-70, extending from Brighton Blvd east to Colorado Blvd, exceed the 55 decibels noise level EPA believes is an annoyance that can interfere with daily activities.    Long-term

8

**U** CDOT is not planning to include a health center as a mitigation to the I-70 East project. CDOT will ensure that access is maintained to the extent possible and advanced notifications are provided to residents and travelers of any detours or closures.

**V** CDOT will provide funding to existing programs that may facilitate access to fresh food. In addition, the project will provide a robust and context sensitive communications and outreach plan throughout construction to ensure residents and travelers are kept informed of detour information in advance. CDOT will also ensure access is maintained to the extent possible.

**W** CDOT has been working with DPS to develop construction mitigation measures for Swansea Elementary School. For more information on how construction impacts to Swansea Elementary School will be mitigated, please see IMP4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The concerns regarding construction noise have been adequately addressed in the Final EIS. For information on noise during construction as it pertains to residents, please see IMP8 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**X** The Final EIS adequately addresses possible noise mitigation. For more information on how traffic noise will be minimized after construction, please see IMP3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

All mitigation measures listed in the ROD will be implemented because it is a legally binding document.

**Y** Noise analysis was conducted within CDOT's Noise Analysis and Abatement Guidelines. For more information on how traffic noise will be minimized after construction, please see IMP3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

CDOT is working with Denver and the community on the aesthetic designs for various elements of the project, including noise walls. This coordination and feedback will continue throughout design.

| Comments | Responses to Comments |
|---|---|

Source: **Submittal**   Document Number: **733**   Name: **Globeville, Elyria, Swansea Organizers Group**

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**Y**

exposure to moderate levels of noise can adversely affect sleep, school and work performance, and increase risk of cardiovascular disease. According to the World Health Organization (WHO), an annual average night noise level exceeding 40 decibels outdoors is recommended for restful sleep and adverse effects of chronic noise exposure on children's ability to learn. Stress from noise affects biological risk factors such as blood pressure, fats and sugar levels, blood flow and other biological activities.   *Denver Environmental Health (DEH) requested a noise study at the Swansea Recreation Center and Park in 2011, as part of the evaluation for improvements at the site. Results of this study indicated that the main sources of noise are Train Horns, Train engines, Various Industrial metal working operations, and Interstate 70 located approximately 1,800 feet to the south.  The average noise levels were approximately 55 decibels.

CDOT must work in collaboration with the City of Denver to design and implement mitigations to noise in a fashion that do not further hinder the character, cohesion, visual integrity and aesthetic quality of the neighborhood (NOI)

**25.** Business development fund. Housing fund. Maintenance fund. Cap maintenance fund. (NOLA)

**Z**

In the interest of empowering relocated businesses and Area Residents to create and pursue their own business initiatives and entrepreneurship (to replace and expand existing businesses) CDOT should detail the resources and assistance necessary and work with CCD OED to leverage possibilities for resources to support business or creative ventures in the development areas. These should include technical assistance/capacity building, a Business Center (with computer lab, internet, faxing, etc.), Small Business Development, Micro Loan Program, Business Incubator, Historically Underutilized Business Zones (HUBZone) and Arts Incubator. (DEV)

**26.** Art funds go to local organizations or agencies, not to CDOT.

**A1**

Local organizations and residents have a better knowledge than CDOT of the type of art needed and desired in the community. It is requested that the process of selecting art be in the control of local entities, not CDOT. This is to be funded by CDOT as part of the mitigation for aesthetic impacts of the project. (DEV)

**NEIGHBORHOOD CONNECTIVITY**

**27.** Making sure trucks and traffic are not diverted onto neighborhood streets during construction and after the reconfigured Interstate opens. There should be an alternative route for trucks between 52nd and Vasquez, to divert them onto Colorado Boulevard and away from the neighborhood.

**B1**

The DSEIS points out that diesel particulate matter is the primary Mobile Source Air Toxic (MSAT) of concern and that these are emitted from heavy diesel vehicles, such as freight/delivery trucks and construction equipment (p.5.10-3 sidebar). Exhibit 5.10-24 says that MSAT emissions could increase during construction. Chapter 4 (p. 4-27) says that the Build Alternatives will improve highway freight transport through and into the study area and that future truck and delivery routes may require alteration or additions based on unknown future needs. Given this environmental justice community efforts need to be made to limit MSAT pollution (Attachment F, p. 2). (TT, CONST)

**C1**

**28.** Discouraging traffic on the frontage roads from using neighborhood streets as short cuts, especially near Swansea Elementary School. Some drivers may be tempted to use neighborhood streets to avoid traffic problems on the Interstate when construction commences. Making sure this does not happen must be a top priority. This is a crucial issue for neighborhood livability and to protect children as they walk to and from school.

9

**Z** Projects that use US DOT funds are subject to the requirements of CDOT's OJT Program. The OJT Program requires that contractors provide training hours to meet or exceed a goal set for the project. The contractor must operate under a training program approved by FHWA. Though the program is open to all, trainees are to be recruited among women and minorities as available according to census data.

In addition to the requirements of the CDOT OJT program, CDOT is developing a strategic approach to preparing and creating opportunities for individuals in the local communities to obtain employment on the project. CDOT is currently collaborating with local workforce centers to determine how CDOT might be able to leverage existing resources to maximize workforce development in anticipation of the project. The contractor will be expected to comply with and develop innovative approaches to the development of the local workforce.

CDOT is committed to providing mitigation to local businesses impacted by the project listed in Exhibit 5.23-5 of the Final EIS, such as providing:
--targeted assistance to encourage businesses that are crucial to low-income and minority populations to find new locations in the same neighborhoods
--funding to CRHDC to assist business owners with financial counseling and funding for replacement property, and securing business loans.

For more information on the contractor's hiring requirements, please see GEN5 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**A1** CDOT will not use any art funds as sources of funds to construct the project. CDOT is working with Denver and the community on the aesthetic designs for various elements of the project, including noise walls. This coordination and feedback will continue throughout design.

**B1** Truck traffic is adequately addressed in the Final EIS. For information on truck traffic impacts on adjacent neighborhoods, please see TRANS9 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The concerns regarding air quality have been adequately addressed in the Final EIS. For information on air quality, please see AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**C1** Traffic control plans will be developed in the next phases of the project. CDOT will coordinate with Denver for development of the plans. Safe access will be maintained throughout the project. Advanced notification of detours or closures will be provided to residents and travelers.

CDOT cannot modify truck routes on city streets. For information on truck traffic in neighborhoods, please see TRANS9 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 733 | Name: Globeville, Elyria, Swansea Organizers Group |
|---|---|---|

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**C1**

The DSEIS points out that during construction, traffic disruptions will interfere with access to homes, businesses, and public services, such as the Swansea Elementary School, the Johnson Recreation Center, and the Valdez-Perry Library. Construction-related traffic, light, glare, and noise will result in temporary effects on neighborhood character and cohesion for several years (5.2-29). The DEIS also points out that diesel particulate matter is the primary Mobile Source Air Toxic (MSAT) of concern and that these are emitted from heavy diesel vehicles, such as freight/delivery trucks and construction equipment (p.5.10-3 sidebar). Exhibit 5.10-24 says that MSAT emissions could increase during construction. In order to protect the health and safety of residents of this environmental justice community, it must be a top priority to discourage traffic from I-70 and on the frontage roads from using neighborhood streets as short cuts.

The two covered lids in the PCL Modified Option significantly assist in providing neighborhood cohesion, but this only works if the Vasquez interchange is closed and utilizes 46th Avenue Service on the South side of I-70 and 46th Avenue Service Road north of I-70 from Colorado to Vasquez, 48th and 50th Avenues are utilized to connect local business traffic to Vasquez from Colorado Blvd. This may require lighting enhancements at these intersections on Colorado Blvd. Truck signage may also be needed to keep truck traffic out of the neighborhood. This option will also reduce truck traffic from the Swansea and Elyria Neighborhoods. (TT, SES)

**D1**

**29.** Funding the construction of sidewalks, bike paths and other amenities that can help better link residents to their neighbors. Elyria-Swansea has long suffered from a lack of connectivity within the neighborhood and with adjacent neighborhoods due to the highway.

The DSEIS points out in 5.3.17 that "Widening and other improvements to I-70 increase the presence of a physical barrier in all the neighborhoods along the corridor… With [The Partial Cover Lowered Alternative], the highway is less visible, but the wider highway still remains a barrier in the Elyria and Swansea Neighborhood."

The DSEIS points out that since its initial construction in the 1960s, the presence of I-70 has disrupted neighborhood cohesion in Elyria and Swansea by bisecting the neighborhood (p.5.2-29). The building of I-70 in the 1960s, prior to NEPA, was done without any public environmental review and as a result it was completed with little consideration for protecting local social and health conditions. As a consequence, it is clear that the surrounding communities have suffered significant ongoing negative impacts. The PCL alternative does not increase neighborhood cohesion as there are no more north-south crossings than currently exist nor a proposal to improve east-west cohesion. All the Build alternatives remove the York Street interchange, which requires drivers to use local streets to gain access to and from I-70 at adjacent interchanges (5.2-36). CDOT needs to do more than just recognize the current problems in the area; they need to see this project as an opportunity to rectify harms done to the community by the original implementation of I-70 as well as prevent further negative impacts as a result of the proposed improvements. Rectifying past harms in cohesion could in part be addressed by the construction of sidewalks, bike paths and other amenities that can help better link residents to their neighbors.

The construction of I-70 caused immediate and long-term harm to the neighborhood by making it difficult for residents to move around, especially on foot. I-70 made it unpleasant and even unsafe to walk from one part of the neighborhood to another. The Federal Highway Act of 1970 states that all projects must "take into account the effects of a project on community cohesion." The 1994 Executive Order 12898 states that all projects must "address disproportionately high and adverse human health and environmental effects of its programs, policies and activities on minority populations and low-income populations." The population of Elyria and Swansea is majority Latino and low-income.

Exhibit 4-3. Existing north-south connectivity from Brighton Boulevard to Colorado

10

**D1**   The reason that CDOT proposed the Partial Cover Lowered Alternative was to mitigate the impacts of the project by reconnecting the community across the highway in response to community concerns. For more information on walkability and bicycle routes improvement and connectivity, please see TRANS2 and PA9 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

Source: Submittal   Document Number: 733   Name: Globeville, Elyria, Swansea Organizers Group

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**D1**

Boulevard, is mis-leading. It omits certain North-South streets from the list of streets providing connectivity because they dog-leg under the viaduct and are not straight. However, this is misleading because although they dog-leg, they can be taken by a traveler as a method to cross the highway. After the preferred alternative is built, these streets will no longer be able to be traveled on to cross the highway. By presenting this information in this misleading way, CDOT is able to manipulate the data to imply there will not be a major loss of connectivity. This is misleading.

Mitigation must provide residents with the opportunity for community interaction and community cohesion, to make up for the loss of these qualities due to the presence of I-70. The construction of new and expanded sidewalks in the neighborhood is crucial to linking the neighborhood together and creating community cohesion. The neighborhood lost much of its pedestrian infrastructure when I-70 was built, and it is essential that this infrastructure is replaced to protect the health and well-being of residents. (OTH-CONNECTIVITY)

**ECONOMIC CONDITIONS**

**The social and economic cohesion and vitality of the neighborhoods must be addressed through fair and just Apportionment; CDOT must define clear pathways that allow residents to compete for jobs, and business and education opportunities.**

The DEIS does not sufficiently address the disruption and destruction to neighborhood economic cohesion and vitality caused by all Project Alternatives. Under Federal policy, Environmental Justice states that if a program, policy, or activity will have a disproportionally high and adverse effect on minority or low-income populations, that program, policy or activity may only be carried out if further mitigation measures or alternatives that would reduce the disproportionally high and adverse effects are not practicable. In determining whether a mitigation measure or an alternative is "practicable," the social, economic (including costs) and environmental effects of avoiding or mitigating the adverse effects will be taken into account.

**E1**

Executive Order 12898 renewed the emphasis on Title VI adding low-income and minority populations to those protected in the principles of Environmental Justice. One of these fundamental principles at the core of Environmental Justice is to avoid, minimize, and mitigate disproportionately high and adverse human health and environmental effects, including social and economic effects on minority and low income populations. The NEPA process includes consideration of actions that could disrupt or destroy the social fabric of a community or sense of place. This specifically includes the destruction or disruption of community cohesion or a community's economic vitality.

The DEIS does not offer significant or appropriate economic mitigation and ignores the neighborhood's high percentage of historically disadvantaged residents. To initiate significant and meaningful impact, the EIS should look to strong legal precedence to commit to ½ Percent Minimum Apportionment from the entire Project Budget to a Business Development Fund designed to benefit residents and businesses in target areas.

CDOT should also define clear pathways for residents to compete for jobs, business and education opportunities. CDOT must guarantee a commitment to mitigate these economic conditions including but not limited to receiving a vote of approval from a policy group of residents recruited from neighborhood coalitions and community groups on decisions including but not limited to language used and published in the Project's RFQ and RFP.

11

**E1** Projects that use US DOT funds are subject to the requirements of CDOT's OJT Program. The OJT Program requires that contractors provide training hours to meet or exceed a goal set for the project. The contractor must operate under a training program approved by FHWA. Though the program is open to all, trainees are to be recruited among women and minorities as available according to census data.

In addition to the requirements of the CDOT OJT program, CDOT is developing a strategic approach to preparing and creating opportunities for individuals in the local communities to obtain employment on the project. CDOT is currently collaborating with local workforce centers to determine how CDOT might be able to leverage existing resources to maximize workforce development in anticipation of the project. The contractor will be expected to comply with and develop innovative approaches to the development of the local workforce. For more information on the contractor's hiring requirements, please see GEN5 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The concerns regarding environmental justice have been adequately addressed in the Final EIS. For information on Environmental Justice considerations, please see EJ1, EJ2, and EJ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

EAR_0213

| Comments | Responses to Comments |
|---|---|

**Source:** Submittal   **Document Number:** 733   **Name:** Globeville, Elyria, Swansea Organizers Group

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**F1**

**30.** There must be clear pathways and strong incentives in order to engage residents in job and education activities

The DEIS does not sufficiently address economic mitigation of the neighborhoods as defined by Environmental Justice. CDOT has not defined or engaged culturally appropriate outreach with diverse populations of the neighborhood. CDOT must define and develop clear pathways that allow residents to compete for jobs, business and education opportunities. CDOT, Contractors and Subcontractors should build strong relationships with a policy council that includes residents, coalition members, and community groups.(OTH-ECON)

**31.** Creation of a Business Development Fund

In order for mitigations to have real economic impact, CDOT should commit 1/2 Percent Minimum Apportionment from the entire Project Budget. This Apportionment should fund Education opportunities for residents, and the creation of a Business Development Fund, including a Job Development Center in the neighborhood.  (OTH-ECON).

**32.** Retaining and creating jobs

The DEIS does not appropriately address retaining and creating jobs. CDOT estimates the total jobs created to build the project range from 4,400 for the No-Action Alternative and 14,800 jobs for the Partial Cover Lowered Alternative. The DEIS states that CDOT is planning on holding job fairs to encourage residents to apply for various construction jobs.  This is an insufficient response, as the level of resources and education in the community may not allow them to obtain these jobs, and no pathway is provided to enhance participation from these populations. To assist with mitigating the social and economic impact of the project, residents must be provided job training and employment opportunities and  be recruited and connected through trusted community-based groups. The EIS should include job training and employment goals in all contracts for companies receiving contracts on the project.   (OTH-ECON).

**G1**

**33.** Providing Job Training and Workforce Development

The DEIS does not address Job Training and Workforce Development. The EIS should detail how companies can build local capacity of residents in target areas by providing training to develop the local workforce. This training may be designed to equip employees with skills for new responsibilities within the company or instead simply provide general livelihood skills. Employee development programs can include everything from basic literacy and numeracy to training for managerial and other skilled work. Community development programs targeted at employees benefit the company and the broader community.   (OTH-ECON).

CDOT should also detail how it is important that residents be afforded the training and professional development programs necessary to qualify them for the jobs and careers arising from the construction. The EIS should include provisions to assist in employment opportunities for local low-income and minority populations.  Hiring should be 20-25% from the local community, 80216 and 80205 when possible. Contractors and subcontractors should have detailed local hiring plan, including training and education. (OTH-ECON).

**34.** Developing Business Initiatives

Job training and business incubation programs should be developed by trusted organizations currently offering business services, including but not limited to Mi Casa, Centro San Juan Diego, El Centro Humanitario, Rocky Mountain Micro Finance Institute, Rocky Mountain Farmers Union, and

12

**F1** CDOT has conducted continuous public involvement on the I-70 East project for more than 11 years. For more information regarding CDOT's public outreach efforts in general and also specific to Environmental Justice populations, please see OUT1 and EJ1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

Federal laws prohibit CDOT on requiring the contractor to hire from a specific location. For information on the contractor's hiring requirements, please see GEN5 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**G1** Projects that use US DOT funds are subject to the requirements of CDOT's OJT Program. The OJT Program requires that contractors provide training hours to meet or exceed a goal set for the project. The contractor must operate under a training program approved by the Federal Highway Administration (FHWA). Though the program is open to all, trainees are to be recruited among women and minorities as available according to census data.

In addition to the requirements of the CDOT OJT program, CDOT is developing a strategic approach to preparing and creating opportunities for individuals in the local communities to obtain employment on the project. CDOT is currently collaborating with local workforce centers to determine how CDOT might be able to leverage existing resources to maximize workforce development in anticipation of the project. The contractor will be expected to comply with and develop innovative approaches to the development of the local workforce.

CDOT is committed to providing mitigation to local businesses impacted by the project listed in Exhibit 5.23-5 of the Final EIS, such as providing:
--targeted assistance to encourage businesses that are crucial to low-income and minority populations to find new locations in the same neighborhoods
--funding to CRHDC to assist business owners with financial counseling and funding for replacement property, and securing business loans.

The project will provide a robust and context sensitive communications and outreach plan throughout construction to ensure residents and businesses are kept informed of detour information.

For more information on the contractor's hiring requirements, please see GEN5 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | | | Comments | | |
|---|---|---|---|---|---|
| Source: Submittal | Document Number: 733 | Name: Globeville, Elyria, Swansea Organizers Group | Source: Submittal | Document Number: 733 | Name: Globeville, Elyria, Swansea Organizers Group |

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

Women's Bean Project, among many more. The Denver Office of Economic Development and Community Colleges of Denver should also play integral roles in this development. (DEV)

**35.** Providing Education, Scholarships and Apprenticeship Opportunities

The EIS should explain how job training will be made accessible for community members to take on skilled employment. Training programs can include apprenticeship programs to equip residents with on-the-job experience, certification programs offered in conjunction with a technical school or equivalent organization, and university scholarships for community residents to study subjects that would qualify them for managerial and other skilled employment (Oth-Econ)

**36.** Supporting a vibrant retail core, including neighborhood retail for residents

In the interest of empowering relocated businesses and Area Residents to create and pursue their own business initiatives and entrepreneurship (to replace and expand existing businesses) CDOT should detail the resources and assistance necessary and work with CCD OED to leverage possibilities for resources to support business or creative ventures in the development areas, including supporting a vibrant retail core. These should include technical assistance/capacity building, a Business Center (with computer lab, internet, faxing, etc.), Small Business Development, Micro Loan Program, Business Incubator, Historically Underutilized Business Zones (HUBZone) and Arts Incubator. (DEV)

**37.** Establishing a Resource center to deliver social services, grow existing businesses, provide technical assistance, and build relationships between residents, partners and stakeholders

The EIS should outline the strategy to propose a Job or Resource Center in the target area. CDOT should develop a strict criteria to seek contractors and subcontractors that employ social enterprise models and/or partner with nonprofit community-based organizations that can provide support and training services for low-income individuals embarking on a career pathway to economic self-sufficiency in the building and construction trades. CDOT should also seek innovative, collaborative approaches with trusted neighborhood partners and groups in order to reach residents, including those of low and moderate income populations in targeted neighborhoods. (DEV)

**38.** Providing Apprenticeship programs to equip residents with on-the-job experience

The EIS should include provisions to assist in employment opportunities for local low-income and minority populations including detail of how investment in the education of area residents is a priority of the project. A comprehensive and sustainable community enrichment initiative should include a strong educational component that opens opportunities to area residents including: GED, education and scholarship fund, technical school, internship, apprenticeship and job training programs, and training subsidies. (Oth-Econ)

**39.** Define a clear pathway for Contractors and Subcontractors in the Project's RFQ and RFP

The EIS should show how Contractors and Subcontractors can have a positive socio-economic impact in a project area by sourcing products and services locally through subcontracts with local companies. It is important for CDOT to identify ways they can promote local subcontracting while also working to avoid potential dependency of subcontractors on company purchases. Preferences for local businesses as subcontractors are a good first step. These preferences should be linked with mentoring or skill development to help local businesses win contracts with other companies in the locality of the neighborhood. (Oth-Econ)

13

**G1**

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

Supplier development programs are also a means of maximizing subcontracts to larger local firms. It is possible to develop the skills of local businesses to meet a company's purchasing needs. To promote Local Subcontracting, the EIS should indicate how CDOT, Contractors and Subcontractors will 1.) Make information on purchasing policies and upcoming contracts available as early as possible to allow local businesses adequate preparation time; 2.) Break contracts into smaller pieces to encourage greater local competition; 3.) Shape contracts to make them compatible with the capabilities of local businesses; 4.) Offer technical assistance and training to local contractors; 5.) Encourage outside contractors to partner with local businesses when awarding contracts; 6.) Assist potential contractors in acquiring credit; 7.) Help local businesses write their company profiles; 8.) Provide guidance and direct local business owners to sources of management and administrative support services; and 9.) Promote local contracting and/or building the skills and capabilities of local businesses in order to maximize the local impacts of company purchasing and equip local businesses to compete in regional and wider markets.

The EIS should also propose Qualified Training Programs. To be designated as a Qualified Training Program, the EIS should develop how Qualified Training Programs 1.) Provide training that includes health & safety, as well as hazardous material recognition; 2.) Have at least three defined partnerships with state recognized pre-apprenticeship programs or signatory community organizations that serve historically disadvantaged or underrepresented populations, including women, and minorities; 3.) In conjunction with those partner organizations, ensure that a majority of its trainees are women, minorities, residents of low-income communities, or other disadvantaged or underrepresented people; 4.) Offer mentoring, follow-up monitoring and/or other support to assure retention of participants in the program; 5.) Demonstrate a track record of graduating and placing trainees from underrepresented communities in construction careers.

Businesses owned by historically disadvantaged or underrepresented people, including minorities and women-owned businesses should have targeted support to increase their participation in the project. The EIS should demonstrate types of support that businesses will receive which include but are not limited to 1.) Cultural competency and inclusive and harassment-free workplace training; 2.) Assistance for contractors to find subcontractors that are historically disadvantaged or underrepresented, including minorities and women-owned businesses; 3.) Assessment to ensure support is directed as needed to succeed. For example, the Evaluation and Implementation Committee can assist Primes in assessing Mentor-subs so that Mentor-subs can be prepared to bid as a Prime in following rounds of contracting, including 4.) Increased capacity to provide on the job training; 5.) Technical assistance developing mentoring programs for underrepresented employees; 6.) Technical assistance providing health insurance to employees; 7.) Scholarships for BPI certification for businesses owned by historically disadvantaged or underrepresented people, including minorities and women-owned businesses; and 8.) Technical assistance with bonding.

The EIS should outline types of support that training programs should receive which include but are not limited to 1.) Funding for Qualified Training Programs; 2.) Funding for Pre-Apprenticeship programs and other programs that focus on connecting disadvantaged populations to jobs and careers in construction; 3.) Scholarships to provide opportunities for workers to participate in an advanced occupational training.

The EIS should also define Additional Responsible Contractor Requirements in which Contractors and Subcontractors should be required to, 1.) Identify the number of jobs that will be created; 2.) Identify the job titles and skills required for the projected new jobs; 3.) Develop a hiring and recruitment plan in conjunction with the Department of Small Business Services.

The EIS should also detail how Contractors and Subcontractors will indicate 1.) The number of community residents enrolled in the pre-apprentice training initiative; 2.) The percentage of minority and women workers enrolled in the pre-apprentice training initiative; 3.) The number who completed

14

**G1**

The information on these pages has been reviewed. Responses to specific comments are included on the previous page.

| Comments | Comments |
|---|---|
| Source: Submittal    Document Number: 733    Name: Globeville, Elyria, Swansea Organizers Group | Source: Submittal    Document Number: 733    Name: Globeville, Elyria, Swansea Organizers Group |

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

training and were hired; 4.) The anticipated time they will be employed; 5.) The total number of construction workers and journey level workers hired; 6.) Percentage of those hired that are minority and women workers; 7.) Total non-construction and construction contracts award and the percentage awarded to community-based, minority or women-owned businesses; and 8.) Status of job fairs, including the number of employers participating, the number of attendees, and the status of any applicants filed by them.

The EIS should also detail how CDOT, Contractors and Subcontractors will provide and ensure 1.) On-site space for job recruitment and pre-screening services; 2.) A training and apprenticeship program for construction jobs; 3.) Reservation of a percentage of square feet of retail space for existing small and local businesses; 4.) Commitments concerning purchasing and contracting with neighborhood-based businesses; 6.) Offering reduced price memberships for low-income neighborhood residents; 7.) Set-aside of a percentage of square feet for child care services to be leased at a below-market rent; 8.) Investing in a job training funds targeted to neighborhood residents; and 9.) All project employers participate in the specified local hiring program.

In addition, the EIS should note that all contractors and subcontractors should 1.) Have an exemplary record of customer service; 2.) Have a successful track record in hiring and retaining historically disadvantaged or underrepresented people, including minorities and women. (Newer contractors can receive preference by providing a detailed plan for how they will hire, maintain, and welcome diversity in their workforce in the immediate future); 3.) Have a well described plan on establishing "Mentor-sub" relationships with businesses owned by historically disadvantaged or underrepresented people, including minority and women-owned businesses who have been in business for a minimum of 6 months and shall receive a significant amount of work on jobs while they are seeking necessary training and experience; 4.) Have a well described plan for establishing sub-contracting relationships with businesses owned by historically disadvantaged or underrepresented people, including minority and women-owned businesses who have been in business for a minimum of 6 months; 5.) Hire graduates of pre-apprenticeship training programs; 6.) Recognize the value of quality training for employees by participating in registered apprenticeship and other credential-granting programs; and 7.) Demonstrate efforts to strive to provide employment opportunities to formerly incarcerated individuals.

The EIS should propose how Contractors and Subcontractors should start by completing the questions about Employment and Business Impacts. These questions target the net economic and employment impacts generated by the project— whether residential, commercial, retail, or mixed use. These questions include but are not limited to: What skills do local residents offer employers? Do residents face unusual economic challenges, such as high poverty rates, high unemployment, or barriers to work such as limited English proficiency? Are small businesses operating in the area? Are there adequate living wage jobs in the area that provide career opportunities? What will be the net gain in jobs (new jobs minus displaced jobs)? Will the jobs be construction jobs mainly, or permanent jobs onsite? Will residents have access to those jobs, given existing skills and conditions? Will the project add living wage jobs to the regional labor market? Will existing small businesses lose customers during the development? (OTH - ECON)

**40.** Sourcing Local Products

The EIS should also show how funding micro-enterprise development programs can be an effective part of a community development program. These programs are often linked to specific business needs, and for this reason the risk of micro-enterprises becoming dependent on the company must be addressed. Contractors and subcontractors can use this strategy to encourage community members to start companies that may provide catering services, cleaning services, construction services or the production of a variety of products for both the company and other local businesses. Contractors and

**G1**

> The information on these pages has been reviewed. Responses to specific comments are included on the previous page.

subcontractors can also offer market research support to help small businesses aim their products at a broader regional market. With skills development and market research, Contractors and Subcontractors can transform programs to promote local subcontracting into more sustainable programs designed to build the capacity and promote the competitiveness of local businesses. Local products and services should be sourced when available. (OTH-ECON)

**41.** Supporting displaced and affected businesses from the I-70 project

The DEIS states that job loss associated with business displacements may directly affect residents of the neighborhood. The DEIS also mentions 20 businesses will be relocated, and the property acquisitions for the right of way will result in a short term loss in property tax revenues for Denver, and that the elimination of the York Street interchange will cause access disruptions for local businesses. The DEIS also states that the disruption will result in a minor decrease in Denver's property tax revenues of approximately 0.03 percent.  However, the DEIS offers no mitigation for this loss, and ignores mitigating the community's economic vitality protected by Environmental Justice.

The DEIS also notes that the elimination of the York Street interchange will cause some access disruption for local business.  The DEIS is misleading when it states that the overall effect will be minor because access to I-70 will be provided through interchanges at Brighton Boulevard and Steele Street/Vasquez Boulevard.  The impact on businesses at York and 46th and along 46th Avenue will be dramatically affected by the loss of access, as the majority of businesses in this area rely on traffic from York and 46th Avenue.  Business owners at York and 46th can attest to how the closing of York during construction of the commuter line caused serious economic loss during the entire closure. When the parking lot under the south side of the I-70 viaduct at 46th and York was closed for striping, business owners reported that business was out in half. The DEIS greatly minimizes these negative effects, and makes no mention how serious the impact will be to business owners in target areas affected by all Project Alternatives.  Again the DEIS ignores mitigating the community's economic vitality and puts another unfair burden the neighborhood. The EIS should directly address mitigations for businesses at areas within 500 feet of all closures.

The DEIS also states that business displacement is less likely to result in job losses for the neighborhood because 90% of residents' commute is 10 minutes or more.  This is also misleading, as many of the businesses at the York interchange and along 46th Avenue employee a high percentage of neighborhood residents. Business owners at York and 46th nor business owners along the south side of 46th Avenue reported having been contacted by CDOT, nor are they aware of project plans, development or potential mitigations. (OTH-ECON)

**42.** Guaranteeing the allocation of funding toward innovative programs that teach and support meaningful, culturally relevant, and sustainable economic opportunities available to residents and business owners in Elyria-Swansea.

Committing ½ Percent Minimum Apportionment from the entire Project Budget in order to fund jobs, business development and education opportunities must be central to CDOT's strategies to mitigate the disruption and destruction of the neighborhood's economic vitality. The design and implementation of the economic mitigations must be carried out through coalition work that includes trusted neighborhood community groups, government partners, experts, allies, partners, and diverse populations of neighborhood residents. All economic mitigations must be culturally relevant and sustainable, and approved by a vote from a resident-led policy group.

**G1**

15

16

| Comments | Responses to Comments |
|---|---|

Source: **Submittal**  Document Number: **733**  Name: **Globeville, Elyria, Swansea Organizers Group**

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**43.** Prioritizing investment in creating commercial density and supporting existing small neighborhood businesses

All economic mitigation from all Project Alternatives should maximize opportunities to create commercial density in or near all target areas. (OTH-ECON)

**G1**

**ENVIRONMENTAL JUSTICE**

One of the primary principles of environmental justice is, "To avoid, minimize, or mitigate disproportionately high and adverse human health and environmental effects, including social and economic effects, on minority populations and low-income populations." The first step is to understand the effects in order to avoid, minimize, or mitigate them. One major deficiency of the DSEIS is that it does not understand the health effects of the highway. A health impact assessment of the highway widening was not conducted. To ensure open disclosure and consideration of the consequences that project emissions will have on health, a health impact assessment must be included in the current NEPA review because of the disparate health outcomes that have been identified in these communities by a Health Impact Assessment issued by Denver Environmental Health. The Health Impact Assessment did NOT specifically examine the impact of widening the highway in the Elyria-Swansea neighborhood, but it did provide information about existing conditions in the neighborhoods related to air quality. This Health Impact Assessment stated that the higher pollutant exposures expected from increasing traffic by 30% in these neighborhoods will significantly degrade the health status of these communities.

**H1**

The building of I-70 in the 1960s, prior to NEPA, was done without any public environmental review and as a result it was completed with little consideration for protecting local social and health conditions. As a consequence, it is clear that the surrounding communities have suffered significant ongoing negative impacts. The 1994 Executive Order 12898 states that all projects must "address disproportionately high and adverse human health or environmental effects of its programs, policies and activities on minority populations and low-income populations." Because the original highway was built without public review, it is unacceptable to use the "as-is" condition as the baseline for action. The re-building of I-70 should be seen as an opportunity to improve and restore the conditions of the community, not just to maintain the levels of hazards that were imposed without public process. The ultimate impacts of the highway should ensure that this low-income and minority population is living in an environment that is no less healthy than other populations in Denver. Any incremental negative impact of the highway expansion and reconstruction should be considered a Cumulative Impact as per NEPA, on top of the impacts already suffered by this community.

Section 5.3.5 of the Environmental Justice section states that "environmental justice guidelines and orders require that low income and minority populations are provided with opportunities for meaningful public involvement." CDOT claims that they have done significant public outreach, however, the community is not knowledgeable nor involved in the I-70 process. First, despite Elyria-Swansea containing 41% Spanish-speaking adults, the Environmental Impact Study was not provided for public review in Spanish. Only the Executive Summary of the SDEIS was published in Spanish. This results in the bulk of the report not being understandable by the people affected. The process did not sufficiently communicate the scope of the impacts and mitigations to the most affected residents and stakeholders in the community. In addition, organizers working on the ground with Globeville Elyria and Swansea stated that they heard from residents that they felt fear of participating in the process for fear of retribution due to their documentation status if they made their protest to the highway heard.

Second, the majority of residents have very low familiarity with the project, and a large number know nothing about the project. Globeville Elyria Swansea LiveWell, a neighborhood based non-profit program, conducted a door-to-door survey of residents living within 0 and 6 blocks of I-70 in the Elyria-Swansea neighborhood in spring of 2014. 91 people, in different households responded to the survey. When asked "How much do you know about the I-70 Planning project?" 28% responded, "Nothing,"

17

**H1** Health concerns have been adequately addressed in the Final EIS. For information on the Health Impact Assessments, please see AQ1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The I-70 East project team used a variety of tools to solicit input and involvement from stakeholders that addressed issues of diversity of language, level of literacy and exposure to media. For more information on Environmental Justice considerations, please see EJ1, EJ2, and EJ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

Cumulative impacts are discussed in Chapter 6 of the Final EIS.

Outreach concerns have been addressed adequately in the Final EIS. For information on CDOT's public involvement and Spanish-speaking community involvement please see OUT1 and OUT3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

Source: Submittal | Document Number: 733 | Name: Globeville, Elyria, Swansea Organizers Group

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

**H1** 27% responded, "Very little." 53% of surveyed residents within 3 blocks of the widening area new nothing to very little about the project. 34% responded "Some." 3.3% responded "A lot," and 8% responded, "Most." Thus 11% that they knew "A Lot," or "Most" and 53% stated they knew "nothing" or "very little." This is significant lack of knowledge in the community. Interestingly, 0% of respondents responded, "I don't care." Clearly, the community cares about the project, however, they have not been affectively reached with information. These results counteract the claim that CDOT makes that they have meaningfully involved residents in the planning process.

Thirdly, a large majority of residents were not involved in any way with the discussions of the project. In Globeville, Elyria-Swansea LiveWell's survey, surveyors asked "Have you been involved in the planning of the I-70 widening?" 81% of respondents answered, "No." 4.4% responded "Yes, very little," 12% responded, "Yes, some" and 2.2% responded, "Yes, a lot." Thus, 81% of respondents were not involved in any way with planning the project, compared to 2% who were very involved.

**I1** **44.** Rather than basing mitigation on a set budget, mitigation should un-do the impact from the highway project.

In various conversations and presentations, CDOT has stated that it has a limited budget for mitigation. This is counter to the one of the basic principles of environmental justice is "To avoid, minimize, or mitigate disproportionately high and adverse human health and environmental effects, including social and economic effects, on minority populations and low-income populations." In order to properly plan and implement the project, CDOT must concentrate on truly avoiding, minimizing, and mitigating the effects on the highway, and not on setting a budget for mitigation. If the cost of mitigating becomes too high, then the project must be done differently. It is not appropriate to simply pick and choose mitigations and not properly mitigate impacts because it does not fit within the budget.

What will be done to prevent CDOT from stating they run out of money and not implementing the required mitigations? This has happened in the past. For example, the widening of I-70 through Globeville promised artwork under I-70 and only a few panels were ever done near National Western. CDOT claimed they ran out of money. (EJ)

**J1** **45.** Money for maintenance of all improvements.

One of the primary principles of environmental justice is, "To avoid, minimize, or mitigate disproportionately high and adverse human health and environmental effects, including social and economic effects, on minority populations and low-income populations." One way that CDOT must mitigate its impact is to ensure that there is funding to pay for the maintenance of all mitigation measures. CDOT does not have a good track record of maintaining its properties in these neighborhoods. Their properties are full of weeds and trash and are a detriment to the neighborhood. Due to the low income nature of the community, it is unreasonable to expect local organizations, institutions, and / or community members to pay to maintain the mitigations which are only needed because CDOT is building the widened highway. Examples of items that must be maintained are: the cover on the highway in front of Swansea School, the filtration system at Swansea School and Garden Place School, the improved doors and windows in all homes and organizations within 500 feet of the highway, the art, and the noise walls. (MAINT)

Sincerely,

Councilwoman Judy Montero, City Council District 1
3457 Ringsby Court, Suite 215, Denver, CO 80216
(720) 337-7709

Councilwoman Deborah Ortega, City Council District 13
1437 Bannock Street, Suite 451, Denver, CO 80202

18

**I1** Mitigation commitments for the project are proposed based on the impacts of the project, not on budgetary requirements. For information on Environmental Justice considerations, please see EJ1, EJ2, and EJ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in part 1 of Attachment Q.

CDOT is legally accountable to implement all mitigation that is included in the ROD.

**J1** Once a ROD is signed, CDOT is held legally accountable to deliver the mitigation identified in the ROD.

CDOT commits to identify a maintaining party for the cover's facilities prior to the construction. For information on the maintenance of the Preferred Alternative highway cover, please see PA3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

Improvements to Swansea Elementary School will be maintained by the school. Garden Place Elementary School is not impacted by the project and will not have any mitigation.

Improvements to homes, including air conditioners, will be maintained through construction.

CDOT will maintain noise walls.

| Comments | Responses to Comments |
|---|---|
| **Source:** Submittal   **Document Number:** 733   **Name:** Globeville, Elyria, Swansea Organizers Group | |

*I-70 East Supplemental Environmental Impact Statement*
*Globeville, Elyria-Swansea Organizers Group Public Comment*

(720) 337-7713

Councilman Albus Brooks, City Council District 8
3815 Steele Street, Denver, CO 80205
(720) 337-8888

Coby Gould
Executive Director, on behalf of The GrowHaus
4751 York Street, Denver, CO 80206
(303) 949-0930

Felicia Griffin
Executive Director, on behalf of FRESC: Good Jobs Strong Communities
140 Sheridan Boulevard, Denver, CO 80226
(303) 477-6111

Rachel Cleaves
Coordinator, on behalf of Globeville, Elyria-Swansea LiveWell
2501 E. 48th Avenue, Denver, CO 80216
(720) 217-5468

Steven Moss
Executive Director, on behalf of Focus Points Family Resource Center
2501 E 48th Ave, Denver, CO 80216
(303) 292-0770

Wendy Hawthorne
Executive Director, on behalf of Groundwork Denver
3050 Champa St, Denver, CO 80205
(303) 455-5600

| Comments | Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Bob Yuhnke | Source: Submittal | Document Number: 754 | Name: Sierra Club - Bob Yuhnke |
|---|---|---|---|---|---|

Current Folder: **SDEIS Comments Responded to**

**Welcome:** contactus@i-70east.com

### Re: I-70 East EIS - SDEIS COMMENTS

**From:** "Bob Yuhnke"
**Date:** Fri, October 31, 2014 5:13 pm
**To:** contactus@i-70east.com
**Cc:** "English, Becky"

Dear CDOT and FHWA,

Attached for your review and consideration are comments submitted on behalf of the Sierra Club, Rocky Mountain Chapter, and Joe Elliott, Swansea resident.

Bob Yuhnke
303-499-0425

The information on these pages has been reviewed. Responses to **specific comments** are included on the following pages.

| Duration | D | EPA Region | State | County | City | CBSA | Address | Site ID | POC | Exc Events | Obs |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 24 HOUR | | 8 | CO | Adams | Commerce | Denver-Au | 7101 Birch | 80010006 | 1 | None | 121/105/10 |
| 24 HOUR | | 8 | CO | Adams | Commerce | Denver-Au | 7101 Birch | 80010006 | 2 | None | 62/50/73 |
| 24 HOUR | | 8 | CO | Denver | Denver | Denver-Au | 2105 Broad | 80310002 | 1 | None | 354/301/33 |
| 24 HOUR | | 8 | CO | Denver | Denver | Denver-Au | 2105 Broad | 80310002 | 2 | None | 67/50/62 |
| 24-HR BLK | | 8 | CO | Denver | Denver | Denver-Au | 2105 Broad | 80310002 | 3 | None | 270 |
| 24-HR BLK | | 8 | CO | Denver | Denver | Denver-Au | 2105 Broad | 80310002 | 3 | None | 151 |
| 24 HOUR | | 8 | CO | Denver | Denver | Denver-Au | 971 W. Yur | 80310027 | 1 | None | 75 |
| 24-HR BLK | | 8 | CO | Denver | Denver | Denver-Au | 971 W. Yur | 80310027 | 3 | None | 131 |

| First Max | Second Ma | Third Max | Fourth Ma | 98th %ile | 2 3-yr averag | Weighted / 3-yr average annual means | |
|---|---|---|---|---|---|---|---|
| 41.9/33.7/ | 20/28.7/26 | 19.5/25.4/ | 18.3/19.3/ | 20 / 25 / 2 | 23 | 7.6 / 8.6 / 8 | 8.1 |
| 20.9/25.8/ | 18.8/16.4/ | 13.2/15.5/ | 13.2/13.4/ | 19 / 26 / 2 | 24 | 7.2 / 7.9 / 8 | 7.9 |
| 28.5 | 27.2 | 22.7 | 21 | 19 / 19 / 2 | 19 | 7.5 / 8.0 / 7 | 7.7 |
| 29.9 | 28.6 | 18.9 | 18.3 | 15 / 37 / 2 | 27 | 7.2 / 7.9 / 8 | 7.9 |
| 36.4 | 36 | 30.2 | 30.2 | 28 (2013) | | 8.8 | NA |
| 44.3 | 39 | 37.5 | 28.5 | 29 (2014) | | 9.3 | NA |
| 48.3 | 34.9 | 29.9 | 25.1 | 35 (2014) | | 9.3 | NA |
| 57 | 44.3 | 35.3 | 30.3 | 35 (2014) | | 10.7 | NA |

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Bob Yuhnke |
|---|---|---|

**THE SUPPLEMENTAL DRAFT EIS FOR PROPOSED EXPANSION OF I-70 EAST MUST BE REVISED TO ADEQUATELY DISCLOSE IMPACTS OF AIR POLLUTANTS ON COMMUNITY HEALTH AND AIR QUALITY.**

By
**Robert E. Yuhnke**

**Executive Summary.**

**The SUPPLEMENTAL DRAFT EIS (SDEIS) for the proposed expansion of I-70 EAST is Not Adequate because the impacts of air pollutants emitted from the Project on the health of near-by residents and on air quality are not investigated or disclosed, and alternatives and/or mitigation needed to enhance the health of nearby communities, and to prevent or avoid violations of national ambient air quality standards have not been identified.**

**Health Impact Assessment Required.**

**[A]** Evidence documented by Denver Environmental Health (DEH) showing disparate health outcomes for residents in the Globeville/Elyria/Swansea neighborhoods and the city council districts where I-70 is located compared to other council districts in Denver, including a 50% higher incidence of mortality related to cardiovascular disease, 50,000 more years of life lost annually, and 40% greater rate of hospitalization of children for asthma, demonstrate that these residents are disproportionately affected by the diseases of air pollution. The contribution that emissions from current vehicle travel on heavily trafficked highways such as I-70 make to these adverse community health outcomes must be evaluated, disclosed to decisionmakers and the public, and considered in the evaluation of alternatives to determine the extent to which community health can be enhanced by reducing, not increasing, exposure to traffic pollution in these neighborhoods.

**Modeling of all Mobile Source-Related NAAQS Required.**

**[B]** Both emissions from an expected 30% increase in traffic traveling in the I-70 Project area, and emissions during construction of the project from heavy equipment, could cause violations of national ambient air quality standards (NAAQS) in the Project area. The Clean Air Act (CAA), Part C, requires that States adopt an implementation plan containing control measures to prevent violations of NAAQS in areas that currently attain the NAAQS. If violations of these air quality standards occur, the CAA requires that the plan for the area be revised to reduce ambient concentrations below the level of the NAAQS. 40 CFR §51.160. Violations trigger obligations to develop and implement a control strategy to eliminate the NAAQS violations, and imposes limitations on the permitting of new or modified sources. Preventing violations of the NAAQS protects public health by avoiding pollutant concentrations known to be harmful, is cheaper than requiring emission reductions after violations occur, and is less burdensome on other emission sources.

**Consideration of Alternatives and Mitigation Measures to Reduce Public Exposure to Harmful Pollutants, and to Ensure Attainment of NAAQS Required.**

**[C]** The proposed Project is proposed to accommodate at least a 30% increase in traffic and related increases in pollutant exposures in an area where traffic pollution is currently contributing to

**[A]** Section 5.20, Human Health Conditions, of the Final EIS contains an expanded discussion of environmental health issues in the Globeville and Swansea and Elyria neighborhoods, including the Health Impact Assessment conducted by DEH. It is important to consider that the neighborhoods in question also experience disproportionate levels of poverty, non-highway pollution from stationary sources (including the Xcel Cherokee Power Station, the Suncor Refinery, the Purina pet food facility, Metro Wastewater), and many other factors that have been identified by the DEH study. An additional health impact assessment is not required by NEPA or the Clean Air Act, would be subject to very large uncertainties, and would not assist the decision makers in evaluating the choice among reasonable alternatives. As seen in the emissions inventories for NAAQS pollutants and MSATs, the difference between the alternatives (including the No-Action Alternative) in emissions is around 2-4 percent or less; see Attachment J Air Quality Technical Report. This difference is much smaller than the large ranges of uncertainties associated with the development of a health impact assessment. Further, it is critical to consider that the emissions (and, therefore, likely concentrations) associated with I-70 East are substantially declining. For example, diesel particulate matter emissions are predicted to drop from 749 pounds per day in 2010 to 48 pounds per day (No Action) or 49 pounds per day (Partial Cover Lowered Managed Lanes) in 2035. Benzene emissions are predicted to drop from 133 pounds per day in 2010 to 26 pounds per day (No Action) or 27 pounds per day (Partial Cover Lowered Managed Lanes) in 2035. The other MSATs see similar reductions in emissions; see Section 7.4 of Attachment J, Air Quality Technical Report. All of these emissions levels incorporate predicted increases in VMT in the corridor.

**[B]** The air quality analyses have been updated for the Final EIS, and the Preferred Alternative would not cause the violation of any NAAQS. The Final EIS (Section 5.10, Air Quality, and Attachment J, Air Quality Technical Report) provides all air quality emissions and modeling that is required by law and useful to an informed decision among the alternatives. See also the response to comments W, X and Y.

**[C]** The Final EIS considers all reasonable alternatives that meet the purpose and need for the I-70 East Project. The 2008 Draft EIS, Supplemental Draft EIS, and Final EIS have considered the alternative of diverting future traffic to the I-76/I-270 alignment and found that the alternative would not meet the purpose and need; see the Appendix to Attachment C Alternatives Analysis Technical Report Addendum. Further, such an approach would be impractical because of its very large cost and diversion of traffic to local streets. The alternative would also likely increase regional emissions of greenhouse gases, ozone precursors and other pollutants by increasing the number of miles that must be driven, as well as cause congestion and idling emissions in areas (including the Globeville and Elyria and Swansea neighborhoods and schools) affected by diversion of traffic to local streets. Potential impacts from the I-70 project, including effects of each alternative on the ability to meet the health-based NAAQS, and on levels of MSATs are discussed in detail in the Final EIS Section 5.10, Air Quality. In addition, CDOT has committed to providing measures to mitigate for dust during construction; see AQ7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

Source: **Submittal**      Document Number: **754**      Name: **Sierra Club - Bob Yuhnke**



**C**

adverse health impacts in nearby communities. Not included in the analysis are reasonable alternatives and mitigation measures that enhance the human environment by reducing public exposure to these harmful pollutants. At a minimum, the SDEIS must include an evaluation of measures such as, but not limited to, diverting future traffic to other interstate alignments (I-76 and I-270) where commercial and industrial uses are the predominant near-highway land use, dense urban neighborhoods are not in close proximity to the highway, and schools are not located next to the highway right-of-way. So long as the currently proposed cut-and-cover alternative in the existing I-70 alignment remains the preferred alternative, another mitigation measure that must be included is the buy-out of all nearby residents, and the re-location of school buildings located within the zone of adverse health impacts adjacent to the Project alignment.

**D**

This SDEIS is not adequate under the National Environmental Policy Act (NEPA), or under the requirements of the Federal Aid Highway Act, 23 USC § 109(h), because the Draft Statement, along with the Air Quality Technical Report prepared as Attachment J for the I-70 East SDEIS, fails to –

1. investigate and disclose the impact that highway emissions are having on community health in the Project study area;
2. investigate and identify alternatives and/or mitigation measures that can enhance the human environment by reducing community exposure to harmful air pollutants, and avoid the adverse health effects that will result from increasing exposure to these pollutants that will result if traffic in the corridor is allowed to increase by 30%;

**E**

3. investigate and disclose likely violations of the NAAQS for PM2.5 and NO2 caused by those pollutants emitted from vehicles traveling on the completed project and in the area affected by the Project;

**F**

4. use credible scientific methods to investigate and disclose likely violations of the NAAQS for PM-10 caused by particulate matter (PM) emitted from or by vehicles traveling on the completed project and in the area affected by the Project;

**G**

5. investigate and disclose likely violations of the NAAQS for PM-10, PM2.5 and NO2 caused by those pollutants emitted from heavy equipment and traffic during construction of the Project;

**H**

6. investigate and identify alternatives and/or mitigation measures that are necessary and sufficient to prevent or avoid violations of the NAAQS for PM-10, PM2.5 and NO2;

**G**

7. demonstrate compliance with the obligations imposed by the Federal-Aid Highway Act, 23 USC §109(h), to estimate the costs of mitigation, compare those costs with the transportation benefits of the proposed Project, determine whether the Project is in the best overall public interest, and commit to implement any necessary mitigation; and

**J**

8. include a conformity determination for the Project as required by § 176(c) of the Clean Air Act (CAA) and implementing regulations. 40 CFR §§ 93.116, 123.

**K**

**I. Impact on Health of Emissions from Vehicle Miles Traveled Not Assessed or Disclosed.**

Overall impacts of air pollution from the Project on community health are the primary concern of this comment. The adverse health outcomes among residents in the I-70 Project area reported by Denver Environmental Health [DEH ] in the community health status report released in September, 2014, demonstrate that these residents are currently experiencing serious adverse

2

**D** The Supplemental Draft EIS and Final EIS are fully compliant with the requirements of NEPA, the Clean Air Act, 23 U.S.C. Sec. 109(h) and other provisions, and have adequately addressed environmental health issues and air quality impacts, which are considered in Section 5.20, Human Health Conditions, of the Final EIS and the Air Quality Technical Report. The Final EIS considers the emissions of both NAAQS and MSAT pollutants for all of the alternatives during the period from 2010 to 2035, based on protocols and methodologies approved by EPA and CDPHE. As reported in the Final EIS Section 5.10, Air Quality, and Attachment J Air Quality Technical Report, total emissions of mobile source pollutants have been modeled and they are predicted to decline in the corridor considerably between 2010 and 2035 for all alternatives, even accounting for increases in VMT. No additional alternatives analysis or mitigation measures are required under NEPA or other federal requirements because the identified preferred alternative does not exceed the NAAQS.

**E** PM2.5 and NO2 were not modeled in the Supplemental Draft EIS because they are not pollutants of concern in the Denver area. The area has never been in nonattainment status for either pollutant and is not in imminent danger of becoming so based on current monitoring data. Furthermore, extrapolating the existing ratio of PM2.5 to PM10 to other scenarios in an effort to predict violations of the NAAQS is not scientifically valid, as particulate emissions in different size fractions come from multiple different sources, not all of which vary at the same rate with changes between build alternatives or traffic loads. See also responses to Comments W, X, and Y.

**F** Effects of PM10 emissions on the ambient air were analyzed using state-of-the-art modeling software, in accordance with EPA regulations and guidelines, to determine whether or not specific alternatives would exceed the NAAQS. See also the responses to Comments W, X, and Y.

**G** Construction impacts are not required to be assessed if construction will not last more than 5 years in any individual site (40 CFR 93.123(c)(5)), and there is no evidence there will be any exceedances of the NAAQS during the construction period based on the air quality analysis for the Final EIS. Monitoring supported data available nationwide, and—specific to Colorado highway construction—confirms that BMPs for dust control and suppression deployed by CDOT and other DOTs have been successful in keeping temporary construction dust from contributing to an exceedance or violation of the public health PM10 NAAQS.

**H** Air quality impacts have been adequately addressed in the Final EIS. PM2.5 and NO2 were not modeled in the Supplemental Draft EIS because they are not pollutants of concern in the Denver area. The area has never been in nonattainment status for either pollutant and is not in imminent danger of becoming so based on current monitoring data.

*Responses continue on the following page.*

| Comments | Responses to Comments |
|---|---|

Source: **Submittal**   Document Number: **754**   Name: **Sierra Club - Bob Yuhnke**

**K** — effects of current pollutant exposures, and that the impact of future increases in pollutant exposures must be fully disclosed in the EIS. *See* https://www.denvergov.org/Portals/746/documents/HIA/HIA%20Composite%20Report_9-18-14.pdf. The higher pollutant exposures expected from increasing traffic by 30% in these neighborhoods will significantly further degrade the health status of these communities. Sacrificing the health of children and increasing years of life lost to build a regional transportation facility is not an acceptable public policy. To ensure open disclosure and consideration of the consequences that Project emissions will have on health, a health impact assessment must be included in the current NEPA review because of the evidence provided by DEH showing that residents in these communities are now experiencing disparate health outcomes compared to other communities in Denver.

**A. Health Impacts of Exposure to Traffic Pollution Not Assessed or Disclosed in SDEIS.**

**L** — The SDEIS contains no discussion of the current health status of these communities, and no investigation of the likely impact that increased vehicle emissions will have on community health. The impacts that Project emissions will have on air quality in the affected communities are only partially addressed. The SDEIS includes modeling to estimate future concentrations in the ambient air for only two transportation-related pollutants: PM-10 and carbon monoxide. The other two criteria pollutants emitted from highways that EPA has identified as having the greatest impact on health, and has recently required be monitored adjacent to highways, PM2.5 and NO2, are not evaluated for impact on future air quality. A shorthand method for using the modeled concentrations of PM-10 to estimate future PM2.5 concentrations indicates that Project emissions will worsen health status in the communities by nearly doubling current background concentrations, and violating the NAAQS for PM2.5.

In addition to determining the impact of Project emissions on the attainment of all the mobile source-related NAAQS, the SDEIS must include an assessment of the health impacts on the community that will result from the full mix of criteria and toxic air pollutants emitted from motor vehicles. Residents do not just breath one pollutant at a time, and the adequacy of national air quality standards to protect health do not account for the cumulative and synergistic effects on human health that result from exposure to the full array of criteria and toxic air pollutants emitted from highways.

**1. Adverse Health Outcomes Are Occurring Disproportionately in Communities Affected by I-70 Pollution.**

**M** — The final DEH report identifies four metrics of health as demonstrating a significant disparity between community health in the four city council districts where I-70 is located, and especially Globeville/Elyria/Swansea (GES) neighborhoods, and other parts of Denver: 1) mortality caused by cardiovascular disease, 2) hospitalization of children for asthma, 3) cancer, and 4) obesity. In addition, the draft DEH report identified years of life lost as another important metric of community health which was significantly worse in the GES neighborhoods compared to the city as a whole.

**N** — **i) Disproportionately High Cardiovascular Mortality.**

3

**I** The I-70 East Project complies with Federal Aid Highway Act, 23 USC §109(h). Motor vehicle emissions from the implementation of the No-Action Alternative and the Build Alternatives will not cause or contribute to any new localized carbon monoxide or particulate matter violations, nor will they increase the frequency or severity of any existing violations based on the hotspot analysis. Further, emissions of almost all pollutants will be considerably lower in 2035 for all alternatives, even with an increase in VMT. CDOT is committing to implement the road dust emissions control measures included in the PM10 hotspot modeling, but no other specific mitigation measures are necessary.

**J** The conformity determination was not required in the draft stage of the document, and is being made for the Final EIS, and a final conformity determination will be made in the ROD. See Section 5.1.2 of Attachment J to the Final EIS, Air Quality Technical Report, and Section 5.10.6 of the Final EIS for the conformity determination.

**K** The emissions modeling for this project shows that emissions of all health-related pollutants will decline considerably between 2010 and 2035 under all alternatives, with the sole exception of road dust. See Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health in the identified neighborhoods, Attachment J Air Quality Technical Report, and the response to Comment A.

It is important to consider that the DEH study points out that the neighborhoods in question also experience disproportionate levels of poverty, non-highway pollution from stationary sources, and many other factors that contribute to the health status of the communities. A health impact assessment is not required by NEPA or the Clean Air Act, would be subject to very large uncertainties, and would not assist the decision makers in evaluating the choice among reasonable alternatives. For information on impacts of the highway air pollution on human health, please see AQ2 and AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**L** The current health status of the communities is adequately discussed in Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health issues in the Globeville, Swansea and Elyria neighborhoods. See the response to Comment X for discussion of NO2 and PM2.5 as well as AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. With regard to the suggestion to model all air pollutants simultaneously in a health impact assessment, see the response to comment A and Attachment J Air Quality Technical Report.

For information on air quality in the project area, please see AQ3 and AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**M** Comment noted.

*Responses continue on the following page.*

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Bob Yuhnke |

The data reported by DEH , HIA, Fig. 6, show that residents in the four city council districts where I-70 is located.(1, 8, 9, and 11) have the highest cardiovascular mortality rates. Residents in city council Districts 1 and 9 experience 30% greater cardiovascular mortality than dist 2 (213 vs. 155). In districts 8 and 11, respectively, cardiovascular mortality is 77% higher than dist 2 (275 vs. 155), and 74% higher (270 vs. 155). On average, cardiovascular mortality in these four council districts along I-70 is roughly 50% greater than other parts of the city. These are remarkably huge differences in cardiovascular mortality, the largest single cause of death in Denver and the U.S.

Increased community exposure to Project emissions will occur primarily in Districts 9 and 8. District 9 includes the GES and other neighborhoods along the east side of I-25 from the Auraria campus to the Commerce City line, including the neighborhoods along I-70 east of the mousetrap. The mortality rate in council district 9 is identical to the rate in council district 1 (213/ 100,000). District 1 includes the neighborhoods on the west side of I-25 from the Auraria campus north to the city line, including the neighborhoods along I-70 west of the mousetrap. Together, these two districts have significantly higher cardiovascular mortality rates than all other council districts except 8 and 11. In addition to emissions from I-70, residents in Dists 1 and 9 are exposed to emissions from I-25, residents in Dist 8 are most exposed to the additional pollution burden coming from the refineries, and district 11 is most exposed to emissions from the I-225 interchange, Pena Blvd and airport operations. A recent study at LAX indicates that residents along the path of aircraft take-offs and landings are exposed to aircraft emissions that are roughly comparable to the emissions from highways in these neighborhoods. It makes sense that all 4 of these council districts show greater rates of the diseases of air pollution, including cardiovascular disease, when compared to other council districts not exposed to emissions from major highways and other high emitting sources.

**N**

These data point an incriminating finger at air pollution from the high traffic volumes on interstate highways because all the council districts with higher pollution levels from both interstates and major stationary sources have elevated cardiovascular mortality rates. If higher mortality were observed only in one district, then air pollution could not account for the disparity between that district and both cleaner districts and districts with high pollution levels.

**ii) Disproportionately Higher Years of Life Lost.**
These massively greater mortality rates from cardiovascular disease obviously contribute to increased years-of-life-lost. Missing from the final DEH report, but no less relevant to the need for a NEPA analysis of health risks, is the discussion of years-of-potential-life-lost (YPLL) that was included in the draft HIA, at p. 9 (published for comment in April). The draft described this metric as commonly "used as an indicator of health equity. Generally, this is a measure of premature death before the age of 75 compared across a population or geographic area. The assumption is that a higher number indicates inequitable social or physical determinants of health. Data from Denver Health indicate that 'years of potential life lost' is higher in Globeville and Elyria Swansea than in Denver overall."

**O**

The draft reported that years-of-life-lost, averaged across the community, is 3.5 years greater for the residents of GES neighborhoods compared to other Denver residents. This means residents of these neighborhoods are losing 50,000 years of life annually compared to other Denver

4

**N** These conclusions regarding the causality of cardiovascular impacts by I-70 were not reached by the DEH study or any other studies. Further, because the differences between the project alternatives in emissions are minimal, the choice among alternatives would not significantly affect cardiovascular health in the corridor. The DEH study also identifies other potential causal factors for cardiovascular health impacts, including diet, obesity, and smoking.

For information on Health Impact Assessments, please see AQ1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. See also Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health issues in the corridor neighborhoods, Attachment J Air Quality Technical Report regarding highway-related health impacts analysis, and the response to Comment A regarding the decreasing emissions associated with the I-70 corridor and the minor differences among alternatives.

**O** The fact that DEH determined not to retain years of life in its final study suggests that its use could not be supported with the evidence and methods available. Based on the lack of causality in the DEH study, it is not clear how calculation of years of life lost would be necessary or appropriate. Because the differences between the project alternatives in emissions are minimal (and decreasing considerably for all alternatives for most pollutants), the choice among alternatives would not significantly affect years of life in the corridor.

For more information on Health Impact Assessments, please see AQ1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. See Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health issues in the corridor neighborhoods and Attachment J Air Quality Technical Report regarding highway-related health impacts analysis.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Bob Yuhnke |
|---|---|---|

**[O]** neighborhoods. Deletion of this metric in the final HIA is not explained anywhere. Purging this critical metric of community health from the report makes the report less valuable to residents and decisionmakers because of its importance as a measure for comparing community health among neighborhoods.
.
The fact that this key metric was deleted without explanation is highly suspicious. Without any explanation, the motive for removing this important metric must be questioned especially since DEH stated before the release of the final report that there were no changes in the data included in the final compared to the draft. The lack of any explanation suggests an intent to deprive the public of important information, and effectively deceives the public regarding the significance of disparate health effects in these neighborhoods. This omission from the final DEH report further highlights the need for these disparate health outcomes to be explored in an EIS.

**iii) Disproportionately Higher Hospitalization of Children for Asthma.**
The other adverse health outcome for which the disparity between the GES neighborhoods and other areas of the City is quantified is hospitalization for childhood asthma. The final DEH report, Fig. 7, shows 40% greater incidence (38.6 vs. 28.5 admissions/1,000) of hospitalization of children in Elyria/Swansea, and 20% higher in Globeville than the rest of the city. The additional emissions from the train traffic on the main line running between Elyria and Swansea is a plausible explanation for the higher incidence in these neighborhoods. Certainly 40%, and even 20% more children hospitalized for asthma is a significant adverse health outcome for a community that also suffers from other adverse social and economic factors.

**[P]** The facts that 1) the GES neighborhoods have 3.5 years shorter longevity, or 50,000 years of life lost, compared to other neighborhoods in Denver (which was shown by the YPLL data presented in the draft report, but purged from the final), 2) the residents in the districts along the I-70 corridor experienced 50% higher cardiovascular mortality than other parts of the city, and 3) that significantly more children in GES neighborhoods require hospital care for asthma strongly suggests that these adverse health outcomes are linked to air pollution. There is enough variability in socio-economic factors across the four council districts that comprise north Denver that socio-economic factors alone cannot account for higher cardiovascular mortality rates in all four I-70 districts. Some other extrinsic factor, such as air pollution, must be a causative factor.

**2. The Disparate Adverse Health Outcomes Observed in Communities Along the I-70 Corridor Are Causally Related to Exposure to Traffic Pollutants.**

**[Q]** The DEH report does not offer any explanation for these disparate health outcomes other than air pollution. Air pollution is the only environmental factor identified in the report that is causally related to these diseases. Air pollution offers the only reasonable explanation for the elevated incidence in the GES neighborhoods of the four health outcomes identified by DEH as being significantly worse than other areas of Denver. Increased mortality associated with cardiovascular disease is one of the most significant adverse health outcomes identified by EPA as associated with exposure to PM2.5. The correlation between the observed health outcome among residents in the four I-70 districts and the health outcomes predicted by the health effects data reviewed by EPA is strong. Air pollution is also the only well-documented explanation for

5

**[P]** It is important to consider that the DEH study points out that the neighborhoods in question also experience disproportionate levels of poverty, non-highway pollution from stationary sources, and many other factors that contribute to the health status of the communities. For information on impacts of the highway air pollution on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. See also Section 5.20, Human Health Conditions, of the Final EIS regarding environmental health issues in the corridor neighborhoods, Attachment J Air Quality Technical Report regarding highway-related health impacts analysis, and the response to Comment A regarding the decreasing emissions associated with the I-70 corridor and the minor differences among alternatives.

**[Q]** The DEH study does identify a greater incidence of asthma in the Globeville and Swansea and Elyria neighborhoods, along with a number of possible causes, including air pollution from traffic, industrial stationary sources, rail and other sources. As discussed elsewhere, air emissions associated with I-70 will decline between now and 2035 under all alternatives for most pollutants and the differences in the emissions of air pollutants among the alternatives are minor.

For more information on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

**Q**

the higher incidence of hospitalization for asthma among children. Air pollution also includes indoor air pollution from smoking and other sources in the home, so not all of it comes from highways. But the health effects research reviewed by EPA includes studies showing the prevalence of childhood asthma is linked to increased exposure to air pollution from major traffic corridors. The HIA provides no evidence to show that smoking in the home differs enough between council districts to explain the significantly greater hospitalization of children for asthma.

**i) DEH Report Only Identifies Air Pollution As Causally Linked to Disparate Health Outcomes.**

**R**

The DEH report does not offer any other explanation for these disparate health outcomes. Along with air pollution, the DEH report lists possible environmental factors contributing to adverse health outcomes -- noise from trains, traffic and industry, elevated summertime e-coli in the S. Platte, and soil contamination. *See* HIA, Environmental Quality, p. 19. But the report notes that soil contaminants have been removed from the community as part of the CERCLA clean-up of the areas around the former smelters. The HIA offers no plausible explanation for how these remaining environmental factors other than air pollution are linked to the adverse health outcomes that demonstrate worsened health for residents in the GES neighborhoods compared to other parts of Denver. EPA's analysis of the effects of air pollutants on health in the Integrated Science Assessments for PM and NO2 provides a scientific basis for linking PM to all of these adverse health outcomes, and NO2 to some of them. But none of the other environmental risk factors identified in the DEH report have any apparent causal relationship to these adverse health outcomes. For example, noise has never been identified as a cause of childhood asthma, and e-coli in the river is not linked to pre-mature mortality from cardiovascular disease. The only environmental factor listed in the report that is known to be associated with these diseases is air pollution.

Of the sources of air pollution in these neighborhoods, the HIA states: "Vehicle exhaust is the main source of air pollution in Denver." "The [GES] neighborhoods are close to sources of air pollution from vehicles on I-70 and I-25, which carry approximately 150,000 and 250,000 vehicles per day respectively, and are the main sources of air pollution. Stationary sources such as industrial plants also impact air quality." HIA, pp. 20, 19. The report claims that the highest traffic density in the city is downtown, but CDOT traffic measurements show that the highest traffic density in the metro area is actually at the mousetrap, in the center of Globeville and upwind of Elyria and Swansea where 326,000 vehicles pass through daily.

The communities near the mousetrap are exposed to the highest pollutant levels in Colorado. At the mousetrap the total daily trips passing through the interchange are 326,000, more than 30 percent more traffic than any other location in the state. Traffic counts reported by CDOT for 2012 show AADT at the mousetrap as (truck share shown in parenthesis)[1]

I-25 south of interchange: 243,000 (9.1%)
I-25 north of interchange: 198,000 (10.9%)

---
[1] Colorado Department of Transportation, Traffic Data Explorer, 2013. Available online at: http://dtdapps.coloradodot.info/Otis/TrafficData (last accessed October 30, 2013).

6

**R**

The DEH study identified disparate health outcomes and identifies possible causes for these outcomes. It does not definitively establish any of the causal relationships and indicates that further study will be necessary and conducted to do so. DEH identified a number of potential causal factors, including obesity, lack of medical access, lack of activity, lower income, exposure to hazardous substances, etc. Air emissions were identified as a potential cause, too, including emissions from highways, railroads, refineries, power plants and other industrial facilities, including spikes in pollution occurring during upset conditions at stationary sources.

According to the DEH study: "Within the Denver metro area, the highest concentrations of air pollution are near the downtown area [several miles south of Globeville and Elyria Swansea]. Vehicle emissions are highest along I-25 near downtown, as is the traffic density within a one-mile radius of downtown Denver." While there are high levels of emissions along I-70 (and other transportation corridors), they are not the highest in the metropolitan area or state. According to the DEH study: "The average annual level of air pollution in Globeville and Elyria Swansea is not higher than other areas of metro Denver, for the air pollutants routinely measured. But North Denver neighborhoods are located closer to major sources of air pollution (e.g., refinery, power plant, asphalt roofing manufacturer), and occasional spikes are noticeable and measurable." The DEH also noted that concentrations of some pollutants are higher immediately adjacent to roadways like I-70, but fall off with distance. The monitored particulate matter concentrations in Commerce City are well below the applicable NAAQS.

For more information on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

I-70 west of interchange: 150,000 (9.1%)
I-70 east of interchange: 140,000 (9.3%)

Especially important is the fact that the share of AADT represented by truck trips at the mousetrap is much higher than at other locations along I-25. CDOT's data show that approximately 40 percent more truck trips use the I-25 segments north and south of the mousetrap than on I-25 south of downtown at 8th Avenue. Together, the higher AADT and the greater number of truck trips show that the mousetrap is the location in the Denver CBSA where mobile source emissions are the highest.

In addition, regional air quality monitor data received by EPA from the CDPHE, Air Pollution Control Division, and reported on EPA's Air Data website, demonstrate that cumulative effect of traffic emissions combined with industrial pollution is greatest along the interstates. Monitored levels of total particulate matter pollution from all sources in the metro area are highest at the Birch Street monitoring station in Commerce City, located about 2 miles south of Denver city line, and 1.25 miles east of the I-76/I-270 interchange. In the SDEIS, CDOT determined that the pollution levels reported at this monitor are representative of background levels to which I-70 will add emissions from the highway.

Thus when total pollution burden (highway emissions plus existing background) is considered, the neighborhoods along I-70 experience the highest pollution concentrations in the metro area. Therefore it is consistent with the air quality data for the most adverse health outcomes to be observed in the four council districts where I-70 is located.

**ii) EPA Finds Causal Relationship Between Exposure to Traffic Pollutants, Cardiovascular Disease, Pre-Mature Mortality, Asthma and other Adverse Health Outcomes Observed in the I-70 Corridor.**

The U.S. Environmental Protection Agency (EPA) has now identified four criteria pollutants emitted from highways as presenting significant health risks that must be prevented through attainment of the NAAQS near highways: carbon monoxide (CO), PM-10, PM2.5, and nitrogen oxides (NO2).[2] This public health concern is reflected in requirements that states must now establish roadside monitors for PM2.5 and NO2 in addition to the long-standing requirement to monitor CO.[3] In addition to these four mobile source-related criteria pollutants, EPA has identified 92 mobile source air toxic (MSAT) pollutants. MSATs are governed by technology-based standards that must be met in emissions from tailpipes, but are not governed by ambient air standards that limit the concentrations of pollutants to which the public may be exposed. None of these standards take into account the interactions among these pollutants in the ambient air, or their cumulative impact on human health.

Together, these pollutants create a hazardous pall of pollution in the neighborhoods around highways that has been shown to contribute to cardiovascular and respiratory diseases among children, adults and the elderly that 1) increases the need for hospital and urgent care, 2) causes

---

[2] 40 CFR Part 50.
[3] 40 CFR Part 58; 77 Fed. Reg. at 39009 (June 29, 2012); 78 Fed. Reg. at 16,184 (March 14, 2013), *Revisions to Ambient Nitrogen Dioxide Monitoring Requirements*, Final Rule.

7

EPA has found a variety of causal relationships between PM2.5, PM-10 and NO2 and health effects through its science-based NAAQS process. The Clean Air Act Section 109(b) creates a legal duty for EPA to set the NAAQS at levels necessary to protect public health, including an adequate margin of safety. Based on this duty, EPA has set NAAQS for PM2.5, PM10, NO2, and other pollutants that meet this requirement to adequately protect public health. EPA set new NAAQS for both PM2.5, PM10 and NO2 since the 2009 EPA sources cited in the comment; the agency set NAAQS thresholds for the pollutants (as reflected in the Supplemental Draft EIS and Final EIS) that represent the levels necessary for public health. EPA did not set "no threshold" or "zero pollutant" standards. Further, EPA's NAAQS process considers evidence of co-pollutants and mixtures of pollutants in the NAAQS setting process. Thus, findings of compliance with the NAAQS are critical information for decision makers.

The PM10 & CO hotspot analyses that were performed for the Final EIS (see Section 5.10 Air Quality and Attachment J, Air Quality Technical Report for details) predict no violation of these EPA health based standards. As discussed elsewhere, air emissions associated with I-70 will decline between now and 2035 under all alternatives for most pollutants and the differences in the emissions of air pollutants among the alternatives are minor.

For more information on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

Source: Submittal   Document Number: 754   Name: Sierra Club - Robert Yuhnke

pre-mature death that significantly shortens the lives of residents, 3) increases the prevalence of asthma among children which interferes with school attendance and education, and requires medical treatment and hospitalization, 4) interferes with normal lung development in children and adolescents that results in permanent, lifetime impairment of lung function, 5) increases the incidence of debilitating or fatal cancers, and 6) impairs immune function.

In its recent reviews of the adequacy of the NAAQS for $PM_{2.5}$ and NO2, EPA has identified causal relationships between exposure to these pollutants and many of the adverse health outcomes associated with exposure to highway pollutants. In its review of the health effects literature available through 2009 as part of the Agency's determination to make the NAAQS for $PM_{2.5}$ more protective, EPA found [bold in original] [4] –

- "**a causal relationship exists between short-term exposures to PM2.5 and mortality.**"
- "**a causal relationship exists between long-term exposures to PM2.5 and mortality.**"
- "**a causal relationship exists between short-term exposures to PM2.5 and cardiovascular effects.**"
- "**a causal relationship exists between long-term exposures to PM2.5 and cardiovascular effects.**"

Although EPA did not attribute these effects exclusively to fine particles emitted from motor vehicles, EPA did cite studies that establish a causal relationship between exposure to traffic PM, or one or more components of traffic PM emissions, and pre-mature mortality and emergency treatment for cardiovascular outcomes. For example, "multiple outcomes have been linked to a $PM_{2.5}$ crustal/soil/**road dust** source, including cardiovascular mortality"; "studies have reported associations between other sources (i.e., traffic and wood smoke/vegetative burning) and cardiovascular outcomes (i.e., mortality and ED visits)"; "Studies that only examined the effects of individual $PM_{2.5}$ constituents found evidence for an association between EC and cardiovascular hospital admissions and cardiovascular mortality"; [5] "studies found an association between mortality and the PM2.5 sources: …, traffic"; "recent studies have suggested that PM (both $PM_{2.5}$ and $PM_{10-2.5}$) from .. road dust sources or PM tracers linked to these sources are associated with cardiovascular effects." [6]

In addition, EPA cited studies demonstrating a causal relationship between exposure to PM2.5 and childhood asthma: "road dust and traffic sources of PM have been found to be associated with increased respiratory symptoms in asthmatic children and decreased PEF in asthmatic adults." [7]

EPA also found a causal relationship between exposure to NO2 and childhood hospitalization for asthma: "Epidemiologic evidence exists for **positive associations of short-term ambient NO2 concentrations below the current [1983] NAAQS level with increased numbers of ED visits and hospital admissions for respiratory causes, especially asthma.** These associations are particularly consistent among children and older adults (65+ years) when all respiratory outcomes are analyzed together, and among children and subjects of all ages for asthma admissions." [8]

---

[4] *Integrated Science Assessment for Particulate Matter* (US EPA, December 2009), pp. 2-10, 2-11, 2-12.[hereinafter *ISA for PM*] available at: http://cfpub.epa.gov/ncea/isa/recordisplay.cfm?deid=216546.
[5] Note that "EC" is short-hand for "elemental carbon" which is primarily unburned carbon from fossil fuel combustion, and is a significant component of fine particles emitted from diesel and gasoline engines.
[6] *ISA for PM*, p. 2-26.
[7] *Id.*
[8] *Integrated Science Assessment for Oxides of Nitrogen – Health Criteria* (US EPA, July 2008), p. 5-11. available at: http://cfpub.epa.gov/ncea/cfm/recordisplay.cfm?deid=194645.

8

The information on these pages has been reviewed. Responses to **specific comments** are included on the previous page.

| Comments | Responses to Comments |
|---|---|

Source: Submittal   Document Number: 754   Name: Sierra Club - Robert Yuhnke

**S** More recent studies not available for EPA's 2008 *ISA for Oxides of Nitrogen*, or 2009 *ISA for PM*, confirm and strengthen these associations. All of the relevant research currently available that establishes the relationship between exposure to traffic pollution and the adverse health outcomes occurring in residents living along the I-70 corridor, including cardiovascular disease, pre-mature mortality, childhood asthma and cancer, should be included in an assessment of the relationship between adverse health outcomes observed in the I-70 Project area and traffic pollution.

**iii) EPA Finds No Threshold for Safe Exposure to Highway Pollutants.**

In addition to EPA's findings that there is a causal relationship between the mobile source-related pollutants emitted from highways and the disparate health outcomes reported by DEH in the communities along I-70, EPA also found that there is no safe level of exposure to these pollutants. In the *ISA for PM*, at p. 2-25, EPA concluded that "evidence from the studies evaluated supports the use of a no-threshold, log-linear model." EPA reached a similar conclusion with respect to NO2: " In studies that have examined concentration-response relationships between NO₂ and health outcomes, the concentration-response relationship appears linear within the observed range of data, including at levels below the current standard. There is **little evidence of any effect threshold.**"[9] [Emphasis in original.]

**T** The most critical implication of these findings for purposes of assessing health impacts under NEPA is that evidence showing that concentrations of PM2.5 and NO2 are below the NAAQS for these pollutants cannot be relied upon to support a conclusion that exposure to existing concentrations of each of these pollutants is not contributing to the adverse health outcomes being observed in the near-highway communities along I-70.

However, no determination of pollutant exposures for near-highway communities can be made from information provided in the SDEIS because only background concentrations for PM-10 and CO are provided from a monitoring station outside the Project area, and no near-highway measurements are provided for any of the four mobile source-related criteria pollutants.

**3. Existing Adverse Health Outcomes in I-70 Project Area, and Likely Increase Adverse Health Outcomes from Higher Project Emissions, Not Adequately Disclosed by Modeling for Attainment of PM-10 and CO NAAQS.**

**U** The SDEIS air quality analysis is not a surrogate for a comprehensive health impact assessment because 1) the NAAQS are not an adequate surrogate for the health effects associated with exposure to the full array of pollutants emitted from highways, and 2) the modeling reported in the Air Quality Technical Report only includes two of the four NAAQS that establish limits on ambient concentrations of mobile source-related pollutants. Evidence provided in the SDEIS, but not analyzed or discussed for decisionmakers or the public, strongly suggests that Project emissions will cause the NAAQS for PM2.5 to be violated. Other highway pollution data suggest that the NAAQS for NO2 may be violated by Project emissions as well. Emissions of these pollutants from the Project must also be modeled to determine if these NAAQS will be violated.

**V** **i) NAAQS Not a Surrogate for Overall Highway Pollutant Exposures.**

[9] *ISA for Oxides of Nitrogen*, p. 5-15.

9

**T** As previously discussed in the responses to comments A, K and S, EPA has set NAAQS thresholds for pollutants including PM2.5, PM10 and NO2 (as reflected in the Supplemental Draft EIS and Final EIS) that represent the levels necessary for public health. By showing that the project is in compliance with the NAAQS, the EIS provides critical information for the decision makers. In addition, the lack of significant differences between alternatives, along with the substantially decreasing emissions of almost all pollutants show that there are no significant impacts associated with the choice among alternatives and that total air pollution emissions associated with I-70 East will be declining over time. The monitoring station that provides the background concentrations changed for the Final EIS, and was decided in coordination and agreement with CDOT, FHWA, CDPHE, and EPA; see Attachment J, Air Quality Technical Report for details.

For information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, and air quality in the area please see AQ2 and AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**U** A review of the environmental health issues in the corridor neighborhoods is included in Section 5.20, Human Health Conditions, of the Final EIS, and a comprehensive health impact assessment is not required by NEPA or the Clean Air Act. The Air Quality protocols that determined which pollutants and the methodology used to analyze the air quality impacts of the project were developed through interagency coordination between CDOT, FHWA, CDPHE, and EPA. All agreed that PM2.5 and NO2 did not need to be modeled because they are not pollutants of concern in the Denver area or the project area, at the present time or in the foreseeable future. The results of the air quality analysis show that the No-Action and the Build Alternatives will not result in exceedances of the NAAQS, which have been set by the EPA to protect human health. For information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q. See also responses to comments V, W, and X.

For information on air quality in the project area, please see AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

*Responses continue on the following page.*

| Comments | Responses to Comments |
|---|---|
| Source: Submittal    Document Number: **754**    Name: Sierra Club - Robert Yuhnke |  |

All the air pollutants emitted from mobile sources in the I-70 corridor contribute to the adverse health effects experienced by residents in the neighborhoods along I-70. These include the four mobile source related criteria pollutants governed by a NAAQS pursuant to section 109 of the CAA, and the mobile source air toxic (MSATs) pollutants regulated pursuant to section 202(l). 42 U.S.C. § 7521(l).

EPA has listed pollutants as MSATs that cause chronic adverse health effects, such as cancer, and acute effects from short-term exposures (hours or days) such as asthma attacks. Congress listed benzene, 1,3 butadiene and formaldehyde as mobile source-related air toxics in the 1990 CAA amendments when it required EPA to set vehicle emission standards for these pollutants. *Id.* EPA included these three statutory MSATs and ten other mobile source-related toxic pollutants on a list of 33 priority pollutants targeted for control under EPA's Integrated National Urban Air Toxics Strategy.[10] This Strategy "established a list of urban HAPs ["hazardous air pollutants"] which pose the greatest threats to public health in urban areas, considering emissions from major, area and mobile sources."[11]  EPA observed that "mobile sources are an important contributor to the urban air toxics problem."[12]

The neighborhoods near I-70 suffer from some of the worst air in the state. More than half a million pounds of toxics were released into the air in Globeville, Swansea, and Elyria in 2012, according to EPA's Toxics Release Inventory – more than any other zip code in Colorado, and more than 20 percent of the state's total toxic air releases.[13] Denver County as a whole suffers from some of the worst diesel particulate pollution in the entire nation – ranking 9th out of the 3,109 counties nationwide. The lifetime cancer risk from diesel soot in Denver exceeds the risk of all other air toxics tracked by EPA. Diesel soot is a major component of PM2.5 near highways, and is a major source of the health risks linked to breathing fine particles. The average lifetime diesel soot cancer risk for a resident of Denver County is 1 in 1,938, which is 516 times greater than the EPA's acceptable cancer level of 1 in a million.[14] This diesel pollution is likely most concentrated at the mousetrap, where Colorado's two most heavily traveled highways – I-70 and I-25 -- intersect.

EPA's findings that exposure to MSATs poses serious threats to public health were significantly enhanced by research conducted by the South Coast Air Quality Management District to monitor and model exposures to 31 urban toxic air pollutants in the Los Angeles air basin. Four studies have now been completed in a series known as the *Multiple Air Toxics Exposure Study* (MATES). Beginning with MATES-II (March 2000), the measurements of toxic air pollutants in the ambient air throughout the Los Angeles basin provided compelling new evidence that the cancer risk attributable to public exposure to ambient concentrations of toxic air pollutants is much higher than had been previously suspected, and is attributable primarily to mobile source

[10] 64 Fed. Reg. 38,706 (July 19, 1999).
[11] *Id.* at 38,714.
[12] *Id.* at 38,705.
[13] EPA's TRI website at: http://www2.epa.gov/toxics-release-inventory-tri-program using zip code 80216.
[14] Clean Air Task Force website, Diesel Soot Health Impacts: Where You Live, Denver County. Available at: http://www.catf.us/diesel/dieselhealth/county.php?c=08031&site=0 (last accessed October 14, 2013).

10

The Final EIS considers the emissions of both NAAQS and MSAT pollutants for all of the alternatives during the period from 2010 to 2035, based on protocols and methodologies approved by EPA and CDPHE. As reported in the Final EIS Section 5.10, Air Quality, and Attachment J Air Quality Technical Report, emissions of benzene, 1,3 butadiene, formaldehyde, diesel particulate matter and other MSATs have been modeled and they are predicted to decline in the corridor considerably between 2010 and 2035 for all alternatives, even accounting for increases in VMT. As an example, diesel particulate emissions are forecast to decline by a factor of 15 times during this period. Further, the difference between the alternatives in these much lower emissions is around 2-4 percent (e.g., 2 percent for diesel particulate matter). Thus, analyses of historic emissions, concentrations, or health impacts do not guide the choice among alternatives. According to the DEH Health Impact Assessment: "Within the Denver metro area, the highest concentration of air pollution are near the downtown area [several miles south of Globeville and Elyria Swansea]. Vehicle emissions are highest along I-25 near downtown, as is the traffic density within a one-mile radius of downtown Denver." While there are high levels of emissions along I-70 (and other transportation corridors), they are not the highest in the metropolitan area or state. According to the DEH study: "The average annual level of air pollution in Globeville and Elyria Swansea is not higher than other areas of metro Denver, for the air pollutants routinely measured. But North Denver neighborhoods are located closer to major sources of air pollution (e.g., refinery, power plant, asphalt roofing manufacturer), and occasional spikes are noticeable and measurable." While the MATES studies, conducted by the South Coast Air Quality Management District in the Los Angeles metropolitan area, have provided information about health impacts in the Los Angeles area, they do not provide information about the impacts of the alternatives under consideration for I-70 East. The levels of traffic, nearby stationary and other sources, airports, seaports, meteorology, modeling and other factors in the MATES studies in Los Angeles vary considerably from Denver generally and I-70 East particularly. Further, the MATES studies' conclusions regarding cancer and other health effects rely on health risk factors adopted by the State of California that have not been adopted by EPA or CDPHE. For example, cancer risks estimated in the MATES studies are dominated by diesel particulate matter based on carcinogenic dose-response relationships that EPA has not accepted. As discussed in the response to Comment A and elsewhere, I-70 Corridor-specific emissions are expected to drop considerably between now and 2035 and will not significantly vary among alternatives. The reductions in emissions are not gradual, but instead are very large reductions (e.g., 15-fold reduction in diesel particulate matter). While EPA's 2009 comments on the 2008 Draft EIS did suggest conducting more health study, it has agreed to the air quality analysis protocol used in the 2014 Supplemental Draft EIS and the Final EIS. It also did not argue for additional health impact assessment studies in its comments on the Supplemental Draft EIS or for dispersion modeling of PM2.5 or NO2. The Final EIS considers all reasonable alternatives to address the identified purpose and need. NEPA does not require FHWA to provide any detailed examination of alternatives that cannot meet the purpose and need of this project.

For information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on air quality in the project area, please AQ3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

EAR_0230

| Comments | Responses to Comments |
|---|---|

| Source: | Submittal | Document Number: | 754 | Name: | Sierra Club - Robert Yuhnke |
|---|---|---|---|---|---|

emissions. The total cancer risk from all sources, including traffic ("on-road mobile"), non-road mobile and stationary sources, averaged across the region was found to be 1400 per million.  On-road vehicle emissions accounted for half of this risk, or 700 per million.  This equates to about 1 cancer for each 1450 exposed people.

MATES-II also demonstrated that higher levels of exposure and risk occur near highways.  The study found that the range of cancer risks varied significantly across the region, from 1,120 in a million in the cleanest neighborhoods to about 1,740 in a million in the most polluted. *Id.,* p. 7-1, ¶ 1. The Report found the greatest risk levels at locations where "the dominance of mobile sources is even greater than at other sites." *Id.,* ¶ 2. It also found that "model results, which are more complete in describing risk levels…than is possible with the monitored data, show that the higher risk levels occur… near freeways." *Id.,* p. ES-5, ¶ 2. "Results show that the higher pollutant concentrations generally occur near their emission sources." *Id.,* ¶ 4. These findings provide further evidence that neighborhoods near highways would experience higher concentrations than the regional averages. Based on all these observations, MATES-II concluded that "[f]or mobile source compounds such as benzene, 1-3 butadiene, and particulates associated with diesel fuels, higher concentration levels are seen along freeways and freeway junctions." *Id.,* p. 5-9.

MATES-IV (October, 2014),[15] the most recent iteration of the toxic air pollutant exposure research in the Los Angeles basin, shows significant reductions in toxic pollutant concentrations other than diesel particulate and associated cancer risks. But the most recent data does not support the conclusion that cleaner vehicles have eliminated the health risks from exposure to MSATs. The MSATs included in the study, benzene and 1,3 butadiene, "were down 35% and 11%, respectively." But this reduction was significantly less than the reductions in air toxics emitted from stationary sources. The remaining toxic emissions from mobile sources continue to present a significant health risk, especially in locales near highways and interchanges where concentrations are highest.

While diesel particles are counted as part of PM2.5 and are included in monitored concentrations, other components of diesel exhaust are MSATs, and MSATs emitted from gasoline vehicles are not emitted as particles, and are not counted as PM. Emitted as gases from diesel and gasoline vehicles, other MSATs include benzene, formaldehyde, 1,3 butadiene, and the other hazardous air pollutants listed by EPA in its Urban Air Toxics strategy. The AQ Technical Report lists some of these MSATs, and provides estimates of the reductions in emissions of these pollutants expected by 2035. However, the SDEIS does not link current emissions to the community exposures that are contributing to adverse health outcomes in nearby communities,  and makes no effort to estimate the residual impact that future emission of these pollutants will have on human health during the 20 years after the Project comes into service.

The DEH report, Fig. 11, provides compelling proof that traffic emissions cause benzene pollution levels that are 3 to 5 times higher in neighborhoods near the interstates than in other areas away from major highways. [In response to inquiry, Gregg Thomas at DEH informed me

**V**

The information on these pages has been reviewed. Responses to **specific comments** are included on the previous page.

[15] MATES-IV (South Coast Air Quality Management District, 2014) available at : http://www.aqmd.gov/docs/default-source/air-quality/air-toxic-studies/mates-iv/mates-iv-draft-report-10-1-14.pdf?sfvrsn=2.

11

| Comments | Responses to Comments |
|---|---|

Source: Submittal   Document Number: 754   Name: Sierra Club - Robert Yuhnke

that the units in Fig. 11 are modeled benzene concentrations.] This pattern of elevated exposure to a potent carcinogen near highways is likely typical of other MSATs emitted from highways. These modeling results provide a local example of the pollutant exposures that contribute to adverse health outcomes in these neighborhoods.

In its 2009 comments on the DEIS, EPA flagged this omission as a major flaw in the DEIS. As the results of the latest MATES-IV report shows, the health risks associated with exposure to MSATs remain significant. The use of trend data in the SDEIS to show gradual reductions in future exposure to these pollutants is not enough to justify FHWA's failure to provide an assessment of exposures in response to EPA's comment. The evidence available from MATES-IV establishes that these pollutants will continue to contribute to adverse health effects from continuing exposure to mobile source pollutants. FHWA offers no evidence to establish that no beneficial improvement in health could be achieved by implementing alternatives that remove traffic and pollution from these communities. The obligation under NEPA and FAHA remains to disclose the impact that future emissions of mobile source pollutants – both criteria and MSAT pollutants -- will have on community health. The available evidence that MSATs will continue to contribute to future overall adverse health outcomes in communities along the I-70 corridor. These impacts are a "significant impact on the human environment" that must be assessed and disclosed.

**ii) Not All Impacts of Highway-related Pollutants on National Ambient Air Quality Standards Have Been Investigated and Disclosed.**

The Air Quality Technical Report (AQ Report), supplemental draft environmental impact statement (SDEIS), claims, at p. 83, that –

> Motor vehicle emissions from the implementation of the No-Action and Build Alternatives in the study area have been evaluated. With the exception of PM for several of the project alternatives, the project is not expected to cause any new violations of any standard, increase frequency or severity of any existing violation, or delay timely attainment of the NAAQS.

This assertion is not correct because the AQ Report only includes modeling of expected ambient concentrations for CO and PM-10. An emissions inventory has been developed for PM2.5, but the ambient concentrations of PM2.5 have not been specifically modeled or reported. An emissions inventory has been reported for NO2, but no modeling has been conducted. No explanation is offered in the AQ Report why PM2.5 and NO2 have not been modeled to determine the impact that emissions of these pollutants will have on attainment of the applicable NAAQS. In addition, the claim that one Build Alternative will not violate the NAAQS for PM-10 is not credible for the reasons discussed below.

Given EPA's findings that emissions of PM2.5 and NO2 from highways present a significant risk of causing violations of the NAAQS for those pollutants in neighborhoods near highways, and highway emissions studies that confirm those findings, emissions of those pollutants significantly impact the human environment and therefore trigger the obligation under NEPA to (i) investigate and disclose to the public and decisionmakers in the SDEIS the likelihood that emissions of those pollutants from the I-70 Project threaten to violate the NAAQS for PM2.5 and NO2, and (ii) to identify alternatives or mitigation measures sufficient to prevent or avoid any likely violations of such NAAQS. In addition, section 109(h) of the Federal-Aid Highway Act

12

**W** CDOT, FHWA, CDPHE, and EPA have all coordinated regarding analysis needs, specifically including the pollutants for which there is a local air quality concern. They specifically identified PM10 and CO as a result of past nonattainment and current maintenance area status. And, the analysis was specifically tied to intersections with LOS below level C, which is usually tied to CO hotspots. The identification of the need to model hotspots specifically excluded PM2.5 and NO2, because these pollutants have never been pollutants of local air quality concern in the Denver Metropolitan area and all monitoring for these pollutants show concentrations well below NAAQS standards. EPA's general, nationwide concerns about PM2.5 and NO2 do not demonstrate that they are localized concerns with NAAQS likely to be violated in the Denver area. This is particularly the case where the emissions inventories for the I-70 East corridor show large reductions in PM2.5 tailpipe and NO2 emissions (the precursor to NO2). For example, the emissions analysis shows that PM2.5 emissions will drop from 0.74 tons per day in 2010 to 0.37 tpd for the No-Action Alternative or 0.38 tpd for the Partial Cover Lowered Managed Lane Alternative in January. NO2 emissions are predicted to drop from 15.38 tpd in 2010 to 3.40 tpd for the No-Action Alternative in 2035 or 3.50 for the Partial Cover Lowered Managed Lanes. Both pollutant inventories account for increases in VMT. Further, the difference between the No-Action and Partial Cover Lowered Managed Lanes Alternative was only 2.7 percent for PM2.5 emissions in 2035 and 3.5 percent for NO2. There is no specific basis for believing that NO2 NAAQS would be exceeded near I-70 other than that EPA has found exceedances in some high-traffic areas elsewhere in the country. However, actual monitoring data in Colorado shows that monitored levels of NO2 are well below short-term and long-term standards. This includes CDPHE's new NO2 near-road monitor at I-25 in Downtown Denver that experiences much higher, close-by vehicle counts than along I-70. See CDPHE/APCD, Colorado Annual Monitoring Network Plan 2015 (June 2015): at http://www.colorado.gov/airquality/tech_doc_repository. aspx?action=open&file=2015AnnualNetworkPlan.pdf. In addition, the conformity regulations provide for hotspot analyses of PM and CO, not NO2. See also the responses to comments X and Y, as well as Attachment J Air Quality Technical Report.

For more information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

**W**

requires that any such mitigation measures needed to prevent violations of NAAQS be implemented in the ROD.  As discussed in more detail in the legal section of these comments, the failure to investigate and disclose potential violations of these NAAQS, and the failure to identify such violations and/or mitigation measures as are necessary to prevent of avoid such violations makes this SDEIS inadequate as a matter of law.

**PM2.5 Attainment.** EPA found the highest relative risk factors for the adverse health outcomes observed in the near-I-70 neighborhoods to be associated with exposure to PM2.5 (fine particles smaller than 2.5 micrometers in diameter), also referred to as soot. This is the air pollutant emitted from diesel trucks and gasoline vehicles, and particles that result from brake and pavement wear. But the impact of PM2.5 emitted from the Project on ambient air quality are not modeled in the AQ Technical Report, and not discussed in the SDEIS.

A short-hand approach for using the modeling results for PM-10 to approximate the concentrations of PM2.5 demonstrates that traffic emissions of PM2.5 from every Project scenario will violate the 24-hour NAAQS for PM2.5. Compliance with the annual NAAQS for PM2.5 is not discussed or demonstrated anywhere in the SDEIS.

The emissions inventory developed for the analysis and modeling of of PM-10 concentrations includes an emissions inventory for PM2.5, which constitutes a fraction of total PM-10. The inventory data show that PM-10 particles less than 2.5 µm in diameter comprise 57% of total PM-10 emissions from the I-70 Project. *See AQ Report*, Tables 22 and 23, p.69 (showing that daily total PM-10 emissions from traffic in the I-70 in January 2035 will be 0.7 tons/day, and of that total 0.4 t/d will be PM2.5).

**X**

The air quality modeling for PM-10 estimates that the cleanest build alternative (the lowered 10-lane scenario with a single 800 feet cover, an interchange at Vasquez Blvd/Steele St and managed lanes) will add 38 µg/m3 to daily (24-hr) background concentrations of PM-10. The emission inventory data states that of this 38 µg/m3 of PM-10 added by Project emissions, 57% will be PM2.5. Thus if the 43% of the PM-10 that is larger than 2.5 µm is removed from the calculation, the concentration that remains is particles in the PM2.5 size range. Thus the modeling demonstrates that traffic emissions from the project will add (38 x .57) 21.7 µg/m3 to daily concentrations of PM2.5 at the peak receptor locations.

Using the same methodology used in the AQ Report to estimate future 24-hour concentrations of PM-10, this 21.7 µg/m3 of PM2.5 must be added to the 98th percentile concentrations of PM2.5 measured at the monitoring station used to establish background air quality for the Project area. Background 24-hour concentrations of PM2.5 at the Commerce City monitoring station (Birch Street and 71st) , using EPA's methodology for calculating the 24-hour "design value,"[16] consistently exceed 20 µg/m3 in the project area. *See Design Values for 2011, 2012, 2013* (attached hereto as Appendix A).

When the approximate 24-hour concentrations of PM2.5 added by Project emissions, as derived from the PM-10 modeling results, are added to background PM2.5 design values occurring at the Commerce City monitor, the modeling results for PM-10 demonstrate that even the cleanest

---

[16] 40 CFR Part 50, Appendix N.

13

**X**

The project includes a PM10 hotspot analysis per EPA guidelines. The project does not include a PM2.5 hotspot analysis, for the reasons discussed in the response to comment U. The "short-hand approach" for extrapolating from PM10 dispersion modeling to reach conclusions regarding PM2.5 concentrations is not supported by any EPA or CDPHE regulations, guidance or protocols. The approach also relies on a fundamental error in applying the ratio of PM10 and PM2.5 emissions from Tables 22 and 23 of the Air Quality Technical Report from the Supplemental Draft EIS. However, these tables only account for the tailpipe, road wear and tire wear elements of PM2.5 and PM10 emissions, even though the vast majority of PM10 emissions (87 percent) modeled are from re-entrained road dust. The project follows the EPA PM10 hotspot analysis per EPA guidelines. See Tables 22, 23 and 35 of the Final EIS Attachment J Air Quality Technical Report. This error is critical, because most of the tailpipe emissions are very small diameter particulates that qualify as PM10 and PM2.5. However, the same assumption cannot be made of road dust, which is disproportionately PM10 and not PM2.5. The precise fraction of PM2.5 in road dust from paved roads is small and dependent on a multitude of factors, including the proportion of silt in soil material on roads, the precise formulation of traction materials applied for snow and ice, sweeping activities, region-wide measures to reduce road dust, rain and other wet conditions, etc. None of these factors were addressed in the methodology for the "short-hand approach." The difference is also critical because EPA requires road dust to be considered in PM2.5 hotspot analyses "only if EPA or the state air agency has made a finding that such emissions are a significant contributor to the PM2.5 air quality problem in a given nonattainment or maintenance area." EPA, Transportation Conformity Guidance for Quantitative Hot-Spot Analyses in PM2.5 and PM10 Nonattainment and Maintenance Areas at Sections 2.5.3 and 2.5.4 (Nov. 2013). In this circumstance neither CDPHE nor EPA have identified a PM2.5 air quality problem for Denver (to the contrary, CDPHE consistently finds monitored levels below NAAQS values) nor that road dust contributes to such a problem. Removing the road dust portion of the PM10 inventories modeled for the I-70 East alternatives drastically reduces PM2.5 emissions and the percentage that could be used under the "short-hand approach," such that it would not exceed NAAQS thresholds, even if such methodology were appropriate. As a result, the only credible evidence -- the monitored levels used by the agencies -- strongly supports the conclusion that there is no PM2.5 problem that would require or justify modeling PM2.5 concentrations and no risk of a PM2.5 NAAQS exceedance. Since the concentrations from dispersion models are directly proportional to emissions, the relative differences in concentrations between alternatives (modeled concentrations, not including background) would be the same for PM10 and any other pollutant.

| Comments | Responses to Comments |
|---|---|

Source: Submittal  Document Number: 754  Name: Sierra Club - Robert Yuhnke

**X**

Project alternative will contribute to 24-hour concentrations greater than 40 µg/m3. The 24-hour NAAQS is 35 µg/m3. The PM-10 modeling results for other Project alternatives show that PM2.5 emitted from these alternatives will add even more than 40 µg/m3 of PM2.5 to background 24-hour concentrations. Therefore, all Project alternatives will cause violations of the 24-hour NAAQS for PM2.5.

Given this evidence that the 24-hour NAAQS for PM2.5 will be violated, NEPA requires that the Draft EIS must consider Project alternatives or control strategies that will prevent or avoid these violations. See 40 CFR §§1502.1, 1502.2(d), 1502.14 and 1502.16(h). To determine whether alternatives or control strategies will be adequate to prevent NAAQS violations, the impact of Project emissions on PM2.5 concentrations must include a quantitative assessment of the expected magnitude of violations of both the 24-hour and annual NAAQS, and a quantitative demonstration that alternatives or control strategies will achieve sufficient reductions in emissions to ensure attainment at all receptor locations included in the modeling analysis.

**PM-10 Attainment.** The modeling results for PM-10 show that traffic emissions from five of the six "build" Project alternatives will violate the 24-hour NAAQS for PM-10. See AQ Report, Table 20, p.65. These violations are expected to exceed the PM-10 NAAQS (150 µg/m3) by 20 to 45 µg/m3. Only one "build" alternative (the lowered 10-lane scenario with a single 800 feet cover, an interchange at Vasquez Blvd/Steele St and managed lanes referred to as the "Basic Option") and the No-build alternative are modeled as exactly attaining the NAAQS.

Despite the requirement of 40 CFR §1502.14(e) that the Draft EIS identify a "preferred alternative," no alternatives are identified as preferred. Each alternative is treated as an available option for CDOT and FHWA to select. Therefore the Draft EIS must identify Project alternatives or control strategies that will prevent or avoid these modeled NAAQS violations for each of the available options. See 40 CFR §§1502.1, 1502.2(d), 1502.14 and 1502.16(h).

**Y**

In addition, the modeling result for the one lowered, managed lane option that allegedly does not violate the NAAQS is not credible. The emissions for the alternative that demonstrates attainment (the "Basic Option") is modeled to add only 38 µg/m3 to ambient concentrations of PM-10, whereas emissions from the other lowered, managed lane option (with two covers and no interchange at Vasquez Blvd/Steele St referred to as the "Modified Option") is expected to add 82 µg/m3 to background concentrations of PM-10, thereby causing concentrations at peak receptors to reach 195 µg/m3, violating the NAAQS by 45 µg/m3. See AQ Report, Table 20. Yet the expected winter day emissions of PM-10 from the two alternatives are virtually identical: 0.68 t/day. See AQ Report, Table 23 (p. 69). The discussion of PM emissions in the AQ Report, at p.68, explains that –

Although there are minor differences in emissions among the No-Action and Build Alternatives, there is no real discernible difference, since they are all very close in any given year. The particulate matter emissions are not a discriminating factor in the selection of a preferred alternative.

It is not plausible that virtually identical emissions from the two lowered, managed lane alternatives could produce daily ambient concentrations of PM-10 that differ by 45 µg/m3.

The traffic data for these two alternatives also does not explain the large (55%) difference in peak daily ambient concentrations of PM-10 added by the two alternatives (38 µg/m3 versus 82

14

**Y** The modeling analysis for PM10 was revised since the release of the Supplemental Draft EIS, in coordination with the EPA and the CDPHE. The higher predicted emissions from the Partial Cover Lowered Alternative, Modified Option was caused by the accumulation of emissions from both of the covers converging in one location between the two covers. With the Basic Option, there is only one cover, so this accumulation did not occur. The second cover is not included as part of the Preferred Alternative in the Final EIS, but if it is pursued by others in the future, air quality will need to be analyzed. The PM10 analysis performed for the Final EIS shows that all alternatives will result in levels at or below the NAAQS for this pollutant. For information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|
| Source: Submittal    Document Number: 754    Name: Sierra Club - Robert Yuhnke | |

μg/m3). The Basic Option has higher expected traffic (annual VMT = 2,959,000) on I-70, compared to expected traffic on the Modified Option (annual VMT = 2,935,000). Total VMT in the Project study area differs between the two alternatives by less than 0.35%: Basic Option = 25,036,000 versus Modified Option = 25,125,000. [17]

**Y**

Given that the contribution added to ambient concentrations by the Modified Option (82 μg/m3) is much closer to the concentrations added by other alternatives without managed lanes, and without covers over segments of the lowered portion of the Project, the much lower contribution added by the Basic Option (38 μg/m3) is the implausible outlier. In the absence of any correlation between the significantly lower ambient concentrations for the Basic Option and key factors that could account for 55% lower concentrations, such as either lower total Project emissions or significantly lower traffic counts, the claim that the Basic Option will not contribute to violations of the NAAQS for PM-10 is not credible.

Information that would help better understand the modeling results is not provided in the AQ Technical report. Missing information includes data files showing inputs to the MOVES emission model and to the dispersion model runs.

**II. Construction Emissions.**

Neither the Draft EIS, nor the AQ Technical Report include any discussion of the likely impact that construction emissions will have on air quality or adverse health outcomes in the communities affected by emissions from heavy equipment during construction operations.

**Z**

Emissions during construction will be a much greater concern for this project than most highway projects because of the years of excavation and earth moving that will be required to dig the trench and haul the removed earth to a disposal site 20 or more miles away. For most projects, construction activities are limited to grading, laying a road bed and paving. Here, the years of excavation required will likely increase construction emissions by an order of magnitude compared to most projects.

Despite the potential significance of these emissions for community health, the SDEIS lacks any discussion of the mitigation measures available to CDOT to require contractors to use low sulfur fuels, employ low-emitting equipment that can minimize the impact of diesel fumes on local residents, and other mitigation measures identified in EPA's 2008 comment letter.

EPA has now added non-road emissions factors to the MOVES model for use in modeling the impact of activities such as construction on ambient air quality. This tool should be applied to the expected construction operations during the excavation of the I-70 trench in addition to more traditional highway construction activities to estimate the likely impact on air quality near the construction zone.

---

[17] *See* I-70 East Environmental Impact Statement, Traffic Technical Report, Figures 86 and 88, pp. 95-96.

15

**Z** Construction impacts are not required to be assessed if construction will not last more than 5 years in any individual site (40 CFR 93.123(c)(5)), and there is no credible evidence that there will be any exceedances of the NAAQS during the construction period. Monitoring supported data available nationwide and specific to Colorado highway construction confirms that BMPs for dust control and suppression deployed by CDOT and other DOTs have been successful in goal of keeping temporary construction dust from contributing to an exceedance or violation of the public health PM10 NAAQS.

Many mitigation measures have been identified in the Final EIS to offset the impacts of the project. For information on project mitigation measures, please see IMP1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The concerns regarding dust during construction have been adequately addressed in the Final EIS. For information on mitigating fugitive dust during construction, please see IMP7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

**Z**

In addition the alternatives and mitigation options discussed by EPA in 2009 should be committed to minimize public exposure during construction. Additional measures should be committed if emissions will potentially contribute to exceedances of short-term NAAQS.

**III. Legal Standards for Decisionmaking Not Satisfied by SDEIS.**

Three statutory regimes establish decisi0nmaking criteria relevant to the health and air quality issues of concern to local residents: 1) the National Environmental Policy Act (NEPA), 42 U.S.C. 4321 et seq.; 2) section 109(h) of the Federal Aid Highway Act (FAHA), 23 U.S.C. 109(h); and 3) the conformity requirements of section 176(c) of the Clean Air Act, 42 U.S.C. § 7506(c). The SDEIS fails to comply with each of these statutes because it does not –

**A1**

1. investigate all of the adverse impacts of emissions from the Project;
2. disclose to decisionmakers and the public all potential adverse impacts of the Project;
3. consider numerous reasonable alternatives, or mitigation measures, that can avoid or prevent some or all of the adverse health and air quality impacts;
4. include the costs of mitigation as required by FAHA;
5. does not contain any comparison of mitigation costs with transportation benefits to explain why the Project is in the "best overall public interest"; and
6. does not contain a conformity determination as required by the CAA.

**A. NEPA Rules Governing Federal Decisionmaking.**

The CEQ NEPA regulations that govern environmental statements require that an EIS must –
   1) disclose to the public and the decisionmaker any "significant environmental impact" the proposed action will likely have, 40 CFR 1502.1; and
   2) "inform decisionmakers and the public of reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment;" *id.*, and
   3) "discuss means to mitigate adverse environmental impacts" which includes avoiding the impacts by not taking the action, or compensating for the impacts by providing alternative resources or environments. 40 CFR 1502.14(f), 1502.16(h), 1508.20.

**B1**

The Supreme Court has interpreted these provisions to require that an EIS must consider alternatives and mitigation that can avoid or minimize the adverse impacts of a proposed project. As the Supreme Court observed, embedded in these requirements "is an understanding that the EIS will discuss the extent to which adverse effects can be avoided." *Robertson v. Methow Valley*, 490 U.S. 332, 352 (1989). The SDEIS for I-70 is inadequate because the project alternatives and mitigation options were not evaluated to determine whether they will "avoid or minimize" the adverse health impacts on the near-highway communities that will result from increased exposure to harmful pollutants, or avoid localized NAAQS violations that will likely be caused by emissions from the expanded highway. Equally important, the SDEIS fails to consider alternatives that will "enhance the quality of the human environment" by reducing pollutant exposures in the communities along I-70 below levels that are currently contributing to disparate adverse health outcomes for residents in communities near I-70.

Mitigation cannot be evaluated in the abstract; it must be evaluated with reference to the adverse impacts that are to be avoided. Here, the failure to estimate adverse health outcomes attributable

16

**A1** Refer to responses to comments B1, C1, D1, E1, and F1 for detailed information and responses to these points.

**B1** The Final EIS discloses project-related impacts for all alternatives and considers mitigation measures where there are project impacts. For example, see IMP1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q regarding mitigation to address emissions during the construction period. NEPA does not require FHWA to consider or implement alternatives that are not feasible and prudent, such as removing I-70 from this corridor or rerouting traffic to the I-76/I-270 corridor. Similarly, moving residents to other locations is not reasonable. It also isn't a feasible mitigation measure because no areas have been identified in the Final EIS analysis to exceed any state or federal air quality standard. No portion of the Denver metropolitan area experiences zero pollution levels from motor vehicles and there are no criteria provided that would allow CDOT to determine what areas are "safe and healthful." For example, some areas with lower PM2.5 may have higher ozone levels. The purpose of the EPA and CDPHE NAAQS and MSAT programs are to allow all areas to meet health standards and reduce overall risk. As discussed in detail in the Final EIS, all of the alternatives evaluated will experience significant reductions in emissions for all health-related pollutants (except for road dust), even with increases in VMT. Thus, any health effects below NAAQS thresholds or pollutants without EPA thresholds are expected to improve with time. The analysis of air quality shows that no exceedances of air quality standards are expected. Furthermore, extrapolating the existing ratio of PM2.5 to PM10 to other scenarios in an effort to predict violations of the NAAQS is not scientifically valid, as particulate emissions in different size fractions come from multiple different sources, not all of which vary at the same rate with changes between build alternatives or traffic loads. And, all of the alternatives are nearly identical from an air quality perspective, with only very small differences between them and none exceeding applicable standards. Accordingly, there is no requirement under NEPA to conduct further analyses or analyze mitigation.

For more information on transportation-related pollutants, including PM2.5, NO2, CO, and PM10, please see AQ2 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

**B1**

to current and future emissions from I-70, provides no basis for estimating the health benefits likely to accrue to the near-highway communities that could be achieved by reducing pollutant exposures through an alternative that, for example, would divert "through" traffic onto I-76 and I-270. Similarly, the mitigation needed to avoid violations of the NAAQS for PM2.5 or NO2 cannot be determined without modeling PM2.5 and NO2 emissions from the Project to determine the magnitude of likely violations of the NAAQS. The SDEIS fails to disclose these likely significant impacts, fails to determine the extent of the pollutant concentrations that would need to be reduced to avoid adverse health effects or NAAQS violations, and fails to consider any alternatives or mitigation sufficient to avoid the adverse health effects or NAAQS violations.

Both increased health impacts, 40 CFR 1508.27(b)(2), and the likelihood of violating an environmental standard such as a NAAQS, 40 CFR 1508.27(b)(10), are separate criteria for determining that an impact is "significant" for the purpose of triggering an investigation under NEPA. The failure of this SDEIS to address either the impact of Project emissions on health outcomes in the affected neighborhoods, or the likelihood that emissions will cause the NAAQS for PM2.5 and NO2 to be violated, makes the SDEIS deficient. The I-70 SDEIS falls short of these requirements because the air quality section includes a modeling analysis of only two of the criteria pollutants emitted from highways: CO and PM-10, but not the pollutants EPA has identified as most responsible for the adverse health effects of highways: PM2.5 and NO2. In addition, the SDEIS includes no discussion or analysis of the adverse health impacts associated with the total exposure to all the pollutants emitted from highways that will result from increasing traffic by 30% above current levels. The current SDEIS is deficient both because there is no consideration of the overall public health impact of exposure to all pollutants that will be emitted from the Project, and because the analysis of whether specific criteria pollutants will violate relevant NAAQS is lacking or deficient.

The short-hand approach using the modeling results for PM-10 emissions from the Project discussed above to approximate the impact of PM2.5 emissions on attainment of the NAAQS demonstrates why PM2.5 emissions from the Project "threaten a violation" of the NAAQS for PM2.5. This evidence may not be suitable for establishing expected concentrations of PM2.5 for the purpose of determining whether any proposed alternative or mitigation is sufficient to prevent a violation of the NAAQS, but it is suitable for the purpose of demonstrating that the Project threatens to violate the NAAQS. That threat triggers the obligations to determine what the impact that such emissions will have on attainment of the NAAQS, to ensure the scientific integrity of the methods used to assess the threat, 40 CFR § 1502.24, and to determine how much emission reduction is needed to avoid or prevent the violation.

In this case, where a violation of the CAA is threatened by causing or contributing to violations of a NAAQS, the methods prescribed by EPA for assessing the impact of highway emissions on NAAQS violations should be used because the use of a method not approved by EPA would not satisfy the requirement that an EIS "shall state how alternatives … will or will not achieve the requirements of … other environmental laws and policies." 40 CFR § 1502.2(d). The analysis for PM-10 and CO apply the methodologies prescribed by EPA in its Quantitative Guidance for making project-level conformity determinations. Those methodologies should be applied to assess the likely impacts of PM2.5 and NO2 emissions as well.

The information on these pages has been reviewed. Responses to **specific comments** are included on the previous page.

| Comments | Responses to Comments |
|---|---|

Source: Submittal    Document Number: **754**    Name: Sierra Club - Robert Yuhnke

**C1** The requirements of Section 109(h) are met, because the NEPA process has exhaustively considered the project on air pollution, health, economic, and other environmental considerations, and has taken steps to avoid and minimize impacts. Because I-70 is already in place and will stay in place under the No-Action Alternative, the Build Alternatives -- including the Preferred Alternative -- will have no air quality impacts. Further, for air quality, the project will not result in an increase in emissions as federal emissions standards and other regulations reduce emissions from motor vehicles. The Final EIS also includes a detailed list of mitigation measures and BMPs related to air quality.

For information on human health, please see AQ4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**B1**

Both the adverse health outcomes documented in the communities adjacent to I-70, and the likelihood that Project emissions will contribute to violations of one or more NAAQS, trigger the obligation under NEPA to consider alternatives and/or mitigation that can avoid or minimize these adverse impacts. 40 CFR § 1502.1 (duty to consider alternatives that can avoid or minimize adverse impacts), §§ 1502.14 and 1502.16(e) (duty to compare alternatives based on their environmental impacts), §§ 1502.14(f) and 1502.16(h) (duty to disclose all means to mitigate adverse environmental impacts not avoided by preferred alternative), § 1508.20 (must consider mitigation that "avoid[s] the impact altogether" and "compensating for the impact by replacing or providing substitute resources or environments").

In addition to avoiding adverse environmental impacts, NEPA also requires consideration of "reasonable alternatives which would enhance the quality of the human environment." 40 CFR § 1502.1. This obligation implements the statutory directive that the Federal Government "use all practicable means … to the end that the Nation may – (2) assure for all Americans safe, healthful, [and] productive … surroundings; … and (6) enhance the quality of renewable resources." 42 U.S.C. § 4331(b). Consideration of alternatives that enhance the human environment serve the Congressional declaration that the "purposes" of NEPA include "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man…." 42 U.S.C. § 4321.

In this case, public health in the communities adjacent to I-70 is being impaired by exposure to air pollutants from highways. The proposed project provides an opportunity to reduce those impacts on human health by either 1) removing traffic and traffic-related pollution from the neighborhoods that are suffering from adverse health outcomes without interfering with regional mobility by redirecting through traffic around north Denver onto I-76 and I-270, or 2) offering to buy out residents in the zone of adverse health impacts to allow them to move to safe and healthful surroundings. The SDEIS does not consider either of these alternatives.

**B. Environmental Impacts of Project Not Evaluated under Supplemental Criteria Enacted for Highway Projects.**

**C1**

Section 109(h) of the Federal-Aid Highway Act, enacted one year after NEPA, supplements the general procedures applicable to all major federal actions under NEPA by requiring a three-step evaluation of air quality impacts and mitigation measures to ensure that "final decisions on the project are made in the best overall public interest." 23 U.S.C. § 109(h). The first step is to determine the "possible adverse economic, social and environmental effects relating to any proposed project." *Id.* The second step is to determine "the costs of eliminating or minimizing such adverse effects and … (1) air…pollution." *Id.* The third step is to weigh "the costs of eliminating or minimizing such adverse effects" together with "the need for fast, safe and efficient transportation" to make a final decision whether the project is "in the best overall public interest." *Id.* FHWA's implementing regulation further requires that any measures necessary to mitigate these adverse effects be incorporated into the project. 23 C.F.R. § 771.105(d).

The SDEIS fails to include consideration of any of these factors for the adverse effects of air pollution. There is no consideration at all of the potentially severe health effects of exposure to the mix of criteria pollutants and MSATs that will be emitted from the Project, not to speak of the costs of eliminating or minimizing the adverse health effects of community exposure to these

18

| Comments | Responses to Comments |
|---|---|
| Source: Submittal   Document Number: 754   Name: Sierra Club - Robert Yuhnke | |

**Comments:**

pollutants.  Indeed, the administrative record is devoid of any mention of section 109(h) and the factors that it requires FHWA to consider.

Importantly, § 109(h) adds a requirement that before it can sign a ROD, FHWA must document the "adverse economic [and] social effects relating to any proposed project," and weigh these effects in deciding whether the Project is in the "best overall public interest." These are in addition to the environmental factors made relevant under NEPA. These include the economic costs of 1) adverse health effects, including loss of life, and 2) loss of value in homes that will be imposed on residents in neighboring communities by the emissions from the project. This provision also requires that FHWA and CDOT document the social effects that result from disruption to families after the loss of a parent from pre-mature death or hospitalization for the diseases of air pollution, and the effects on childhood development that are caused by impaired lung development and asthma attacks that interfere with school attendance and slow educational advancement among children.

**C1** Under this provision, FHWA must also determine "the costs of eliminating or minimizing such adverse effects and … (1) air…pollution." To eliminate the adverse effects of air pollution, emissions must be reduced to levels not expected to harm local residents, or local residents must be given the option to receive the value of their homes and move to a location outside the zone exposed to dangerous concentrations of air pollution. So long as FHWA and CDOT treats the expansion of I-70 as a preferred alternative, the evaluation of Project costs must include the cost of purchasing the homes of nearby residents within the zone of exposure to harmful levels of air pollution emitted from the Project.

FHWA must also explain how it weighs these factors in making the public interest determination required by FAHA. The SDEIS omits any discussion of the factors made relevant by the Act, and contains no explanation of how these factors are to be weighed in determining whether the Project is in the "best overall public interest."

Finally, the ROD for the Project must provide for the implementation of all mitigation measures that are relied upon to determine that the transportation benefits of the Project outweigh the adverse effects.

**C. SDEIS Does Not Include a Proposed CAA Conformity Determination.**

**D1** The SDEIS discusses the tests that must be satisfied for the Project to be found in conformity under section 176(c) of the CAA, but does not propose to make a finding that the Project meets all of those tests and conforms. Instead, the AQ Technical Report asserts that a conformity determination is not necessary because the Project is not a "project of air quality concern."

**1. I-70 is Project of Air Quality Concern.**

**E1** EPA's Hot Spot conformity rule does not establish numeric criteria for exempting highway projects from the conformity requirement. When it revised the Hot Spot rule in 2006, EPA explained that "Clean Air Act section 176(c)(1)(B) is the statutory criterion that must be met by all projects in nonattainment and maintenance areas that are subject to transportation conformity." 71 F.R. 12,471(March 10, 2006). The I-70

19

**Responses to Comments:**

**D1** The conformity determination was not required in the draft stage of the document, and is being made for the Final EIS. A final conformity determination will be made in the ROD. See Section 5.1.2 of Attachment J to the Final EIS, Air Quality Technical Report, and Section 5.10.6 of the Final EIS for the conformity determination.

**E1** In consultation with CDPHE and EPA, CDOT determined that the project was a project of local air quality concern. The Air Quality Technical Report has been revised, and is included as Attachment J to the Final EIS. The report now identifies the designation of the I-70 East project as a project of local air quality concern.

| Comments | Responses to Comments |
|---|---|
| Source: Submittal    Document Number: 754    Name: Sierra Club - Robert Yuhnke | |

Project is subject to transportation conformity because it is a source of PM-10 in a maintenance area for PM-10.[18]

EPA explained that the Hot Spot rule requires that "all projects that have the potential to impact the air quality standards will be analyzed using appropriate methods before they receive Federal funding or approval." 71 F.R. 12,472 (March 10, 2006). In the case of I-70, the modeling for the Project makes clear that this Project has the potential to violate the NAAQS for PM-10 because all alternatives, except one build alternative and the No-build alternative, will cause the NAAQS to be violated. This modeling evidence demonstrates that the Project is a "project of air quality concern."

EPA did recognize authority under the Act to exempt projects from Hot Spot analyses, but EPA recognized that only it has that authority, and that it must be exercised through rulemaking.

> EPA also believes it has discretion to not require analyses of localized impacts of projects if we have scientific evidence that PM2.5 and PM10 hot-spots are not a concern with respect to the standards. That is, even under the statutory standards of section 176(c)(1)(A) and (B), if EPA determines through rulemaking that certain types of projects will not cause or contribute to violations of any standard or delay attainment, EPA concludes that we have the authority to determine through the conformity rule that no additional analysis would be necessary to meet section 176(c)(1)(A) and (B).

**E1**

71 F.R. 12,481(March 10, 2006). EPA has not adopted a rule exempting major interstate expansion projects from Hot Spot analysis, nor has it authorized transportation agencies to exempt projects from Hot Spot analysis on a case-by-case basis.

The Hot Spot rule also recognizes a procedure whereby the State, through its SIP, may exempt projects from hot spot analysis for PM-10. "40 CFR 93.109(k) already allows PM10 areas with insignificant regional motor vehicle emissions to demonstrate, when appropriate, that individual projects will not create new localized violations or make existing violations worse. Projects in such cases would not require PM10 hot-spot analyses." 71 F.R. 12,489 (March 10, 2006). But Colorado has not made any finding that regional motor vehicle emissions are "insignificant" with respect to PM-10.

In the AQ Technical report, FHWA claims that it may exempt projects that do not involve a significant increase in diesel trucks. But that is not the test that EPA provided in the Hot Spot rule. The rule requires projects with a "significant number of diesel vehicles" to be analyzed for impacts on the NAAQS.

> Section 93.123(b)(1) of today's final rule requires PM2.5 and PM10 hot-spot analyses for the following projects of air quality concern:
>     Section 93.123(b)(1)(i): New or expanded highway projects that have *a significant number of* or a significant increase in diesel vehicles." [Emphasis added.] 71 F.R. 12,490 (March 10, 2006).

The information on these pages has been reviewed. Responses to **specific comments** are included on the previous page.

---
[18] 42 U.S.C. § 7506(c)(6).

20

| Comments | Responses to Comments |
|---|---|

Source: Submittal  Document Number: 754  Name: Sierra Club - Robert Yuhnke

EPA described an example of a highway expansion project that may be found not to be a "project of air quality concern":

> Projects that do not meet the criteria under Sec. 93.123(b)(1), such as any new or expanded highway project that primarily services gasoline vehicle traffic (i.e., does not involve a significant number or increase in the number of diesel vehicles).

**E1**

71 F.R. 12,491 (March 10, 2006). A project with a significant number of diesel vehicles, regardless of whether the project causes that number to increase, is a project of air quality concern.

An example of a project considered to have a significant number of diesel vehicles is a "highway or expressway that serves a significant volume of diesel truck traffic, such as facilities with greater than 125,000 annual average daily traffic (AADT) and 8% or more of such AADT is diesel truck traffic." *Id.* Such a project has 10,000 diesel vehicle trips per day. The AADT data posted by CDOT for current traffic on I-70, *see* p. 6 above, shows that I-70 currently carries over 13,000 trucks per day. The proposed Project is expected to carry at least 30% more traffic., or approximately 16,000 trucks per day. The total number of trucks is significant, and the Project is a "project of air quality concern" that must be analyzed for conformity.

**2. Conformity Determination Must be Included in SDEIS for Public Review and Comment.**

The Conformity Determination required by the CAA must be included in, and addressed by the review of the Project under NEPA. "EIS shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of … other environmental laws and policies." 40 CFR 1502.2(d). *See* 40 CFR §§ 1501.6, 1502.25.

**F1**

The information developed to determine that one of the build alternatives (basic managed lane alternative) will not contribute to violations of the NAAQS has not been disclosed. In other project reviews, FHWA has made available information such as the inputs to MOVES to estimate emissions, and inputs to the dispersion model, and outputs from dispersion modeling to show receptor locations used for modeling, and the concentrations predicted at receptor locations. These kinds of information have not been provided in this SDEIS, or AQ Technical Report. Commenters request pursuant to NEPA and the Freedom of Information Act that all input and output files prepared for, or used in, the modeling analyses be made available for review by the public.

**IV. Assessment of Alternatives and Mitigation to Avoid Adverse Health Impacts and NAAQS Violations is Absent.**

**G1**

The SDEIS is fundamentally flawed under NEPA and FAHA because it omits any assessment of alternatives and mitigation measures that can 1) reduce the adverse health impacts likely to result from exposure to increased air pollution, and 2) reduce emissions to the levels needed to prevent NAAQS violations.

21

---

**F1** After completion of the Supplemental Draft EIS modeling, interagency consultation partners EPA and APCD reviewed the Air Quality Technical Report and modeling files. Both agencies suggested revisions to the modeling, as noted in the revised Air Quality Technical Report. These revisions have been incorporated in the Final EIS modeling which is documented in Attachment J Air Quality Technical Report to the Final EIS. The conformity determination is being made for the Final EIS, and a final conformity determination will be made in the ROD. See Section 5.1.2 of Attachment J to the Final EIS, Air Quality Technical Report, and Section 5.10.6 of the Final EIS for the conformity determination.

For information on how to obtain the input and output files for published documents, please use the project email: contactus@i-70east.com

**G1** As previously discussed in responses to Comments A, K and S, EPA has set NAAQS thresholds for pollutants including PM2.5, PM10 and NO2 (as reflected in the Supplemental Draft EIS and Final EIS). By showing that the project is in compliance with the NAAQS and no violations are predicted, the EIS provides critical information for the decision makers. Construction impacts are not required to be assessed if construction will not last more than 5 years in any individual site (40 CFR 93.123(c)(5)), and there is no evidence that there will be any exceedances of the NAAQS during the construction period based on the air quality analysis for the Final EIS. Monitoring supported data available nationwide and specific to Colorado highway construction confirms that BMPs for dust control and suppression deployed by CDOT and other DOTs have been successful in goal of keeping temporary construction dust from contributing to an exceedance or violation of the public health PM10 NAAQS.

Many mitigation measures have been identified in the Final EIS to offset the impacts of the project. For information on project mitigation measures, please see IMP1 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

The concerns regarding dust during construction have been adequately addressed in the Final EIS. For information on mitigating fugitive dust during construction, please see IMP7 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

**G1** The SDEIS is also deficient for its failure to mitigate emissions from heavy duty diesel equipment used during construction.

**A. Alternatives to Reduce Pollutant Exposures in the I-70 Corridor.**

At a minimum, two alternatives should be considered to reduce emissions and pollutant exposures in the neighborhoods adjacent to I-70:

1) re-signing I-70 to route the 40% of traffic that is "through" traffic out of the neighborhoods where dense urban development and elementary schools are located within a few hundred meters of I-70 onto I-76 and I-270; and

2) routing all truck traffic off the current alignment between Washington Street and Colorado Blvd which would require through truck traffic to use I-76 and I-270, and local truck traffic to disperse on local streets leading to their local destination rather than concentrating on the current alignment next to schools and houses along the highway.

These alternatives are reasonable because they will add mobility for traffic traveling through the metro area, without significantly increasing the cost of mobility, while at the same time providing health benefits for communities along the current I-70 alignment. These alternatives have not been evaluated in prior NEPA documents.

Consideration of these alternatives should include traffic modeling and air quality modeling to answer the following questions for decisionmakers and the public:

**H1**
a) how much reduction in traffic emissions within the I-70 Project study area could be achieved by diverting truck traffic away from the segment of I-70 where NAAQS violations are expected by requiring that trucks use I-76 and I-270?

b) would the reductions in PM emissions achieved by a truck diversion rule be sufficient to ensure attainment of every applicable NAAQS for mobile source-related pollutants (PM-10, PM2.5, NO2 and CO)?

c) would the diversion of trucks from I-70 and onto I-76/I-270 increase emissions enough in those corridors to cause NAAQS violations?

(d) if the diversion of truck traffic would not be sufficient to ensure that attainment of any NAAQS will not be maintained in the Project study area, would the diversion of through traffic from the current I-70 alignment onto I-76 and I-270 be sufficient to ensure attainment during the life of the Project?

(e) how much of the traffic expected to use the current I-70 alignment in 2035 would be through traffic (i.e., not expected to exit or enter between the Mousetrap and Colorado Blvd)?

(f) if through traffic were diverted onto I-76 and I-270, would emissions from those highways cause any NAAQS to be violated along those alignments?

(g) if any NAAQS violations are predicted at receptor locations along those highways, are any of those receptors in a location which EPA defines as "ambient air," 40 CFR § 50.1, i.e. a location outside the right-of-way owned by CDOT where the general public has access?

Without answers to these questions, informed decisions about these alternatives cannot be made.

CDOT Director Hunt has stated during public meetings that CDOT cannot limit truck or car access to segments of the interstate system, and that therefore the alternatives proposed here for

22

**H1** The Final EIS discloses project-related impacts for all alternatives and considers mitigation measures where there are project impacts. NEPA does not require FHWA to consider or implement alternatives that are not feasible and prudent, such as removing I-70 from this corridor or rerouting traffic to the I-76/I-270 corridor. Similarly, moving trucks to other alignments isn't a feasible mitigation measure because no routes can be identified that would not affect other neighborhoods, and limiting trucks could impact some commercial uses in this segment of the I-70 corridor that rely on trucking. The purpose of the EPA and CDPHE NAAQS and MSAT programs are to allow all areas to meet health standards and reduce overall risk. For information on alternatives that remove I-70 East from its current alignment, please see ALT2 and ALT3 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

For information on restricting truck traffic along I-70, please see TRANS8 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

| Comments | Responses to Comments |
|---|---|

| Source: Submittal | Document Number: 754 | Name: Sierra Club - Robert Yuhnke |
|---|---|---|

**H1**

evaluation are not permissible. This is an incorrect understanding of the law. CDOT may not have authority to limit vehicle access under statutes that it has authority to implement, but the State clearly has authority under the CAA to limit vehicle access if necessary to attain or maintain a NAAQS for mobile source-related pollutants. For example, the State may adopt measures pursuant to an indirect source review program to prevent a highway from attracting mobile sources, the emissions from which will cause or contribute to violations of a mobile source-related NAAQS. 42 U.S.C. § 7410(a)(5). When necessary to attain a mobile source-related NAAQS in a nonattainment area, or maintain a NAAQS in an attainment area, the State may also adopt directly into its SIP any of the transportation control measures authorized by CAA section 108(f)(1), including "(vii) programs to limit or restrict vehicle use in downtown areas or other areas of emission concentration particularly during periods of peak use."

An EIS shall include reasonable alternatives not within the jurisdiction of the agency proposing the action. 40 CFR 1502.14(c). Thus the traffic diversion strategies described above should be considered in the EIS because Congress has delegated authority to the State to adopt such alternatives into its SIP as control measures.

**B. Alternatives to Allow Residents to Move from the Pollution Danger Zone.**

**I1**

For comparison of health benefits, improved air quality and costs under § 109(h), an alternative that invests resources to allow residents to protect themselves from the pollution danger zone by moving away must also be evaluated. This alternative allows residents to reduce their exposure to emissions from the highway to zero, and to avoid any adverse health impacts. This option is the kind of mitigation contemplated by 40 CFR § 1508.20(e) by providing a substitute environment for the residents adversely affected by exposure to pollution from the Project.

Together, the failure to investigate the impacts that Project emissions will have on air pollution standards, on community health, and to consider options that could prevent adverse air quality impacts and improve local health outcomes makes the SDEIS inadequate under NEPA. In addition, the failure to consider and adopt mitigation puts Denver at risk of becoming nonattainment under the CAA for PM2.5, and possibly for NO2 as well. There is no discussion of the regulatory burdens that such an outcome will have on sources of PM2.5 in the region, on regional transportation planning and transportation funding, and on the City.

**CONCLUSION.**

**J1**

The SDEIS is not adequate to satisfy the requirements of NEPA, FAHA or the CAA for the reasons discussed above. A ROD for the proposed I-70 Project may not be signed, or the project funded or approved until a revised SDEIS is prepared that remedies the described deficiencies and is made available for public review and comment.

Respectfully submitted,

Robert E. Yuhnke
Robert E. Yuhnke and Associates
(303) 499-0425
Colorado Attorney (#012686)

23      Joanne Spalding
Attorney, Sierra Club Law Program
85 Second Street
San Francisco, CA  94105
(415) 977-5725

---

**I1** Moving residents out of the I-70 corridor is not necessary because mitigation is not needed since there will be no air quality impacts as a result of the project and no violation of the NAAQS is predicted. This would be an expensive measure that would impair neighborhoods rather than improving them by displacing more people than the bare minimum necessary to safely meet the purpose and need. Further, because no relocation areas in the Denver metropolitan area have zero air pollutants (from vehicles or other sources), it is unclear how much risk would be reduced. Overall air quality and health are improving and will continue to improve with reductions in motor vehicle emissions, the closure of coal units at the nearby Cherokee Station, cleanup of old industrial sites and similar measures.

CDOT follows the Uniform Act for relocating businesses and residents impacted by the project. For information on relocation of residences that will not be acquired by the project, please see PROP4 of the Frequently Received Comments and Responses on the Supplemental Draft EIS, located in Part 1 of Attachment Q.

**J1** The Supplemental Draft EIS and Final EIS are fully compliant with the requirements of NEPA, the Clean Air Act, the Federal Aid Highway Act, and other provisions. FHWA will take into account all public comment prior to making a final decision for the ROD.

# Excerpts From The Record of Decision





# I-70 EAST ROD 1:
## Phase 1 (Central 70 Project)

**January 2017**

EAR 0245



## 1.3    Project Limits

The I-70 East Project extends almost 12 miles along I-70 between I-25 and Tower Road through the neighborhoods of Globeville, Elyria and Swansea, Northeast Park Hill, Stapleton, Montbello, Gateway, and a portion of Aurora. The limits for the Central 70 Project extend approximately 9.5 miles along I-70 between I-25 and Chambers Road (see **Exhibit 1**).

**Exhibit 1        I-70 East Project and Central 70 Project Limits**



Existing and forecasted traffic volumes were the main factor in determining the project limits for the I-70 East Project. Forecasted traffic volumes for the year 2035 range from 95,000 vehicles per day (vpd) to 270,000 vpd between I-25 and Peña Boulevard, declining east of there. The western limit is I-25 because of the high diversion of traffic from I-70 to both northbound and southbound I-25. Between 40 percent and 50 percent of traffic traveling westbound on I-70 diverts onto I-25. Tower Road is the eastern limit because the traffic volumes drop substantially east of Peña Boulevard. These limits do not preclude other NEPA transportation improvement studies outside the corridor (DRCOG, 2013).

The project limits and logical termini for the Central 70 Project are discussed in Section 4.3 of this document.

## 1.4    Compliance with 23 USC 109(h)

The environmental review process carried out for the I-70 East Project followed the procedures set forth in 23 CFR §771, which serves to comply with 23 USC §109(h). The process of developing the EIS in accordance with these procedures assured that possible adverse economic, social, and environmental effects related to the I-70 East Project were

fully considered. It ensures that the final decision on the project is made in the best overall public interest and the interest of economically disadvantaged communities, taking into consideration the need for fast, safe, and efficient transportation and public services, and the costs of eliminating or minimizing such adverse effects.

It also assures consideration of the following:

- Air, noise, and water pollution

- Destruction or disruption of man-made and natural resources, aesthetic values, community cohesion, and the availability of public facilities and services

- Adverse employment effects, and tax and property value losses

- Injurious displacement of people, businesses, and farms

- Disruption of desirable community and regional growth

## 1.5    Document Organization

This document is designed to provide readers with a complete record of the environmental process followed to arrive at FHWA's decision to select Phase 1 of the Preferred Alternative (the Central 70 Project) as the project for implementation at this time. This ROD:

- Provides background information on the EIS process for the I-70 East Project as it has evolved during the past 13 years,

- Discusses FHWA's decision to implement the Central 70 Project,

- Responds to overarching concerns raised by the substantive comments that were received on the Final EIS, and

- Presents updates to the analysis and text of the Final EIS and to the Section 4(f) evaluation.

It is comprised of 11 chapters and six attachments that support the information and updates presented. The chapters of this ROD are as follows:

- Chapter 1: Introduction

- Chapter 2: Alternatives Considered

- Chapter 3: Measures to Minimize Harm

- Chapter 4: Central 70 Project

- Chapter 5: Central 70 Mitigation Measures

- Chapter 6: Federal, State, and Local Permits and Approvals

- Chapter 7: Community Outreach and Agency Involvement

- Chapter 8: Comments on the Final EIS and Air Quality Documents

- Chapter 9: Updates and Clarifications since the Publication of the Final EIS

## 2.2     Final EIS Preferred Alternative

The Partial Cover Lowered Alternative with Managed Lanes Option was identified as the Preferred Alternative in the Final EIS. The Preferred Alternative removes the existing I-70 viaduct between Brighton Boulevard and Colorado Boulevard and lowers the highway below grade in this area. It includes one to two additional lane(s) in each direction from Brighton Boulevard to Tower Road, which will be managed lanes. The existing highway between I-25 and Brighton Boulevard has enough width so that only restriping is necessary to fit the additional capacity.

The Managed Lanes Option is identified as the Operational Option of the Preferred Alternative because of its long-term operational flexibility and mobility. Managed lanes provide drivers with flexibility by allowing them to pay a fee to bypass congestion in the general-purpose lanes. This can improve reliability in travel times. It also allows CDOT to manage congestion over the long term, thereby reducing the need for future expansion. The Managed Lanes Option also has a higher through-put potential in terms of accommodating more people at a given time. This option accommodates express buses and other high-occupancy vehicles and, therefore, it can provide increased service to those riders.

The highway starts descending west of Brighton Boulevard to a maximum depth of approximately 40 feet below the existing ground surface just east of the Union Pacific Railroad (UPRR). This depth is necessary to allow the lowered highway to cross below the existing UPRR railroad crossing. The remaining portion of the lowered section has an average depth of approximately 25 feet below grade. The lowered highway ascends just east of the Burlington Northern Santa Fe (BNSF) Denver Market Lead Railroad to reach the existing grade east of the Colorado Boulevard interchange.

The Preferred Alternative does not provide direct access from westbound I-70 to Steele Street/Vasquez Boulevard or from Steele Street/Vasquez Boulevard to eastbound I-70. Access at Steele Street/Vasquez Boulevard and Colorado Boulevard is provided by a split-diamond interchange. In addition, slip ramps are included to provide an eastbound off-ramp and westbound on-ramp at Colorado Boulevard.

An acceleration/deceleration lane is provided in each direction at the ramp junctions between Brighton Boulevard and Steele Street/Vasquez Boulevard to make it easier for vehicles to safely enter or exit between two facilities with different operational speeds.

### Slip ramps

A slip ramp generally is located between a freeway mainline and an adjacent frontage road. These ramps allow motorists to "slip" from one roadway to the adjacent parallel roadway. The connection of the slip ramp and the parallel roadway typically is not an intersection, but just a merging zone.



These additional lanes—and space needed for 46th Avenue from Brighton Boulevard to
Colorado Boulevard—result in a total width that is approximately three times greater than
the existing highway width. **Exhibit 4** shows the total number of lanes and interchange
reconstruction as part of the Preferred Alternative.

**Exhibit 4      Preferred Alternative Lane Configuration and Interchange
Reconstruction**



**Exhibit 5** shows a typical section for the Preferred Alternative between Brighton
Boulevard and Colorado Boulevard. The typical sections shown in these exhibits do not
represent the configuration in the covered area of the highway.

The Preferred Alternative continues to provide north-south connectivity at York Street,
Josephine Street, Columbine Street, Clayton Street, Fillmore Street, and Steele
Street/Vasquez Boulevard. It also provides additional north-south connectivity at Cook
Street and Monroe Street over the lowered, reconstructed highway. **Exhibit 6** shows a
profile view of the Partial Cover Lowered Alternative from Brighton Boulevard to Colorado
Boulevard.

Alternatives Considered                    I-70 East ROD 1: Phase 1 (Central 70 Project)

**Exhibit 5**      **Preferred Alternative Typical Section (Between Brighton Boulevard and Colorado Boulevard)**



*Note: Shoulder widths may vary but will not exceed what is illustrated in this exhibit.*

**Exhibit 6**      **Partial Cover Lowered Alternative Profile View of the Lowered Section (Between Brighton Boulevard and Colorado Boulevard)**





On the north side of I-70, 46th Avenue will be discontinued between Clayton Street and Columbine Street to allow for a seamless connection between Swansea Elementary School and the highway cover facility. This alternative eliminates the portion of Elizabeth Street north of 46th Avenue and south of 47th Avenue.

As part of the Preferred Alternative, the existing UPRR bridge structure that currently passes under the existing viaduct and over 46th Avenue will be reconstructed to allow both I-70 and 46th Avenue to cross below the UPRR. For the BNSF Market Lead Railroad, a new bridge crossing over I-70 and at-grade crossings at 46th Avenue will be provided.

46th Avenue extends across Colorado Boulevard and connects with the existing one-way couplet of Stapleton Drive North and Stapleton Drive South. These streets are extended to the east and connect to the Quebec Street ramps to allow for connectivity between Colorado Boulevard and Quebec Street.

The Preferred Alternative east of Colorado Boulevard includes:

- Removing the existing slip ramps at Dahlia Street and Monaco Street, respectively, and replacing them with a full interchange at Holly Street to avoid conflicts with the geometry of proposed ramp locations at Colorado Boulevard and Quebec Street, as well as to avoid traffic weaving issues

- Maintaining north-south connections at Dahlia Street, Holly Street, Monaco Street, Quebec Street, Central Park Boulevard, Havana Street, Peoria Street, Chambers Road, Airport Road, and Tower Road

- Replacing the I-270 eastbound to I-70 eastbound flyover structure to accommodate the widened highway

- Reconstructing the Quebec Street interchange to maintain the existing access

- Leaving the existing interchange accesses at Havana Street, Central Park Boulevard, Peoria Street, Chambers Road, Airport Boulevard, and Tower Road without modification or reconstruction

- Maintaining the existing highway crossing over the Denver Rock Island Railroad (DRIR) west of Quebec Street

- Including direct connections from the managed lanes to Peña Boulevard, I-225, and I-270

For more details on the Preferred Alternative, please see *Chapter 3, Summary of Project Alternatives* and *Attachment C, Alternative Analysis*, both in the Final EIS.

## 2.2.1    Highway Cover

The Preferred Alternative provides a cover over the highway, located between Clayton Street and Columbine Street in the proximity of Swansea Elementary School. The length of the cover is designed to be less than 1,000 feet due to fire and safety restrictions. A preliminary design for the highway cover is shown in **Exhibit 7**.

CDOT is working with the City and County of Denver (Denver) and Denver Public Schools (DPS) to develop agreements for shared use on the cover and long-term operations and maintenance of the cover. These agreements will be finalized before construction begins.

### Highway cover

The cover is intended to be a shared, active space between the surrounding community and Swansea Elementary School. CDOT has worked with the community and the school to identify what amenities work best for the space.

Negotiations are ongoing between Denver and DPS to develop agreements for shared use on the cover and long-term operations and maintenance of the cover.

**Exhibit 7          Preferred Alternative Preliminary Cover Design**



*Note: The design of the elements on the cover continues to evolve throughout the public input process.*

As part of the Preferred Alternative, Elizabeth Street between 46th Avenue and 47th Avenue will be closed to accommodate the proposed redesign of the Swansea Elementary School site to use adjacent parcels.

The cover design includes an urban landscape to serve the community. Strategically placed landscape elements—such as trees and shrubs—are included only at designated locations to minimize the loading on the structure.

The cover is intended to be a shared, active space between the surrounding community and Swansea Elementary School. It is important to provide an active and safe space on the highway cover to maintain the status of the school as a community center in the neighborhood. The school playground is available to the community outside of school hours.

> **Second cover**
>
> To accommodate Denver's interest in constructing a second cover in the future, the Preferred Alternative and the Central 70 Project include an overall approach to design and construction that would not preclude the construction of a second cover over the highway from west of the Steele Street/Vasquez Boulevard highway crossing to east of Cook Street by others in the future.
>
> This second cover is not included as part of the Preferred Alternative or the Central 70 Project.

The design of the cover will have a direct impact on the perception of safety and can influence an individual's willingness to use the space. While designing for safety (and incorporating elements such as lighting and Americans with Disabilities Act (ADA)-compliant facilities) the design also will meet the needs of its users, provide diverse and interesting features, and connect people with place.

The FHWA Livability and Sustainability Principles were utilized on this project during the development of the Preferred Alternative and the design of the highway cover. Incorporation of the highway cover will reconnect the surrounding areas and provide easy and safe connections between these communities for all users, especially pedestrians and bicyclists. The inclusion of the highway cover helps achieve some broader community goals of livability, quality schools, and safe streets.

The landscaped highway cover also supports social connections in the Elyria and Swansea Neighborhood by creating a place where residents and visitors can gather and interact. Based on community input and area needs, the amenities and design in these spaces—such as playgrounds or sports fields (to be determined by the community)—will encourage users to stay and interact.

## 2.3    Environmentally Preferable Alternative

FHWA and CDOT have identified the No-Action Alternative as the Environmentally Preferable Alternative for the I-70 East Project because it causes the least damage to the natural and physical environment.

The identification of the Environmentally Preferable Alternative may involve difficult judgments, particularly when one environmental value must be balanced against another.

### 4.4.4    Safety Concerns

Within the limits of the project, I-70 generally experiences more crashes than the state average for urban freeways. As supported in *Section 2.5.4, Safety Concerns,* of the Final EIS, these crashes cause unpredictable and unavoidable traffic congestion, which adds to or worsens the already existing congestion from travel demand that exceeds the normal roadway capacity. The unpredictable nature of traffic congestion on I-70 increases safety concerns for freight carriers, employers, manufacturers, and business interests in the region, as well as commuters and residents who depend on reliability for their daily travel.

The Central 70 Project will address safety needs and upgrade facilities to current standards by:

- Optimizing safety, thereby minimizing crashes by conforming to engineering design, safety standards, and standard practices for construction, maintenance, and operations

- Providing access for emergency response and evacuation situations through adequate shoulder widths on the highway and ramps and acceleration/deceleration lanes

## 4.5    Central 70 Project Environmental Impacts

Any updates to the Preferred Alternative (previously described in Section 2.5) that resulted in changes to the outcome of the analysis also were evaluated for the Central 70 Project. **Exhibit 13** lists the impacts of the Central 70 Project for each resource. More detail on the impacts and analysis is available in the technical reports attached to this document, if applicable, or in the attachments to the Final EIS. For information on specific determinations and other monitoring or enforcement requirements for the Central 70 Project, see Chapter 6, Federal, State, and Local Permits and Approvals, of this document.

**Exhibit 13        Summary of the Central 70 Project Impacts**

| Transportation |
| --- |
| • Temporary road closures and traffic detours may have impacts on access to certain public services |
| • Improved pedestrian/bicycle facilities |
| • Improved traffic operations due to the addition of new lanes, improvement to ramps, addition of auxiliary lanes, improvements to roadways, and modification of interchanges |
| • Temporary impacts to rail facilities will result from the construction of railroad bridge structures and/or the relocation of track operations |
| • Impacts to local traffic volumes caused by removal of the York Street interchange and changes to the Steele Street/Vasquez Boulevard interchange and the Colorado Boulevard interchange |
| • Improved transportation operations, preservation of transportation capacity, and the ability to provide reliable travel times |

**Exhibit 13          Summary of the Central 70 Project Impacts**

| Social and Economic Conditions |
| --- |
| • 56 residential relocations |
| • 17 business relocations (includes one non-profit relocation) |
| • Acquisition of right of way from the buffer area between 46th Avenue and the field to the south of Swansea Elementary School |
| • Temporary effect to the regional economy from construction-related traffic congestion |
| • Temporary road closures and traffic detours may have impacts on access to certain public services |
| • $1,736.3 million of regional economic output (9,000 person years of employment) |

| Environmental Justice |
| --- |
| • Creating new construction-related jobs |
| • Building the highway to updated standards and improving mobility |
| • Increasing noise and dust during construction |
| • Potential for disturbing hazardous material sites during construction |
| • Impacting mobility during construction due to detours |
| • Temporarily closing or delaying, or permanently rerouting, public transit services in the area |
| • Removing the viaduct's visual barrier between Brighton Boulevard and Colorado Boulevard |
| • Minimizing the presence of the highway in environmental justice areas, since it is below grade and is covered |
| • Providing multi-modal safety from improved lighting and sidewalks at north-south connections |
| • Displacing the Pilot Travel Center truck stop, which will eliminate a point-source location for air pollution |
| • Reducing highway noise and air quality impacts to Swansea Elementary School and adjacent properties by placing a cover over the highway |
| • Keeping the Nestlé Purina Petcare Company at its existing location |
| • Improving safety of north-south pedestrian and bicycle connectivity compared to the existing conditions by eliminating unsafe crossings underneath the viaduct |
| • Relocating 56 residences |
| • Impacting 109 noise receptors |
| • Moving the highway closer to Swansea Elementary School |
| • Displacing Stop N Shop and Pilot Travel Center truck stop |
| • Creating visual obstruction with safety barriers; eliminating views across the highway |
| • Creating reliable travel times |
| • Providing congestion-free lanes |
| • Reducing congestion in all travel lanes |
| • Creating a financial burden to low-income community, who may not be able to afford to use the tolled express lanes |

| Land Use |
| --- |
| • 56.2 acres converted to transportation use |
| • Creation of a four-acre cover, with public park/open space land use |

| Relocations and Displacements |
| --- |
| • 56 residential relocations |
| • 17 business relocations (includes 1 non-profit relocation) |

**Exhibit 13      Summary of the Central 70 Project Impacts**

| Historic Preservation |
| --- |

- Adverse Effect—13 historic resources
- No Adverse Effect—72 historic resources
- No Effect—2 historic resources
- Temporary impacts may include dust and debris, visual and auditory degradation related to construction activities, and decreased access

| Paleontological Resources |
| --- |

- Increased potential for encountering paleontological resources in excavated bedrock of the Denver and Arapahoe Formations

| Visual Resources and Aesthetic Qualities |
| --- |

- Introducing public space to the area and reducing the roadway's visual dominance by removing the existing viaduct will enhance the visual quality
- Ground-level noise walls or safety barriers are less intrusive to viewers' eyes compared to the No-Action and Revised Viaduct Alternatives, but they also introduce a new visual impact by blocking the view across the highway
- Views for drivers traveling eastbound and westbound will be entirely different from the existing conditions
- New features of the project (e.g., detention ponds, retaining walls) will change the visual environment along the project corridor
- Tolled express lanes will create new visual impacts along the project corridor due to the introduction of infrastructure

| Parks and Recreational Areas |
| --- |

- South Platte River Greenway (Section 6(f) resource) temporary impacts may occur during construction
- 0.95 acre of impact to Swansea Elementary School
- Impacts from construction of the Globeville Landing Park Outfall (GLO) will result in a temporary non-conforming use under Section 6(f) to Globeville Landing Park during the construction of the enhancements
- Part of Globeville Landing Park will be closed during construction

| Air Quality |
| --- |

- Mobile source air toxic (MSAT) emissions decline dramatically over the life of the project, but could increase temporarily during construction
- Construction fugitive dust could cause temporary impacts
- No violation of the National Ambient Air Quality Standards (NAAQS)

| Energy |
| --- |

- 70.0 billion British thermal units (Btu) consumed per day (daily Btu is calculated based on study area, which is the same for all phases)
- 5,808 billion Btu consumed during construction

| Noise |
| --- |

- Number of noise receptors that exceed the Noise Abatement Criteria (NAC) threshold

  - Globeville: 27
  - Elyria: 40 (11 increase substantially—by 10 dBA or more)
  - Swansea: 37
  - Stapleton: 0
  - Peoria Street: 0
  - Montbello: 3
  - Aurora: 2

- Construction noise will present short-term effects to those dwelling units located along the corridor and along designated construction access routes

| Biological Resources |
| --- |

- 369.2 acres of permanent, direct impact to wildlife habitat
- 0.999 acres of permanent impacts and 0.892 acre of temporary impacts to riparian areas

**Exhibit 13        Summary of the Central 70 Project Impacts**

| Floodplains and Drainage/Hydrology |
| --- |

- Impact to potential ponding areas due to the increased width of the highway, which may increase runoff from I-70
- The potential ponding areas between Brighton Boulevard and Dahlia Street will be substantially impacted due to lowered profile of the highway

| Wetlands and Other Waters of the U.S. |
| --- |

- 5.507 acres of permanent impacts and 0.081 acres of temporary impacts to wetlands
- 0.219 acres of permanent impacts and 0.556 acre of temporary impacts to other waters of the U.S

| Water Quality |
| --- |

- Increase in runoff total suspended solids (TSS) loads of six percent to the South Platte River
- Increase in runoff TSS loads of 18 percent to Sand Creek
- Stormwater runoff can create erosion and degradation of water quality during and after construction
- Winter maintenance activities use solutions and compounds that could lead to water quality issues from runoff

| Geology and Soils |
| --- |

- Excavation is anticipated to extend below the depth of groundwater from approximately the UPRR to Columbine Street
- Temporary impacts to groundwater during excavation

| Hazardous Materials |
| --- |

- 34 hazardous material sites affected
- 750 acres of land disturbed
- Extensive excavation through a known landfill that contains contaminants
- Construction activities at hazardous material sites have the potential to spread soil or groundwater contamination
- Construction at hazardous material sites also may affect the construction budget and schedule, particularly if previously unidentified contamination is found

| Utilities |
| --- |

- All utility types will be affected to some extent
- Construction impacts to utilities will be substantial to accommodate the lowered highway and increased width
- Offsite stormwater drainage system south of I-70 will cause additional impacts to utilities and result in major benefit to address an existing deficiency

| Section 4(f) |
| --- |

- Use of Swansea Elementary School Public Playground
- Use of Globeville Landing Park
- Use of 22 historic resources, which includes 9 *de minimis* impact determinations

This page intentionally left blank.

- ~~Conditional approval from CPW and NPS is anticipated before the ROD is completed. FHWA has indicated that approval, or lack of objection, at this point is sufficient for NEPA clearance. Near the end of construction, but before closing the project, a formal Section 6(f) conversion proposal will be submitted to the NPS by CPW. CDOT will prepare the request for CPW with their approval.~~

# 9.9    Air Quality

## Updates to the Final EIS Analysis

Air quality continues to be an important resource for the I-70 East Project. This section discusses updates to the air quality analysis completed in the Final EIS for carbon monoxide and $PM_{10}$. Transportation conformity air quality analysis is discussed in Section 6.1.

As presented in the Final EIS, emissions inventories for MSATs show declining trends and almost no difference between project alternatives. Through interagency consultation, it was determined that minor changes in the project design since publication of the Final EIS will not impact results of emission inventory analyses for MSATs, criteria pollutants, and greenhouse gases. Results of emissions inventory analysis of total pollutants in the air quality study area remain as presented in the Final EIS.

The air quality analysis procedures for the NEPA comparative analysis build upon the air quality analysis conducted for the 2014 Supplemental Draft EIS and the 2016 Final EIS. Traffic data from the 2040 DRCOG regional travel demand model were used to conduct the analysis. Additional details on the analysis update for the ROD can be found in *Attachment C, Air Quality NEPA Comparison Technical Report*.

The November 2015 updates to the EPA guidance report EPA-420-B-15-090 were formalized since the Final EIS modeling results were published. These updates were followed for the analysis for the Final EIS under the direction of the interagency consultation partners. These procedures were used again for the updates completed for this ROD. Further explanation of the changes to the analysis are detailed within *Attachment C, Air Quality NEPA Comparison Technical Report* and *Air Quality Conformity Technical Report*, which includes information on interagency consultation and decisions.

The following subsections summarize results for the carbon monoxide and $PM_{10}$ NEPA comparative analysis for the alternatives evaluated in the Final EIS. Additional details of the analysis are provided in *Attachment C, Air Quality NEPA Comparison Technical Report*.

### Carbon Monoxide Comparative Analysis Results

As with the Final EIS, the Colorado Boulevard interchange was identified as the location to represent the worst traffic conditions on the corridor. For the Final EIS, a sensitivity analysis was performed using the DynusT traffic model to validate the choice of the I-70

interchange at Colorado Boulevard as the worst-case location for the carbon monoxide NEPA comparative analysis. The analysis found that the I-70 interchanges at Quebec Street and Colorado Boulevard are the two worst interchanges in 2035, with the model predicting slightly higher carbon monoxide emissions at the Quebec Street interchange due to higher traffic volumes and longer delays.

While updating the traffic data to the most recent 2040 Focus model released since publication of the Final EIS, the traffic volumes at Colorado Boulevard and Quebec Street were reviewed again. The predicted 2040 traffic Level of Service (LOS) at Colorado Boulevard in the morning (AM) and afternoon (PM) peak hours is LOS D. The same relatively small differences in traffic and congestion between the two intersections exist in the new 2040 model as was reported in the Final EIS. The predicted results from modeling carbon monoxide emissions would vary only by 0.2 parts per million (ppm) to 0.4 ppm, as disclosed in the Final EIS *Air Quality Technical Report*. Given the minimal differences, continued use of the I-70 and Colorado Boulevard interchange as the location for the carbon monoxide analysis is appropriate.

For the update of the carbon monoxide NEPA comparative analysis, the methodology remained primarily the same as the Final EIS. The highest emission factors (2022) were combined with the highest traffic volumes (2040). This method overstates carbon monoxide concentrations, but ensures the maximum potential carbon monoxide concentrations are considered. Other modeling parameters, such as meteorology, were consistent with those used during Final EIS carbon monoxide hot spot analysis.

**Exhibit 33** shows the modeled 1-hour and 8-hour carbon monoxide concentrations from CAL3QHC and the resulting total carbon monoxide concentrations for the Preferred Alternative and Central 70 Project for the AM and PM peak periods at I-70 and Colorado Boulevard. Concentrations in the table are shown for the receptors with the highest levels inside the study area for the carbon monoxide analysis. As the numbers indicate, the 8-hour design values resulting from the AM and PM analysis are both well below the 8-hour NAAQS limit of 9.0 ppm. Since the carbon monoxide comparative analysis is a worst-case scenario, it is reasonable to conclude that the carbon monoxide concentrations at any intersection also would be well below the NAAQS limit.

**Exhibit 33      Carbon Monoxide Comparative Analysis Maximum Concentrations**

| Analysis Time Period | Time of Day | Carbon Monoxide Concentration in parts per million (ppm) | | |
|---|---|---|---|---|
| | | Background* | Modeled | Total Background + Modeled |
| Preferred Alternative (Partial Cover Lowered Alternative with Managed Lanes) | | | | |
| 1-hour | AM | ~~6.73~~ 5.5 | ~~3.61~~ 1.4 | ~~10.34~~ 6.9 |
| | PM | | ~~2.53~~ 1.9 | ~~10.26~~ 7.4 |
| 8-hour | AM | ~~4.55~~ 3.6 | ~~3.53~~ 0.9 | ~~7.08~~ 4.5 |
| | PM | | ~~2.47~~ 1.2 | ~~7.02~~ 4.8 |

**Exhibit 33          Carbon Monoxide Comparative Analysis Maximum Concentrations**

| Analysis Time Period | Time of Day | Carbon Monoxide Concentration in parts per million (ppm) | | |
|---|---|---|---|---|
| | | Background* | Modeled | Total Background + Modeled |
| Central 70 Project (Phase 1 of the Preferred Alternative) | | | | |
| 1-hour | AM | 5.5 | 1.4 | 6.9 |
| | PM | | 1.9 | 7.4 |
| 8-hour | AM | 3.6 | 0.9 | 4.5 |
| | PM | | 1.3 | 4.9 |

The receptor with the maximum carbon monoxide concentrations included in **Exhibit 33** are shown in **Exhibit 34**. The maximum receptor for both the AM and PM periods is located in the southwestern quadrant of the Colorado Boulevard interchange. This location differs from results presented in the Final EIS, which showed the maximum receptor in the northwestern quadrant in the AM period. Modeled concentrations make up such a small percentage of the total carbon monoxide concentrations that small variations in traffic input are exaggerated in the comparisons between modeling estimations for each receptor. This exaggeration would explain differences between the Final EIS and ROD modeling results.

**Exhibit 34          Maximum Concentration Receptor Location for Carbon Monoxide**



● Carbon Monoxide receptors     ● Maximum receptor locations

## PM₁₀ Comparative Analysis Results

NEPA comparative analysis was conducted at locations that are expected to have the highest concentrations of $PM_{10}$ across the study area. Considerations for locations with the highest concentrations include areas with the highest traffic volumes and congestion,

nearby land uses with public access, high numbers of diesel vehicles, and other factors. The locations analyzed for NEPA comparative analysis for PM$_{10}$ are the interchange of I-70 and I-25 and the interchange of I-70 and I-225. **Exhibit 35** contains the comparative analysis results at the locations for the alternatives evaluated in the Final EIS.

**Exhibit 35      PM$_{10}$ Comparative Analysis Maximum Concentrations**

| Alternative | General-Purpose Lanes Option (µg/m³) | | | Managed Lanes Option (µg/m³) | | |
|---|---|---|---|---|---|---|
| | Modeled | Project + Background[1] | Design Value | Modeled | Project + Background[1] | Design Value |
| **I-70 at I-25** | | | | | | |
| No-Action Alternative | ~~62~~ 40.396 | ~~151~~ 153.396 | 150 | N/A | N/A | N/A |
| Revised Viaduct Alternative | ~~62~~ 41.554 | ~~151~~ 154.554 | 150 | ~~64~~ 41.073 | ~~153~~ 154.073 | 150 |
| Partial Cover Lowered Alternative | ~~63~~ 41.703 | ~~152~~ 154.703 | 150 | ~~57~~ 41.196 | ~~146~~ 154.196 | 150 |
| Central 70 (Phase 1) | N/A | N/A | N/A | ~~61~~ 41.136 | ~~150~~ 154.136 | 150 |
| **I-70 at I-225** | | | | | | |
| No-Action Alternative | ~~26~~ 28.732 | ~~115~~ 141.732 | ~~120~~ 140 | N/A | N/A | N/A |
| Revised Viaduct Alternative | ~~35~~ 30.564 | ~~124~~ 143.564 | ~~120~~ 140 | ~~41~~ 32.968 | ~~130~~ 144.968 | ~~130~~ 140 |
| Partial Cover Lowered Alternative | ~~46~~ 31.085 | ~~135~~ 144.085 | 140 | ~~40~~ 32.285 | ~~129~~ 145.285 | ~~130~~ 150 |
| Central 70 (Phase 1) | N/A | N/A | N/A | ~~41~~ 32.220 | ~~130~~ 145.220 | ~~130~~ 150 |

Note: Design values for all alternatives at the I-25 and I-225 hot spot locations are less than the 24-hour PM$_{10}$ NAAQS of 150 µg/m³. To develop these estimates, the 24-hour PM$_{10}$ design value is rounded per guidance to the nearest 10 µg/m³. For example, 155.000 rounds to 160, and 154.999 rounds to 150.
1. A background concentration of 113 µg/m³ was used to estimate total 24-hour concentrations

Similarly to the Final EIS, PM$_{10}$ concentration levels vary throughout the I-25 and I-225 PM$_{10}$ comparative analysis areas depending on the alternative modeled. **Exhibit 36** and **Exhibit 37** show receptor locations and maximum receptor values for the I-70/I-25 and I-70/I-225 PM$_{10}$ comparative areas for all alternatives analyzed.

As with results presented in the Final EIS, the design values presented in **Exhibit 36** simulate worst-case conditions because they represent the highest PM$_{10}$ concentrations at the highest traffic volume locations in the corridor. Therefore, it can be assumed that the PM$_{10}$ concentrations would be lower than these values at every possible receptor location throughout the corridor, including all schools, parks, open spaces, and other places.

**Exhibit 36          Maximum Concentration Receptor Locations for PM$_{10}$ at I-70/ I-25**



● Receptor          ● Maximum receptor all alternatives

Approximate Scale

0          1,000 feet

**Exhibit 37**        **Maximum Concentration Receptor Locations for PM$_{10}$ at I-70/ I-225**



| | | |
|---|---|---|
| ● Receptor | Maximum receptor: | |

No-Action Alternative
Partial Cover Lowered Alternative – Phase 1

Partial Cover Lowered Alternative – General Purpose Lanes
Partial Cover Lowered Alternative – Managed Lanes
Revised Viaduct Alternative – General Purpose Lanes

Revised Viaduct Alternative – Managed Lanes

Approximate Scale

0          1,000 feet

## Air Quality Analysis Summary

The air quality analysis for PM$_{10}$ and carbon monoxide have been updated since the publication of the Final EIS to reflect minor differences in the roadway configuration of the Preferred Alternative, and the corresponding minor traffic volume variations. The conclusions of this analysis have not changed:

- The Preferred Alternative (Partial Cover Lowered Alternative with Managed Lanes) has been shown to meet all of the EPA-required NAAQS.

- There is not a substantial difference between alternatives in the declining trends for MSAT emissions in the project study area. MSAT emissions decline by 88.6 percent in the project area if the project is built, and by 88.9 percent if the project is not built.

- Traffic volume and traffic speed are the primary drivers of project-level air quality impacts.

- Road dust emissions are the primary indicators of future particulate matter emissions.

## Changes to the Final EIS Text

The discussions under Section 9.9 supersede information for the carbon monoxide and $PM_{10}$ presented in subsection 5.10.6 of the Final EIS. All other discussions under *Section 5.10, Air Quality*, in the Final EIS remain unchanged.

Additional analysis has been performed as part of the Transportation Conformity process and is available in Section 6.1 of this document.

# 9.10   Noise

## Updates to the Final EIS Analysis

Since the completion of the analysis for the Final EIS, CDOT's *Colorado Noise Analysis and Abatement Guidelines* were updated (November 2015). This update is in the form of a memo titled *CDOT Noise Analysis and Abatement Guidelines Update: Long-Term Noise Measurements*. This update does not change the noise analysis performed for the Final EIS.

However, the minor changes in the project design since publication of the Final EIS prompted a new noise analysis to be performed on the Partial Cover Lowered Alternative to identify any potential changes in the impacts and mitigations. The methodology for updating the noise analysis remains the same as the methodology used in the Final EIS. Only neighborhoods and alternatives that were affected by changes in the design were re-analyzed. The analysis results are available in detail in *Attachment C, Updates to Noise Technical Report*. All mitigation commitments from the Final EIS document remain the same.

The updated impacts and mitigation discussions are included in the following subsections by neighborhood.

### *Globeville*

The Globeville Neighborhood is located north and south of I-70 and spans between I-25 and Washington Street. Of the 232 receptors evaluated in Globeville, 38 (14 north of I-70 and 24 south of I-70)—which is 18 modeled locations—would meet or exceed their respective NAC thresholds, although none would experience substantial increases (10 dBA or more above existing levels) in noise as shown in **Exhibit 38**. Noise levels under the General-Purpose Lanes Option would range from 60 dBA (A-weighted decibel level) to 70 dBA north of I-70, and increase by as much as 3 dBA over existing noise levels. Noise levels south of I-70 would range from 61 dBA to 68 dBA, and increase by 1 dBA to 4 dBA over the existing noise levels.